IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| | ) | | |
| v. | ) | No. | 3:17-cr-00124-3 |
| | ) | | |
| | ) | | Chief Judge Crenshaw |
| BRANDON DURELL HARDISON | ) | | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT BRANDON HARDISON'S
MOTION TO STRIKE CERTAIN ALLEGED OVERT ACTS AND SURPLUSAGE
FROM THE FOURTH SUPERSEDING INDICTMENT (MOTION IN LIMINE #1)**

The United States of America, by and through its attorney, the Acting United States Attorney for the Middle District of Tennessee, and the Chief of the Organized Crime and Gang Section, U.S. Department of Justice, respectfully opposes defendant Brandon HARDISON's Motion to Strike Certain Alleged Overt Acts and Surplusage from the Fourth Superseding Indictment (Motion in Limine #1) (Doc. 1874). By his motion, HARDISON asks the Court to reject longstanding precedent regarding the admissibility of evidence in RICO conspiracy prosecutions and to exclude evidence that is plainly relevant to the charges against him in this case. HARDISON has also failed to cite a single case or statute in support of his arguments. This Court should reject his request and decline to strike any of the overt acts he has identified in his motion. This Court should also decline to strike language in the indictment HARDISON erroneously describes as "surplusage" but which is in fact language required under *Apprendi v. New Jersey*, 530 U.S. 466 (2000).

I.      **Factual Background**

On August 9, 2021, a federal grand jury in the Middle District of Tennessee returned a Fourth Superseding Indictment in this case, charging HARDISON with RICO Conspiracy (Count One); Murder in Aid of Racketeering and other offenses related to HARDISON's murder of

1

Derrick Sherden and Amanda Weyand in Clarksville on January 6, 2012 (Counts Two through Six); and Assault Resulting in Serious Bodily Injury in Aid of Racketeering related to HARDISON's assault of Malcolm Wright in Clarksville on November 3, 2012. (Doc. 1852.) The Fourth Superseding Indictment also included allegations that the agreement underlying the RICO Conspiracy alleged in Count One included acts involving murder. (*Id.* at 20-21.)

HARDISON asks this Court to strike the following overt acts from the Fourth Superseding Indictment and to also prevent the government from introducing the evidence underlying these overt acts at trial:

- Overt acts "a" and "b," related to the shooting of Crips gang member William Miller a/k/a "Li'l Will" by co-defendants Marcus Darden and Rex Whitlock in Clarksville on January 15, 2006;

- Overt act "c," related to drug trafficking activity carried out by co-defendant Lamar Warfield during the course of the RICO conspiracy;

- Overt act "d," related to drug trafficking activity carried out by co-defendant Lawrence Mitchell during the course of the RICO conspiracy;

- Overt act "e," related to drug trafficking activity carried out by co-defendant DeCarlos Titington during the course of the RICO conspiracy;

- Overt acts "f" through "h," "k," and "m" through "s," related to meetings of the Clarksville deck of the Gangster Disciples in 2007 and 2008;

- Overt acts "i" and "j," related to co-defendant Rex Whitlock's murder of Bloods gang member Jesse Hairston in Clarksville on September 1, 2007;

- Overt act "l," related to co-defendant Marcus Darden's attempted murder of Darius Wilridge a/k/a "Hot Dog" in Clarksville on December 15, 2007;

- Overt act "t," related to the arrest of co-defendant Rex Whitlock and Gangster Disciples member Tray Galbreath in Georgia, while Whitlock and Galbreath were transporting eight kilograms of cocaine to Clarksville for distribution;

- Overt act "u," related to drug trafficking activity carried out by co-defendant James Luke during the course of the RICO conspiracy;

- Overt act "v," related to co-defendant James Luke's attempted murder of Vice Lords gang member James Farley, Jr. on June 24, 2009;

- Overt act "w," related to the attempt by Gangster Disciples members and co-defendant James Luke to murder members of the Vice Lords gang on September 13, 2009, during which a person named Crystal Allen was shot in the buttocks;

- Overt acts "x," "y" and "z," related to co-defendant Maurice Burks's sale of controlled substances in Hopkinsville, Kentucky in 2010;

- Overt act "aa," related to HARDISON's possession of a Taurus .357 caliber revolver and a Masterpiece Arms 9mm pistol, and his later guilty plea to possessing those firearms;

- Overt act "kk," related to co-defendant James Luke's attempted murder of Belvin Williams in Clarksville on April 28, 2012;

- Overt act "ll," related to a gathering of Gangster Disciples members in Clarksville on or about September 23, 2012, to discuss possible retaliation against members of the Bloods gang for the murder of Shannon Fairley a/k/a "Mac Juve," a Gangster Disciples associate;

- Overt acts "yy" through "hhh," "jjj," "kkk," "mmm," and "ttt," related to meetings of the Gangster Disciples in Murfreesboro and Nashville in 2013 and 2014;

- Overt act "iii," related to co-defendant Rex Whitlock's dissemination of videos explaining how to determine whether a federal defendant is cooperating with the government, while Whitlock was incarcerated in federal prison;

- Overt acts "lll," "vvv," and "xxx," related to co-defendant Marcus Darden's sale of cocaine and crack cocaine in Clarksville in 2014;

- Overt acts "nnn" and "ooo," related to co-defendant Derrick Kilgore's sale of crack cocaine in Clarksville in 2014;

- Overt acts "ppp," "sss," "uuu," and "www," related to co-defendant Lorenzo Brown's sale of cocaine and crack cocaine in Murfreesboro in 2014;

- Overt act "qqq," related to a meeting of the Gangster Disciples in Clarksville on or about February 23, 2014;

- Overt act "rrr," related to the "smashing" of Errika Stephens, a "sister of the struggle" (meaning a female member of the Gangster Disciples), in Nashville in approximately March 2014, which was overseen by co-defendant Marcus Darden;

- Overt act "yyy" and "zzz," related to a drive-by shooting in Clarksville on August 13, 2014 targeting members of the Vice Lords gang carried by out co-defendants Lamar Warfield and Derrick Kilgore;

- Overt act "aaaa," related to co-defendant DeCarlos Titington's attempted murder of Vice Lords gang members in Clarksville on December 23, 2014;

3

- Overt act "bbbb," related to the recovery of cocaine and the pistol co-defendant DeCarlos Titington used to carry out the December 23, 2014 shooting from a car Titington was found inside while passed out in the driver's seat in Clarksville;

- Overt acts "cccc" through "eeee," related to co-defendant Elance Lucas's sales of cocaine in Kentucky in 2015;

- Overt act "ffff," related to the recovery of cocaine, marijuana, a pistol, additional contraband, and cell phones containing drug-related and gang-related text messages from a car co-defendant Derrick Kilgore was found inside while passed out at a stoplight in Clarksville; and

- Overt act "gggg," related to the recovery of approximately one pound of marijuana and a loaded Springfield XD 9mm pistol from the residence where HARDISON was arrested in connection with this case on June 30, 2017.

This Court should reject HARDISON's unsupported request to strike all of these overt acts from the Fourth Superseding Indictment.

## II.    Argument

### A.    Overt Acts

To meet the elements of Count One, the government must prove that HARDISON agreed that he or a coconspirator would participate, directly or indirectly, in the conduct of the affairs of a criminal enterprise through a pattern of racketeering activity. *United States v. Sinito*, 723 F.2d 1250, 1260-61 (6th Cir. 1983); *see also Jury Instructions, United States v. Marcus Darden, et al.*, Doc. 1397 at 32, 34-35. "An enterprise is defined as including 'any individual partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Sinito*, 723 F.2d at 1260-61 (*quoting* 18 U.S.C. § 1961(4)); Doc. 1397 at 32-33. "Racketeering activity means any activity indictable under the provisions of Title 18." *Sinito*, 723 F.2d at 1261. "[A] pattern of racketeering activity requires at least two acts of the activities prohibited under Title 18." *Id.*; Doc. 1397 at 35-36. Notably, "[i]t is unnecessary that the underlying predicate acts be interrelated as long as the acts are connected to the affairs of the

4

enterprise." *Sinito*, 723 F.2d at 1261. Furthermore, as this Court has previously explained, the existence of the enterprise is an element of Count One that the government must prove at trial. *See* Mem. Op. and Omnibus Order II, Doc. 918, at 17 ("To establish its RICO case, it is incumbent upon the Government to establish the existence of an enterprise and [a defendant's] association with that enterprise.").

Here, the overt acts HARDISON seeks to strike from the Fourth Superseding Indictment all describe evidence of the allegations against him in Count One. Overt acts "a," "b," "i," "j," "l," "v," "w," "kk," "yyy," "zzz," and "aaaa" relate to shootings and/or murders carried out by members of the Gangster Disciples enterprise between 2006 and 2014 targeting rival gang members or persons who "disrespected" members of the Gangster Disciples. The perpetrators of those shootings included HARDISON's co-defendants Darden, Warfield, Kilgore, Titington, Whitlock, and Luke. Evidence like this undeniably constitutes proof of the Gangster Disciples enterprise and the continuity of its pattern of racketeering activity. Indeed, in its recent opinion upholding the convictions of Darden, Kilgore, Titington, and Lucas after their trial before this Court in 2019, the United States Court of Appeals for the Sixth Circuit pointed to such evidence in describing the evolution of the criminal enterprise in this case. *See United States v. Lucas*, __ F. App'x __, 2021 WL 4099241, at *2-3, (6th Cir. Sep. 9, 2021) (explaining that Darden and Whitlock's shooting of William Miller in January 2006 marked the beginning of an escalation in gang violence in Clarksville, driven in part by Darden's ambition, and citing the August 2014 drive-by shooting as evidence that "[t]he violence only grew with Mr. Darden's rise to power").

Nor, furthermore, should this evidence be excluded under Rule 403. Under Rule 403, the court "may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice." "Unfair prejudice within the context of [Rule 403] means an undue

tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Weinstock*, 153 F.3d 272, 277-78 (6th Cir. 1998).

Here, evidence of shootings and/or murders carried out by members of the Gangster Disciples enterprise between 2006 and 2014 targeting rival gang members or persons who "disrespected" members of the Gangster Disciples is highly probative of the existence of the enterprise, as its helps establish that members of the enterprise engaged in a pattern of racketeering activity for nearly the entire duration of the charged conspiracy. And although this evidence is undoubtedly prejudicial to HARDISON, who is alleged to have participated in multiple murders, shootings, assaults, and other violent conduct, it is no way "unfairly" prejudicial, as it merely reflects the nature of the violent conduct in which members of the Gangster Disciples, including HARDISON, engaged.

Overt acts "c" through "e," "t," "u," "x," "y," "z," "lll," "nnn" through "ppp," "sss," "uuu" through "xxx," and "bbbb" through "ffff" relate to drug trafficking activity carried out by members of the Gangster Disciples enterprise between 2007 and 2017. The perpetrators of this activity included HARDISON's co-defendants Darden, Burks, Warfield, Kilgore, Lucas, Titington, Mitchell, Brown, Luke, and Whitlock. Evidence like this constitutes proof of the allegations underlying Count One, including (for example) that the purposes of the Gangster Disciples enterprise included "[e]nriching the leaders, members, associates, and prospects of the enterprise through, among other things, the facilitation of the illegal trafficking of controlled substances"; that the means and methods of the Gangster Disciples enterprise included engaging in narcotics trafficking to generate income for the gang; and that the racketeering activity in which the enterprise was engaged included narcotics trafficking. (Doc. 1852 at 6-10.) Evidence like this undeniably constitutes proof of the Gangster Disciples enterprise and the continuity of its pattern of racketeering activity. Indeed, the Sixth Circuit pointed to this sort of evidence in describing the

6

nature of the Gangster Disciples criminal enterprise in this case. *See Lucas*, __ F. App'x __, 2021 WL 4099241, at *2 (describing the ways in which membership in the Gangster Disciples enhanced the ability of persons to engage in drug trafficking). The Sixth Circuit also pointed to this evidence in explaining how the enterprise changed over time. *Id.* at *3 (describing how Whitlock and Galbreath's arrest in 2008 "dried up" the supply of cocaine in the 615 region).

Nor should this evidence be excluded under Rule 403. Evidence that members of the Gangster Disciples enterprise engaged in drug trafficking activity between 2007 and 2017 is highly probative of the existence of the enterprise, as its helps establish that members of the enterprise engaged in a pattern of racketeering activity for nearly the entire duration of the charged conspiracy. And although this evidence is undoubtedly prejudicial to HARDISON, it is no way "unfairly" prejudicial, as it merely reflects the nature of the illegal conduct in which members of the Gangster Disciples, including HARDISON, engaged.

Overt acts "f" through "h," "k," "m" through "s," "yy" through "hhh," "jjj," "kkk," "mmm," "qqq," and "ttt" relate to Gangster Disciples meetings in Clarksville, Nashville, and Murfreesboro in 2007, 2008, 2013, and 2014, at which attendees often paid dues. Attendees at these meetings included HARDISON's co-defendants Darden, Burks, Warfield, Kilgore, Lucas, Titington, Mitchell, Brown, Xavier Jenkins, Whitlock, and Luke. Evidence like this constitutes proof of the allegations underlying Count One, including (for example) that the means and methods of the Gangster Disciples enterprise included "attend[ing] regular meetings where gang membership, gang business, and criminal incidents were discussed," "financial proceeds from criminal and other activity (including drug trafficking) were collected as 'dues' to benefit the enterprise and its leaders and members," and "disciplinary beatings of fellow Gangster Disciples were administered." (Doc. 1852 at 7.) Evidence like this undeniably constitutes proof of the Gangster Disciples enterprise and the continuity of its pattern of racketeering activity. Indeed, the

7

Sixth Circuit pointed to this sort of evidence in describing the nature of the Gangster Disciples criminal enterprise in this case. *See Lucas*, __ F. App'x __, 2021 WL 4099241, at *1 ("Each deck in good standing with the national gang has monthly meetings and collects monthly dues from each member. Dues are a flat fee that goes into the deck's 'box' . . . the box . . . helped the gang perpetuate and attain its criminal objectives—through helping fugitive members, buying firearms, or investing in drugs to resell at a profit.").

Nor should this evidence be excluded under Rule 403. Evidence that members of the Gangster Disciples had regular meetings during the years above is highly probative of the existence of the enterprise, as its helps establish that the enterprise's structure persisted for a substantial portion of the charged conspiracy. And although this evidence is somewhat prejudicial to HARDISON, it is no way "unfairly" prejudicial, as it merely demonstrates that enterprise members were meeting regularly over the course of the charged conspiracy.

Overt "aa" relates to HARDISON's possession of a Taurus .357 caliber revolver and a Masterpiece Arms 9mm pistol in 2011. There can be no doubt that this overt act is connected to the affairs of the enterprise. Between on or about June 1, 2011, and on or about July 4, 2011, HARDISON obtained a Taurus, model 605, .357 caliber revolver from an acquaintance in Nashville. HARDISON then returned to his home in Clarksville. HARDISON later traded the revolver to Tyrell Oliver a/k/a "Feva" in the apartment of his then-girlfriend Kandice Wallace. A photograph, which depicts HARDISON holding the Taurus, model 605, .357 caliber revolver while standing next to Oliver, was taken during that transaction, and was later posted to Facebook; it is reproduced below:



Additionally, in the fall of 2011, HARDISON obtained and possessed a Masterpiece Arms, 9mm pistol in the New Providence area of Clarksville, Tennessee. HARDISON's possession of this firearm was depicted in a video posted to YouTube. During that video, HARDISON also flashed the Gangster Disciples' "pitchfork" hand sign, and produced and displayed a dark blue or black handkerchief of the sort used to demonstrate affiliation with the Gangster Disciples. Screen captures from that video are depicted below:

 

9



Other members of the enterprise have demonstrated their affiliation with the Gangster Disciples by flashing similar hand signals or, in the case of co-defendants Darden and Whitlock, by displaying a black handkerchief like the one HARDISON is carrying in the video above:





In a June 24, 2013 interview with a federal agent, during which HARDISON was shown the above-described Facebook photograph and a still photograph from the above-described YouTube video, HARDISON admitted that he possessed the Taurus pistol and the Masterpiece Arms pistol. HARDISON later pled guilty and was sentenced, in Middle District of Tennessee case number 13-cr-128, to being a felon in possession of these firearms.

Evidence like this constitutes proof of the allegations underlying Count One, including (for example) that the means and methods of the Gangster Disciples enterprise included "acquir[ing], shar[ing], carr[ying], and us[ing] firearms" "[f]or protection, attacks, and armed combat," and "us[ing] gang-related terminology, symbols, phrases, and gestures to demonstrate

affiliation with the gang." (Doc. 1852 at 8.) Evidence like this undeniably constitutes proof of the Gangster Disciples enterprise and of the continuity of its pattern of racketeering activity, as well as of HARDISON's affiliation with the Gangster Disciples enterprise. Indeed, the Sixth Circuit pointed to this sort of evidence in describing the nature of the criminal enterprise in this case. *See Lucas*, __ F. App'x __, 2021 WL 4099241, at *2 (describing various violent episodes involving firearms and summarizing testimony that Miller, a member of the rival Crips gang, was targeted by Darden and Whitlock because Miller was observed "'throwing down the pitchforks,' a sign of disrespect toward one of the Gangster Disciples' symbols, the pitchfork'"). Similarly, in the *Darden* trial, Gangster Disciples member Danyon Dowlen testified that his first face-to-face encounter with HARDISON occurred because Dowlen saw HARDISON "throwing up the pitchforks" at a club in Clarksville.[1]

HARDISON's principal objection to the introduction of this evidence, including that he pled guilty to this conduct, is that it will effectively inform the jury that HARDISON is a felon, a fact he contends is inadmissible. (*See* Doc. 1874 at 2.) This objection is misplaced. First, HARDISON offers no legal support for the assertion that his conviction of and guilty plea to a felony offense "is not admissible as evidence at the trial, unless admitted pursuant to Rule 609." To the contrary, prior convictions are routinely admitted as evidence of a defendant's commission of predicate acts underlying a RICO conspiracy. *See*, *e.g.*, *United States v. Tocco*, 200 F.3d 401,

---

[1]    Q.    Did you end up meeting with Creep in person?
       A.    Yes. I say—I can't call—say how many days it was later or weeks. But I ran into him at a club. And I seen him on the dance floor throwing up the pitchforks. And I was trying to figure out who he was. And we called him over. Me and a couple other brothers called him over and talked to him, asked him who he was and who he knew. He asked me about did I know a couple of gangstas that he was locked up, from Clarksville, and we wind up figuring out that this was the guy that I talked to on the phone [some days earlier].
       Q.    Did Mr. Hardison come on count with the Gangster Disciples in Clarksville?
       A.    Yes.
Doc. 1474, 03/20/2019 Trial Tr., at PageID # 12356-57.

417-18 (6th Cir. 2000) (upholding the district court's admission of a judgment of conviction entered in a prior prosecution, finding the defendant guilty of an offense that was charged as a RICO predicate act). This Court, furthermore, has previously rejected an argument that is nearly identical to the argument HARDISON seeks to advance here. *See United States v. Frazier*, 443 F. Supp. 3d 885 (M.D. Tenn. Mar. 5, 2020) (Crenshaw, J.) (rejecting defendant's argument that his prior convictions for felony drug offenses were inadmissible under Rule 609, and holding that his prior convictions were admissible as "probative evidence of the RICO conspiracy").

Second, although HARDISON does not explicitly make this argument, he appears to contend that this evidence is also inadmissible under Rule 403. To the extent he makes that argument, it is also misplaced. Evidence that HARDISON illegally possessed multiple firearms— indeed, that he *pled guilty* to possessing these firearms—including near in time to his display of loyalty to the Gangster Disciples through hand signs and gang attire, within the time frame of the RICO Conspiracy, is highly probative evidence of the existence of the enterprise, of HARDISON's connection to the enterprise, and of the allegations in the Fourth Superseding Indictment that enterprise members routinely possessed or carried firearms to further the various purposes of the enterprise. And although this evidence is undoubtedly prejudicial to HARDISON, it is no way "unfairly" prejudicial, as it merely reflects the sort of illegal conduct in which members of the Gangster Disciples, including HARDISON, were engaged.

Lastly, HARDISON's unsupported claim that informing the jury of his prior felony conviction is unfairly prejudicial is fatally undercut by the defense he apparently intends to advance against many of the allegations in the Fourth Superseding Indictment, namely, that he was incarcerated when these events occurred. Indeed, HARDISON appears poised to contend that he had nothing to do with large swaths of overt acts because he was incarcerated from approximately April 2004 until May 2011, and from approximately June 2013 until November 2015. (*See* Doc.

1874 at 2.) Thus, to the extent HARDISON seeks to argue at trial that he was not involved in the gang's activities for at least these periods of time as a result of his incarceration, the jury will be aware that he was incarcerated for one seven-year period and another 2.5-year period. It is difficult to fathom how a jury would be more prejudiced by learning that HARDISON had previously been convicted of a felony offense than by learning that he was incarcerated for many years at a time before the trial in this case.

Overt act "ll" relates to a gathering of Gangster Disciples members in Clarksville on or about September 23, 2012, to discuss possible retaliation against members of the Bloods gang for the murder of Shannon Fairley a/k/a "Mac Juve." Evidence underlying this overt act is directly related to the allegations against HARDISON. That is because Fairley's murder by Bloods gang members served to raise tensions between the Gangster Disciples and Bloods, and was a contributing factor to the murder of Bloods gang member Malcolm Wright by Gangster Disciples member Maurice Burks in the C-Ray's nightclub on November 3, 2012. HARDISON, of course, played a crucial role in setting the events leading to Wright's murder in motion, after he called for other Gangster Disciples to "aid and assist" him after he believed he had been jumped by Bloods gang members at Sidelines on the night of Wright's murder. Evidence like this also undeniably constitutes proof of the Gangster Disciples enterprise and the continuity of its pattern of racketeering activity. Indeed, the Sixth Circuit pointed to this exact piece of evidence in describing the evolution of the Gangster Disciples criminal enterprise in this case. *See Lucas*, __ F. App'x __, 2021 WL 4099241, at *3 ("The violence only grew with Mr. Darden's rise to power. There were smashings and eradications . . .; the murder of Malcolm Wright, a Blood, in response to the Bloods' killing of a Gangster Disciple.").

Nor should this evidence be excluded under Rule 403. Evidence that tensions were running high between the Gangster Disciples and the Bloods in the lead-up to Wright's murder is highly

probative evidence of the circumstances of the murder—in which HARDISON played a critical role—itself. And this evidence is no more prejudicial to HARDISON than other evidence linking him to the events immediately preceding Wright's murder, including HARDISON's confrontation with Wright inside C-Ray's immediately prior to Wright's murder.[2]

Overt act "iii" relates to co-defendant Rex Whitlock's dissemination of videos explaining how to determine whether a federal defendant is cooperating with the government, while Whitlock was incarcerated in federal prison. Evidence like this constitutes proof of the allegations underlying Count One, including (for example) that the purposes of the Gangster Disciples enterprise included "[p]reserving and protecting the power, territory, operations, reputation, and proceeds of the enterprise through the use of threats, intimidation, violence, and destruction, including, but not limited to, acts involving . . . intimidation of witnesses and victims . . . . ," "[k]eeping victims and others in fear of the enterprise and in fear of its leaders, members, associates, and prospects through threats of violence . . . ," "undert[aking] all steps necessary to prevent the detection of . . . criminal activities," and seeking "to prevent and resolve the imposition of any criminal liabilities upon . . . leaders, members, associates, and prospects by the use of . . . intimidation directed against witnesses, victims, and others." (Doc. 1852 at 6-7.) Similarly, evidence like this constitutes proof that the means and methods of the Gangster Disciples enterprise included "commit[ing] and conspir[ing] to commit acts involving . . . intimidation . . . against individuals who posed a threat to the enterprise or jeopardized its operations, including . . . Gangster Disciples gang members and associates, and witnesses to illegal activities of the

---

[2]     As Kristine Gaskin testified at the *Darden* trial, several Gangster Disciples members approached Wright inside C-Ray's immediately prior to Wright's murder. One of them, whom Gaskin described as a man with "tattoos all over his face," asked Wright, "So are you a Blood?" Moments later, the man with "tattoos all over his face" began assaulting Wright. Gaskin identified a photograph of HARDISON as the man with "tattoos all over his face." *See* Doc. 1483, at Page ID # 12800-03.

enterprise." (Doc. 1852 at 8.) Evidence like this undeniably constitutes proof of the Gangster Disciples enterprise and the continuity of its pattern of racketeering activity. Indeed, the Sixth Circuit pointed to this sort of evidence in describing the nature of the Gangster Disciples criminal enterprise in this case. *See Lucas*, __ F. App'x __, 2021 WL 4099241, at *2-3 (noting that the rules of the Gangster Disciples "emphasized 'silence and secrecy' foremost—never to talk about gang business with outsiders, especially law enforcement," and explaining that, when Darden assumed command of the Clarksville deck, "he 'ran [the deck] with an iron fist,' purging weak members— and potential police cooperators—and surrounding himself with loyal allies whom he could trust to do the gang's business").

Nor should this evidence be excluded under Rule 403. Evidence that members of the Gangster Disciples sought to intimidate witnesses and dissuade them from cooperating with law enforcement investigations into the gang's criminal activities is highly probative evidence of the purposes and means and methods of the enterprise. HARDISON, of course, is alleged to have murdered Weyand because she was a witness to HARDISON's murder of Sherden. HARDISON is also alleged to have planned and carried out the murder of J.H., a witness to HARDISON's murder of Sherden and Weyand. The government also anticipates introducing substantial evidence that HARDISON sought to deter witnesses from cooperating with law enforcement investigations into his criminal activity, and indeed that he disseminated discovery materials from his 2013 federal case to other persons as a means to identify potential witnesses against him. And although this evidence is somewhat prejudicial to HARDISON, it is no way "unfairly" prejudicial, as it merely demonstrates that other enterprise members were engaged in witness intimidation as well.

Overt act "rrr" relates to the smashing of Errika Stephens, a "sister of the struggle" (a female member of the Gangster Disciples), in Nashville in approximately March 2014, which was overseen by co-defendant Marcus Darden. Stephens was "smashed" because she spoke with the

15

police after law enforcement officers seized guns which belonged to a Gangster Disciples member from a residence where Stephens was living at the time. Evidence like this constitutes proof of the allegations underlying Count One, including (for example) that the means and methods of the Gangster Disciples enterprise included "punish[ing] errant gang members and associates for violations of gang rules" "[t]o enforce discipline within the enterprise," through a "physical assault of the offending member or associate." (Doc. 1852 at 7.) Evidence like this undeniably constitutes proof of the Gangster Disciples enterprise and the continuity of its pattern of racketeering activity. Indeed, the Sixth Circuit pointed to this sort of evidence in describing the nature of the Gangster Disciples criminal enterprise in this case. *See Lucas*, __ F. App'x __, 2021 WL 4099241, at *3 ("The violence only grew with Mr. Darden's rise to power. There were smashings and eradications, especially for cooperation with law enforcement, no matter how slight . . . .").

Nor should this evidence be excluded under Rule 403. Evidence that members of the Gangster Disciples carried out "violations" and "smashings" of members who violated the gang's rules is highly probative evidence of the purposes and means and methods of the enterprise. HARDISON himself is alleged to participated in several such "violations" or "smashings." Although this evidence is somewhat prejudicial to HARDISON, it is no way "unfairly" prejudicial, as it merely demonstrates that other enterprise members were engaged in "violations" and "smashings" as well.

Overt act "ffff" relates to the recovery of cocaine, marijuana, a pistol, other contraband, and cell phones containing drug-related and gang-related text messages from a car co-defendant Derrick Kilgore was found inside while passed out at a stoplight in Clarksville. Evidence like this constitutes proof of the allegations underlying Count One, including (for example) that the purposes of the Gangster Disciples enterprise included "[e]nriching the leaders, members, associates, and prospects of the enterprise through, among other things, the facilitation of the

16

illegal trafficking of controlled substances"; that the means and methods of the Gangster Disciples enterprise included engaging in narcotics trafficking to generate income for the gang; that Gangster Disciples members and associates "maintained, distributed, and shared firearms and provided transportation" "[i]n order to facilitate and commit crimes"; that Gangster Disciples members and associates "acquired, shared, carried, and used firearms" "[f]or protection, attacks, and armed combat"; that Gangster Disciples members and associates "used cell phones and social media to communicate with one another"; and that the racketeering activity in which the enterprise was engaged included narcotics trafficking. (Doc. 1852 at 6-10.) Evidence like this undeniably constitutes proof of the Gangster Disciples enterprise and the continuity of its pattern of racketeering activity. Indeed, the Sixth Circuit pointed to this sort of evidence in describing the nature of the Gangster Disciples criminal enterprise in this case. *See Lucas*, __ F. App'x __, 2021 WL 4099241, at *2 (describing the ways in which membership in the Gangster Disciples enhanced the ability of persons to engage in drug trafficking).

Nor should this evidence be excluded under Rule 403. Evidence that another member of the Gangster Disciples enterprise engaged in drug trafficking activity and other criminal conduct in 2017 is highly probative of the existence of the enterprise, for the reasons above. And although this evidence is undoubtedly prejudicial to HARDISON, it is no way "unfairly" prejudicial, as it merely reflects the nature of the illegal conduct in which members of the Gangster Disciples, including HARDISON, engaged.

Finally, overt act "gggg" relates to the recovery of approximately one pound of marijuana and a loaded Springfield XD 9mm pistol from the residence where HARDISON was arrested in connection with this case on June 30, 2017. HARDISON's objection to the introduction of this evidence is that "[t]here is no known connection between the possession of these items and a

connection to the Gangster Disciples."[3] HARDISON is mistaken. On June 30, 2017, ATF agents from the Chattanooga Field Office and officers with the Shelbyville Police Department arrested HARDISON at a residence located at 701 East Depot Street in Shelbyville, Tennessee. During their arrest of HARDISON, officers detected a strong odor of marijuana inside the residence. After obtaining verbal consent to search the residence from HARDISON and Jaquilla Fitts, with whom HARDISON was living at the residence (along with several minor children, who were also present at the time of the search), officers recovered a large bag containing approximately 1.09 pounds of marijuana and a marijuana grinder on top of a storage container in a bedroom, 19 rounds of 9mm ammunition in a lock box located near a television in the bedroom, and 71 rounds of 9mm ammunition inside an ammunition box in the closet of the bedroom. They also recovered a loaded Springfield XD 9mm handgun in a laundry basket in the same bedroom where they found the marijuana and the ammunition. In a recorded, post-*Miranda* interview conducted outside the residence, HARDISON admitted possession of the marijuana and the handgun.

In addition to seizing the evidence above, agents also took several photographs of the scene, including the laundry basket where they found the 9mm pistol:

---

[3]     HARDISON also notes that he "is not charged with any offenses related to these acts." (Doc. 1874 at 3.) The government understands HARDISON to mean that he is not charged with any substantive offenses related to these acts, including being a felon in possession of a firearm or possession of a controlled substance with intent to distribute. While it is true that HARDISON is not charged with any substantive offenses related to these acts, it is not because the government lacks the evidence to charge him; rather, it is because these acts occurred in Shelbyville, Tennessee, which is in the Eastern District of Tennessee. The government was therefore unable to charge HARDISON with substantive offenses related to these offenses in the Middle District of Tennessee.

 

Hanging on a hook above the laundry basket was a black baseball cap with the word "MARLEY" written across the front of the cap. HARDISON, as the government has argued elsewhere, started an offshoot of the Gangster Disciples that HARDISON referred to as the "Marley Gang." The bill of the cap, moreover, is adorned with three gold six-pointed stars. Six-pointed stars are, of course, one of the Gangster Disciples' most identifiable symbols:

 

In other words, on the day of his federal arrest in this case, HARDISON—a multi-convicted felon who was on federal supervised release—kept inside the residence where he was staying a loaded pistol, more than a pound of marijuana, and a hat bearing markings associated with the two gangs he has affiliated with, including the Gangster Disciples. Evidence like this constitutes proof of the allegations underlying Count One, including (for example) that the purposes of the Gangster

Disciples enterprise included "[e]nriching the leaders, members, associates, and prospects of the enterprise through, among other things, the facilitation of the illegal trafficking of controlled substances"; that the means and methods of the Gangster Disciples enterprise included engaging in narcotics trafficking to generate income for the gang; that Gangster Disciples members and associates "maintained, distributed, and shared firearms and provided transportation" "[i]n order to facilitate and commit crimes"; that Gangster Disciples members and associates "acquired, shared, carried, and used firearms" "[f]or protection, attacks, and armed combat"; that the racketeering activity in which the enterprise was engaged included narcotics trafficking; and that members and associates "used gang-related terminology, symbols, phrases, and gestures to demonstrate affiliation with the gang." (Doc. 1852 at 6-10.) Evidence like this undeniably constitutes proof of the Gangster Disciples enterprise and the continuity of its pattern of racketeering activity, as well as of HARDISON's affiliation with the Gangster Disciples enterprise.

Nor should this evidence be excluded under Rule 403. Evidence that HARDISON possessed a firearm, a distribution quantity of marijuana, and gang paraphernalia on the date of his arrest is highly probative evidence of the existence of the enterprise, of HARDISON's connection to the enterprise, and of the allegations in the Fourth Superseding Indictment that enterprise members routinely possessed or carried firearms to further the various purposes of the enterprise and that they engaged in drug trafficking activity. And although this evidence is undoubtedly prejudicial to HARDISON, it is no way "unfairly" prejudicial, as it merely reflects the sort of illegal conduct in which members of the Gangster Disciples, including HARDISON, were engaged.

There is yet another reason why none of the evidence above should be struck from the indictment: much of this evidence constitutes impeachment material for witnesses the government

anticipates calling at trial. For example, the governments intends to call at trial witnesses who carried out some of the gang-related shootings described above and/or who engaged in some of the drug trafficking activity described above. HARDISON's attorneys will presumably seek to cross-examine these witnesses about criminal activity the witnesses engaged in. But it is axiomatic that the government may elicit such evidence during its direct examination of these cooperating defendants in anticipation of defense attacks on their credibility. *See*, *e.g.*, *Brooks v. Caterpillar Global Mining America, LLC*, No. 4:14CV-00022-JHM, 2017 WL 3401476, at *7 (W.D. Ky. Aug. 8, 2017) (citing cases) ("Federal courts have repeatedly held that in a criminal case, the government may offer evidence in its case-in-chief in anticipation of an expected defense."). Thus, to the extent HARDISON succeeds in striking the overt acts above, he cannot thereafter be permitted to cross-examine witnesses about those acts, lest it appear that the government is seeking to conceal unfavorable or impeaching information about its witnesses from the jury.

At bottom, HARDISON appears to contend—without citation to any supporting caselaw—that if an overt act does not name him personally, or if he was incarcerated when it was committed, it is irrelevant and/or unfairly prejudicial and must be excluded. Neither of these claims finds support in the law. If anything, the opposite is true: it is settled that evidence of "uncharged" acts is admissible in RICO-related prosecutions if such "uncharged" conduct serves to prove the elements of the underlying racketeering conspiracy offense. *See*, *e.g.*, *United States v. Fowler*, 535 F.3d 408, 422 (6th Cir. 2008) (evidence of uncharged murder properly admitted as to RICO conspiracy charge because it tended to prove defendant's membership in the conspiracy and intent to further and facilitate the enterprise's criminal endeavor); *United States v. Rios*, 830 F.3d 403, 426 (6th Cir. 2016) (evidence of prior shooting and other uncharged acts admissible in trial for racketeering and drug distribution conspiracies). If "uncharged" conduct is admissible in RICO

prosecutions under such circumstances, it follows that conduct specifically charged in an indictment involving a trial defendant's charged coconspirators is also admissible.

For all of the reasons above, this Court should reject HARDISON's request and decline to strike any of the above-described overt acts from the Fourth Superseding Indictment.

### B.        Notice of Enhanced Sentencing Factors

#### 1.        Legal Framework

Rule 7(d) of the Federal Rules of Criminal Procedure provides that, "[u]pon the defendant's motion, the court may strike surplusage from the indictment or information." Thus, the Rule "makes the striking of surplusage permissive but not mandatory," and the decision whether to strike such language is within the sound discretion of the district court. *United States v. Kemper*, 503 F.2d 327, 329 (6th Cir. 1974). Furthermore, the Rule applies only to allegations that are both nonessential and prejudicial; prejudice alone does not render statements surplusage. *Id.* Language in an indictment is unfairly prejudicial if it "serves only to inflame the jury, confuse the issues, and blur the elements necessary for conviction." *United States v. Prejean*, 429 F. Supp. 2d 782, 796 (E.D. La. 2006) (quoting *United States v. Bullock*, 451 F.2d 884, 888 (5th Cir. 1971)).

Furthermore, Rule 7(d) is strictly construed against striking surplusage. *Id.* Courts have ordered surplusage stricken only "rarely." C. Wright, *Federal Practice and Procedure* § 127 at 426-27. An order to strike surplusage, then, requires an "exacting" level of proof. *Prejean*, 429 F. Supp. 2d at 796 (quoting *Bullock*, 451 F.2d at 888). Most significantly, "if the language in the indictment is information which the government hopes to properly prove at trial, it cannot be considered surplusage no matter how prejudicial it may be (provided, of course, it is legally relevant)." *United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir. 1989); *see also United States v. Moss*, 9 F.3d 543, 550 (6th Cir. 1993).

22

2.    **Argument**

HARDISON contends that the Court should strike as "surplusage" the "Notice of Enhanced Sentencing Factors" from the Fourth Superseding Indictment, on the grounds that this case is "no longer a death penalty case" and that "Counts One through Six carry a maximum life sentence." (Doc. 1874 at 4.) HARDISON is correct that his case is no longer a "death penalty case," but he is mistaken about the purpose of the Notice of Enhanced Sentencing Factors. As the Sixth Circuit explained in *Lucas*, "[t]he statutory maximum sentence for a bare RICO conviction is 20 years but increases to life imprisonment 'if the violation is based on racketeering activity for which the maximum penalty includes life imprisonment.'" *Lucas*, __ F. App'x __, 2021 WL 4099241, at *4. In order for HARDISON to be subject to life imprisonment under Count One, *Apprendi* requires that the jury find that the racketeering activity underlying Count One included acts involving murder. *See id.* (citing *Apprendi*). Indeed, that is why this Court, in the *Darden* trial, included a special-verdict form asking the jury to make such findings, as appropriate. *See id.* n.1. The Notice of Enhanced Sentencing Factors is thus language intended to put HARDISON on notice that the government will seek to prove that the RICO Conspiracy alleged in Count One included acts involving murder, and that HARDISON is potentially subject to a life sentence upon his conviction of that count.

III.    **Conclusion**

WHEREFORE, for the reasons above, the government respectfully requests that this Court deny defendant Brandon HARDISON's unsupported Motion to Strike Certain Alleged Overt Acts and Surplusage from the Fourth Superseding Indictment (Motion in Limine #1) (Doc. 1874) without a hearing.

Respectfully submitted,

MARY JANE STEWART
Acting United States Attorney

23

By:    */s/ Ben Schrader*
BEN SCHRADER
Assistant United States Attorney
Middle District of Tennessee


DAVID L. JAFFE
Chief, Organized Crime and Gang Section
Criminal Division
U.S. Department of Justice


By:    */s/ Gerald A.A. Collins*
GERALD A.A. COLLINS
Trial Attorney
Organized Crime and Gang Section
U.S. Department of Justice


Dated:       September 20, 2021

24

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2021, I sent a copy of the foregoing via the Court's electronic filing system to counsel for the defendant.

*s/ Ben Schrader*
BEN SCHRADER
Assistant United States Attorney