```
 1                IN THE UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF TENNESSEE
 2                       NASHVILLE DIVISION

 3
     UNITED STATES OF AMERICA           )
 4                                      )
                                        )
 5       v.                             ) 3:17-cr-00124-3
                                        ) CHIEF JUDGE CRENSHAW
 6                                      )
     BRANDON DURELL HARDISON            )
 7                                      )
                                        )
 8   -----------------------------------------------------------

 9

10

11

12

13       BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR.,
                      CHIEF DISTRICT JUDGE
14

15                    TRANSCRIPT OF PROCEEDINGS

16
                        October 12, 2021
17

18

19

20

21

22   -----------------------------------------------------------

23   DEBORAH K. WATSON, RPR, CRR
     Official Court Reporter
24   801 Broadway, Room A837
     Nashville, TN 37203
25   debbie_watson@tnmd.uscourts.gov
```

```
 1   APPEARANCES:

 2

 3   For the Government:

 4               MR. JOHN BENJAMIN SCHRADER
                 Assistant U.S. Attorney
 5               U.S. Attorney's Office
                 Middle District of Tennessee
 6               110 Ninth Avenue South
                    Suite A961
 7               Nashville, TN 37203-3870
                 (615) 401-6615
 8               ben.schrader@usdoj.gov

 9               MR. GERALD A.A. COLLINS
                 Assistant U.S. Attorney
10               Department of Justice - Criminal Division
                 1400 New York Avenue, NW
11                  Third Floor
                 Washington, DC 20036
12               (202) 262-6484
                 gerald.a.collins@usdoj.gov

13

14
     For the Defendant:
15
                 MR. LUKE A. EVANS
16               MR. PAUL J. BRUNO
                 Bullock, Fly, Hornsby & Evans PLLC
17               302 North Spring Street
                 PO Box 398
18               Murfreesboro, TN 37133-0398
                 (615) 896-4154
19               lukeevans@bfhelaw.com
                 pauljbruno@bfhelaw.com
20

21

22

23

24

25
```

I  N  D  E  X

                                                            Page

TESTIMONY OF VALERIE RIVES

Direct Examination
By Mr. Collins                                                5

Cross-Examination
By Mr. Evans                                                 23

Redirect Examination
By Mr. Collins                                               40

Recross-Examination
By Mr. Evans                                                 44

Questions
By The Court                                                 46


TESTIMONY OF AUTUMN MICHELLE PASQUALE

Direct Examination
By Mr. Collins                                               54

Cross-Examination
By Mr. Evans                                                 88

Redirect Examination
By Mr. Collins                                               99




                    E  X  H  I  B  I  T  S

                                                            Page

Government Exhibit 1 (For ID only)                           18
       Transcript of Valerie Rives from August
       9, 2021

1                          *   *   *

2              The above-styled cause came on to be heard at

3      1:48 p.m. on October 12, 2021, before the Honorable

4      Waverly D. Crenshaw, Jr., Chief District Judge, when the

5      following proceedings were had, to-wit:

6

7              THE COURT:  We're here on Case 17-124, *United*

8      *States of America v. Brandon Hardison*.  Mr. Hardison is here.

9              If counsel could make their appearance on the

10     record.

11             MR. SCHRADER:  Good afternoon, Your Honor.  Ben

12     Schrader for the United States.

13             MR. COLLINS:  Good afternoon, Your Honor.  Gerald

14     Collins on behalf of the United States Government.

15             MR. BRUNO:  Good afternoon, Your Honor.  Luke

16     Evans and Paul Bruno on behalf of Mr. Hardison.

17             THE COURT:  Okay.  So we're here for an

18     evidentiary hearing on Document 1929, the United States'

19     motion in limine to admit certain statements.  I've read

20     that.  I've read everything that's been filed about Josh

21     Henry, and I've read the Grand Jury transcripts.

22             So do you want to call your first witness?

23             MR. COLLINS:  Thank you, Your Honor.  The

24     government would call Ms. Valerie Rives, Your Honor.  And for

25     the record, that's R-I-V-E-S.

1              (The witness was sworn.)

2              **COURTROOM DEPUTY:**  Please state your full name for

3    the record.

4              **THE WITNESS:**  Valerie Rives.

5              **COURTROOM DEPUTY:**  Thank you.

6              **MR. COLLINS:**  Thank you, Your Honor.  May I

7    inquire?

8              **THE COURT:**  Yes.

9              **MR. COLLINS:**  Thank you.

10                       *   *   *

11                    <u>**VALERIE RIVES,**</u>

12   **was called as a witness, and after having been first duly**

13   **sworn, testified as follows:**

14                    **DIRECT EXAMINATION**

15   **QUESTIONS BY MR. COLLINS:**

16   Q.    Ma'am, how old are you?

17   A.    33.

18   Q.    And where are you from?

19             **THE COURT:**  You're going to have to talk into that

20   microphone.  Why don't you pull it towards you.  A little bit

21   more.

22   **BY MR. COLLINS:**

23   Q.    Ma'am, how old are you?

24   A.    33.

25   Q.    Where are you from?

```
 1   A.     Clarksville.

 2   Q.     And have you lived there continuously throughout your

 3   life?

 4   A.     Yes, sir.

 5   Q.     And have you lived anywhere else besides Clarksville?

 6   A.     Kentucky.

 7   Q.     All right.  And did you go school in Clarksville?

 8   A.     Yes.

 9   Q.     And what type of -- what levels of education did you go

10   to school in Clarksville?

11   A.     11th.

12   Q.     All right.  And that's your highest level of education;

13   is that correct?

14   A.     Yes, sir.

15   Q.     All right.  And are you currently employed?

16   A.     Yes.

17   Q.     What type of work do you do?

18   A.     I cook.

19   Q.     All right.  During the period of time that you've lived

20   in Clarksville, did you come to know a person by the name of

21   Joshua Henry?

22   A.     Yes.

23   Q.     And how did you know Joshua Henry?

24   A.     I went to school with him.

25   Q.     All right.  And at what grade -- what was the first
```

1  grade that you went to school with Joshua Henry?

2  A.    From elementary through middle.

3  Q.    Okay.  And approximately how old do you think you were

4  the first time you met Joshua Henry?

5  A.    5 or 6.

6  Q.    And how old was he?

7  A.    He's like 6, 5.

8  Q.    All right.  Now, throughout the time that you knew

9  Joshua Henry, did you-all engage in a romantic relationship?

10  A.    On and off.

11  Q.    Okay.  And when was the first time that you had a

12  romantic relationship with Joshua Henry?

13  A.    Fifth grade.

14  Q.    All right.  So he was your fifth grade boyfriend?

15  A.    Uh-huh.

16  Q.    How long did that last?

17  A.    All the way up until sixth.

18  Q.    Okay.  And when was the next time that you had a

19  romantic relationship or a boyfriend/girlfriend relationship

20  with Joshua Henry?

21  A.    2013.

22  Q.    Okay.  And how old were you then?

23  A.    I was 23, 24.

24  Q.    Okay.  And approximately how long in terms of months

25  did that relationship last?

1  A.    Not long.

2  Q.    When you say not long, do you mean one month, two

3  months?

4  A.    Not even a month.

5  Q.    Okay.  To your knowledge, is Joshua Henry still alive?

6  A.    No.

7  Q.    Do you know approximately when Joshua Henry died?

8  A.    April 30th.

9  Q.    What year was that?

10  A.    2013.

11  Q.    All right.  And prior to Josh's death, had you met any

12  of his associates, specifically in that 2013 window?

13  A.    Yes.

14  Q.    All right.  And was one of them an individual by the

15  name of Creep?

16  A.    Yes.

17  Q.    And approximately how many times do you think that you

18  interacted with this individual named Creep?

19  A.    Three.

20  Q.    And do you recall when the first time you met this

21  individual was?

22  A.    When I first went over to see Josh.

23  Q.    And around -- using Josh's -- the period of Josh's

24  death as a time frame, how far before that had you met the

25  person named Creep?

```
 1   A.     It was late March.

 2   Q.     And do you recall where you first met him?

 3   A.     Glenn Street.

 4   Q.     I'm sorry, if you could repeat that.

 5   A.     It was Glenn Street.

 6   Q.     Glenn Street?

 7   A.     Uh-huh.

 8              THE COURT:  You're saying Glenn, G-L-E-N-N?

 9              THE WITNESS:  Yes, sir.

10   BY MR. COLLINS:

11   Q.     And was that -- was that at a certain place?

12   A.     It was a house.

13   Q.     Okay.  And whose house was that?

14   A.     It was Kandice Wallace.

15   Q.     All right.  And who is Kandice Wallace?

16   A.     It was Creep's girlfriend.

17   Q.     All right.  And based off the interactions that you had

18   with this person named Creep, would you be able to recognize

19   that individual?

20   A.     Yes.

21   Q.     Is he present in the courtroom today?

22   A.     Yes.

23   Q.     Can you identify him by an article of clothing where

24   he's sitting in the courtroom?

25   A.     Sitting right over there (indicating).
```

1    Q.    Can you just be more specific?

2    A.    Sitting over there wearing the glasses with the tattoo

3    in the middle of his forehead.

4              MR. COLLINS:   Your Honor, may the Court reflect

5    the in-court identification of the defendant?

6              THE COURT:   So noted.

7              MR. COLLINS:   Thank you, Your Honor.

8    BY MR. COLLINS:

9    Q.    Now, the first time you met Creep, how were you

10   introduced to him?

11   A.    Josh introduced him as his brother.

12   Q.    All right.   But you had grown up with Josh; is that

13   correct?

14   A.    Yes, sir.

15   Q.    Had you ever met other members of Josh's family?

16   A.    His adopted family.

17   Q.    Okay.   And did you know the defendant to be a member of

18   his adopted family?

19   A.    No, sir.

20   Q.    All right.   Did you know him to be a member of his

21   blood family?

22   A.    No, sir.

23   Q.    Did there come a point in time when you received

24   clarification on what this title "brother" meant?

25   A.    After a while.

1  Q.    And what was that?

2  A.    He was affiliated with them.

3  Q.    And I'm sorry.  If you could repeat that.

4  A.    He was affiliated with them.

5  Q.    All right.  When you say --

6          **THE COURT:**  Affiliated with who?

7          **THE WITNESS:**  With Creep.

8          **THE COURT:**  Josh was?

9          **THE WITNESS:**  Uh-huh.

10         **THE COURT:**  Okay.

11 **BY MR. COLLINS:**

12 Q.    And when you say affiliated with him, what do you mean?

13 A.    Gang-wise.

14 Q.    Now, based on your observations of their interactions,

15 how would you characterize the relationship between the

16 defendant and Joshua?

17 A.    Not good.

18 Q.    When you say "not good," what do you mean?

19 A.    He's controlling.

20 Q.    And when you say "he," who do you mean?

21 A.    Creep.

22 Q.    All right.  And how would you see that -- how would you

23 see that play out in the interactions with Joshua?

24 A.    Because if Creep says jump, Joshua say how high.

25 Q.    All right.  Now, the interactions that you observed

```
1    between Joshua and Creep, were they all at the residence?

2    A.    The three times I've seen him, yes.

3    Q.    All right.  And do you recall who lived at the

4    residence?

5    A.    Creep, Josh, and Kandice.

6    Q.    All right.  Now, during your interactions with Josh,

7    did you observe that he had any tattoos?

8    A.    On his left arm, he had a tattoo from Marley Gang

9    tatted on his arm.

10   Q.    All right.  And did you ask him about that, what that

11   tattoo meant?

12   A.    I did.

13   Q.    And based off that conversation, what was your

14   understanding?

15   A.    It was just a gang.

16   Q.    I'm sorry?

17   A.    It was just a gang.

18   Q.    All right.  And was that a gang that Josh was

19   affiliated with?

20   A.    From my knowledgment [sic], yes.

21   Q.    All right.  Based off of your interactions with both

22   Josh and Creep, was that a gang that Creep was also

23   affiliated with?

24   A.    Not to my knowledgment.

25             THE COURT:  And the gang you're referring to is
```

1    the Marley Gang?

2              THE WITNESS:  Yes, sir.

3              THE COURT:  Okay.  Go ahead.

4    BY MR. COLLINS:

5    Q.   Now, did there come a point in time when you had a

6    conversation with Josh about the Marley Gang?

7    A.   (No response.)

8    Q.   Let me rephrase that question.  Let me withdraw it and

9    rephrase that question.

10         Did there come a point in time when Josh talked to you

11   about changing his life?

12   A.   Yes.

13   Q.   And where did that conversation take place?

14   A.   In my car.

15   Q.   And where was your car at that point in time?

16   A.   It was outside.

17             THE COURT:  What's the time period?

18             THE WITNESS:  Midday.

19             THE COURT:  I'm sorry.  The day, are we talking

20   about March, February?

21             THE WITNESS:  It was in -- it was in April.

22             THE COURT:  Of 2013?

23             THE WITNESS:  Yes, sir.

24             THE COURT:  Go ahead.

25   ///

**BY MR. COLLINS:**

1
2  Q.   In using the date of Josh's death as a time -- or a

3  point of reference, how far in advance did that conversation

4  take place of Josh's death?

5  A.   The last conversation I had with him was on Monday,

6  that Monday.

7  Q.   Okay.  So you've testified that his death was on

8  April 30th; is that correct?

9  A.   Yes.

10  Q.   Using April 30th as a point of reference, when was the

11  time that you had that conversation with Josh about him

12  wanting to change his life?

13  A.   The day before.

14  Q.   All right.  So approximately April 29th?

15  A.   Yes, sir.

16  Q.   And this conversation took place in the car; is that

17  correct?

18  A.   Yes, sir.

19  Q.   And where was the car at the time of the conversation?

20  A.   Outside on the street of Glenn Street.

21  Q.   All right.  Can you explain to the Court what happened

22  during that conversation?  What was communicated during that

23  conversation?

24  A.   He told me he wanted to change his life for the better

25  and for his kids.  He wanted to get out of it.

Q.   And when you say "get out of it," you mean get out of what?

A.   Get out of the gang, get out of everything.   He wanted -- he wanted to fix his life right.

Q.   During the conversations, did Josh indicate that he was involved in any type of criminal activity?

A.   No.   He just said he wanted to get out.

Q.   All right.   Did Josh indicate that he wanted to get away from Creep?

A.   He just told me he just wanted to get out.   He wanted to get out.

Q.   All right.   Did Josh at some point have a similar type of conversation with Creep?

A.   Yes, he did.

Q.   And were you present?

A.   I was.

Q.   And when did that conversation take place?

A.   Later that -- later that day.

Q.   And where exactly did this conversation take place?

A.   Inside the house.

Q.   And it's the same residence on Glenn Street?

A.   Yes, sir.

Q.   Do you recall the conversation as it took place?

A.   Yes, sir.

Q.   What did Josh say in that conversation to Creep?

1   A.    He looked at Creep and he told Creep that he wanted to

2   get out and he wanted to do better.  And Creep looked at

3   him -- he sat up off the couch and he looked at Josh, and he

4   said, "There's only two ways out: on a stretcher to ICU or a

5   bullet in a dome."

6   Q.    And what was Creep's demeanor when he said that

7   statement?

8   A.    He wasn't playing.  He was being serious.

9   Q.    And based off of the statement, how did Josh react?

10   A.    He didn't say anything.

11   Q.    How did you respond?

12   A.    I looked at my friend and I told her, I was like, "I'm

13   going to the car."

14   Q.    I'm sorry.  If you could repeat that, please.

15   A.    I told -- I looked at my friend, Autumn, that was also

16   in the house when it was said, and I told her, "I'm going to

17   the car."

18   Q.    And why did you say you were going to the car?

19   A.    Because I didn't feel right after he said that because

20   it didn't settle right with me.

21   Q.    All right.  Now, did there come a point in time when

22   you left that residence?

23   A.    Yes.

24   Q.    And did Josh leave with you or did he stay there?

25   A.    He left.  He left that day to go cut an elderly lady's

```
 1  │ yard that evening.  And I brought him back, and that was the
 2  │ last time I ever heard anything from him.
 3  │ Q.    Ms. Rives, do you need a minute?
 4  │            THE COURT:  Do you have a Kleenex there?  Does she
 5  │ have water?
 6  │            (Respite.)
 7  │ BY MR. COLLINS:
 8  │ Q.    Ms. Rives, now, did you see Josh the following day?
 9  │ A.    No.
10  │ Q.    Okay.
11  │ A.    After he got done cutting the grass, I dropped him off.
12  │ Q.    Ms. Rives, you've testified about this matter in the
13  │ Grand Jury; is that correct?
14  │ A.    Yes.
15  │ Q.    And do you recall that during your testimony, you
16  │ advised that you saw Josh the following day when he cut the
17  │ grass?  Do you recall that?
18  │ A.    (No audible response.)
19  │ Q.    And I'm sorry.  You have to answer verbally.
20  │ A.    That Monday, he cut the grass.
21  │            THE COURT:  Why don't you pull the microphone a
22  │ little bit closer to you.
23  │ BY MR. COLLINS:
24  │ Q.    Ms. Rives, would looking at your Grand Jury transcript
25  │ help refresh your recollection?
```

```
 1   A.    Yes, please.
 2              THE COURT:  Why don't we take a minute and let her
 3   collect herself.
 4              MR. COLLINS:  Sure.  Thank you, Your Honor.
 5              (Recess 2:06 p.m. to 2:16 p.m.)
 6              THE COURT:  All right.  Let's continue.
 7              MR. COLLINS:  Thank you, Your Honor.
 8              (Government Exhibit 1 was marked for ID.)
 9   BY MR. COLLINS:
10   Q.    Ma'am, I'm showing you what's been marked as -- or
11   what's being marked as Government's Exhibit 1 for
12   identification purposes only.  It's right there on the front
13   of the desk.  Do you see that?
14   A.    Yes.
15   Q.    All right.  And do you recognize what that is?
16   A.    It's the transcripts.
17   Q.    And that's the transcript of your Grand Jury testimony;
18   is that correct?
19   A.    Yes.
20   Q.    And have you had an opportunity to look at that before?
21   A.    Yes.
22   Q.    And is that an accurate reflection of what you
23   testified to in the Grand Jury?
24   A.    Yes.
25   Q.    What I want to do is I want to direct your attention
```

1   starting on page 33, line 17.  If you could start there and

2   read into the next page.  And then when you're done, let me

3   know when you've had an opportunity to refresh your

4   recollection, or if it does refresh your recollection.

5   A.    (Reviewing document.)

6         Yes.

7   Q.    So, ma'am, does that refresh your recollection?

8   A.    Yes, sir.

9   Q.    All right.  Now, when was the -- after you heard the

10  conversation between Creep and Josh, when was the next time

11  you saw Josh again?

12  A.    It was that following Monday.

13         THE COURT:  You're going to have to talk louder

14  for me, ma'am.

15         THE WITNESS:  That following Monday.

16  BY MR. COLLINS:

17  Q.    All right.  Was that the next day?

18  A.    Yes.

19  Q.    All right.  And approximately what time did you see

20  Josh that day?

21  A.    That late afternoon.

22  Q.    All right.  And how did you come to see Josh that day?

23  A.    He actually called me.

24  Q.    And based on that call, what did you do?

25  A.    I told him I was getting my kids ready, and he said

1    okay.  And I told him I'd be around there to pick him up so

2    he can go cut the grass for that lady.

3    Q.    All right.  And when you say to go around there, where

4    do you mean?  You were going to pick him up from where?

5    A.    Off of Glenn Street.

6    Q.    Okay.  And this is the same residence that you saw him

7    at the night before; is that correct?

8    A.    Yes, sir.

9    Q.    All right.  And once you picked up Josh from the Glenn

10   Street address, what did you do next?

11   A.    I took him to the lady.

12   Q.    And do you recall where that was?

13   A.    It's over there off of Pollard.

14   Q.    Okay.  And that's somewhere in Clarksville; is that

15   correct?

16   A.    Yes, sir.

17   Q.    All right.  And approximately what time did you drop

18   Josh off at the place on Pollard?

19   A.    It was like around 6:00.

20   Q.    Okay.  This is 6:00 in the morning?

21   A.    Huh-uh.  6:00 in the evening.

22   Q.    And approximately when was the next time you saw Josh

23   again after that?

24   A.    I picked him back up.

25   Q.    Now, during the time that you were dating Josh, did

```
1    Josh have a telephone?
2    A.    No.
3    Q.    How would people get in touch with him?
4    A.    He would use -- he would use Creep's phone.
5    Q.    Okay.  If Josh was with you, how would people get in
6    touch with Josh?
7    A.    He would ask to use my phone.
8    Q.    Okay.  Would people call you looking for Josh?
9    A.    Only person that asked was Creep.
10   Q.    All right.  During that window of time where you
11   dropped Josh off to cut the grass and you picked him up, did
12   anybody call looking for him?
13   A.    Creep.
14   Q.    And do you remember how many times he called?
15   A.    He called once.
16   Q.    And did you have an opportunity to speak with Creep?
17   A.    He asked where he was at.
18   Q.    Okay.
19   A.    And I told him I dropped him off to cut this lady's
20   grass.
21   Q.    And approximately how long do you think that
22   conversation was?
23   A.    Not long.
24   Q.    All right.  And how would you describe Creep's demeanor
25   during that conversation?
```

1   A.    He was mad.

2   Q.    All right.  And did he express that he was mad because

3   he couldn't reach Josh?

4   A.    No.

5   Q.    Okay.

6   A.    He was mad at somebody else.

7   Q.    Okay.  Once you received that call, what did you do

8   next?

9   A.    I hung up.  When I got back to Josh, I told Josh that

10  Creep was looking for him, and he said okay.  And we headed

11  back over there to Glenn Street.  Something wasn't setting

12  right with me and I told Josh, I was like, "Please stay in

13  the house.  Just don't go nowhere."

14  Q.    All right.  And did there come a point in time when

15  Josh exited the vehicle?

16  A.    Yes.

17  Q.    And where did he go from there?

18  A.    He walked over to the driver's side of the window, and

19  he said, "I love you.  I'll always love you."  And he gave me

20  a kiss on the cheek and he walked in the house.

21  Q.    All right.  And did you see Josh again alive after

22  that?

23  A.    No.

24  Q.    When did you find out that Josh had died?

25  A.    The next day.

```
 1   Q.    And how did you find that out?

 2   A.    My sister.

 3   Q.    Okay.

 4              MR. COLLINS:  Court's brief indulgence, Your

 5   Honor?

 6              THE COURT:  Uh-huh.

 7              (Respite.)

 8              MR. COLLINS:  No further questions for this

 9   witness, Your Honor.

10              THE COURT:  All right.  Cross?

11              MR. EVANS:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   QUESTIONS BY MR. EVANS:

14   Q.    Good afternoon, Ms. Rives.

15   A.    Good afternoon.

16   Q.    And if you don't mind, just speak up just a little bit

17   for me, okay?

18   A.    Yes.

19   Q.    Now, I just want to cross-examine you, talk to you for

20   a few minutes on some of the matters you've been testifying

21   about today that you've told the Grand Jury in the past,

22   okay?

23   A.    Okay.

24   Q.    All right.  So you've spoken with law enforcement

25   several times since you last saw Josh Henry in relation to
```

1  his murder; is that correct?

2  A.    Correct.

3  Q.    And even so, you first spoke with him on Tuesday,

4  April 30th of 2013; is that right?

5  A.    Correct.

6  Q.    And you recall being called in by the Metro Nashville

7  Police Department detective questioning you at the

8  Clarksville Police Department specifically for a couple of

9  hours that day?

10  A.    Yes.

11  Q.    And have you had a chance to review that video prior to

12  testifying today?

13  A.    Yes.

14  Q.    And I notice that you're visibly upset today talking

15  about this subject.  Right?

16  A.    Yes.

17  Q.    You would agree with me, when you watched the video

18  that occurred back on April 30th, 2013, you didn't shed a

19  tear talking about Josh, only hours after finding out he was

20  dead.

21  A.    I didn't know what -- I didn't know what was going on.

22  I grew up with him.

23  Q.    Well, you told the police that you'd heard from your

24  sister he'd been murdered, correct?

25  A.    Yes.  And we were trying to find out what was going on

1  because Clarksville is very small, and a lot of people like

2  to run their mouth.

3  Q.    But either way, regardless of what you wanted to find

4  out or learn that day, you weren't crying at all during your

5  almost two-hour-long interview with the police department on

6  April 30th, correct?

7  A.    Correct, because I was in shock.

8  Q.    And during that interview, you didn't make one mention

9  of your friend Autumn; isn't that correct?

10 A.    Correct.

11 Q.    Now, you didn't make one mention of anything about

12 something called the Marley Gang, correct?

13 A.    Correct.

14 Q.    You didn't make one mention about anything related to

15 this conversation that supposedly occurred between

16 Mr. Hardison and Mr. Henry; is that correct?

17 A.    Correct.

18 Q.    Now, you were questioned again by Metro Nashville

19 detectives on May 30th, 2013.  Do you remember that?  You

20 were actually at your friend Autumn's house?

21 A.    Yes.

22 Q.    And have you had a chance to listen to that audio

23 recording as well?

24 A.    Yes.

25 Q.    And you would agree with me that during that whole

1  interaction, that you weren't visibly crying or upset in

2  talking about Mr. Henry's death, were you?

3  A.    Huh-uh.

4            **THE COURT:**  You need to verbalize your answer.

5            **THE WITNESS:**  No.

6  **BY MR. EVANS:**

7  Q.    And when you actually appeared in that, as you recall

8  from the audio of that interview, the police were actually

9  already questioning your friend Autumn, were they not?

10  A.    Yes.

11  Q.    And when they got there, isn't it true that you were

12  actually asked to confirm this story?  They told you this

13  story about the bullet in the head and asked you if that

14  actually happened?

15  A.    Yes.

16  Q.    And that was the first time that you ever said anything

17  about this conversation, basically agreeing with what the

18  police told you Autumn had said about bullet in the dome;

19  isn't that correct?

20  A.    Yes.

21  Q.    Now, since that interview on May 30th, 2013, about how

22  many times would you say you have met with law enforcement

23  and talked about Mr. Henry's death?

24  A.    After that?

25  Q.    Yes, ma'am.

1  A.    I haven't spoken to anybody until they got in touch
2  with my family members.
3  Q.    Okay.  And since -- and you're talking about "they."
4  Are you referring to Mr. Schrader and Mr. Collins over at
5  this table here?
6  A.    Yes, sir.
7  Q.    And the agent.
8        Okay.  And when's the first time you remember meeting
9  them?
10 A.    Last -- it was in August.
11 Q.    Okay.  How many times have you met with them?
12 A.    It would be twice: once in Clarksville and then down
13 here.
14 Q.    Okay.  And does it sound accurate that you would have
15 met with them sometime in Clarksville around July 28th of
16 2021?
17 A.    That's what I was referring to.
18 Q.    Okay.  And then it looks like you testified at the
19 Grand Jury on September 9th, 2021.  Does that sound right?
20 A.    Yes.
21 Q.    Did you meet with the prosecutors in this case,
22 Mr. Schrader and Mr. Collins, and any of the agents prior to
23 your testimony and go over what you were going to say?
24 A.    Yes.
25 Q.    Okay.  Now, earlier in your testimony, you seemed to

1    have some trouble remembering things, and the prosecutor,

2    Mr. Collins, he had to hand you a transcript to refresh your

3    memory.  As you sit here today, do you have an independent

4    recollection of the days leading up to Mr. Henry's death?

5    A.    It's very vague.  The certain ones that -- the certain

6    part that I remember was the conversation that he had with me

7    and him, and me taking him to go cut the grass.

8    Q.    Okay.  Is it -- do you -- is it fair to say that you

9    don't have an independent recollection of this conversation

10   about the bullet in the dome?

11   A.    We were in the house when that was said.  I wanted to

12   forget about it, because if you was up here like I am, you'd

13   be scared the way we were scared.

14   Q.    Okay.  So you actually remember yourself, as you sit

15   here today, that conversation that you claim happened between

16   Mr. Hardison and Mr. Henry?

17   A.    Yes.

18   Q.    Okay.  So let's back up.  First of all, I think you

19   testified earlier -- I want to make sure I heard you -- that

20   you said you have no knowledge of Brandon Hardison, or who

21   you refer to as Creep, being affiliated with something called

22   the Marley Gang; is that right?

23   A.    Correct.

24   Q.    And I'm sorry.  I didn't --

25            **THE COURT:**  I couldn't hear you either.

```
 1              THE WITNESS:  Correct.
 2    BY MR. EVANS:
 3    Q.    And you don't have any independent --
 4              THE COURT:  The only time you heard about the
 5    Marley Gang was from Mr. Henry?
 6              THE WITNESS:  On his arm.
 7              THE COURT:  When you and he were talking?
 8              THE WITNESS:  Yes, sir.
 9              THE COURT:  And you saw the tattoo?
10              THE WITNESS:  Yes, sir.
11              THE COURT:  And he said that's the Marley Gang
12    tattoo?
13              THE WITNESS:  Yes, sir.
14              THE COURT:  Okay.
15    BY MR. EVANS:
16    Q.    And you don't have any knowledge of Mr. Hardison being
17    affiliated with the Gangster Disciples either, do you?
18    A.    Not to my knowledge, no, I don't.
19    Q.    Okay.  Now, I want to kind of go back a little bit from
20    the date that you were being questioned by the police.  Would
21    you agree with me that that would have been on Tuesday, April
22    30th of 2013, the first time you were questioned right after
23    you found out Josh had been killed?
24    A.    Can you -- can you --
25    Q.    Sure.  So the day you were questioned by the police the
```

1   first time, do you recall saying that it was April 30th of

2   2013?

3   A.   Yes.

4   Q.   Okay.  And on that day, do you remember that being a

5   Tuesday?  Or do you remember at all?

6   A.   I don't remember.

7   Q.   Okay.  But there's no question that the day you met

8   with the police, that's the day that you found out Josh Henry

9   had been killed, correct, the first time?

10  A.   Yes.

11  Q.   All right.  And if I understood your testimony earlier,

12  you were saying that this -- well, let me back up -- that you

13  dropped him off at Mr. Hardison's home the night before.

14  A.   Yes.

15  Q.   Okay.  So if April 30th was Tuesday, that would have

16  been a Monday night that you dropped him off at

17  Mr. Hardison's home?

18  A.   Yes, sir.

19  Q.   Okay.  And so the day before that, you would agree,

20  would have been Sunday, correct?

21  A.   Yes, sir.

22  Q.   All right.  So I want to take you to Sunday, to that

23  Sunday.  How did you first interact with Josh Henry that day?

24  A.   I actually -- I -- we picked him up.

25  Q.   You picked him up?

```
 1   A.     Yes.

 2   Q.     Okay.  And about what time did you pick him up?

 3   A.     About that afternoon.

 4   Q.     All right.  And I think at the time, you said, you

 5   drove a Camry; is that right?

 6   A.     Yes.

 7   Q.     Were you alone when you picked him up or was somebody

 8   with you?

 9   A.     It was just -- I think it was just me and him that day.

10   Q.     Okay.  So it's just you and him.  What did y'all do for

11   the day?

12   A.     Drove around.  We went to -- it's called a greenway.

13   Q.     Okay.  Anywhere else?

14   A.     I think we -- I think -- I'm not for sure, but . . .

15   Q.     Ms. Rives, are you sleepy today?

16   A.     I got off work at 3:00 this morning.

17   Q.     You seem to be closing your eyes a lot.  I want to make

18   sure:  Are you staying with us?

19   A.     I'm tired.  I'm tired.

20            THE COURT:  Do you work at night?

21            THE WITNESS:  Yes.  I get off at 3:00 in the

22   morning, and this right here is unexpected.

23            THE COURT:  Do you have to work tonight?

24            THE WITNESS:  Yes, I do.  And right now, my mental

25   state is not stable.  I'm telling you I can't do this.
```

```
1            THE COURT:  Do you -- today is Tuesday.  Do you
2   work Thursday too?
3            THE WITNESS:  Yes, I work -- I'm a mother of
4   three.  I work.  I support my kids.  I'm their main support.
5            THE COURT:  Okay.
6            THE WITNESS:  I'm tired.
7   BY MR. EVANS:
8   Q.    I understand.  I'll try to --
9   A.    I feel like I'm getting beat up.
10  Q.    Let me ask you this:  Did anybody threaten you to be
11  here today?
12  A.    No.
13  Q.    Okay.  Now, let's go back to that Sunday.  I know it's
14  hard and I know you're tired.  But let's go back to that
15  Sunday.
16        So you and Josh went to the greenway; is that right?
17  A.    Yes.  We went to the greenway.  We walked.
18  Q.    Okay.  And that's still just you and Josh, right?
19  A.    Yes.
20  Q.    And what did y'all do after the greenway?
21  A.    I took -- I took him back over there.
22            THE COURT:  Why don't you remove -- take your mask
23  off.
24            THE WITNESS:  I took him back over to Glenn
25  Street.
```

**BY MR. EVANS:**

1

2  Q.    Okay.  And did y'all have any conversation on the way

3  back to Glenn Street that you recall?

4  A.    Not to my memory.

5  Q.    Okay.  And so you took him from the greenway straight

6  back to Glenn Street, correct?

7  A.    Correct.

8  Q.    All right.  And it's still just you and Josh, right?

9  A.    Yes.

10  Q.    All right.  Once you get back to Glenn Street, what

11  happens then?

12  A.    I tell him I'll see him.  I told him I'd see him later.

13  He got out, and that was it.  I went back to my kids.

14  Q.    Okay.  And we're still -- we're talking about --

15  A.    Sunday.

16  Q.    -- Sunday, correct?

17  A.    Yes, sir.

18  Q.    All right.  Did you go inside Glenn Street that night,

19  on Sunday?

20  A.    No.  I stayed in my car.

21  Q.    Okay.  And then you went back home to your kids,

22  correct?

23  A.    Yes.

24  Q.    Now, at that point in time, you were living with your

25  children's father; is that correct?

```
1    A.    Yes.

2    Q.    Now, did he know that you were having a relationship

3    with Josh at the time?

4    A.    No.

5    Q.    He did not?  Okay.

6    A.    No.

7    Q.    Would he have been upset had he found out?

8    A.    He was.

9    Q.    He did find out?  Okay.

10   A.    Yes.  There was actually problems in our relationship.

11   Q.    Okay.  Now let's move to Monday.  So Monday morning,

12   you wake up.  When is the next time you hear from Josh on

13   Monday morning?

14   A.    Monday morning, I got my kids ready.  Took them to -- I

15   took them to the babysitter or something like that.  And then

16   if I'm not mistaken, I think me and Autumn had anger

17   management classes, and he rode with us, and he wanted to

18   look for a job.

19   Q.    Okay.  So you're saying that on Monday, he went to --

20   with you guys to anger management, is that right, you and

21   Autumn?

22   A.    Yes.

23   Q.    All right.  And by "he," just to be clear, that's Josh,

24   correct?

25   A.    Yes.
```

1  Q.    And then what time would that have been?

2  A.    Around 12:00; 11:00, 12:00.

3  Q.    11:00 or 12:00?

4  A.    Yes.

5  Q.    Okay.  11:00 a.m.?

6  A.    Yes.

7  Q.    Okay.  And so how long does it take you guys to go to

8  anger management on Monday?

9  A.    It's about 30-minutes-to-an-hour session.

10 Q.    Okay.  And was that -- is that done in Clarksville?

11 A.    Yes.

12 Q.    All right.  And so y'all get done with anger

13 management, what do you and Autumn and Josh do then?

14 A.    I dropped Autumn off to grab her daughter from her

15 grandmother's house, took her back to her apartment -- I mean

16 to her trailer.

17 Q.    Okay.  You went to Autumn's trailer?

18 A.    Yes.

19 Q.    Okay.  And when you say you went there, was it you and

20 Josh and Autumn and then her daughter?

21 A.    Yes.  We picked up her daughter.

22 Q.    Okay.  So you drop off -- do you drop her off, or do

23 you go in the trailer with Autumn?

24 A.    We dropped her off.

25 Q.    Okay.  And so you dropped off Autumn and her daughter

1   at her trailer.  About what time do you think that would have

2   been?

3   A.    I don't -- I don't remember the time.

4   Q.    All right.  So we're on Monday the 29th of April, 2013.

5   You've just dropped Autumn off and her daughter at her

6   trailer.  Where do you and Josh go next?

7   A.    I drop him off.  I pick up my kids.  I drop them off.

8   And then I get ready to go back, pick him up and go take him

9   to go cut the grass that Monday.

10  Q.    So you dropped him off to cut the grass?

11  A.    Yeah.  It was that Monday, the 29th.

12  Q.    Okay.  And about what time is it that you dropped him

13  off to cut the grass?

14  A.    It was around like 6:00-ish.

15  Q.    Okay.  So you drop him off to cut the grass.  How long

16  is it before you go back to pick him up?

17  A.    Maybe four or five hours.

18  Q.    All right.  So you dropped him off at 6:00 p.m., and

19  you're saying that you picked him up at around 10:00 p.m.,

20  11:00 p.m.?

21  A.    It was around 10:00-ish.

22  Q.    Okay.  And after you pick him up around 10:00-ish, you

23  said, at night, is it just you in the car?

24  A.    Yes.

25  Q.    Can you repeat that answer?

1  A.     Yes.

2  Q.     Thank you.  Where do y'all go from there?

3  A.     I take him back to Glenn Street, and we sit in the car.

4  And I sat there and I told him that I had a bad feeling, not

5  to go nowhere.  And he said, "I won't.  I promise.  I won't

6  leave the house."  And he gets out the car; he comes to the

7  driver's side; he tells me he loves me, he'll always love me.

8  And he gave me a kiss on the cheek, and he walked in the

9  house.  And that's the last time I seen him.

10 Q.     All right.  So you didn't go in the house that Monday

11 night either, correct?

12 A.     No, I didn't.

13 Q.     All right.  And you didn't go in the house the night

14 before on Sunday night either, correct?

15 A.     Sunday, me and Autumn did.

16 Q.     All right.

17 A.     That's when we heard -- that's when we heard Creep --

18 that's when we heard Josh tell Creep that he wanted to get

19 out.  And that's when Creep was sitting on the couch, and he

20 leaned up and he looked Josh dead in his eyes and said what

21 he said, what he said.

22 Q.     Okay.  Because I just walked you through Sunday from

23 daylight to dark just now on -- and you didn't say one word.

24 You actually said you didn't go into Creep's house at all on

25 Sunday, that you just dropped Josh off.

1    A.    I did go in there, me and Autumn both were.  We were

2    standing right beside the door.

3    Q.    And you also just testified, ma'am, that Autumn wasn't

4    even with you on Sunday.  You said she was with you on

5    Monday.

6              **THE WITNESS:**  I can't do this.  I can't.  I'm

7    tired and he's badgering me.  I can't deal with the pressure.

8    I can't.  I want to go.  I want to go now.  I want to go to

9    my kids.

10              Look, this is what I remember.  Sunday, me, Autumn

11   and Josh.  Me and Autumn was standing right there beside the

12   damn door.  Josh told him what he said.  He sat there and he

13   said that he wanted out.  And Creep sat there and looked at

14   Josh's face and said, "There's only two ways out; on a

15   stretcher to ICU or a bullet in the dome."

16   **BY MR. EVANS:**

17   Q.    And you remember that clearly as you sit here right

18   now?

19   A.    How can we not?

20   Q.    Well, how come you couldn't say it five minutes ago,

21   ma'am?

22              **MR. COLLINS:**  Your Honor, objection, Your Honor.

23   It's been asked and answered --

24              **THE COURT:**  Overruled.

25              **THE WITNESS:**  Because I'm in fear of my life

```
1   because of him.  Y'all put a bullet on my back.
2   BY MR. EVANS:
3   Q.    So, ma'am, you say that --
4   A.    Y'all put a bull's-eye on my back because of him.  Are
5   you happy now?  You put a bull's-eye on my back.  Now I gotta
6   protect my kids.
7   Q.    Ma'am --
8   A.    I don't want to talk to you, please.  I don't want to
9   talk to you.
10  Q.    You were asked directly on April 30th, 2013, by Metro
11  Nashville Police Department whether or not you were scared of
12  Brandon Hardison, and you said no.  You said you had spoken
13  to him, he was concerned about Josh Henry.  Do you remember
14  that?
15  A.    It was after I had -- after I found out it was all a
16  lie.
17          THE COURT:  You're going to have to move your hand
18  so we can hear you.
19          THE WITNESS:  Which, I don't know that was all a
20  lie.  He didn't care about Josh.  He didn't care about Josh
21  at all.  Josh never hurt anybody.  Josh was . . .
22          MR. COLLINS:  Your Honor, can we take another
23  break?
24          THE COURT:  Yeah.
25          MR. COLLINS:  Thank you.
```

1      (Recess 2:48 p.m. to 3:11 p.m.)

2           **MR. EVANS:**  Thank you, Your Honor.

3  **BY MR. EVANS:**

4  Q.   Ms. Rives, so on direct, you testified about this

5  statement you claim you heard Mr. Hardison make to Mr. Henry

6  about a bullet in the dome.  I think you testified on direct,

7  at least, that that occurred on Sunday night.

8  A.     Yes.

9  Q.     Who-all was present in the room?

10  A.     It was me, Autumn -- me, Autumn, Josh, and Creep.

11  Q.     Who?  You, Autumn, who, and who?

12  A.     And Josh and Creep.

13  Q.     And when you say Creep, are you referring to Brandon

14  Hardison?

15  A.     Yes.

16  Q.     Was anyone else in the room?

17  A.     No.

18  Q.     What room in the house were you in?

19  A.     Living room.

20           **MR. EVANS:**  Those are my questions.

21           **THE COURT:**  All right.  Redirect?

22           **MR. COLLINS:**  Thank you, Your Honor.

23                      **REDIRECT EXAMINATION**

24  **QUESTIONS BY MR. COLLINS:**

25  Q.   Ms. Rives, do you want to be here today?

```
 1   A.    No.
 2              THE COURT:  I couldn't hear you now.
 3              MR. COLLINS:  I apologize, Your Honor.  The
 4   technology.
 5   BY MR. COLLINS:
 6   Q.    Ms. Rives, do you want to be here today?
 7   A.    No.
 8   Q.    But you're under a subpoena; is that correct?
 9   A.    Yes.
10   Q.    And that's why you're here today; is that right?
11   A.    Yeah.
12   Q.    Despite that, you're still testifying truthfully; is
13   that correct?
14   A.    Yes.
15   Q.    And do you recall every single detail about what
16   happened back in 2013?
17   A.    Vaguely.  I just wanted -- I just wanted everything to
18   be put behind me so I can get my life back.
19   Q.    Okay.  Let me ask you:  Back in 2013, was this a
20   traumatic event for you?
21   A.    Yes.  I had to go to counseling.
22   Q.    Okay.  And have you worked over the past decade or so
23   to try to get this out of your memory?
24   A.    Yes.
25   Q.    Okay.  And despite your memory about the details, are
```

1    you certain about the statement that you heard the defendant

2    make to Josh?

3    A.    Uh-huh.   I'm positively sure.

4    Q.    Okay.   Are you familiar with how Josh was killed?

5    A.    He was shot.

6    Q.    And do you know where he was found?

7    A.    On a roadside.

8    Q.    All right.   And over the years, have you been concerned

9    about that?

10   A.    I have.

11   Q.    And why is that?

12   A.    Because he didn't have to die like that.

13   Q.    All right.   Now, when you first talked to law

14   enforcement, did you know what was going on at that point in

15   time?

16   A.    No, I didn't.

17   Q.    Okay.   Did you -- did you like the manner in which law

18   enforcement interacted with you during that first interview?

19   A.    No, I don't.

20   Q.    And why was that?

21   A.    They were rude, they were belligerent, and they accused

22   me of murdering my best friend.

23   Q.    Were you reluctant to talk to them?

24   A.    I don't like talking to -- I don't like talking to them

25   at all.

1  Q.    Were your concerns about how Josh -- did you have

2  concerns about Josh -- how Josh died that also --

3  A.    Yes.

4  Q.    And I'm sorry.

5        -- that also impacted how you interacted with them?

6  A.    Yes.

7  Q.    Now, you met with the police back on May 30th, 2013; is

8  that correct?

9  A.    Yes.

10 Q.    And this was at Autumn's house; is that correct?

11 A.    Yes.

12 Q.    Did Autumn feed you the story about what happened

13 during this conversation between Creep and Josh?

14 A.    No.

15 Q.    The subsequent times that you've met with law

16 enforcement, has anyone fed you this story?

17 A.    No.

18 Q.    Ms. Rives, I want you to look across the room at this

19 table.  Has anyone at this table told you what to say today?

20 A.    No.

21 Q.    The story about the statement, the statement between

22 Josh and the defendant, was that something that you told the

23 police back on that -- during that interview at Autumn's

24 house?

25 A.    Yes.

1    Q.    I'm sorry?

2    A.    Yes.

3    Q.    And no one fed you that story; is that correct?

4    A.    Excuse me?

5    Q.    No one fed you that story; is that correct?

6    A.    No, sir.

7         **MR. COLLINS:** Court's brief indulgence, Your

8 Honor?

9         **THE COURT:** Sure.

10         **MR. COLLINS:** No further questions for this

11 witness, Your Honor.

12         **THE COURT:** All right.

13                **RECROSS-EXAMINATION**

14 **QUESTIONS BY MR. EVANS:**

15 Q.   Ms. Rives, when you met with the police on April 30th,

16 2013, you knew in that interview how Josh died because they

17 told you.

18         **MR. COLLINS:** Objection, Your Honor. This has

19 already been asked, it's been answered, and it's recross and

20 recross.

21         **THE COURT:** Overruled. Go ahead.

22 **BY MR. EVANS:**

23 Q.   They told you. You said -- just on your redirect, you

24 just said that you didn't know all the facts about how he

25 died until later, but they told you in the interview how he

1  died and then blamed you for it, didn't they?

2  A.    Because of the fact that I wasn't showing my tears,

3  that I wasn't hysterical.

4  Q.    Ma'am, my question is:  During that interview, the

5  police did, in fact, tell you that Josh was shot and found on

6  the side of the road in Madison, Tennessee, did they not?

7  A.    Yes, they did, after they accused me of murdering him.

8  Q.    Okay.  The second thing that was just talked about on

9  your redirect, going back to this May 30th interview at

10  Autumn's house, you testified earlier today that you were

11  told by police when you arrived at that residence about the

12  "bullet to the dome" question.  That's what you said earlier

13  today, and that you confirmed it.

14  A.    He asked me why did I not say anything, and I just sat

15  there quietly.  Because if you was there when I saw his face

16  when he was looking at Josh, you would be scared shitless

17  too.

18  Q.    And that detective, on May 30th, asked you why you

19  didn't say anything after he told you the statement, after he

20  said, "Did Creep  say that?  Did Creep say bullet to the dome

21  or to the ICU," right?

22  A.    I shook my head yes to him.

23  Q.    And, in fact, when you were interviewed on April 30th,

24  isn't it true that the first time that Brandon Hardison's

25  name is mentioned is not by you, it's by law enforcement?

1  A.    I didn't even know his real name until they showed a

2  picture.

3            THE COURT:  All right.  Anything else?

4            MR. EVANS:  No, sir.

5            THE COURT:  Okay.  From the government?

6            MR. COLLINS:  No, Your Honor.  Thank you.

7                    Q U E S T I O N S

8  BY THE COURT:

9  Q.    So Ms. Rives, I want to make sure I understand what

10  you're saying.  I just had a couple of follow-up questions.

11  Can you do that for me?

12  A.    Yes, sir.

13  Q.    Okay.  So you and Mr. Henry reunited in March of 2013?

14  A.    Yes, sir.

15  Q.    Okay.  And prior to that, am I correct you-all really

16  did not have any contact with each other?

17  A.    No, sir.

18  Q.    Okay.  So when you reconnected with him in March of

19  2013, until, you know, he passed away, did you ever have any

20  conversations with him about any bad things or illegal things

21  that he had been involved in?

22  A.    I told him he -- he told me that he wanted to stop

23  selling weed, and I told him that he needed to straighten up

24  because since he was little, he's been in and out of trouble.

25  And he's my best friend.  Everybody picked on him in school.

```
 1   And I -- basically, I was basically like a -- I was a
 2   sister/best friend, and then it grew into something more.
 3   Q.     Okay.  And I respect that and I appreciate you sharing
 4   it.  Other than him selling some weed now and then, I guess,
 5   did he ever say that he had been with anybody else and did
 6   any harm --
 7   A.     Not --
 8   Q.     -- to anyone?
 9   A.     Not to my knowledge.  He never could hurt a fly.
10   Q.     So did he ever talk to you that he and anybody else in
11   the world had ever been part of shooting somebody or ever say
12   he witnessed somebody else shooting somebody?
13   A.     No.
14   Q.     With -- at no time?
15   A.     No.  He's never spoken to me about any of that to my
16   knowledgment at all.  He never could hurt a fly at all.  He
17   couldn't even discipline his son.
18   Q.     Did he ever say or suggest to you in any way to make
19   you believe that he felt like he needed to go to law
20   enforcement to report some bad criminal activity?
21   A.     No.
22   Q.     That he wanted to report that he had information about
23   somebody being murdered?
24   A.     No.
25   Q.     Never?
```

1   A.    (Shaking head negatively.)

2   Q.    From March until he passed away?

3   A.    No.

4   Q.    Did he talk to you before March about that?

5   A.    No.

6   Q.    Never?

7   A.    No.

8   Q.    All right.  And you know what I mean when I say he

9   wanted to go to law enforcement and report?  You understand

10  what I'm talking about?

11  A.    Yeah.  He wanted to speak to somebody.

12  Q.    Did he ever say I'm going to -- nothing --

13  A.    No, sir.

14  Q.    Why did Mr. Henry want out of the Marley Gang?

15  A.    He got tired of being in trouble.

16  Q.    In the Marley Gang?

17  A.    He just got -- period.  He just got tired of it.

18  Q.    I don't know what -- I'm sorry.  I just don't know what

19  you mean when you say he got tired of being in trouble.  I

20  just --

21  A.    With the law, with being -- running the streets.  He

22  wanted to be a father, he wanted to be there with . . .

23  Q.    And what brought about this change?

24  A.    To be honest, I don't know.

25  Q.    He just said, "I'm tired of being in trouble"?

1  A.    He just looked at me; he just said he was just tired of

2  it.  He wanted out.

3  Q.    He just said, "I want to change my life"?

4  A.    Yes, sir.

5  Q.    Okay.

6  A.    And now he can't.

7  Q.    Had he been in trouble?  Maybe --

8  A.    Yeah, he been in and out -- he been in and out of

9  jails, yeah.  And I was -- I told him, I go, "Look, if you're

10 in any trouble, you need" --

11 Q.    You gotta move your hand.

12 A.    I told him if he was in any trouble, I was like, he

13 needed to go turn himself in or whatever, if he was on the

14 run or whatnot.  Because he was good for escaping from

15 juvenile detention centers and school, all of that.  And he

16 was just tired of it.  He didn't feel like being caged up

17 anymore.  But he didn't deserve to die.

18        But I see his adopted brother every day, and his

19 adopted brother is going downhill because of this.  And it's

20 even hard for me to look at him because we all grew up

21 together.

22 Q.    When you took him back home, I guess that Sunday, you

23 said to him -- you testified, "I had a bad feeling"?

24 A.    That was Monday.  It was Monday.  It was Monday

25 evening.

1    Q.    Monday?

2    A.    When I told him that I had a bad feeling.

3    Q.    What was your bad feeling about?

4    A.    Something was just -- it's just an intuition that

5    something wasn't settled right, in the back of my -- in the

6    back of my head and my stomach, that something wasn't right,

7    something didn't feel right.

8    Q.    Did you -- could you be any more specific?

9    A.    (Shaking head negatively.)  I just told him, I said --

10   I told him not to leave the house.  I was like, "I just don't

11   know what it is."  I was like, "Just don't leave the house."

12   I was like, "I'll call you tomorrow."  He goes, "Okay."  And

13   he gets out, he comes on the other side of the car, he tells

14   me he loves me, he always loves me, and he gave me a kiss on

15   the cheek.

16   Q.    So if you and Autumn and Mr. Henry heard Mr. Hardison

17   make this comment, why didn't Mr. Henry just go home with

18   you?  Why would you go back in the house with somebody who

19   said that?

20   A.    He didn't have nowhere else to go.

21   Q.    He couldn't come with you?

22   A.    I was in the process of moving with both my kids.

23   Q.    Was the source of your bad feeling what you have

24   testified that you say Mr. Hardison said?

25   A.    Yeah, that played a part in it.  Because ever since

```
1   that day, I cannot -- it didn't sound right.
2   Q.    Well, you've told me that Mr. Henry heard what you
3   and -- Mr. Henry heard what you and Autumn heard from
4   Mr. Hardison, right?
5   A.    Yes.
6   Q.    So when y'all were in the car, did you talk about,
7   "Well, maybe, Josh, you don't need to be going back to the
8   house with Mr. Hardison"?
9   A.    We didn't speak.  We did not speak.
10  Q.    You didn't say a word to each other?  On Monday?  I
11  don't understand what you mean by you didn't speak.
12  A.    When that was said, I sat in the car.  I didn't say
13  anything.
14  Q.    That was on Sunday?
15  A.    Yes.  When that was said, when he said what he said, I
16  didn't say anything.
17  Q.    Okay.  But you were in the car with him on Monday?
18  A.    Monday when I --
19  Q.    You brought him back home Monday and had the bad
20  feeling?
21  A.    Yes.  It was just me and him, and -- because he got
22  done cutting the grass and I took him back to the house.
23  Q.    And when you-all were in the car on Monday, did he make
24  any comment about what you say Mr. Hardison said?
25  A.    No.
```

1  Q.    Not a word?

2  A.    No.  He just -- he just told me okay, and then he gave

3  me a kiss, and he walked into the house.

4  Q.    No, no.  I'm talking about when you were in the

5  house -- I mean, when you were in the car taking him to cut

6  the grass and picking him up from cutting the grass.

7  A.    No, he didn't say anything.

8  Q.    And you didn't say anything?

9  A.    No, nothing.

10  Q.    Why didn't you say anything?  I mean, you hear somebody

11  make that comment, why wouldn't you have said, "Josh, do you

12  need to find another place to sleep?"

13  A.    Josh is Josh.

14  Q.    What does that mean?

15  A.    Josh is Josh.  He's stubborn.  He was stubborn.  He'll

16  listen to you, but it will go through one ear and out the

17  other.

18  Q.    And this is I shouldn't say my last question, but I'm

19  going to ask you the same thing:  At any time after you

20  reconnected with Mr. Henry, did he say anything to you about

21  him going to law enforcement to tell -- to tell law

22  enforcement some bad things he was --

23  A.    No, sir.

24  Q.    Never?

25  A.    Not at all.

1  Q.    And if he had said something like that, wouldn't that

2  have -- wouldn't that have struck you?

3  A.    Yes.

4            THE COURT:  All right.  Anything else?

5            MR. EVANS:  No, Your Honor.

6            THE COURT:  All right.  You can step down.  Thank

7  you for being here.

8            THE WITNESS:  Thank you.

9            (The witness stepped down.)

10            THE COURT:  All right.  You want to call your next

11  witness?

12            MR. COLLINS:  Yes, Your Honor.  Your Honor, the

13  government would call Ms. Autumn Pasquale.

14            Your Honor, she's in custody.  Thank you.

15            (The witness was sworn.)

16            COURTROOM DEPUTY:  Please state your full name for

17  the record and spell your last name.

18            THE WITNESS:  Autumn Michelle Pasquale,

19  P-A-S-Q-U-A-L-E.

20            THE COURT:  You can remove your mask.

21            All right.

22            MR. COLLINS:  Thank you, Your Honor.

23  ///

24  ///

25  ///

```
1                          *   *   *
2                  AUTUMN MICHELLE PASQUALE,
3   was called as a witness, and after having been first duly
4   sworn, testified as follows:
5                        DIRECT EXAMINATION
6   QUESTIONS BY MR. COLLINS:
7   Q.    Ma'am, how old are you?
8   A.    36.
9   Q.    And what's your highest level of education?
10  A.    Some college.
11  Q.    And what state did you -- what state are you from?
12  A.    Tennessee.
13  Q.    And have you ever lived in a city called Clarksville?
14  A.    Yes.
15  Q.    And what's the longest period of time that you've lived
16  in Clarksville?
17  A.    Approximately ten years.
18  Q.    And what was the -- what was the window of time or the
19  years that you lived in Clarksville?
20  A.    Between 2009-2017.
21  Q.    I want to draw your attention to August 2021.  Okay?
22  Did there come a point in time when you were contacted by the
23  ATF to talk to them about a homicide investigation?
24  A.    Yes.
25  Q.    And was this based off of a statement that you provided
```

```
 1    to law enforcement back in 2013?
 2    A.    Yes.
 3    Q.    And to your knowledge, was this a recorded statement?
 4    A.    Yes.
 5    Q.    And specifically, were you contacted by an ATF agent by
 6    the name of Justin Meinecke?
 7    A.    Yes.
 8    Q.    And during the conversations with Justin Meinecke, did
 9    he schedule an appointment for you to meet with not only ATF,
10    but members of the prosecution who were looking at this
11    homicide investigation?
12    A.    Yes.
13    Q.    And did you ever show up for that meeting?
14    A.    No.
15    Q.    And did they try to reach you again?
16    A.    Yes.
17    Q.    And actually, did Mr. Meinecke try to reach you several
18    times?
19    A.    Yes.
20    Q.    And did you ever meet with the ATF?
21    A.    No.
22    Q.    Did you refuse to meet with them?
23    A.    Yes.
24    Q.    And why is that?
25    A.    Because I was worried about retaliation.
```

```
1    Q.    When you say "worried about retaliation," what do you
2    mean?
3    A.    I was worried that there was going to be some kind of
4    punishment on my end if I did it, like I was going to end up
5    being hurt.
6    Q.    Okay.  Being hurt if you talked to ATF about this
7    investigation?
8    A.    Yes.
9    Q.    And specifically, was this an investigation that
10   involved a person by the name of Joshua Henry?
11   A.    Yes.
12   Q.    All right.  Now, once you failed to meet with ATF, was
13   there a warrant issued for your arrest?
14   A.    Yes.
15   Q.    And were you ultimately arrested on that warrant?
16   A.    Yes.
17   Q.    At the time that you were arrested, did you have
18   multiple addresses that were associated with you?
19   A.    Yes.
20   Q.    All right.  And was one your permanent address?
21   A.    Yes.
22   Q.    Okay.  And was the other one a mailing address?
23   A.    Yes.
24   Q.    And the ATF tried to locate you at at least one of
25   those addresses?
```

```
1   A.     Yes.

2   Q.     And which one was that?

3   A.     My sister's.

4   Q.     And did there come a point in time when you no longer

5   had access to the permanent address?

6   A.     Yes.

7   Q.     And why is that?

8   A.     Because word was out that the feds were looking for me,

9   so --

10  Q.     And why did that prevent you from having access?

11  A.     I guess when feds come poking around a small town,

12  people get nervous.

13  Q.     Okay.

14  A.     That's all I can say.

15  Q.     Okay.  So you lived with somebody else in the permanent

16  address; is that correct?

17  A.     Yes.

18  Q.     All right.  And they wouldn't let you stay there once

19  ATF was looking for you; is that correct?

20  A.     Yes.

21  Q.     All right.  Now, following that, did you stay in

22  different places including motels?

23  A.     Yes.

24  Q.     All right.  When detectives interviewed you back in

25  2013, where were you living then?
```

1  A.    Clarksville.

2  Q.    Okay.  And were you living in a house, an apartment?

3  Where were you living?

4  A.    A trailer.

5  Q.    Okay.  And how long did you live in that trailer?

6  A.    Four years.

7  Q.    So that would be from 2013 to approximately 2017?

8  A.    Yes.

9  Q.    Okay.  In between the period of 2017 to 2021 when

10 Agent Meinecke was looking for you, did you stay at multiple

11 different places?

12 A.    Yes.

13 Q.    And did that include an apartment that you rented for

14 about a year?

15 A.    Yes.

16 Q.    And did that also include stops at a rehab center?

17 A.    Yes.

18 Q.    And did that also include periods of incarceration?

19 A.    Yes.

20 Q.    Did that also include stays at motels?

21 A.    Yes.

22 Q.    And correct me if I'm wrong:  You even stayed, at one

23 point in time, in a shed; is that correct?

24 A.    Yes.

25 Q.    All right.  So you were pretty transient during that

1   window of time; is that correct?

2   A.    Yes.

3   Q.    All right.  Now, once you were ultimately arrested for

4   failing to appear to meet with Agent Meinecke -- and that was

5   for a Grand Jury appearance; is that correct?

6   A.    I believe so, yes.

7   Q.    Okay.  Were you ultimately served with a Grand Jury

8   subpoena?

9   A.    Yes --

10  Q.    All right.  And based off of that subpoena, did you

11  testify in the Grand Jury here in the Middle District of

12  Tennessee?

13  A.    I did.

14  Q.    Do you recall approximately when that was?

15  A.    A couple of weeks back.

16  Q.    All right.  Would September 13th, 2021, sound familiar?

17  A.    Yes.

18  Q.    All right.  Following that testimony, did you appear

19  before a magistrate judge here in this district?

20  A.    Yes.

21  Q.    And were you released from detention?

22  A.    Yes.

23  Q.    All right.  And were you released with specific

24  conditions, conditions of reporting in lieu of trial?

25  A.    Yes.

1  Q.    And specifically, I mean lieu of trial in the matter
2  that we're here for today.  Is that correct?
3  A.    Yes.
4  Q.    All right.  Did you fail to comply with those
5  conditions?
6  A.    Yes.
7  Q.    And were you once again arrested?
8  A.    Yes.
9  Q.    And is that why you're here today?
10  A.    Yes.
11  Q.    Is it fair to say that you don't want to be here today?
12  A.    Yes.
13  Q.    Outside of you being arrested now twice for this, you
14  wouldn't be here; is that correct?
15  A.    Yes.
16  Q.    And just so it's clear, why is that?
17  A.    Retaliation.  I just don't want to be a part of it.  I
18  mean, there's a murder, you know, somebody's dead.  I don't
19  want to be the next person.
20  Q.    Okay.  Despite that, though, you understand that you
21  have an obligation to testify truthfully today; is that
22  correct?
23  A.    Yes.
24  Q.    And is that what you plan to do?
25  A.    Yes.

1  Q.   All right.  Now, what I want to do is I want to draw

2  your attention back to the period of 2013.  Okay?  Were

3  you -- first of all, let me start.

4       Do you recall every specific detail about 2013?

5  A.   For the most part, yes.

6  Q.   Okay.  Let me ask you this.  I want to talk to you

7  about a person by the name of Joshua Henry.  Do you know that

8  individual?

9  A.   Yes.

10  Q.   And how do you know Joshua Henry?

11  A.   He was a friend of mine, a mutual friend of another --

12  well, a mutual friend of another friend.

13  Q.   Okay.  And --

14  A.   I was friends with his girlfriend.

15  Q.   Okay.  And who was that girlfriend?

16  A.   Her name's Valerie.

17  Q.   And how did you know Valerie?

18  A.   We was doing anger management classes, and I was

19  friends with her sister.

20  Q.   Okay.  And who did you know first?  Did you know

21  Valerie or did you know her sister first?

22  A.   I knew her sister.

23  Q.   And how long had you known her sister?

24  A.   Not very long.  Probably less than a year, maybe.

25  Q.   Okay.  And did the relationship with her sister help

1   you form a relationship with Valerie?

2   A.    Sort of, yeah.

3   Q.    Okay.  Now, during the period of 2013, do you recall

4   when you first met Valerie?

5   A.    Yes.

6   Q.    And when was that, about?

7   A.    It was sometime in 2013 at our anger management

8   classes.

9   Q.    All right.  But do you recall what month it was, is

10  what I'm saying?

11  A.    No, I don't.

12  Q.    Okay.  Do you recall when you met Josh?

13  A.    During the time I was doing my anger management

14  classes.

15  Q.    Okay.  Explain just how you were able to meet Josh

16  through Valerie.

17  A.    Valerie, I would arrive with Valerie to anger

18  management classes because I didn't have my own

19  transportation.  And she would, most of the time, have Josh

20  with her.  They were seeing each other, and they both had

21  other boyfriends, girlfriends or whatever.  So that was their

22  only way of being able to kind of see each other without

23  getting caught.  So he would ride -- Josh would ride with me

24  and Valerie to our anger management classes.  So it was

25  during the period of when I was doing my anger management

```
1    classes.
2    Q.    As you sit here today, do you -- well, let me back up.
3          To your knowledge, is Josh still alive today?
4    A.    No.
5    Q.    As you sit here today, do you recall his exact date of
6    death?
7    A.    I do not recall the exact date, but I know the year.
8    It was 2013.
9    Q.    Do you recall a month it was?
10   A.    It was sometime in the summertime; spring, summer.
11   Q.    Okay.  Let me ask you this:  Using what you kind of
12   understand to be the period around he -- the period around
13   which he died, how long do you think you knew Josh prior to
14   his death?
15   A.    Probably less than six weeks.
16   Q.    Now, during that six-week time, did you interact with
17   Josh regularly?
18   A.    At least once a week.
19   Q.    Okay.  And was this during rides to the class?
20   A.    Yes.
21   Q.    Okay.  And did you-all -- when I say you-all, did you,
22   Valerie, and Josh socialize at all during that period of
23   time?
24   A.    Yes.
25   Q.    All right.  And during those interactions, did you have
```

```
1    an opportunity to meet any of Josh's friends or associates?

2    A.    Yes.

3    Q.    And did you ever meet a friend of Joshua's by the name

4    of Creep?

5    A.    Yes.

6    Q.    And do you recall the first time that you met this

7    individual?

8    A.    Yes.

9    Q.    All right.  Using that six-week window, when do you

10   think you first met Creep?

11   A.    Probably around the third, fourth week.

12   Q.    And do you recall where you met this individual?

13   A.    Josh and Creep's home.

14   Q.    All right.  And when you say Josh and Creep's home, do

15   you recall, was that a house or an apartment?

16   A.    A house.

17   Q.    And do you recall where it was?

18   A.    Clarksville.

19   Q.    Okay.  Do you recall the street, by any chance?

20   A.    I don't.

21   Q.    Okay.  Now, did you ever personally interact with this

22   person by the name of Creep?

23   A.    Yes.

24   Q.    And where did these interactions take place?

25   A.    At the house.
```

1    Q.    Okay.  And do you recall today approximately how many

2    times you may have interacted with this person?

3    A.    Three or four.

4    Q.    All right.  Based off those three or four

5    interactions --

6              THE COURT:  How do you define "personal

7    interaction"?  What are you talking about?

8              THE WITNESS:  Talking or being in the same room

9    with them.

10             THE COURT:  Okay.  Go ahead.

11             MR. COLLINS:  Thank you, Your Honor.

12   BY MR. COLLINS:

13   Q.    Based off of those three to four times that you were

14   either in the same room or had the opportunity to speak with

15   him, did you become familiar with what he looked like?

16   A.    Yes.

17   Q.    Would you be able to recognize him if you saw him?

18   A.    Yes.

19   Q.    Is he present in this courtroom today?

20   A.    Yes.

21   Q.    Can you please identify him by an article of clothing

22   where he's sitting in the courtroom?

23   A.    Black and white hat.

24             MR. COLLINS:  Your Honor, may the Court reflect

25   the in-court identification of the defendant?

```
 1              THE COURT:  So noted.

 2              MR. COLLINS:  Thank you, Your Honor.

 3    BY MR. COLLINS:

 4    Q.    Now --

 5              THE COURT:  Hold on a second.

 6              (Respite.)

 7              THE COURT:  All right.  Go ahead.  I'm sorry.

 8              MR. COLLINS:  Thank you, Your Honor.

 9    BY MR. COLLINS:

10    Q.    The three to four interactions that you had, where did

11    they take place?  And I'm sorry.  The three to four

12    interactions that you had with the defendant, where did they

13    take place?

14    A.    It was always at the house.

15    Q.    Okay, always at the house.

16          And based off your recollection, who lived at the

17    house?

18    A.    Josh; Creep; Creep's old lady, I think Sis.  Josh.

19    Just those three that I'm aware of.

20    Q.    All right.  And just so I'm clear, when you say Sis,

21    you don't mean Creep's sister, correct?

22    A.    No.

23    Q.    I heard you said Creep's old lady.

24    A.    His girlfriend.

25    Q.    Okay.  And what did you call her?
```

```
1   A.    Sis.

2   Q.    Sis?  Okay.

3         And so just for the record, just -- so one more time,

4   who lived in the house?

5   A.    Josh, Sis, and Creep.

6   Q.    Okay.

7         THE COURT:  Do you know the person's real name

8   that you referred to as --

9         THE WITNESS:  No.  No, sir.

10         THE COURT:  You don't know what his real name is?

11         THE WITNESS:  Creep?

12         THE COURT:  Yes.

13         THE WITNESS:  Yes, sir.

14         THE COURT:  Oh.  What is it?

15         THE WITNESS:  Brandon Hardison.

16         THE COURT:  Okay.  Let's call him Mr. Hardison.

17         THE WITNESS:  Okay.

18         THE COURT:  All right.

19         MR. COLLINS:  Thank you, Your Honor.

20   BY MR. COLLINS:

21   Q.    Now, during the period of time that you interacted with

22   the defendant and with Josh, did you ever hear about a group

23   called the Marley Gang?

24   A.    Yes.

25   Q.    All right.  And based off your interactions with both
```

```
 1   of those individuals, what was your understanding of the
 2   group?  What was the group supposed to be?
 3   A.    It was a gang that Josh said that he was in that
 4   Mr. Hardison had, I guess, came up with.  That's what Josh
 5   said.
 6   Q.    Okay.  And --
 7              THE COURT:  What did you understand that he came
 8   up with?  What does "came up with" mean?
 9              THE WITNESS:  Like, he founded it.
10              THE COURT:  Mr. Hardison?
11              THE WITNESS:  Yes, sir.
12              THE COURT:  That's what Mr. Henry told you?
13              THE WITNESS:  Yes.
14              THE COURT:  All right.  Go ahead.
15   BY MR. COLLINS:
16   Q.    And did Mr. Henry ever talk about his experiences with
17   members of this gang?
18   A.    Yes.
19   Q.    And what specifically did he tell you?
20   A.    A few hours prior to him being murdered, he -- I saw
21   him -- saw him at a place in Clarksville.  And he had bruises
22   on him, and I asked him what happened.  And he said that he
23   had been violated.  And he talked about the gang, that he
24   wanted out of it and that he wasn't doing enough for the
25   gang.  And he just pretty much said that he didn't want in it
```

```
1   anymore.
2   Q.    Now, a couple of things:  One, when -- I'm sorry.
3   Where did this conversation take place?
4   A.    I want to -- the first time we talked about it, I saw
5   him at a gas station or somewhere, a store.  I'm not -- I
6   can't really remember exactly where, but -- and the second
7   time was at my house.
8   Q.    Okay.  And these were all on the same day or on
9   different days, these two conversations?
10  A.    I'm pretty sure it was on the same day.
11  Q.    Okay.
12          THE COURT:  Do you recall that being the date that
13  it was discovered Mr. Henry had been killed?
14          THE WITNESS:  A few hours before, yes, sir.
15          THE COURT:  That day?
16          THE WITNESS:  Yes, sir.
17          THE COURT:  All right.  Go ahead.
18  BY MR. COLLINS:
19  Q.    And was anyone else present for that conversation?
20  A.    Which time?
21  Q.    Let's start with the first time.
22  A.    It was just me and him the first time.
23          THE COURT:  Which time?  At the store or your
24  house?
25          THE WITNESS:  In the store.
```

          **THE COURT:**  It was just you and Mr. Henry?

          **THE WITNESS:**  Yes, sir.

BY MR. COLLINS:

Q.    And how about the second time?

A.    The second time was at my house, and that was me, him,
and Valerie.

Q.    Okay.  Now, during the time that you were in
Clarksville, did they have gangs in that community?

A.    Yes.

Q.    And are you familiar with any of the gangs that they
had in that community?

A.    Yes.

Q.    And which gangs in particular are you familiar with?

A.    Vice Lord, Gangster Disciple, M-13, just to name a few
of them that I can think of.

Q.    And let's start with the Vice Lords.  Why are you
familiar with the Vice Lords?

A.    My man -- I had a boyfriend back in 2008 that was
murdered, and he was a Mickey Cobra.

          **THE COURT:**  Hold on.  All right.  I'm sorry.  Go
ahead.

BY MR. COLLINS:

Q.    And I'm sorry.  If you could repeat that.

A.    I had a boyfriend, Brandon Harris.  Back in 2008, he
was murdered, and he was in Mickey Cobra aligned with the

1    Vice Lords.

2    Q.    Okay.  So you had a boyfriend who was in the

3    Vice Lords?

4    A.    Yes.

5    Q.    And based off your interaction with the Vice Lords,

6    were they involved in any rivals with any other gangs?

7    A.    At one point, I remember them having a problem with

8    Gangster Disciples.

9    Q.    All right.  And based off of those interactions, were

10   you familiar with the Gangster Disciples?

11   A.    Yes.  I knew people.

12   Q.    Okay.  And have you ever had any specific interactions

13   or contacts with members of the Gangster Disciples?

14   A.    Yes.

15   Q.    All right.

16           THE COURT:  Who?

17           THE WITNESS:  Antoine Redeemer.  I had -- he did a

18   home invasion on me one time, and there was a case on it.

19           THE COURT:  Anybody else?

20           THE WITNESS:  Mr. Hardison.

21           THE COURT:  How did you know he was Gangster

22   Disciples?

23           THE WITNESS:  From what Josh told me.  I don't

24   know for a fact.

25   ///

1  **BY MR. COLLINS:**

2  Q.     Well, let me ask you this:  Did you ever have

3  conversations or were you ever involved in a conversation

4  between -- that involved the defendant where he talked about

5  Antoine Redeemer?

6  A.     Yes.

7  Q.     All right.  And if you could explain the context of

8  that conversation.

9  A.     I asked him if he knew him, and he said yeah.  And he

10  said that was, like, his brother, and that was it.

11  Q.     Okay.  Did he indicate that he was specifically a

12  Gangster Disciple?

13  A.     Not that I can remember.

14  Q.     Based off your interactions with the Gangster

15  Disciples, were there any observations that you made that

16  indicated he was a member of the Gangster Disciples?

17  A.     Certain tattoos.

18  Q.     What tattoos were those?

19  A.     Some of the ones on his face.

20  Q.     Are there any particular which indicated to you that he

21  was a member of the Gangster Disciples?

22  A.     Six-point star.

23  Q.     Okay.  And you saw those on the defendant's face?

24  A.     Yes.

25  Q.     Okay.  Now, did there come a point in time when Josh

1  talked to the defendant about wanting to leave the Marley

2  Gang?

3  A.    Yes.

4  Q.    And were you present for that conversation?

5  A.    Yes, I was.

6  Q.    And do you recall where that conversation took place?

7  A.    At Josh and -- where Josh stayed at Creep's house, or

8  excuse me, Mr. Hardison's house.

9  Q.    Okay.  And do you recall what day that occurred on?

10  A.    Hours -- I'm not exactly sure on the date.  It was in

11  2013.  A few hours before he was found murdered.

12  Q.    Okay.  And you gave law enforcement a recorded

13  statement as relates to this event; is that correct?

14  A.    Yes.

15  Q.    And you had an opportunity to listen to that before; is

16  that correct?

17  A.    Yes.

18  Q.    And during that interview, did you give law enforcement

19  a different window of time?

20  A.    I'm not sure.

21  Q.    Okay.  But as you sit here today, are you sure of the

22  exact date or window of time in which this conversation took

23  place?

24  A.    Yes.

25  Q.    Okay.  And what do you believe it was?

1    A.    The few hours before he was found murdered.

2              THE COURT:  That day?

3              THE WITNESS:  The day before.

4              THE COURT:  The day before?

5              THE WITNESS:  (Nodding head affirmatively.)  Well,

6    I think he was found -- it was the following morning whenever

7    I found out about it.  So it was less than 24 hours.

8              THE COURT:  Was that before or after you and

9    Mr. Henry were at the store and you and Mr. Henry and Valerie

10   were at your house?

11             THE WITNESS:  After.

12             THE COURT:  After?

13             THE WITNESS:  Yes, sir.

14             THE COURT:  And you told me that occurred on the

15   day you learned of the murder?

16             THE WITNESS:  Yes.

17             THE COURT:  Okay.  Go ahead.

18             MR. COLLINS:  All right.  Thank you, Your Honor.

19   BY MR. COLLINS:

20   Q.    Now, who was present for that conversation?  And when I

21   say that conversation, I mean the conversation between the

22   defendant and Josh regarding the Marley Gang.

23   A.    It was me, Valerie, Josh, Mr. Hardison, and

24   Mr. Hardison's girlfriend.

25   Q.    Okay.  And are you -- where did it take place?

1  A.     Mr. Hardison's house.

2  Q.    No, I'm sorry.  Where in the house did it take place?

3  A.     The living room.

4  Q.    Okay.  And --

5          **THE COURT:**  Did you know Mr. Hardison's

6  girlfriend's name?

7          **THE WITNESS:**  No.

8  **BY MR. COLLINS:**

9  Q.    Just for the record, what was the name that you called

10  her by?  I'm sorry.

11  A.    Sis.

12  Q.    Okay.  Now, if you could explain to the Court how this

13  conversation occurred based on your recollection.

14          **THE COURT:**  Where were you in the house?

15          **THE WITNESS:**  In the living room area.

16          **THE COURT:**  Everybody was in the living room?

17          **THE WITNESS:**  Yes.

18          **THE COURT:**  Okay.  Go ahead.

19          **THE WITNESS:**  Josh and Mr. Hardison were talking

20  back and forth about Josh not being active, like, he wasn't

21  doing enough as far as the gang.  And he wasn't cleaning and

22  he wasn't, like, keeping -- doing the chores around the house

23  to earn his keep.  He wasn't doing anything.

24          And, you know, Josh was upset, and he was just

25  like, if -- well, if I'm not good enough, if I'm -- you know,

1    I just want out.  I want out.  And Hardison just kind of

2    chuckled a little bit and he was, like, well, you know the

3    only way out is going to be on a stretcher or get a bullet in

4    your dome.

5    **BY MR. COLLINS:**

6    Q.    All right.

7    A.    And Josh was like, no, I'm straight.

8            **THE COURT:**  What does that mean?

9            **THE WITNESS:**  Sir?

10           **THE COURT:**  What does that mean?  "No, I'm

11   straight."  Who said that?

12           **THE WITNESS:**  Josh did.

13           **THE COURT:**  What did you understand that to mean?

14           **THE WITNESS:**  My understanding is no, I don't want

15   out the gang if that's how I gotta get out.

16   **BY MR. COLLINS:**

17   Q.    And based on your observations, what was the

18   defendant's demeanor like when he made the statement?

19   A.    I took him serious.

20   Q.    All right.  And based on your observations of Josh,

21   what did he look like?  Did he look like he took it

22   seriously?

23   A.    Yes.

24   Q.    All right.  What about Valerie?  What was her reaction

25   to the statement?

1   A.    I don't really remember.

2   Q.    All right.  Now, in addition to the information that

3   you've already discussed, did the defendant indicate that he

4   was upset with Mr. Henry for any other reason?

5   A.    He was upset at -- about a girl named Kiki, Josh --

6   another one of Josh's girlfriends.  Apparently Kiki was

7   stirring up trouble and threatening with the police and

8   stuff.  So from my understanding, Mr. Hardison wasn't too

9   happy with that.

10  Q.    And why was that?

11  A.    I'm not really sure, you know.  He didn't want any

12  police around his house and stuff.  He just didn't want any

13  problems with the police.

14  Q.    All right.

15        MR. COLLINS:  Court's indulgence, Your Honor?

16        THE COURT:  Sure.

17  BY MR. COLLINS:

18  Q.    Based on your interactions with Josh and the defendant,

19  did they do any criminal activity at that house?  Were they

20  engaged in any criminal activity at that house?

21  A.    Josh said they was.  I never witnessed any criminal

22  activity other than us smoking some weed.

23  Q.    Okay.  Did you ever have any conversations with Josh

24  about drug dealing?

25  A.    Yes.

1    Q.    And if you'd explain to the Court what the nature of
2    those conversations were.
3    A.    Josh was purchasing weed from me, and he wanted me to
4    go in bigger.  And I told him no.  Like, he wanted me to --
5    he said that Mr. Hardison wanted to put in some money with me
6    and purchase a larger amount, go in business with me.  And I
7    said no.  I declined.
8    Q.    And why did you decline that?
9    A.    I just wasn't comfortable with that because I'd already
10   had indictments once before, and, you know, I just -- I was
11   just doing it just to make a couple of dollars here and
12   there.  I wasn't trying to do nothing major.
13   Q.    Now --
14              THE COURT:  Did Mr. Henry ever talk about any
15   other illegal activity he had been engaged in?
16              THE WITNESS:  I don't recall, other than just him
17   being in a gang.
18              THE COURT:  Ever say anything about participating
19   or knowledge of any murder?
20              THE WITNESS:  No, sir.
21              THE COURT:  And did you ever hear Mr. Hardison
22   make any comments about any other illegal activities?
23              THE WITNESS:  No, sir.
24              THE COURT:  And did you ever hear Mr. Hardison
25   talk badly or poorly about Mr. Henry other than this one time

```
1    you just told me about?
2              THE WITNESS:  No, sir.
3              THE COURT:  And that related to Mr. Henry's
4    girlfriend, Kiki?
5              THE WITNESS:  Yes, sir.
6              THE COURT:  Mr. Hardison was upset that Kiki was
7    stirring up trouble?
8              THE WITNESS:  Yes.
9              THE COURT:  Mr. Hardison upset that Mr. Henry was
10   stirring up trouble?
11             THE WITNESS:  He didn't say anything about
12   Mr. Henry stirring up trouble.  Just Kiki.
13             THE COURT:  Okay.
14             MR. COLLINS:  Court's indulgence, please.
15             THE COURT:  Sure.
16             MR. COLLINS:  Thank you.
17             (Respite.)
18   BY MR. COLLINS:
19   Q.   I want to draw your attention to 2013.  Did there come
20   a time when local detectives came and interviewed you about
21   Josh Henry's murder?
22   A.   Yes.
23   Q.   And where did this interview take place?
24   A.   My home.
25   Q.   And approximately how long do you recall the interview
```

```
1    being?

2    A.    I'm sorry?

3    Q.    Do you recall how long the interview was?

4    A.    Maybe an hour.

5    Q.    Okay.  And during that hour, was it just you and the

6    detectives?

7    A.    Not the entire hour.

8    Q.    Okay.  Who else became a part of that interview?

9    A.    Valerie.

10   Q.    And how did she become a part of that interview?

11   A.    She had pulled up because she was supposed to be taking

12   me to job hunt that day, so she actually pulled up and came

13   inside during the interview.

14            THE COURT:  So I gather all this took place at

15   your house?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  All right.  Thank you.

18   BY MR. COLLINS:

19   Q.    And do you recall how long the interview took place

20   prior to Valerie getting there?

21   A.    Between maybe an hour.

22   Q.    Okay.  So you said that the interview took an hour

23   total; is that correct?

24   A.    Yes, sir.

25   Q.    And are you referring to that just as your portion of
```

1    the interview took an hour, or the entire time that the

2    police were there?

3    A.    I believe the entire time.

4    Q.    Okay.  And during that hour, what would you approximate

5    the amount of time before Valerie got there?

6    A.    20 minutes.

7    Q.    Okay.

8    A.    30 minutes.

9    Q.    During that period of time prior to Valerie getting

10    there, did you tell the police about the conversation between

11    the defendant and Mr. Henry?

12    A.    Yes.

13    Q.    Okay.  At any time, did you tell Valerie that she had

14    to tell the police your version of the story?

15    A.    I'm sorry, that she had to tell my version of the

16    story?

17    Q.    That's correct.

18    A.    No, I don't believe so.

19    Q.    Okay.  So the version that you told the police, that's

20    what you observed, correct?

21    A.    Yes.

22    Q.    All right.  And it's your testimony that Valerie

23    observed that as well; is that correct?

24    A.    I believe so, yes.

25    Q.    Let's just back up.  The day that the defendant had the

```
 1   conversation with Mr. Henry, right, about the Marley Gang and
 2   about wanting to get out, you observed that conversation,
 3   correct?
 4   A.    Yes.
 5   Q.    And it's your testimony that Valerie observed that
 6   conversation; is that correct?
 7   A.    Yes.
 8   Q.    The day that you met with the police, you told them
 9   about the conversation; is that correct?
10   A.    Yes.
11   Q.    And you told them about your observations and what you
12   heard; is that correct?
13   A.    Yes.
14   Q.    At any point in time, did you tell Valerie what to tell
15   the police?
16   A.    No.
17   Q.    All right.  Prior to the police showing up, did you
18   ever sit with Valerie and say, hey, this is the story we have
19   to tell the police?
20   A.    No.
21   Q.    All right.  So you didn't feed Valerie a story to tell
22   the police that day?
23   A.    No.
24   Q.    Okay.
25               **THE COURT:**  Had you talked to Valerie after this
```

1  conversation took place in Mr. Hardison's home where he made

2  the comment about the stretcher and the --

3          **THE WITNESS:**  Yes.

4          **THE COURT:**  And did you-all talk about what

5  Mr. Hardison had said?

6          **THE WITNESS:**  Yes.

7          **THE COURT:**  You and Valerie?

8          **THE WITNESS:**  Yes.

9          **THE COURT:**  Tell me about that.

10          **THE WITNESS:**  Well, it was after Josh was found

11  murdered.

12          **THE COURT:**  Before, did you talk before he was

13  found murdered?

14          **THE WITNESS:**  No.

15          **THE COURT:**  Okay.  But you talked after he had

16  been found?

17          **THE WITNESS:**  Yes.

18          **THE COURT:**  Go ahead.

19          **THE WITNESS:**  She called me that morning and said

20  that Josh was found dead.  And she told me some things about

21  Kiki, Kiki having flashbacks that she was in Nashville.  And

22  she wanted me to go to the police about what we had heard

23  Mr. Hardison tell us about -- or tell Josh about the Marley

24  Gang, wanting to be out of the gang, that conversation about

25  getting the bullet in the dome.  She wanted me to go to the

```
1    police about that.  I told her I didn't want to be any part
2    of it.
3              And that's mainly what we talked about.
4              THE COURT:  So did Valerie call you at home?
5              THE WITNESS:  Yes.
6              THE COURT:  And this was shortly -- did you know
7    by that time that Mr. Henry had been killed?
8              THE WITNESS:  I did not.
9              THE COURT:  So Valerie told you?
10             THE WITNESS:  Yes.
11             THE COURT:  Ms. Rives.
12             THE WITNESS:  Uh-huh.
13             THE COURT:  And she told you, I guess, what she
14   saw on TV?
15             THE WITNESS:  I don't know how she -- I don't
16   remember --
17             THE COURT:  You don't know how she learned?
18             THE WITNESS:  Yeah.
19             THE COURT:  She was the first person that told you
20   that Mr. Henry had been killed?
21             THE WITNESS:  Yes, sir.
22             THE COURT:  And she said what to you?
23             THE WITNESS:  That he --
24             THE COURT:  Go to the police and do what?
25             THE WITNESS:  She wanted me to go to the police
```

1   and tell them what we had heard Mr. Hardison talking about.

2   And I told her that I didn't want to go to the police, I

3   don't want to be any part of it, you know.

4           THE COURT:  And just so I make sure I'm clear,

5   what is it that you-all heard Mr. Hardison say that you were

6   going to the police --

7           THE WITNESS:  About the bullet in the dome; being

8   taken out on a stretcher to ICU or getting a bullet in his

9   dome, Josh.

10          THE COURT:  And then what did she say after you

11  told her you didn't want to get involved?

12          THE WITNESS:  She just kept kind of pushing it and

13  pushing it.  She kept calling me and talking about it a lot

14  and telling me new stuff about the case.  And it was like she

15  wanted me to do it.  She didn't want to do it; she wanted me

16  to do it.  I didn't want to do it.

17          THE COURT:  And did you eventually say to her,

18  Valerie, why don't you do it?

19          THE WITNESS:  We had that conversation the day

20  that the detectives came to my house wanting to talk to me.

21          THE COURT:  Go ahead.  Tell me about that

22  conversation.

23          THE WITNESS:  Well, the detectives actually kind

24  of brought --

25          THE COURT:  No, the one between you and Valerie.

```
 1              THE WITNESS:  It was more of a -- between me and
 2    the detectives, you know.  She showed up during the
 3    interview, and it was like, you know, why ain't you -- why
 4    haven't you told us these things, you know.  Why are you
 5    telling Autumn these things?  You haven't came to us and told
 6    us these things.  You're telling all this stuff to Autumn,
 7    but, you know, why haven't you reported any of it?
 8              THE COURT:  That's what the investigators were
 9    saying?
10              THE WITNESS:  Yeah.
11              THE COURT:  All right.  Go ahead.
12    BY MR. COLLINS:
13    Q.   And when the investigators were asking you about this,
14    this is about the information related to Kiki and what
15    Autumn -- I'm sorry -- what Valerie had saw that night,
16    correct?
17    A.   The night of the murder?
18    Q.   The night of the conversation.
19    A.   Oh, yes.
20    Q.   Okay.  But I guess my point is:  Valerie -- you both
21    heard this statement, though, correct?
22    A.   Yes.
23    Q.   All right.  So this wasn't -- Valerie just hadn't told
24    the police until she came to your house that day; is that
25    correct?
```

```
1   A.    Yes.

2   Q.    And that's what the police were asking her, is how come

3   you didn't tell us about this statement, correct?

4   A.    Yes.

5   Q.    All right.

6              MR. COLLINS:  Court's brief indulgence, Your

7   Honor.

8              THE COURT:  Sure.

9              (Respite.)

10             MR. COLLINS:  No further questions, Your Honor.

11  Thank you.

12             THE COURT:  Did Valerie ever say why she didn't

13  tell the police the first time?

14             THE WITNESS:  No, sir.

15             THE COURT:  Did you surmise, from knowing her and

16  being around her, what was Valerie's source of hesitation?

17             THE WITNESS:  She was scared.

18             THE COURT:  Of who?

19             THE WITNESS:  Not -- I don't -- Mr. Hardison.

20             THE COURT:  That's your surmise?  She never said

21  that?

22             THE WITNESS:  Yeah, she said that.

23             THE COURT:  Oh, she said that?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  And what did she say then?
```

```
 1              THE WITNESS:  She said she was scared of him.
 2              THE COURT:  And that's why she didn't tell the
 3   police?
 4              THE WITNESS:  I thought that she had, but I
 5   started noticing like she just pushing it all off on me.  She
 6   wanted me to do all the dirty work, to be honest.
 7              THE COURT:  Mr. Evans?
 8              MR. EVANS:  Yes, Your Honor.
 9                        CROSS-EXAMINATION
10   QUESTIONS BY MR. EVANS:
11   Q.    Good afternoon, Ms. Pasquale; is that correct?
12   A.    Yes.
13   Q.    Okay.  I just wanted to make sure I pronounce it
14   correct.
15   A.    Yes.
16   Q.    My name is Luke Evans.  I'm just going to ask you a few
17   questions to follow up on some of the topics you've been
18   discussing, okay?
19   A.    Yes, sir.
20   Q.    So just to follow up on this last subject matter, you
21   said the detectives showed up at your house on April -- or
22   excuse me -- May 30th of 2013, questioned you for about 20
23   minutes, right, before Valerie showed up?
24   A.    Approximately 20 minutes, yes, sir.
25   Q.    And in between the date that the detectives showed up
```

1  at your house and the date that Valerie had called you and

2  told you that Josh Henry had been killed, you and Valerie had

3  had several conversations about her thoughts about

4  Mr. Henry's murder, correct?

5  A.    Yes.

6  Q.    And y'all talked about Kiki?

7  A.    Yes.

8  Q.    She told you about Kiki.

9        Did she tell you that after the homicide, that she

10 actually went to Mr. Hardison's house and talked to him in

11 person --

12 A.    No, sir.

13 Q.    -- about what had happened to Josh?

14 A.    No, sir.

15 Q.    Did she ever share that with you?

16 A.    No, sir.

17 Q.    Okay.  But she told you that she was -- at some point

18 she was scared of Mr. Hardison?

19 A.    Yes, sir.

20 Q.    Do you recall when that was?

21 A.    Within -- I'd say within the first week after Josh's

22 murder.

23 Q.    Okay.  When she first called you and said Josh had been

24 murdered on the day -- you know, that morning when you first

25 found out, --

1  A.     Yes.

2  Q.     -- in that conversation, did she mention being scared

3  of Mr. Hardison during that conversation?

4  A.     She mentioned that she felt -- felt like he had

5  something to do with it, that she was scared.

6  Q.     Okay.  Did she tell you during that conversation, had

7  she talked to the police yet or not?

8  A.     I don't recall.

9  Q.     Don't recall?  Okay.

10      Did y'all have any conversation during that phone call

11  about the one that you say you overheard hours before he was

12  killed, the Marley Gang/bullet-to-the-dome conversation.

13  That first call when she called you, did y'all talk about

14  that conversation at all?

15  A.     I don't -- I don't recall that either.

16  Q.     Okay.  And going back to that conversation -- well,

17  before I get into that, let me ask you this:  When you were

18  first testifying, the government asked you several questions

19  about kind of where you'd lived since 2013 to present.  Do

20  you remember those?

21  A.     Yes, sir.

22  Q.     And it sounded like you've lived several different

23  places between those years.

24  A.     I have.

25  Q.     All right.  When was the first time that you had any

```
1    direct knowledge that the Feds were looking for you?
2    A.    I want to say about three months ago, two or three
3    months ago maybe.
4    Q.    Between May of 2013 and a few weeks ago, had you ever,
5    at any of your addresses, permanent or otherwise, heard that
6    the Feds had come knocking on the door looking to find you to
7    serve you with something or talk to you about the Josh Henry
8    case?
9    A.    No, sir.
10   Q.    Okay.  Now, I want to make sure that I've got this --
11   that I've got this straight.  So you -- the last time you saw
12   Josh alive, you said was within hours from when he was found
13   dead, correct?
14   A.    Yes, sir.
15   Q.    And a few hours before he's found dead, you say you saw
16   him at a store in Clarksville?
17   A.    I believe that's where I saw him at, yes.
18   Q.    Okay.  And is it your understanding that Valerie called
19   you the day he died and said, Josh is dead?  When you -- when
20   she called you, said, I just found out Josh was dead?
21   A.    Yes, sir.
22   Q.    Okay.  And you were saying earlier the night before is
23   when you would have seen him at the store, the night before
24   that call?
25   A.    It was during the daytime.  It was --
```

```
1    Q.    But the day before that call?

2    A.    Yes, sir.

3    Q.    Okay.  And were you with anyone at the store when you

4    saw Josh?

5    A.    No, sir.

6    Q.    Was he with anyone?

7    A.    I don't recall, no, sir.

8    Q.    Okay.  Did you drive there?

9    A.    I don't recall that either.

10   Q.    All right.  Do you know whether Josh arrived in a car

11   or not?

12   A.    I don't remember.  I just saw him at the store.

13   Q.    Okay.  Did he tell you what he was doing that day?

14   A.    He was cutting grass.

15   Q.    Okay.  And did you see Valerie that day?

16   A.    Yes.

17   Q.    Okay.  Now, did you see her at the store?

18   A.    No.

19   Q.    All right.  And then you said you leave the store, and

20   then you go directly back to your home, or do you go other

21   places?

22   A.    I went home.

23   Q.    All right.  And so once you get home, I think you said

24   you saw Josh again at your home?

25   A.    Yes.
```

1  Q.    All right.  How does that occur?

2  A.    Valerie and him came to pick me up for my anger

3  management class.

4  Q.    Okay.  And about what time during the day -- let's back

5  up.

6        At the store, was it day or night?

7  A.    Day.

8  Q.    Okay.  When they come to your house, is it day or

9  night?

10 A.    It was day.

11 Q.    Do you remember about what time?

12 A.    3:00, about 3:00 in the afternoon, 4:00.

13 Q.    Okay.  And is it your understanding that Josh had --

14 was through cutting grass?

15 A.    Yes.

16 Q.    All right.  And Valerie was picking you guys up to go

17 to anger management?

18 A.    Picking me up.

19 Q.    I apologize.  Picking you up to go to anger management?

20 A.    Yes, sir.

21 Q.    Was it normal for Josh, during that short window of

22 time where you guys hung out together, to accompany you guys

23 to the anger management class?

24 A.    Yes.

25 Q.    Would he attend the anger management class, or would he

1    hang outside, or what would he do?

2    A.    He would hang out in the lobby.

3    Q.    All right.  And so about how long did the anger

4    management class last?

5    A.    About an hour.

6    Q.    All right.  Do you remember what time it started?

7    A.    I don't.

8    Q.    Okay.  Did it start -- you know, back in April, was it

9    dark or light outside?

10   A.    It was light.

11   Q.    Okay.  And did y'all go straight to the anger

12   management class from your house?

13   A.    No, sir.

14   Q.    Did y'all make a stop?

15   A.    Yes, sir.

16   Q.    Where did you stop?

17   A.    Mr. Hardison's house.

18   Q.    Okay.  And so you stopped at Mr. Hardison's on your way

19   to anger management.  And who-all is at Mr. Hardison's when

20   you get there?

21   A.    Just him and his girlfriend.

22   Q.    Now, you were asked a couple of times, I think you

23   called her Sis, his girlfriend?

24   A.    Yes.

25   Q.    And do you recall knowing her name at the Grand Jury?

1    A.    No, sir.

2    Q.    Do you recall calling her Kandice?

3    A.    That name does ring a bell.

4    Q.    Specifically, the question to you on page 26 of the

5    transcript was:

6              "QUESTION:  And what's Creep's girlfriend's

7         name?

8              "ANSWER:  Kandice.  'Sis' is what they

9         called her."

10         Does that refresh your recollection maybe as to what

11   you may have testified to at the Grand Jury?

12   A.    Yes, sir.

13   Q.    Okay.  So you're on your way to anger management.  You

14   get there.  Mr. Hardison is there, correct, at his house?

15   A.    Yes, sir.

16   Q.    Kandice or Sis is there, correct?

17   A.    Yes.

18   Q.    Josh, Valerie --

19   A.    Yes.

20   Q.    -- is there as well?

21         And make sure to answer audibly on Josh.  Was Josh

22   there?

23   A.    Yes.

24   Q.    Okay.  Sorry.  Valerie was there, correct?

25   A.    Yes.

1    Q.    And you were there?

2    A.    Yes.

3    Q.    Anyone else in the house?

4    A.    Not that I'm aware of, no.

5    Q.    Is this when the conversation takes place that you're

6    saying occurred where the bullet-to-the-dome statement was

7    made?

8    A.    Yes.

9    Q.    All right.  I think you testified on direct that once

10   that statement is made by -- supposedly by Mr. Hardison, that

11   Mr. Henry actually responded and made a statement, you know,

12   to that.

13   A.    Yes, sir.

14   Q.    And did he say, what, "I'm straight"?

15   A.    "I'm straight."

16   Q.    Was Valerie still in the room when Mr. Henry made that

17   statement?

18   A.    Yes, I believe so.

19   Q.    Okay.  What happened next?  So the statement gets made

20   by Hardison, and then Mr. Henry responds, says, "I am

21   straight."  What do y'all do next?

22   A.    We leave and go to my anger management class.

23   Q.    All right.  Who leaves the house first?

24   A.    We left together.  It was me, Valerie, and Josh.

25   Q.    Did Valerie, at any point in time, look at you and say,

1   I gotta get out of here and leave before you?

2   A.    I don't recall that.

3   Q.    Okay.

4   A.    No, sir.

5   Q.    Josh walked out with you?

6   A.    Yes.

7   Q.    All right.  And you said that some of the back and

8   forth between Mr. Hardison and Josh in the house was because

9   Josh wasn't taking care of his household chores, right?  He

10  wasn't washing dishes and cleaning up after himself; some of

11  that was going on, right?

12  A.    Yes.

13  Q.    And then there was a discussion about Kiki, correct?

14  A.    Yes.

15  Q.    Okay.  Whose car were y'all in?

16  A.    Valerie's.

17  Q.    All right.  And did she drive a Camry, if you recall?

18  A.    Yes.

19  Q.    Okay.  And did y'all get in that Camry and go to anger

20  management?

21  A.    Yes.

22  Q.    All right.  And Josh went with you?

23  A.    Yes.

24  Q.    Okay.  You go to anger management.  What happens after

25  you leave anger management?

1   A.    They dropped me off at home.

2   Q.    Okay.  And you mean "they," who is "they"?

3   A.    Josh and Valerie.

4   Q.    Okay.  And they left you there, and you don't know

5   where they went next, correct?

6   A.    Correct.

7   Q.    So the last time you saw Josh Henry alive, he was with

8   Valerie, correct?

9   A.    Yes.

10   Q.    You talked about Josh telling you that Mr. Hardison

11   wanted to get marijuana from you.

12   A.    Yes.

13   Q.    But Mr. Hardison never approached you and made that

14   request, did he?

15   A.    No, sir.

16   Q.    And you said that you were -- there was some -- you had

17   some concern about, I guess, staying out of trouble or

18   something, why you didn't take Josh up on his offer for

19   marijuana.  Didn't you tell the Grand Jury it was because you

20   were affiliated with a rival gang?

21   A.    That also, yes, sir.

22   Q.    Okay.  And when you say you were affiliated, you were

23   affiliated with the Vice Lords?

24   A.    Yes, sir.

25   Q.    Okay.

1          **MR. EVANS:**  One moment, Your Honor.

2          Your Honor, those are my questions.

3          **THE COURT:**  Anything further from the government?

4          **MR. COLLINS:**  Court's brief indulgence, Your

5    Honor.

6          **THE COURT:**  Oh, sure.

7          **MR. COLLINS:**  Thank you.

8                    **REDIRECT EXAMINATION**

9    **QUESTIONS BY MR. COLLINS:**

10   Q.    Ms. Pasquale, when you heard the statement made at the

11   house, it was more than just about Kiki and chores, correct?

12   A.    Yes, sir.

13   Q.    There was specific talk about the gang; is that

14   correct?

15   A.    Yes, sir.

16   Q.    And wasn't there conversation about the box?  Do you

17   remember that?

18   A.    Yes, sir.

19   Q.    And what was your understanding of what the box was?

20   A.    Josh told me that the box was the -- something that the

21   gang was supposed to put money into, like contribute to it,

22   like investment.

23   Q.    And during the conversation that you observed, did the

24   term "the box" come up?

25   A.    Yes.

1  Q.    And specifically the conversation between the defendant

2  and Mr. Henry?

3  A.    Yes.

4  Q.    All right.  And just -- what was that conversation that

5  you heard?  What were the specific words that you heard about

6  the box during that conversation?

7  A.    Josh made the statement to Mr. Hardison that Josh had

8  put $10 into that box.

9  Q.    Okay.  Now, as this conversation took place, you said

10 that there were -- it was you, Kandice, Josh, and Valerie and

11 the defendant; is that correct?

12 A.    Yes.

13 Q.    Is it possible that any one of those people could have

14 come in and out of the room while the conversation was going

15 on, while parts of the conversation were going on?

16 A.    Yeah, it's possible.

17 Q.    Okay.  So not everyone was in the room at all points in

18 time during the conversation; is that correct?

19 A.    I don't recall, but it's possible that they could

20 have -- somebody could have went in and out the room, yeah.

21 Q.    Okay.  And you said that you don't recall Valerie

22 saying, hey, we have to leave?  You don't recall that after

23 the statement was made?

24 A.    I don't.

25 Q.    Okay.  Do you remember observing Valerie and seeing how

1  she looked after the statement was made?

2  A.    I don't think anybody was really very comfortable at

3  that point.

4  Q.    Okay.

5  A.    I was trying to mind my own business, but I really

6  wasn't trying to be in it too much.

7  Q.    Now, the last question you answered about you were

8  affiliated with the Vice Lords.  Just so it's clear, you're

9  not a member of the Vice Lords, correct?

10  A.    No, sir.

11  Q.    You've never been a member of a gang; is that correct?

12  A.    No, sir.

13  Q.    All right.  And just so it's clear for the record, when

14  Valerie was contacting you about Josh's death afterwards, she

15  was trying to get you to go talk to the police, right?

16  A.    Yes, sir.

17  Q.    And she was telling you about information that she

18  heard about the murder?

19  A.    Yes, sir.

20  Q.    Okay.  But did that information consist at all of the

21  statement that you're testifying about today?

22  A.    Yes, sir.

23  Q.    No, what I'm saying is:  The statement that you heard

24  during the conversation between the defendant and Mr. Henry,

25  did she -- that was a statement that you both heard; is that

1  correct?

2  A.    Yes, sir.

3  Q.    Okay.  And so her conversations with you about the

4  statement was about what you both heard; is that correct?

5  A.    Yes, sir.

6  Q.    She wasn't saying, "Hey, you have to say this," like,

7  "These are the words that you have to say."  She told you to

8  say what you heard; is that correct?

9  A.    Yes, sir.

10  Q.    Okay.

11          THE COURT:  To the best of your knowledge, did you

12  and Ms. Rives hear the same thing?

13          THE WITNESS:  Yes, sir.

14          MR. COLLINS:  No further questions, Your Honor.

15  Thank you.

16          THE COURT:  All right.  You can step down.

17          (The witness stepped down.)

18          THE COURT:  So we're here on the government's

19  motion in limine to admit certain statements, Document 1929,

20  correct?

21          MR. COLLINS:  That is correct, Your Honor.

22          THE COURT:  Okay.  And do you have it handy?  I

23  just want to clarify something here.  In the first paragraph

24  where you cite Federal Rule of Evidence 804(d)(2)(A), I think

25  that's a typo.  I just want to make sure I'm looking at --

1  want to correct that for the record.  See where it says

2  804(d)(2)(A)?  I think you mean 804(b) --

3          **MR. COLLINS:**  Your Honor, it should be admission

4  of a party opponent.

5          **THE COURT:**  Oh.

6          **MR. COLLINS:**  That's what I mean, Your Honor.

7          **THE COURT:**  Oh, within -- because there is no

8  804(d)(2)(A).  804 has (a) and (b).  There's no (c) or (d).

9  So tell me what I should be -- what that should really mean.

10          **MR. COLLINS:**  Court's indulgence, Your Honor.

11          **THE COURT:**  Oh, I got you on the party opponent.

12  I mean, I don't need one for that.  The way it's -- okay.

13  You cite -- in the next sentence, you say:  "Statements made

14  by Henry do not constitute," and you just cite 802.  That's

15  all you're relying on there?

16          **MR. COLLINS:**  Yes, Your Honor, as it relates to

17  this motion, yes.

18          **THE COURT:**  Okay.  And so it sounds like you've

19  anticipated my next question.  You're not relying on

20  804(b)(6)?  And that's the statement offered against a party

21  that wrongfully caused the declarant's unavailability.

22          804(b)(6) are statements offered against a party

23  that wrongfully caused the declarant's unavailability.  Out

24  of necessity, don't I have to look at that as well?

25          **MR. COLLINS:**  Well, your Honor, that was our

```
 1   original motion.  And at the time, as you note, the Court is
 2   well aware, the government withdrew the motion so that we
 3   wouldn't have to have the hearing that we had today.
 4        I think, Your Honor, if we -- and so once that
 5   motion was withdrawn, we proceeded with just the one
 6   statement to put it into -- to put the whole conversation
 7   into context.  I think, Your Honor, as it relates to the
 8   forfeiture by wrongdoing argument, the government would have
 9   put on additional witnesses in order to establish that, Your
10   Honor.  And so I think we proffered before, especially in our
11   filings, that there are multiple other witnesses who would be
12   needed to establish the chain to show the forfeiture by
13   wrongdoing argument, Your Honor.
14        THE COURT:  Okay.  Do you want to present those
15   witnesses?  Because I don't see how I can rule -- I don't see
16   how I can consider Document 1929, the current
17   motion in limine, without considering subsection (6).
18        (Respite.)
19        MR. COLLINS:  And, Your Honor, I guess the
20   government's not clear on the Court's rationale as to why we
21   would need to conduct a hearing as it relates to both.
22        THE COURT:  We don't.  I just want to know what
23   you want me to look at to rule on your motion.  What's the
24   rule of evidence you say I should be looking at to rule in
25   your favor?
```

1          **MR. COLLINS:**  As it relates to this motion, Your

2     Honor?

3               **THE COURT:**  Yes, sir.

4          **MR. COLLINS:**  It is the party opponent.

5               **THE COURT:**  Right.  That gets you Mr. Hardison.

6     I'm looking at the next part, Henry -- the statements made by

7     Henry do not constitute hearsay because they would be offered

8     at trial for purposes other than to prove the truth of the

9     matter asserted are admissible under Federal Rule of Evidence

10    802.

11              Anything other than 802 you want me to be looking

12    at to rule in your favor?

13         **MR. COLLINS:**  For the purpose of this motion, Your

14    Honor, 802 would be the rule, Your Honor.

15              **THE COURT:**  Okay.  Your briefing obviously

16    discusses 404 as well as 403.

17         **MR. COLLINS:**  That's correct, Your Honor.  And

18    we --

19              **THE COURT:**  So I have to look at those too.

20         **MR. COLLINS:**  Yes, Your Honor.

21              **THE COURT:**  All right.  Now I'm with you.  Go

22    ahead.  I cut you off.  I didn't mean to.

23         **MR. COLLINS:**  No, no, I was going to say, Your

24    Honor:  When we did our original filing, I think we were

25    making a 403 reference that the Court -- we didn't cite the

```
 1  statute, but we were making a probative versus prejudicial
 2  reference.  The Court wanted more explanation as to how
 3  404(b) applied, and that's what the supplemental briefing
 4  tried to address.  We noticed that was a concern that the
 5  Court saw in our original filing, and so that's why we had
 6  the supplemental filing, had that entire back section focus
 7  on the 404(b) argument.
 8              THE COURT:  But the government's real argument is
 9  because it's only being admitted for context; it's not
10  hearsay and it can be admitted?
11              MR. COLLINS:  That's correct, Your Honor.
12              THE COURT:  Okay.
13              All right.  Have I heard all the witnesses?
14              MR. COLLINS:  Yes, Your Honor.
15              THE COURT:  Okay.  I'm assuming, Mr. Evans, you
16  don't have any?
17              MR. EVANS:  No proof.
18              THE COURT:  So I'm going to take another look at
19  everything, and I'll be ready Friday when we get together at
20  9:00 to give you my ruling.  So we're set for 9:00 on Friday.
21  I think I set a deadline for you to advise me if there are
22  any issues you want to take up.  That doesn't preclude you
23  from crazy new issues which I'm sure you do, but anything you
24  know in advance, go ahead and file something by that deadline
25  or now.
```

1      **MR. SCHRADER:**  This is ordinarily the part of the

2   hearing where I stand up and say I have an issue, Your Honor.

3   I did have one question really for the Court about the

4   defense witness list, and about three witnesses in

5   particular.  Two are a person named Hollis Owens, who is a

6   former member of the Gangster Disciples who is currently

7   serving a prison sentence; another is David Hudson whom the

8   government will establish at trial is a Gangster Disciple and

9   who the defendant has pointed to as the person who murdered

10   Josh Henry, which I'll represent to the Court is consistent

11   with the government's theory of how Mr. Henry was murdered.

12           On those two in particular, I don't know whether

13   Mr. Hudson is going to walk into court and say, for example,

14   I'm the one who killed Josh Henry.  But he's never been

15   charged in state court with that.  I'd be very surprised if

16   he did that.

17           And Mr. Owens is going to have some Fifth

18   Amendment issues.  I don't want to put the cart before the

19   horse, but I'm not quite sure exactly where we're headed with

20   those witnesses.  I don't know if the defense anticipates

21   there won't be Fifth Amendment problems, there will be Fifth

22   Amendment problems, or what.  But they are two very unusual

23   witnesses to include on a witness list, kind of given the

24   potential exposure they have.

25           So that's kind of my question, I guess, about

1    those two witnesses.

2            **THE COURT:**  I think your question is really to

3    Mr. Evans, not to the Court.

4            **MR. SCHRADER:**  The second or the last witness may

5    be to the Court.  Michael Terry is listed as a defense

6    witness.  Michael Terry is counsel of record for James Luke.

7            **THE COURT:**  Well, I saw that.  I didn't know --

8    you know, that's a pretty common name.  I didn't immediately

9    assume it was Michael Terry, the lawyer.  Is that Michael

10   Terry, the lawyer?

11           **MR. EVANS:**  Yes, Your Honor.

12           **THE COURT:**  Oh, okay.

13           **MR. SCHRADER:**  Mr. Terry is counsel of record for

14   James Luke, a codefendant in this case and someone who may be

15   a witness at trial.  I called Mr. Terry.  Mr. Terry hasn't

16   gotten a subpoena for this trial.  He doesn't know why he

17   would be on a defense witness list.  But all the defense

18   witness list says about Mr. Terry is that he's going to

19   testify about information related to James Luke, and I just

20   don't think that's sufficient.

21           You can't just put a defense attorney's name on a

22   witness list and say he's going to testify about information

23   about his client who is going to be a witness in the case.

24   So I would ask for the Court to require the defense to

25   provide some additional information about what they plan to

do with Mr. Terry.

        **THE COURT:** Why don't you-all talk. I do have that question for the government for about three of your -- but I was saving mine until Friday to get more.

        Have you-all talked -- I mean, this is not something the Court gets involved. Now, you-all are experienced criminal defense lawyers. Certainly if there is a witness to be called who may need the services of counsel, that needs to be put in place so that that witness does not waive unintentionally, and we need to get them appointed counsel. But I figure you would let me know that at the right time.

        **MR. EVANS:** We will do that, Your Honor.

        **MR. SCHRADER:** And, I mean, I asked Mr. Evans and Mr. Bruno if they were aware that Mr. Terry is counsel of record, and Mr. Bruno said yes.

        **THE COURT:** Okay.

        **MR. SCHRADER:** We haven't had further discussions beyond that.

        **THE COURT:** Well, talk now because we're done here. See you Friday at 9:00. Thanks.

        **IN UNISON:** Thank you, Your Honor.

        (WHEREUPON, the foregoing proceedings were concluded at 4:36 p.m.)

1    REPORTER'S CERTIFICATE

2

3            I, Deborah K. Watson, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7    proceedings held in open court on October 12, 2021, in the

8    matter of *UNITED STATES OF AMERICA vs. BRANDON DURELL*

9    *HARDISON*, Case No. 3:17-cr-00124-3; that said proceedings in

10   connection with the hearing were reduced to typewritten form

11   by me; and that the foregoing transcript (pages 1 through

12   109) is a true and accurate record of said proceedings.

13            This the 12th day of January, 2022.

14

15                              /s/ Deborah K. Watson
                                DEBORAH K. WATSON, RPR, CRR
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25