IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

UNITED STATES OF AMERICA,  )
                           )      Case No. 3:17-00124-3
                           )      Waverly D. Crenshaw, Jr.
v.                         )      Chief U.S. District Court Judge
                           )
                           )
BRANDON DURELL HARDISON,   )


MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HARDISON'S MOTION FOR JUDGMENT OF ACQUITTAL

Comes now Defendant, Brandon Durell Hardison, by and through counsel, pursuant to Rule 29 of the *Federal Rules of Criminal Procedure* and submits the following Memorandum in support of his Motion for Judgment of Acquittal.

INTRODUCTION

In the instant case the government failed to sufficiently prove each element of the crimes alleged in counts Two, Three, Four, Five, and Six of the Fourth Superseding Indictment beyond a reasonable doubt. Therefore, the Court should render a Judgment of Acquittal in favor of Mr. Hardison as to those counts.

Counts Two (murder of D. Sherden) and Four (murder of A. Weyand) charge Mr. Hardison with violations of 18 U.S.C. § 1959, Violent Crimes in Aid of Racketeering ("VICAR"). According to the government's proof, Sherden was killed over an $80 marijuana debt owed to Hardison and Weyand was killed because she witnessed the killing of Sherden. The murders were not sanctioned by the Gangster Disciples. In fact, the murders were done without the gang's knowledge and in direct contradiction to the gang's laws. Therefore, as to these counts, the government

failed to sufficiently prove that the violent crimes were committed to maintain or increase his position in the enterprise; therefore, he should be acquitted.

Counts Three (murder of D. Sherden) and Five (murder of A. Weyand) charge Mr. Hardison with causing death through the use of a firearm in violation of 18 U.S.C. § 924(j). As to these counts, the government failed to sufficiently prove that Mr. Hardison committed the underlying crimes of violence charged in counts Two and Four; therefore, he must be acquitted of counts Three and Five.

Count Six charges Mr. Hardison with tampering with a witness, victim, or informant by killing A. Weyand in violation of 18 U.S.C. § 1512. As to this count, the government failed to sufficiently prove that the there was a reasonable likelihood that a relevant communication would have been made to a federal officer; therefore, he should be acquitted.

PROCEDURAL HISTORY

Mr. Hardison was originally indicted in this case on June 29, 2017. (D.E. 3). The government proceeded to supersede the indictment on four occasions. On August 9, 2021, the government returned a seven-count Fourth Superseding Indictment against Mr. Hardison. (D.E. 1852). Count One charges the defendant with racketeering conspiracy. Count Two charges the defendant with the murder of Derrick Sherden in aid of racketeering, as a principal and as an aider and abettor. Count Three charges the defendant with causing the death of Derrick Sherden through the use of a firearm, as a principal and as an aider and abettor. Count Four charges the defendant with the murder of Amanda Weyand in aid of racketeering, as a principal and as an aider and abettor. Count Five charges the defendant with

2

causing the death of Amanda Weyand through the use of a firearm, as a principal and as an aider and abettor. Count Six charges the defendant with the killing of Amanda Weyand to prevent a witness communication to a law enforcement official regarding a federal offense, as a principal and as an aider and abettor. Count Seven charges the defendant with assault resulting in serious bodily injury to Malcolm Wright in aid of racketeering, as a principal and as an aider and abettor.

The trial in this matter commenced on October 18, 2021. The proof consisted of 31 government witnesses and 842 exhibits. After 8 days of proof, the government rested. The defense did not put on any evidence. On November 3, 2021, the Jury found Mr. Hardison guilty on all counts.

RELEVANT FACTS

While there is no dispute that Sherden and Weyand were in fact murdered during the late evening hours on January 6, 2011, the proof adduced at trial establishes that the homicides were not gang related.

**Travares Trotter**

Travares Trotter is a longtime member of the Gangster Disciples ("GD"). He first met Hardison at the City Club in Clarksville in June of 2011. (Trial Transcript, D.E. 2048, PageID# 25083). He and other GD's saw Hardison on the dance floor "throwing up the pitchforks" surrounded by rival gangs. *Id.* Prior to that night, none of the Clarksville GDs had ever met Hardison. (Trial Transcript, D.E. 2048, PageID# 25085). Trotter took a liking to Hardison because he was "bold." (Trial Transcript, D.E. 2048, PageID# 25088). After that night, Hardison began attending meetings in Clarksville regularly. (Trial Transcript, D.E. 2048, PageID# 25089). He and Trotter

became close. (Trial Transcript, D.E. 2048, PageID# 25090). Hardison never told Trotter "anything about what he wanted to achieve as a Gangster Disciple." (Trial Transcript, D.E. 2048, PageID# 25088). However, when Trotter asked Hardison what he wanted to achieve in a more general sense, Hardison told Trotter that he wanted to be "respected." (Trial Transcript, D.E. 2048, PageID# 25089). According to Trotter, Hardison continued to regularly attend meetings in Clarksville through 2012. *Id.* Trotter testified that during that time he knew Hardison to sell "a little weed here and there." (Trial Transcript, D.E. 2048, PageID# 25092).

Trotter met Sherden in the projects in Clarksville. (Trial Transcript, D.E. 2048, PageID# 25093). Trotter sold Sherden marijuana. *Id.* Sherden claimed that he was a GD. (Trial Transcript, D.E. 2048, PageID# 25094). Sherden never attended meetings. (Trial Transcript, D.E. 2048, PageID# 25095). Sherden never went "on count" with the Clarksville deck of the GDs. *Id.* Trotter had been to Sherden's house on Main Street "four or five times." (Trial Transcript, D.E. 2048, PageID# 25096).

On the evening of January 6, 2011, the night of the Main Street homicides, Trotter was walking though Lincoln Homes on his way back to his sister's house when he heard a "real loud" commotion. (Trial Transcript, D.E. 2048, PageID# 25098). It was Hardison. *Id.* He was upset and saying that he was "going to kill Meech" (Sherden). *Id.* Hardison called Trotter over to him and explained that he was going to kill Sherden because Sherden owed him $80. (Trial Transcript, D.E. 2048, PageID# 25099). Hardison did not know where Sherden lived and had never been to his house. (Trial Transcript, D.E. 2048, PageID# 25100). Hardison asked Trotter to take him to Sherden's house. *Id.* Trotter believed that Sherden had the money and

agreed to go with Hardison to resolve the dispute. *Id.* Trotter began calling Sherden. *Id.* Trotter had no idea that anyone would be killed. *Id.*

Trotter "jumped in the car with Hardison and two of his friends, neither of which were Gangster Disciples. (Trial Transcript, D.E. 2048, PageID# 25103). One of the people in the car was a guy named Joshua. *Id.* The other person was someone from Nashville that Trotter did not know. *Id.* Trotter told the driver how to get to Sherden's house. (Trial Transcript, D.E. 2048, PageID# 25108).

Trotter and Hardison got out of the car at Sherden's house and walked to the front door. (Trial Transcript, D.E. 2048, PageID# 25108). The other two gentlemen stayed in the car. *Id.* Sherden was armed with a pistol when they arrived at the front door. (Trial Transcript, D.E. 2048, PageID# 25109). Once in the house, Sherden offered them a drink. (Trial Transcript, D.E. 2048, PageID# 25110). He and Sherden drank Crown Royale and Coke. *Id.* Hardison did not have a drink. (Trial Transcript, D.E. 2048, PageID# 25111). Amy Weyand was in the bedroom when they entered the house. *Id.* Sherden and Hardison discussed the $80 debt. (Trial Transcript, D.E. 2048, PageID# 25110). Sherden said he needed some more time to get the money. *Id.* Sherden was not being disrespectful to Hardison. (Trial Transcript, D.E. 2048, PageID# 25114). Hardison went outside for a minute. (Trial Transcript, D.E. 2048, PageID# 25111). When Hardison came back into the house he walked up to Sherden, pulled out Trotter's pearl handled 9 mm pistol and shot him in the head. (Trial Transcript, D.E. 2048, PageID# 25118). Trotter got up and "ran." (Trial Transcript, D.E. 2048, PageID# 25119). Weyand Screamed and Hardison told Trotter to "grab the girl." *Id.* Trotter "walked" out the door and heard four more

shots. *Id.* Trotter "walked" back to the car. *Id.* Hardison came out of the house several minutes after Trotter and got back into the car. (Trial Transcript, D.E. 2048, PageID# 25124).

Hardison told the driver to "pull off." *Id.* Hardison told Trotter to "do something" with the pistol and passed it "over his shoulder" to him in the backseat. *Id.* Hardison had borrowed the gun from Trotter two weeks before the murders. (Trial Transcript, D.E. 2048, PageID# 25125-26). Prior to shooting Sherden, Trotter did not know that Hardison had a gun that night. *Id.* Trotter took the gun from Hardison. (Trial Transcript, D.E. 2048, PageID# 25127).

Trotter was dropped off at his sister's house in Lincoln Homes. *Id.* Dan Dowlen and James Luke were sitting on the Porch. *Id.* Trotter went into his sister's house, took the gun apart, and bleached it. (Trial Transcript, D.E. 2048, PageID# 25128). He wanted to get the fingerprints and evidence off of his gun. *Id.* Trotter put the gun in a Walmart bag and told Dan Dowlen and James Luke what happened at Main Steet. *Id.*

Trotter asked James Luke to take him somewhere so he could throw the gun in the river. (Trial Transcript, D.E. 2048, PageID# 25129). After Trotter tossed the gun in the river, he Dan Dowlen and Carlos Tittington went to Club Moet. (Trial Transcript, D.E. 2048, PageID# 25130-31). A couple of days later, Hardison called him to make sure he was alright. (Trial Transcript, D.E. 2048, PageID# 25132). Trotter reported the incident to Marcus Darden, who was the head of the GD's in Clarksville at that time. (Trial Transcript, D.E. 2048, PageID# 25138).

Sometime later, Trotter attended a meeting at the Sportsman's Club regarding the murder of Sherden and Weyand. (Trial Transcript, D.E. 2048, PageID# 25140). Specifically, GD leadership met to decide whether Hardison should be violated by the gang for killing another GD member. *Id.* Approximately, twelve (12) other GD members were in attendance, including Hardison, Marcus Darden and Lamar Warfield. *Id.* Trotter and Hardison both gave their account of what happened at Main Street. (Trial Transcript, D.E. 2048, PageID# 25141-44). Hardison stated that Sherden owed him $80 for some marijuana and the Sherden had "put it on the hammer" that he would pay the debt. *Id*. Hardison also stated that Sherden "had a pistol." *Id.* GD leadership did not make any definitive decision about how to handle the Main Street murders at that meeting. (Trial Transcript, D.E. 2048, PageID# 25145).

After the murders, "everybody started to praise" Hardison and his status in the gang increased. (Trial Transcript, D.E. 2048, PageID# 25146). Hardison was eventually put on the security team. *Id.*  His participation in the homicides earned him respect in the gang. (Trial Transcript, D.E. 2048, PageID# 25147). Hardison participated in shootings on behalf of the Gangster Disciples on other occasions. (Trial Transcript, D.E. 2048, PageID# 25167). Hardison also participated in "violating" other GD members when they did not follow the rules. (Trial Transcript, D.E. 2048, PageID# 25009).

**Lavell Traylor**

Lavell Traylor was friends with Hardison but was not a member of the Gangster Disciples. Hardison told Traylor that he was a Gangster Disciple. (Trial

Transcript, D.E. 2056, PageID# 26107). Traylor also knew that Hardison sold drugs. (Trial Transcript, D.E. 2056, PageID# 26116).

On the night of the Mainstreet homicides Hardison ask him to give him a ride "to go pick up some money." (Trial Transcript, D.E. 2056, PageID# 26108). He picked Hardison, and another individual named Joshua Henry, up at Hardison's house. (Trial Transcript, D.E. 2056, PageID# 26110). At Hardison's direction, Traylor drove to Lincoln Holmes and picked up the other guy. (Trial Transcript, D.E. 2056, PageID# 26112). Traylor then drove to a house on Main Street and parked. (Trial Transcript, D.E. 2056, PageID# 26114). Traylor did not go in the house. (Trial Transcript, D.E. 2056, PageID# 26115). Hardison and the other guy got out of the car. *Id.* Traylor and Josh stayed in the car. *Id.*

After Hardison and the other guy got back in the car, Traylor drove the other guy back to Lincoln Holmes. (Trial Transcript, D.E. 2056, PageID# 26123). Traylor took Josh and Hardison back to Hardison's house and he went home. *Id.*

**Tiffany Baxter**

Tiffany Baxter lived with Hardison and his girlfriend, Kandace Wallace, in Clarksville during the time of the Main Street Homicides. Hardison told her he was a Gangster Disciple. (Trial Transcript, D.E. 2057, PageID# 26331). Baxter dated Joshua Henry for a period of time during 2011 to 2012. (Trial Transcript, D.E. 2057, PageID# 26332). Baxter met Sherden at the house she shared with Hardison and Wallace. (Trial Transcript, D.E. 2057, PageID# 26338). They all hung out together. *Id.* Sherden and Hardison were "cool." *Id.* At some point during 2011, she overheard several conversations between Hardison and Sherden regarding money that

Sherden owed him for "some weed." (Trial Transcript, D.E. 2057, PageID# 26341). She overheard Hardison tell Sherden that if he didn't pay the money, it would be "a problem." (Trial Transcript, D.E. 2057, PageID# 26348). The night of the homicides she recalled Hardison saying that he "wanted his money." (Trial Transcript, D.E. 2057, PageID# 26350). She overheard Hardison say that he wanted Josh to go with him to collect the money from Sherden. (Trial Transcript, D.E. 2057, PageID# 26352). The next morning, she learned that Sherden was dead. (Trial Transcript, D.E. 2057, PageID# 26354).

**Danyon Dowlen**

Dan Dowlen joined the Gangster Disciples in 1998. (Trial Transcript, D.E. 2059, PageID# 26509). He held numerous positions of authority within the gang. (Trial Transcript, D.E. 2059, PageID# 26546). In 2010, after he got released from prison, Dowlen set out to rebuild to Clarksville deck of the Gangster Disciples. (Trial Transcript, D.E. 2059, PageID# 26555). He recruited members and assigned positions of authority. (Trial Transcript, D.E. 2059, PageID# 26556). Members could increase their reputation in the gang by "getting more money and killing." (Trial Transcript, D.E. 2059, PageID# 26561).

Members of the Clarksville deck conducted meetings at the Sportsman's Lodge in Guthrie, Kentucky. (Trial Transcript, D.E. 2059, PageID# 26564). Meetings were intended to discuss gang business and hand down violations to members who violated gang rules. *Id.* The gang had specific laws that members were required to follow. (Trial Transcript, D.E. 2059, PageID# 26586). Members were required to pay dues. (Trial Transcript, D.E. 2059, PageID# 26666).

Dowlen initially met Hardison over the phone when he was trying to recruit members to the Clarksville deck. (Trial Transcript, D.E. 2060, PageID# 26715). Hardison identified himself as a GD member from Nashville. *Id.* Dowlen eventually met Hardison in-person at a club in Clarksville. (Trial Transcript, D.E. 2060, PageID# 26717). Hardison was throwing up GD gang signs on the dance floor surrounded by rival gang members. *Id.* According to Dowlen, Hardison began attending meetings and paid dues to the Clarksville deck. (Trial Transcript, D.E. 2060, PageID# 26719). Hardison wanted to be famous for "rapping or murder." (Trial Transcript, D.E. 2060, PageID# 26720). Hardison was not involved in "drug trafficking activities" with the gangster disciples. (Trial Transcript, D.E. 2060, PageID# 26722). He just sold "small amounts of marijuana. *Id.* Hardison was not bringing money into the gang by selling drugs. (Trial Transcript, D.E. 2060, PageID# 26723).

Trotter introduced Dowlen to Sherden. (Trial Transcript, D.E. 2060, PageID# 26737). Sherden was a member of the Gangster Disciples. *Id.* Sherden sold crack. (Trial Transcript, D.E. 2060, PageID# 26738). In 2011, Hardison told Dowlen that Sherden owed him money for a half ounce of marijuana. (Trial Transcript, D.E. 2060, PageID# 26738). On January 6, 2011, the night of the homicides, Dowlen saw Sherden drive through Lincoln Homes. (Trial Transcript, D.E. 2060, PageID# 26739). Dowlen tried to get Sherden to stop, but he wouldn't. *Id.* Dowlen called Hardison and told him about the encounter. *Id.*

A few minutes later, Hardison showed up in Lincoln Homes with two other individuals, Josh Henry, and another individual he did not know named Lavell. *Id.* Hardison intended to go talk to Sherden about the drug debt but did not know

where he lived. *Id.* Trotter came walking up as Dowlen and Hardison talked. (Trial Transcript, D.E. 2060, PageID# 26742). Trotter knew where Sherden lived and agreed to go with Hardison. *Id.*

Later that night, Trotter told Dowlen that Sherden and his girlfriend were dead. (Trial Transcript, D.E. 2060, PageID# 26743). Dowlen asked Hardison about what happened at Sherden's house. (Trial Transcript, D.E. 2060, PageID# 26744). Hardison explained that Sherden answered the door armed with a pistol and that made him feel "some type of way." (Trial Transcript, D.E. 2060, PageID# 26745). Hardison also stated that Sherden had "put it on the BOS" that he would pay the money that he owed. (Trial Transcript, D.E. 2060, PageID# 26747). Sherden did not pay Hardison the money that he owed him. *Id.*

After the homicides, a Gangster Disciples meeting had to be convened because Hardison had killed another GD. (Trial Transcript, D.E. 2060, PageID# 26748). Killing another GD was a "serious offense." (Trial Transcript, D.E. 2060, PageID# 26749). Hardison faced "eradication" (death) for violating gang rules. (Trial Transcript, D.E. 2060, PageID# 26749). The meeting was held in Nashville and included the upper echelon of GD leadership. (Trial Transcript, D.E. 2060, PageID# 26750). Hardison was not present. *Id.* At first, the consensus was to kill Hardison; however, by the end of the meeting they decided not to kill Hardison because he was "in the right." (Trial Transcript, D.E. 2060, PageID# 26753).

After the homicides, Hardison gained "a lot of respect and fear" within the gang. (Trial Transcript, D.E. 2060, PageID# 26754). Hardison was placed on the security team. *Id.* At some point, Hardison asked Dowlen about being on the

"blackout squad" – a secret hit squad for the Gangster Disciples. (Trial Transcript, D.E. 2060, PageID# 26755). Hardison participated in a number of shootings with the Gangster Disciples. (Trial Transcript, D.E. 2060, PageID# 26763).

**Lamar Warfield**

Lamar Warfield was recruited into the Clarksville deck of the Gangster Disciples in 2007. (Trial Transcript, D.E. 2062, PageID# 27239). He did not meet Hardison until a couple of days after the Mainstreet Homicides at a house in Guthrie. (Trial Transcript, D.E. 2062, PageID# 27268). At the time he met Hardison, Warfield was the Chief of Security for the Clarksville deck. (Trial Transcript, D.E. 2062, PageID# 27276). Hardison was at the house to report the incident to Marcus Darden, who was the leader of the Gangster Disciples in Clarksville at the time. (Trial Transcript, D.E. 2062, PageID# 27270). Hardison told Darden that he "did what he had to do, and he couldn't leave no witnesses behind." (Trial Transcript, D.E. 2062, PageID# 27272). According to Warfield, Hardison "seemed like kind of a scary dude off first glance." (Trial Transcript, D.E. 2062, PageID# 27274). Warfield testified that Hardison seemed like someone who would be valuable to the gang because "he had just kilt two people." *Id.*

After the homicides Hardison's reputation in the gang increased because everyone respected him. *Id.* Warfield put Hardison on the security team. (Trial Transcript, D.E. 2062, PageID# 27276). Hardison and Warfield participated in "violations" against members of the gang who broke the rules. *Id.* These "violations" included physically assaulting the offending members. *Id.* Warfield eventually asked Hardison to be on the "blackout squad" for the gang because he "would do

whatever for GD." (Trial Transcript, D.E. 2062, PageID# 27350-51). Hardison was ultimately named as the chief of security. (Trial Transcript, D.E. 2062, PageID# 27353).

STANDARD OF REVIEW

A defendant moving for a judgment of acquittal under Rule 29 bears a "very heavy burden." *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005) (citing *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002); *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2000)). When considering a Motion for Judgment of Acquittal the "relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011); (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 1 L. Ed. 2d 560 (1979)). "Under the *Jackson v. Virginia* standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" *Id.* "'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" *Id.* (quoting *United States v. Lee*, 359 F.3d 412, 418 (6th Cir. 2004)).

APPLICABLE LAW AND ARGUMENT

**Violent Crimes in Aid of Racketeering**

Counts Two (murder of D. Sherden) and Four (murder of A. Weyand) charge Mr. Hardison with violations of 18 U.S.C. § 1959, Violent Crimes in Aid of Racketeering ("VICAR"). As part of the Comprehensive Crime Control Act of 1984,

13

Pub. L. No. 98-473, 98 Stat. 1976, Congress enacted the Violent Crimes in Aid of Racketeering Activity ("VICAR") statute. VICAR prohibits committing murder for "the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a)(5). VICAR does not extend "to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang[.]" *United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008). Otherwise, in gang cases, the purpose element would be nearly a tautology. *Id.* The Court in *Banks* explained:

> We do not mean to say, however, that a defendant falls within the scope of VICAR if his desire to enhance or maintain his status in the organization had any role, no matter how incidental, in his decision to commit a violent act. To adopt such a broad interpretation would risk extending VICAR to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang; if the reach of this element were not cabined in some way, prosecutors might attempt to turn every spontaneous act or threat of violence by a gang member into a VICAR offense. The VICAR statute itself contains no indication that Congress intended it to make gang membership a status offense such that mere membership plus proof of a criminal act would be sufficient to prove a VICAR violation. Otherwise, every traffic altercation or act of domestic violence, when committed by a gang member, could be prosecuted under VICAR as well.

*Id.* at 968. "It is not enough that a violent gang member did a violent thing." *United States v. Ledbetter*, 929 F.3d 338, 359 (6th Cir. 2019).

Nor is it enough if the defendant's gang-related purpose was "merely incidental" to his action. *Id*. at 969. But neither is the government required to prove the defendant acted "solely" or "primarily" for a gang-related purpose. *See Id*. at 965-66. The purpose element is met if "the jury could properly infer that the

defendant committed his violent crime because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership." *Id.* The Sixth Circuit has held that "VICAR's 'purpose' element is met if the jury could find that an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise." *United States v. Hackett*, 762 F.3d 493, 500, (6th Cir. 2014).

In the instant case, the government failed to show that Hardison's "animating purpose" of the murders was to increase or maintain his position in the Gangster Disciples. Instead, when viewing the proof in a light most favorable to the government, the proof showed that the murders were a "spontaneous act" that occurred over an unpaid $80 marijuana debt that was unrelated to the Gangster Disciples. Multiple witnesses, including Tiffany Baxter, Dowlen, and Trotter knew of the drug debt and knew that Hardison went to Main Street that night to collect it. Hardison told Traylor that he was going to Sherden's to "pick up some money." (Trial Transcript, D.E. 2056, PageID# 26108).

There is no proof that Hardison went to Sherden's house intent on killing him. The purpose of the homicides appears to be as follows: First, Sherden answered the door armed with a pistol and remained armed throughout the interaction. This made Hardison feel "some type of way." (Trial Transcript, D.E. 2060, PageID# 26745). Secondly, Sherden did not pay the $80. Suffice to say, none of those facts have anything to do with the gang and, thus, fail the purpose element of the statute.

Hardison's drug dealing was unrelated to the Gangster Disciples. According to the testimony, Hardison merely dabbled in dealing marijuana and it was not related to his membership in the gang. Dowlen specifically stated that none of Hardison's drug dealing proceeds went to the gang. Those facts are undisputed and stand as uncontroverted proof that the homicides were not gang related.

No government witness testified that Hardison committed the murders for the purpose of increasing or maintaining his position in the gang. At the hearing on Defendant's oral motion for judgment of acquittal, the Court referenced the fact that both Dowlen and Trotter testified that Hardison told them of his desire to be "famous for rapping or murder" and "respected." (Trial Transcript, D.E. 2060, PageID# 26720 and D.E. 2048, PageID# 25089). The Court referenced these facts as a basis for finding that the murders were committed, at least in part, for the purpose of increasing or maintaining his position in the gang. However, neither statement is sufficient to carry the burden of the purpose element because the statements were general in nature and did not relate to his aspirations in the gang.

It was not "expected" of Hardison to kill other GDs as part of his membership in the gang. The proof showed that Hardison's actions in committing the murders were not only unsanctioned by the Gangster Disciples but were also in direct contradiction to their rules and left him facing eradication. Therefore, it could not have been expected of him by virtue of his GD membership to kill another Gangster Disciple and could not be a proper inference from the jury. After the murders, the upper echelon of the gang was initially inclined to kill Hardison for his transgressions. That is a far sight from increasing his position. Based on the proof at

trial related to Hardison's history in the gang, he would have been aware, prior to the homicides, that such actions would be a capital offense under the gang's laws. Therefore, it offends all logic and reason that he would commit these acts as a means to increase or maintain his position.

Other gang members' perception of Hardison after the fact has no bearing on Hardison's purpose for committing the homicides. The government put on considerable proof about how Hardison's reputation increased within the gang after the murders; however, this proof establishes only the incidental effect the murders had on his reputation after they occurred not his purpose in committing them.

In *United States v. Ledbetter*, the Sixth Circuit addressed the "purpose element" of VICAR head on. *Ledbetter* at 338. Both the facts and analysis in *Ledbetter* are applicable in this case. *Ledbetter* involved the RICO prosecution of a gang identified as the Short North Posse. *Id.* At the conclusion of the trial, one of the co-defendants, Deounte Ussury, was convicted for the VICAR murder of Dante Hill. *Id.* According to testimony, Ussury killed Hill during a marijuana deal where "everything went bad" because Ussury perceived that Hill was "trying to do something to him." *Id.* at 356. After the murder, Ussury reached out to the gang for help disposing of the murder weapon. *Id.* According to cooperator testimony, Ussury told the gang that Hill pulled a gun during the interaction, and he shot him. *Id.* While the proof at trial undoubtedly showed that Ussury murdered Hill, it did not show beyond a reasonable doubt that "Ussury did so for one of § 1959(a)'s statutory purposes. *Id.* The prosecution argued, among other things, that Ussury committed the crime, at least in part, to "maintain or increase his position in North Shore Posse;

however, the Court found that that theory unpersuasive." *Id.* Specifically, the Court held:

> the evidence did not show that here. While there was plenty of evidence that Short North Posse members were expected to be violent and take part in sanctioned robberies and murders, there was no evidence that members were expected or encouraged to unilaterally rob and murder low-level drug users who otherwise supported the gang by purchasing its drugs.

*Id.* at 358. The Court vacated his conviction reasoning that the jury would have to go well beyond "reasonable inferences" and engage in "improper speculation" to arrive at the statutory purpose. *Id.* Like *Ledbetter*, the facts in this case demand the same result for the same reason - the facts fail to establish the purpose element of the VICAR statute. Therefore, the Court should grant a judgment of acquittal.

## Causing Death Through the Use of a Firearm

Counts Three (murder of D. Sherden) and Five (murder of A. Weyand) charge Mr. Hardison with causing death through the use of a firearm in violation of 18 U.S.C. § 924(j). To be convicted under this statute, the government must prove beyond a reasonable doubt that Hardison committed the crimes charged in counts Two (Murder in Aid of Racketeering D. Sherden) and Four (Murder in Aid of Racketeering A. Weyand). Because the murders were not gang related (as argued above), Hardison did not commit the underlying crimes of violence - VICAR murder - and, thus, cannot be convicted for counts Three and Five because the government failed to prove all the essential elements of the crime.

## Witness Tampering

Count Six charges Mr. Hardison with tampering with a witness, victim, or informant by killing A. Weyand in violation of 18 U.S.C. 1512. Specifically, the

government alleged that Hardison killed Weyand to prevent her communication to law enforcement regarding his murder of D. Sherden. The federal witness tampering statute makes it a crime "to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer . . . of the United States" of "information relating to the . . . possible commission of a federal offense." 18 U.S.C. § 1512(a)(1)(C). The Government must prove (1) a killing or attempted killing, (2) committed with a particular intent, namely, an intent (a) to "prevent" a "communication" (b) about "the commission or possible commission of a federal offense" (c) to a federal "law enforcement officer or judge." *Fowler v. United States*, 563 U.S. 668, 672 (2011).

The relevant question rest on the defendant's intent. *Id.* The Government must show more than the intent to prevent communications to law enforcement officers in general. *Id. at 674.* The Supreme Court in *Fowler* warned that allowing conviction under this statute based solely on intent to prevent communication with law enforcement in general "would bring within the scope of this statute many instances of witness tampering in purely state investigations and proceedings, thus extending the scope of this federal statute well beyond the primarily federal area that Congress had in mind." *Id.* at 675. Essentially, it would allow conviction every time the government showed "the possible commission of a federal offense." *Id.* Therefore, the *Fowler* Court held "in a case such as this one (where the defendant does not have particular federal law enforcement officers in mind) the Government must show *a reasonable likelihood* that, had, *e.g.*, the victim communicated with law enforcement officers, at least one relevant communication would have been made to

a federal law enforcement officer." *Id.* at 675. "[T]he Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.*

In the case at bar, there is no indication that Weyand would have made a relevant communication with federal law enforcement. There is no mention in the record of any federal investigation or case that was pending at the time of the Main Street homicides. Likewise, there is no evidence to support the contention that Hardison would have any reason to know that the crime might be reported to federal law enforcement. The notion that Weyand would have reported to federal law enforcement is merely hypothetical. Therefore, Hardison should be acquitted of this crime because no reasonable juror could find that the government proved that there was a reasonable likelihood that a relevant communication would have been made to a federal officer.

<u>CONCLUSION</u>

The Court should enter a Judgment of Acquittal as to the Defendant's convictions as set forth herein.

Respectfully submitted,

BULLOCH FLY HORNSBY & EVANS, PLLC

/s/ Luke A. Evans
LUKE A. EVANS, BPR No. 23620
PAUL J. BRUNO, BPR No. 17275
Attorneys for Defendant
302 N. Spring Street
 PO Box 398
Murfreesboro, TN 37133-0398
(615) 896-4154
lukeevans@bfhelaw.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2022, I electronically filed the foregoing Pleading with the clerk if the court by using the CM/ECF system, which will send a Notice of Electronic Filing to the following: **Ben Schrader and Gerald Collins**, Assistant United States Attorneys, 110 Ninth Avenue South, Suite A-961, Nashville, TN 37203.

*/s/ Luke A. Evans*
LUKE A. EVANS