IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    3:17-cr-00124 |
| v. | ) | |
| | ) | Chief Judge Crenshaw |
| [3] BRANDON DURELL HARDISON | ) | |

GOVERNMENT'S OPPOSITION TO DEFENDANT BRANDON DURELL HARDISON'S
MOTION FOR JUDGMENT OF ACQUITTAL (Doc. 2075)

The United States of America, by and through its attorneys, respectfully opposes defendant

Brandon Durell HARDISON's Motion for Judgment of Acquittal (Doc. 2075). HARDISON has

failed to show under Rule 29 that the evidence, viewed in the light most favorable to the

government, was insufficient to establish his guilt beyond a reasonable doubt on Counts Two

through Six of the Fourth Superseding Indictment. HARDISON's motion should be denied.

I.      Factual Background

    A.      Overview of the Gangster Disciples in Clarksville

The Gangster Disciples ("GDs") were founded in the late 1960s in Chicago, Illinois, by

Larry Hoover and David Barksdale. (Doc. 2055 at 107 (Kelly).)[1] Serving underneath Hoover, who

is known as the "chairman," is the Board of Directors, whose members push new policies to

regional and state gang leadership. (*Id.* at 108-9.) GDs also hold positions of authority, or "POAs,"

at the state level, including governor and chief of security. (*Id.* at 109-10.) GDs also hold local

POAs which mirror those at the state level. (*Id.* at 110-11.) POAs carried out specific duties: the

"secretary," for example, handles the organization's paperwork, and the "treasurer" handles the

---

[1]      References to transcripts of the October and November 2021 trial in this case appear in the following format: ECF Docket Number, Page Number, and Witness Name. References to trial exhibits appear as "Exh. #." In the interest of space, the government has avoided citing the testimony of multiple witnesses where doing so would be duplicative.

1

money. (*Id.* at 115-16.) The chief of enforcement, or "chief enforcer," ensures observance of GD laws within the organization. (*Id.* at 110.) The chief of security handles gang "security" and "protocol." (*Id.*) The chief of security also maintained a "security team," whose members carried out violations and collected delinquent dues. (*Id.* at 140.) Members retaliated against those in conflict with the gang and kept guns for that purpose. (*Id.* at 140-41; Doc. 2048 at 56, 64-65 (Trotter).) Members were expected to be armed with guns at all times. (Doc. 2048 at 64 (Trotter).)

The GDs had initiation rituals. (Doc. 2055 at 102-06 (Kelly.) They held meetings to discuss gang business and collect dues. (Doc. 2048 at 67-72, 110 (Trotter).) And they kept track of dues and attendance with dues rosters. (Doc. 2055 at 119-20 (Kelly).) They had foundational literature and laws, most notably the "17 laws." (*Id.* at 136-37.) If a member violated these laws, he could be subject to "violation" or "smashing," or even death, by fellow GDs. (*Id.* at 137-39.) The GDs used specialized terms, like "on count," "poor paymaster," and "putting it on the BOS." (*Id.* at 112-13; Doc. 2048 at 65-66, 99-100, 101 (Trotter); Doc. 2059 at 126-27 (Dowlen).) The GDs had symbols, like the six-pointed star, the pitchfork, and the colors black and blue. (Doc. 2055 at 134-36 (Kelly).) And the GDs had rivals, like the Bloods. (*Id.* at 141.)

The GDs wanted to become the "baddest" and "most feared" gang in Clarksville. (Doc. 2048 at 104 (Trotter).) They sought to achieve that goal by assaulting, shooting, or killing rival gang members. (*Id.* at 106.) Demonstrating a willingness to kill was a way to earn respect within the GDs. (Doc. 2048 at 106-07, 232 (Trotter); Doc. 2062 at 41-42 (Warfield).) The GDs valued members who engaged in such conduct, "encourag[ing]" or "prais[ing]" those who shot at or killed rival gang members. (Doc. 2048 at 106-07, 232 (Trotter); Doc. 2059 at 108-09 (Dowlen).) Violence of this sort made people "fear the GDs." (Doc. 2059 at 69-70 (Dowlen); Doc. 2062 at

41-42 (Warfield).) Members who were unwilling to engage in such conduct were perceived as "weak," and had difficulty maintaining membership in the GDs. (Doc. 2048 at 107-08 (Trotter).)

The GDs had a secretive team of assassins, known as the "Blackout Squad." (Doc. 2062 at 123-24 (Warfield).) The "main mission" of the Blackout Squad was to "carry out murders" or "hits"; to "kill" or "eradicate" persons on behalf of the gang. (Doc. 2055 at 155 (Kelly); Doc. 2060 at 47-48 (Dowlen).) GDs who did not hold a POA typically did not know who was on the Blackout Squad. (Doc. 2060 at 48 (Dowlen).) Its members traveled to different regions or states to carry out assignments so it would be harder for witnesses to identify them. (Doc. 2055 at 156-57 (Kelly).) The GDs looked for specific qualities in members who were placed on the Blackout Squad, including "[h]eartlessness," "fearless[ness]," and a "[w]illingness to kill"; HARDISON possessed those qualities. (Doc. 2060 at 48-49 (Dowlen); Doc. 2062 at 12-25, 125 (Warfield).) Before HARDISON committed the double homicide, he was unequivocal in his desire to join the Blackout Squad: he told Danyon Dowlen, "Put me on the blackout squad." (Doc. 2060 at 48 (Dowlen).)[2]

### B.    HARDISON Comes to Clarksville

HARDISON made his GD affiliation known in Clarksville as early as 2010 or 2011, identifying himself as a GD to Dekota Kelly when they met at a convenience store. (Doc. 2055 at 151-53 (Kelly).)[3] HARDISON introduced himself to GD members Dowlen and Tavares Trotter in June 2011 at a club in Clarksville. (Doc. 2048 at 168 (Trotter.) Rival gang members were also in the club. (*Id.*) The GDs saw HARDISON, who was alone and shirtless on the dance floor, "acting

---

[2]    HARDISON claims that he asked Dowlen to put him on the Blackout Squad "[a]t some point." (*See* Doc. 2076, at 11-12.) The transcript is clear that HARDISON made this request before the double homicide.
[3]    In a Facebook post dated July 4, 2011, HARDISON is depicted in a "selfie"-style photograph, holding what appears to be two firearms and draping a six-pointed star necklace over his arm (Doc. 2055 at 199-203 (Chaney); Exh. 6033.) In a video posted online sometime prior to January 2012, HARDISON is depicted in Clarksville brandishing guns, displaying a black flag, and flashing a pitchfork sign (Doc. 2059 at 137-43 (Dowlen); Exh. 6030.)

3

wild" and "throwing up the pitchforks." (*Id.* at 168-69.) None of the GDs from Clarksville knew HARDISON, so they introduced themselves. (*Id.* at 168-71.) As they exchanged GD greetings, HARDISON said he was from Nashville and had moved to Clarksville. (*Id.* at 170-71.)

HARDISON was a "big, stocky fella," and was "bold." (Doc. 2048 at 173 (Trotter).) The GDs recognized that HARDISON could be an asset, and that they could use him for "security purposes" or to "aid and assist[]" the GDs. (*Id.* at 172-73.) The GDs perceived HARDISON—who was not afraid to flash GD signs in front of rivals even though he had been alone—as someone "strong," who "wouldn't back down from nothing." (Doc. 2060 at 11-12 (Dowlen).) GDs like HARDISON who made it known that they would engage in violence, "set [the GDs] up to be respected and feared" by the "opposition," meaning rival gangs. (*Id.* at 16-17.) After the GDs met him in June 2011, he came to GD meetings in Clarksville regularly. (Doc. 2048 at 174 (Trotter).) He did not have a POA at first. (Doc. 2060 at 13-14 (Dowlen).)[4] HARDISON proved a valuable asset, making himself available to carry out "violations," shootings, or murders. (*Id.* at 16.)

HARDISON made statements to Dowlen and Trotter that gave them insight into what HARDISON wanted to achieve with the GDs. (Doc. 2060 at 12-13 (Dowlen).) HARDISON told Trotter that he "wanted to be respected." (Doc. 2048 at 173-74 (Trotter).) And HARDISON told Dowlen that he wanted to be "famous for something," "either for rapping or murder"; Dowlen testified that HARDISON saw "the Gangster Disciples as a means to do that." (Doc. 2060 at 13 (Dowlen).) Dowlen testified further that the GDs were "all [HARDISON] knew"; that he was "real loyal to the Gangster Disciples"; and that being a GD was "inbred into him." (*Id.* at 12-13.) HARDISON manifested his loyalty to the GDs by acquiring dozens of gang tattoos, including the

---

[4] Dowlen believed HARDISON was initially placed on the "security team" with other GDs who did not have a "function" (meaning a POA). (Doc. 2060 at 13-14 (Dowlen).)

words "Larry Hoover" and six-pointed stars, all over his body. (*Id.* at 19-29 (Dowlen).) HARDISON acquired tattoos demonstrating an affinity for violence and witness intimidation.[5] And HARDISON made posts to Instagram demonstrating his loyalty to the GDs, including "a lot of gang-affiliated stuff" and "a lot of disrespectful stuff towards other rival gangs."[6] HARDISON made posts like this to "instill fear in people." (Doc. 2062 at 118-19 (Warfield).)

        C.      <u>The Main Street Double Homicide</u>

               1.      <u>Derrick Sherden and Amanda Weyand</u>

Derrick Sherden came to Clarksville in early September 2011. (Doc. 2055 at 269 (Heard).)[7] Sherden began dating Amanda Weyand, who moved into 1114 Main Street. (Doc. 2048 at 36-37 (Smith).) Sherden came to Lincoln Homes one day looking to buy marijuana and met Trotter. (Doc. 2048 at 178-79 (Trotter).) Afterwards, Sherden periodically bought marijuana from Trotter. (*Id.*) Sherden also claimed to be a GD: he had a "7-4" tattoo on his face, and a six-pointed star on his wall. (*Id.* at 273-74 (Heard); Exh. 1126.) But he never came to GD meetings in Clarksville and was never considered to be "on count." (*Id.* at 180 (Trotter); Doc. 2060 at 30, 127-28 (Dowlen).) Prior to the double homicide, Trotter had been to Sherden's house approximately 4-5 times, to smoke marijuana and hang out. (Doc. 2048 at 181 (Trotter).) Trotter described Sherden as his "brother," and said that they had a "good relationship"; Dowlen described them as "real cool" and "close." (*Id.* at 181, 187; Doc. 2060 at 151 (Dowlen).) During his visits to Sherden's house, Trotter also encountered Weyand, whom Trotter knew as "Lil Bit." (Doc. 2048 at 181-82 (Trotter).)

---

[5]      These included tattoos of a stop sign meaning "stop snitching," an AK-47 bullet containing the numbers "187" (the police code for murder), and the phrase, "Straightway Assassins." (Doc. 2060 at 19-29 (Dowlen).)

[6]      These included a drawing of a person urinating on a person with a red "flag" and the words "F**k Blood"; a post claiming HARDISON had "bodied some you red rag homies," meaning murdered Bloods; an image of the grim reaper inside a six-pointed star; and the comment, "Send um to da reaper, homie." (Doc. 2062 at 117-21 (Warfield).)

[7]      Sherden had come to Clarksville in approximately 2010, but returned to Indiana. Sherden's move to Clarksville in early September 2011 was understood to be a permanent move. (Doc. 2055 at 272 (Heard).)

## 2.    The Night of the Homicides

On the night of the homicides, at 8:57 p.m., Sherden called his friend Keith Garrett and asked him for a ride to the Universal Package Liquor Store. (Doc. 2056 at 45-49 (Garrett).) Garrett picked Sherden up and drove him to the store. (*Id.* at 50-51.) Garrett waited outside while Sherden went inside and got "a bottle of something." (*Id.*) Records showed that the store sold a $7.99 liquor bottle at 9:12 p.m., 9:28 p.m., and 9:31 p.m. that evening. (Doc. 2056 at 215-25 (Howard).) Sherden came out of the store carrying a brown bag which contained a medium-sized liquor bottle. (Doc. 2056 at 51-52 (Garrett).) Garrett dropped Sherden off at 1114 Main Street. (*Id.* at 52.) Garrett went inside briefly, and Sherden put the liquor bottle on the coffee table. (*Id.* at 52-55, 66-67.)

Lavell Traylor was working that evening at Sonic. (Doc. 2056 at 260-61 (Traylor).) At approximately 8:00 or 9:00 p.m., HARDISON contacted Traylor and told Traylor he "needed a ride to go pick up some money." (*Id.* at 261.)[8] Traylor drove in a black Impala to the house where HARDISON was staying with his girlfriend, Kandice Wallace. (*Id.* at 260-63.) Tiffany Baxter— who was living at the house with her boyfriend, Josh Henry—was also present. (Doc. 2057 at 184-85 (Baxter).) HARDISON said that Sherden "needed to give him his money" and that he wanted Henry to go with him to Sherden's house to collect the debt. (*Id.* at 207-09.)[9]

HARDISON, Henry, and Traylor left and drove to Lincoln Homes to pick up a fourth person. (Doc. 2056 at 263-65 (Traylor).) They arrived in Lincoln Homes and encountered Trotter. (Doc. 2048 at 183-84 (Trotter); Doc. 2056 at 265-66 (Traylor).) Trotter heard HARDISON say,

---

[8]    Dowlen, who knew that Sherden owed HARDISON a drug debt, saw Sherden ride through Lincoln Homes in a Jeep, and called HARDISON to let him know. (Doc. 2060 at 31-32, 128-29, 150 (Dowlen).)
[9]    Baxter testified that HARDISON repeatedly discussed Sherden's drug debt in front of her; that HARDISON demanded repayment from Sherden and threatened that "it was going to be a problem" if Sherden did not pay him back; that HARDISON left "a lot," "possibly" eight or ten threatening calls, texts, or voicemails to Sherden regarding this drug debt; and that Sherden had nevertheless not paid HARDISON back. (Doc. 2057 at 197-206).

"Imma kill that n****r." (Doc. 2048 at 183-84 (Trotter).)[10] Trotter asked HARDISON why he was

"talking reckless" and asked HARDISON who he was talking about. (*Id.* at 184.) HARDISON

said he was talking about "Meech," an alias for Sherden, and that Sherden owed him $80. (*Id.*)

HARDISON asked Trotter to take him to Sherden's house on Main Street. (Doc. 2048 at

185 (Trotter).) Dowlen and Trotter did not think HARDISON knew which house Sherden lived in,

but Trotter thought it possible that HARDISON had been there before. (*Id.* at 186-87, 267-68; Doc.

2060 at 131-32 (Dowlen).)[11] Trotter, believing he could "deescalate[]" the situation—in part

because Sherden had been making money selling drugs, and should have been in a position to

repay his debt to HARDISON—agreed to take HARDISON to Sherden's house. (Doc. 2048 at

185-87, 278-79 (Trotter).)[12] HARDISON and Trotter got into the black Impala with Traylor and

Henry. (Doc. 2056 at 265-66 (Traylor).) Traylor was driving. (Doc. 2048 at 190-91 (Trotter).)

Trotter directed them to Sherden's house and told Traylor to park across the street. (*Id.* at 192-93,

278; Doc. 2056 at 266-67 (Traylor).)[13] HARDISON and Trotter got out of the car and walked to

Sherden's house; Traylor and Henry stayed in the vehicle. (Doc. 2056 at 268-69 (Traylor).)

Trotter knocked on Sherden's door and walked inside, saying, "What's up bruh?" (Doc.

2048 at 194 (Trotter).) Sherden, who was facing away from the door, turned around holding a gun.

(*Id.* at 194, 284-85.) Trotter identified himself and Sherden said, "Boy, you better start knocking."

(*Id.* at 194.) At the same time, Weyand appeared at the door to her bedroom. (*Id.* at 194, 197-98.)

---

[10]     Dowlen denied hearing anyone make this statement. (Doc. 2060 at 134 (Dowlen).)
[11]     Other than testimony from Baxter that there was a time during their relationship when they seemed "cool"
with each other, there was no evidence that HARDISON and Sherden were friends. (Doc. 2057 at 197 (Baxter).)
[12]     Dowlen testified that HARDISON showed up in Lincoln Homes in a dark-colored Malibu or Impala with
Henry and "Lavell" (Lavell Traylor); that, as they were talking, Trotter joined the conversation; that Trotter produced
what may have been a 9mm pistol, with nickel-plating and a pearl handle; that Trotter said, "Yo, check this out. This
is my new baby. I just got—I just bought this"; and that HARDISON asked to see the gun. (Doc. 2060 at 32-35, 132-
33 (Dowlen).) Dowlen testified further that HARDISON asked Trotter whether he would take them to Sherden's
house; that Trotter agreed; and that HARDISON, Trotter, Henry, and "Lavell" left to go to the house. (*Id.* at 35.)
[13]     Traylor testified that HARDISON directed him to the house on Main Street. (Doc. 2056 at 266-67 (Traylor).)

Sherden and Trotter greeted each other with a GD handshake; Sherden and HARDISON did not. (*Id.* at 201-02.) Trotter and HARDISON followed Sherden into the kitchen. (*Id.* at 194-97.) Trotter was not watching HARDISON the entire time they were in the house together and testified that it was possible that there was a time when HARDISON was in the living room while Trotter was in the kitchen. (*Id.* at 198-99.) Sherden tried to make small talk and offered them a drink. (*Id.* at 194-95.) A moment later, HARDISON asked Sherden about the money he owed HARDISON. (*Id.* at 195.) Sherden, who was still holding a gun, replied, "Man, bruh, I'm getting that together," by which he meant that he planned to repay HARDISON. (*Id.* at 195.) Sherden did not repay HARDISON at that time, however. (*Id.* at 199-200.) HARDISON replied, "Say no more," and stepped outside, ostensibly to smoke a cigarette. (*Id.* at 196, 200-01.)

After HARDISON stepped outside, Sherden told Trotter that he had made a rap CD. (Doc. 2048 at 202 (Trotter).) Sherden put the CD in the stereo; sat on the couch near the front door; and laid his gun on the couch next to him. (*Id.* at 202, 285.) Trotter sat in a chair across from Sherden. (*Id.* at 202-03.) As they listened to the CD, HARDISON stepped through the front door; pulled a pistol from his coat pocket; and shot Sherden in the head at point-blank range. (*Id.* at 203-05, 286-87.) Trotter saw smoke rising from Sherden's head. (*Id.* at 204-05.) Trotter leapt from his chair and ran towards the front door. (*Id.*) As he fled, Trotter saw Weyand in her room; she was "screaming," "hysterically," in a way Trotter would "never forget." (*Id.* at 204-06.) HARDISON instructed Trotter, "Man, go grab the girl," but Trotter kept running towards the front door. (*Id.* at 204-05.) As he exited the front door, he heard approximately four or five gunshots. (*Id.*)

Trotter walked quickly back to the car that Traylor and Henry were inside and got into the rear passenger side seat. (Doc. 2048 at 208-09 (Trotter).) HARDISON, who walked out of Sherden's house moments later, got into the front passenger seat. (*Id.* at 209.) HARDISON told

8

Traylor to pull off. (*Id.*) HARDISON threatened the occupants of the vehicle; according to Trotter, HARDISON said, "Anyone of y'all say something about this, I'm going to kill y'all." (*Id.*)[14] HARDISON passed the pistol he had used to commit the murders to Trotter, and said, "Hey, bruh, hey, folks, do something with this." (*Id.* at 209-10.)[15] Trotter then realized that the gun—a chrome 9mm with a marble handle—was one he loaned to HARDISON two weeks earlier. (*Id.* at 209-11.)

Traylor dropped Trotter off in Lincoln Homes. (Doc. 2048 at 212 (Trotter).) Trotter walked to his sister's house; bleached the pistol (to remove any fingerprints); and disassembled it. (*Id.* at 213.) Trotter got into a truck with two other GDs and traveled to a small bridge over a river. (*Id.* at 214-15.) Trotter, who had put the gun into a bag with a brick, threw the bag into the river. (*Id.*)[16] Trotter rode to his sister's house and met up with other GDs at a bar in Clarksville. (*Id.* at 216.)

At 10:26 p.m., Garrett contacted, or was contacted by, Sherden. (Doc. 2056 at 45 (Garrett).) Garrett heard Sherden say words to the effect of, "I don't do business like that," and the phone went dead. (*Id.* at 45, 55-57.) Garrett was close to Sherden's house and drove there to investigate. (*Id.* at 56-57.) He arrived and encountered Marquintus Majors. (*Id.* at 57-58.) Majors said that he had heard gunshots. (*Id.* at 78-79 (Majors).) Garrett peered into the house and saw Sherden's body on the couch. (*Id.* at 58-59 (Garrett).) Majors then called 911. (*Id.* at 79-85 (Majors).)

When the police arrived, they saw that Sherden had been shot twice in the right side of the head. (Doc. 2056 at 145-46 (Minton); Doc. 2057 at 119-25 (Eutenier).) Weyand had been shot in her upper right shoulder (with an exit wound in her back); behind her left ear (with an exit wound

---

[14]     Traylor testified that Trotter said something to the effect of, "Just keep your fucking mouth closed," although Traylor also testified that he did not have a clear memory of the conversations in the car that night. (Doc. 2056 at 274-75 (Traylor); Doc. 2057 at 48-49 (Traylor).) Trotter denied threatening anyone. (Doc. 2056 at 13 (Trotter).)

[15]     Traylor testified that he did not see a gun inside the vehicle and did not see anything get passed from the front seat to the back seat. (Doc. 2057 at 44-46 (Traylor).)

[16]     Dowlen testified that he told Trotter to "get rid" of the gun. (Doc. 2060 at 136 (Dowlen).)

on the left side of her face); and in the lower part of the back of her head (with an exit wound in her forehead). (Doc. 2056 at 146-47, 151 (Minton); Doc. 2057 at 142-45 (Eutenier).) Police recovered one 9mm cartridge casing from the living room floor and four 9mm cartridge casings from the bedroom where Weyand's body was found. (Doc. 2056 at 137, 140-41, 147-50, 197-98 (Minton).) All of these casings had been fired from the same 9mm firearm. (Doc. 2062 at 191-92 (Arney).) Police also recovered a cup and a Taaka vodka bottle from the coffee table in the living room. (Doc. 2056 at (Minton).) Five fingerprints belonging to HARDISON were on the cup. (Doc. 2057 at 81-82, 87 (Kirk).) One fingerprint belonging to HARDISON and one fingerprint belonging to Trotter were on the vodka bottle. (*Id.* at 81-82, 87.) The Taaka vodka bottle was an item that sold for $7.99 at the University Package Liquor Store at that time. (Doc. 2056 at 205-09 (Howard).)

Traylor, after dropping Trotter off, dropped HARDISON and Henry off at Wallace's house. (Doc. 2056 at 276 (Traylor).) The next morning, at approximately 4:00 or 5:00 a.m., HARDISON woke Baxter up, and told her, as he "kind of giggled," that "Meech was dead" and that "somebody got Meech." (Doc. 2057 at 209-10 (Baxter).) Baxter tried to confirm this but could find no news reports of Sherden's death. (*Id.* at 210-11.) Henry, who was present for this conversation, "seemed uncomfortable" and was "[r]eal quiet and strange." (*Id.* at 211-12.) When Baxter asked HARDISON how he knew Sherden had been killed, HARDISON "just said he knew." (*Id.* at 211.)

Shortly after the double homicide, Trotter called Dowlen and said, "They dead," meaning Sherden and Weyand. (Doc. 2060 at 36-37 (Dowlen).) Dowlen described Trotter as "in a bad way" and "kind of shook up about it." (*Id.* at 36-37.)[17] HARDISON met with Dowlen about the double homicide the next day. HARDISON told Dowlen that he and Trotter knocked on the door to

---

[17] Dowlen called HARDISON to ask why HARDISON would "do that," meaning kill Sherden and Weyand, and to tell HARDISON that Trotter "wasn't ready for nothing like that." (Doc. 2060 at 36-37 (Dowlen).)

Sherden's house; that Sherden answered with a .45 caliber pistol in his hand, and that HARDISON "felt some type of way" about that; that Sherden offered them a drink, but HARDISON declined; and that HARDISON stepped out of the house, stepped back in, and shot Sherden. (*Id.* at 37-38.) HARDISON later provided additional details of the murders to Dowlen. HARDISON told Dowlen that Sherden had "put it on the BOS" that Sherden was going to repay the drug debt and that Sherden had not repaid it. (*Id.* at 40-41.) HARDISON also said that he felt "disrespected" that Sherden answered the door with a gun in his hand. (*Id.* at 38-40.) HARDISON said that when he stepped back into the house, he shot Sherden in his head once and Sherden's hands shot up, so HARDISON shot him in the head again. (*Id.* at 39.) HARDISON said that Trotter ran out the door; that HARDISON saw Weyand with a book in her hand; that she "raised the book up to her face"; and that he "double tapped her," meaning that he shot her in the head twice. (*Id.*)[18]

### 3. Trotter and HARDISON Report the Double Homicide to Darden

Approximately two days after the murders, GD member Elance Lucas called Trotter and told him to "come up to Guthrie." (Doc. 2048 at 218 (Trotter).) Trotter traveled to Lucas's father's

---

[18]     The Court also heard powerful corroborating evidence from John Duffey, with whom HARDISON was housed in west Tennessee. (Doc. 2061 at 81-82 (Duffey).) HARDISON and Duffey became friends because Duffey was a tattoo artist, and HARDISON wanted Duffey to draw artwork for some of HARDISON's rap album covers. (*Id.* at 82-89.) Duffey agreed to help HARDISON and prepared a sketch at HARDISON's direction that included images of significance to HARDISON. (*Id.* at 92-93, 95.) HARDISON told Duffey (in conversations over time) that HARDISON had murdered two people, "Derrick" and "Amanda" at "Derrick's" house in Clarksville, Tennessee; that "Josh" and "Wolf" had gone with HARDISON to the house; that HARDISON had shot "Derrick" "in the side of the head on the couch twice"; and that HARDISON had shot "Amanda" "twice in the back of the head." (*Id.* at 98-106, 144-45, 163.) The images included the word "Head Shock," which Duffey explained should have been "Head Shot," and which HARDISON said was a reference to "someone being shot in the head"; the face of a woman with a bullet hole in her forehead, "where the bullet hole was dripping out the front so it looked like she was shot from the back"; the words "Creeper da Reaper," a nickname for HARDISON; an angel of death; and two bullets, which Duffey understood signified "two bullets to the head." (*Id.* at 110-16.) The sketch also included a tumbler glass with a fingerprint on it, which HARDISON said referred to "the only piece of evidence" "the government had on him in the house" where HARDISON had murdered Sherden and Weyand. (*Id.* at 116.) HARDISON also told Duffey about why he was going to trial: he said that he "wanted to pull the rats out that were on the case that were telling on" him, so he could "expose them and have them serve repercussions on it." (*Id.* at 162-63.) HARDISON also said that the bullet/"187" tattoo on his face was meant as a message, so that "anybody who was ratting on him in the future would see that death would come to them." (*Id.* at 118.)

11

house and met with Marcus Darden. (*Id.* at 221.) Trotter reported the double homicide—a "major incident," which gang rules required him to report up the chain of command—to Darden, and then returned to Clarksville. (*Id.* at 221-24 (Trotter).) Similarly, a day or two after the murders, HARDISON traveled to Lucas's father house to report them to gang leadership. (Doc. 2062 at 42-44, 133-34, 136-37 (Warfield).) Darden, Lamar Warfield, and other GDs were present when HARDISON arrived. (*Id.* at 43.) Warfield was aware at that time of a double homicide on Main Street. (*Id.* at 47-48, 133-34.) When HARDISON arrived, Darden asked him whether he was "all right" and whether he "need[ed] any AA [aiding and assisting]." (*Id.* at 43-46 (Warfield).)[19] Darden (or Maurice Burks) also asked HARDISON whether he had gotten rid of the gun he used to carry out the murders; HARDISON said that he had. (*Id.* at 46-47, 135.) HARDISON told Darden that he "did what he had to do," and "couldn't leave no witnesses behind." (*Id.* at 46.) Warfield understood HARDISON to mean that he had committed the murders. (*Id.* at 46-47.)[20]

### 4. GD Meetings Regarding the Double Homicide

Approximately one week after reporting the double homicide to Darden, Trotter was called to a meeting of GDs who held POAs. (Doc. 2048 at 224 (Trotter).) The purpose of the meeting was to help the GDs gather information about the murders and decide how to respond. (*Id.* at 224-25.) Darden, Jabbaul Pettus, Trotter, and HARDISON, among others, attended the meeting. (*Id.* at 225.) HARDISON told the GDs how the double homicide occurred. (*Id.* at 226.) HARDISON said that Sherden owed HARDISON $80 for some marijuana that he had fronted to Sherden. (*Id.*)

---

[19] Warfield did not believe HARDISON was a member of the Clarksville GDs at this time. (Doc. 2062 at 44 (Warfield).) Rather, Warfield believed HARDISON "had just" "moved to Clarksville" and "was trying to become a member of the Clarksville deck." (*Id.*) But HARDISON reported the incident to Darden as required under GD rules. (*Id.* at 44-45.) And the GDs "knew he was GD already," and "just treated him like a brother." (*Id.* at 138.)

[20] Warfield acknowledged that HARDISON did not state explicitly that he murdered Sherden and Weyand on Main Street. (Doc. 2062 at 137 (Warfield).) But based on Darden's mentioning that HARDISON was coming to the house to talk about the Main Street double homicide and the timing of HARDISON's arrival, Warfield understood, that HARDISON was referring to the double homicide on Main Street. (*Id.* at 136-37.)

12

HARDISON said that Sherden had "put it on the hammer" or "put it on the BOS" that he was going to pay HARDISON back, meaning that it was "certified and stamped" that Sherden would do it. (*Id.* at 226-28.) Putting something "on the BOS," or "on the hammer," was like swearing an oath on the GDs; a GD could be violated for putting something "on the BOS" or "on the hammer" and not following through. (*Id.* at 101; Doc. 2059 at 126 (Dowlen).) HARDISON said that Sherden was "acting hard, like he ain't want to pay." (*Id.* at 226.) HARDISON also said that Sherden "had the pistol out" and "ain't put the pistol down," and that HARDISON shot him. (*Id.* at 226-28.)

As HARDISON finished, Trotter interrupted him; said that Sherden "did say he was going to pay"; but that HARDISON said, "Say no more." (Doc. 2048 at 228 (Trotter).) Trotter then gave his account. (*Id.* at 229.) The GDs deliberated about how to address the murders. (*Id.*) Darden and Pettus, commenting on HARDISON's account, said, "Bruh got a point. Brother [Sherden] didn't never put the gun down. He was being a poor paymaster." (*Id.*) A "poor paymaster," in GD parlance, was a person who failed to make good on his debts, like drug debts; a GD member could be violated for being a "poor paymaster." (*Id.* at 99-100; Doc. 2059 at 125-26 (Dowlen).) The GDs took no action regarding the murders at this time, however. (Doc. 2048 at 230 (Trotter).)

The GDs also held a meeting of regional POAs in Nashville about the double homicide. (Doc. 2060 at 41-44 (Dowlen).) There was a perception at the time that Sherden was a GD, and if HARDISON had killed a fellow GD, the GDs might "eradicate" HARDISON. (*Id.*) Dowlen traveled to that meeting with Darden and Pettus. (*Id.*) Byron Purdy, the GD "governor" who exercised authority over all of Tennessee, was present by phone. (*Id.* at 44.) At the beginning of the meeting, Purdy asked the GDs to explain what had happened. (*Id.*) The GDs said that HARDISON had killed two people, one of whom "was supposed to be a GD," and then debated how the GDs ought to respond. (*Id.*) Initially, the "majority" of the GDs were "leaning towards

eradicating" HARDISON; at one point, they asked Purdy if they could bring GDs from outside Clarksville to "eradicate" HARDISON. (*Id.* at 44-45.) Dowlen then gave an impassioned defense of HARDISON. (*Id.* at 45.) Dowlen explained that the GDs had never "verified" Sherden and did not know whether he was a legitimate GD, as he had claimed; by contrast, there was no question that HARDISON was "verified." (*Id.* at 45, 126-27.) Dowlen also argued that Sherden had "put it on the BOS" that he would repay his debt to HARDISON, and that Sherden had not, and that this failure could be considered a violation of GD rules. (*Id.* at 46.) Dowlen also argued that Sherden answered the door with a gun in his hand, which HARDISON perceived as a sign of "disrespect." (*Id.* at 45-46.) After Dowlen's arguments, the GDs "came to the conclusion that . . . HARDISON was "in the right" and "wouldn't be sanctioned or eradicated" for killing Sherden. (*Id.* at 46.)[21]

### 5.     HARDISON's Reputation Rises

After the double homicide, HARDISON "gained a lot of respect and a lot of fear" among the GDs. (Doc. 2060 at 47 (Dowlen).) They "looked up to him, bow[ed] down to him" and to "whatever he sa[id]," and "praise[d]" him. (Doc. 2048 at 231-32 (Trotter).) The murders "boosted his MO within the gang," and helped him "get[] status," because it was "clear at that point . . . that . . . HARDISON was not afraid to pull a trigger" and was "[n]ot afraid to commit multiple murders." (*Id.* at 132-33, 231-32; Doc. 2060 at 47, 120 (Dowlen).) Warfield, the chief of security in Clarksville at the time, knew that HARDISON could be a valuable asset to the GDs after the double homicide, because he had "kilt two people" and could be called upon for "retaliation to other rival gangs or security purposes." (Doc. 2062 at 48-50, 124 (Warfield).) Warfield put HARDISON on the security team "right after" the double homicide, meaning within a month or

---

[21]      There is no evidence in the record about whether the GDs discussed possible sanctions for HARDISON for killing Weyand, who was not a GD and was therefore considered to be a "peon."

two. (Doc. 2048 at 231-32 (Trotter).) That decision was a direct result of HARDISON's commission of the double homicide. (Doc. 2062 at 49-50 (Warfield).) Warfield also put together a "Blackout Squad" for the Clarksville deck after the double homicide. (*Id.* at 124-25.) Warfield "always just knew [HARDISON] was willing" to serve on the Blackout Squad, and so when Warfield began assembling it, HARDISON was "one of the first candidates for it." (*Id.* at 125.) Later, in approximately 2016, when Warfield was serving as chief of security for the 615 region, Warfield put HARDISON on the regional Blackout Squad. (*Id.* at 125-27.) In approximately 2016 and 2017, HARDISON became the chief of security or chief enforcer for the 615 region. (Doc. 2055 at 154, 158 (Kelly); Doc. 2062 at 91-92, 111-15, 176 (Warfield); Exh. 3755.)

During his time with the Clarksville deck, HARDISON lived up to his reputation for violence. The gang used him to carry out several vicious "smashings" of members who had violated gang rules. (Doc. 2048 at 77-98 (Trotter); Doc. 2062 at 50-58 (Warfield); Exh. 6211.) HARDISON was chosen to carry out beatings like these because he was a member of the security team; because he was "big" and "hit hard"; and because he was prepared to "go full force" during the beatings. (Doc. 2048 at 96-98 (Trotter).) The GDs also used HARDISON to plan and/or carry out drive-by shootings targeting members of the Bloods gang. On September 26, 2012, for example, following the Bloods' murder of GD member Shannon Fairley a/k/a "Mac Juve," HARDISON, Trotter, and other GDs carried out a drive-by shooting of a residence where Bloods gang member Antonio McGougan a/k/a "Tum Tum" lived. (Doc. 2055 at 195-96 (Chaney); Doc. 2048 at 242-57, 259-60 (Trotter); Doc. 2060 at 51-58 (Dowlen).) In the fall of 2012, HARDISON and other GDs planned (but did not carry out) a shooting targeting Plush, a Clarksville nightclub frequented by Bloods. (Doc. 2060 at 80-84 (Dowlen); Doc. 2062 at 60-65, 150 (Warfield).) And on November 3, 2012, when HARDISON was jumped at Sidelines bar in Clarksville by (he

15

believed) a member of the Bloods, he called on the GDs for backup. (Doc. 2057 at 8-12 (Traylor); Doc. 2060 at 50, 84-87, 95-96, 107-08, 111 (Dowlen); Doc. 2062 at 58-59, 65, 69-72, 76 (Warfield).) The GDs responded in force, traveling to C-Ray's nightclub, where HARDISON assaulted Bloods gang member Malcolm Wright. (Doc. 2060 at 206-09 (Gaskin); Doc. 2062 at 71-74, 81-84, 180 (Warfield).) Shortly after that assault began, Maurice Burks shot Wright and killed him. (Doc. 2062 at 76-80, 84-87 (Warfield).) HARDISON, who was a "valued" and "respected" member of the GDs, was "praised" by the GDs for the assault. (Doc. 2060 at 95-96 (Dowlen).)

II.    Sufficiency of the Evidence

A.    Legal Standard

A Rule 29 motion for a judgment of acquittal "is a challenge to the sufficiency of the evidence." *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996). "Evidence is sufficient to support a criminal conviction if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Beddow*, 957 F.2d 1330, 1334 (6th Cir. 1992) (citation omitted). A defendant seeking a Rule 29 acquittal bears a "very heavy" burden. *United States v. Ostrander*, 411 F.3d 684, 691 (6th Cir. 2005). "The government must be given the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial." *United States v. Head*, 927 F.2d 1361, 1365 (6th Cir. 1991). "It is not necessary that the evidence exclude every reasonable hypothesis except that of guilt." *United States v. Gallo*, 763, F.2d 1504, 1518 (6th Cir. 1985). And the district court "does not judge the credibility of witnesses or weigh evidence." *Ostrander*, 411 F.3d at 691. Indeed, the "uncorroborated testimony of a single accomplice may support a conviction under federal law." *Gallo*, 763 F.2d at 1518.

B.     <u>Argument</u>

    1.     <u>There Was Sufficient Evidence to Support HARDISON's Conviction on Counts Two through Five</u>

HARDISON has not challenged the government's proof on four of the five elements of Counts Two and Four. (*See* Doc. 2076.)[22] Rather, HARDISON contends only that the government failed to offer sufficient evidence of the "purpose" element of those Counts to sustain a conviction. (*See id.* at 13-18.) HARDISON likewise contends that the government failed to offer sufficient evidence on Counts Three and Five because an element of those crimes is the commission, respectively, of Counts Two and Four, the predicate murders in aid of racketeering. (*Id.* at 18.)

HARDISON is mistaken. "To establish a VICAR[23] violation" against a defendant, the government must show that the defendant's "general purpose in [committing the alleged crime of violence] was to maintain or increase his position in the enterprise." *United States v. Odum*, 878 F.3d 508, 516 (6th Cir. 2018), *rev'd on other grounds,* 139 S. Ct. 319 (2018). It is not "enough if the defendant's gang-related purpose was 'merely incidental' to his action." *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014) (*quoting United States v. Banks*, 514 F.3d 959, 968 (9th Cir. 2008)). Nor does VICAR "extend 'to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang[.]'" *Hackett*, 762 F.3d at 500 (quoting *Banks*, 514 F.3d at 959)). "But neither is the government required to prove the defendant acted 'solely' or 'primarily' for a gang-related purpose." *Id*. (quoting *Banks*, 514 F.3d at 965-66). Instead, this element is met "if the jury

---

[22]     It appears undisputed, in satisfaction of the elements of Counts Two and Four, *see* Doc. 2018, at 68-73, that the government established that the GDs existed as an "enterprise" on January 6, 2012; that the GDs engaged in, or its activities affected, interstate commerce; that the enterprise engaged in racketeering activity; and that HARDISON committed the murders. HARDISON's arguments instead attack the government's proof regarding the purpose behind HARDISON's commission of the murders. The government's response is therefore tailored to those arguments.

[23]     Violent Crime in Aid of Racketeering.

could find that an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise." *Odum*, 878 F.3d at 519 (*quoting Hackett*, 762 F.3d at 500). "[A] jury can reasonably infer this motive 'where the evidence shows that a defendant committed the violent crime "because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership,"'" including where the defendant "retaliate[d] violently in response to disrespectful behavior." *United States v. Rich*, 2021 WL 4144059, at *25 (6th Cir. Sep. 13, 2021) (citations omitted).[24]

Here, viewing the evidence in the light most favorable to the government, a rational juror could conclude that an "animating purpose" of HARDISON's commission of the murders was to maintain or increase his position in the GDs. HARDISON lived and breathed the GDs: he manifested his affiliation by covering his body with GD tattoos, and he unabashedly publicized his affiliation even before joining the Clarksville deck by flashing hand signals in social settings. He also saw the GDs as a means to acquire notoriety through "murder," lobbying Dowlen for a spot on the Blackout Squad, the gang's squad of assassins, before committing the double homicide.

HARDISON was not a large-scale drug dealer, but he had fronted approximately $60 of marijuana to Sherden. Sherden claimed to be a GD, but was not coming to meetings or paying dues, and was therefore in violation of gang rules.[25] Sherden also broke a sacred GD oath and became a "poor paymaster," by "putting it on the BOS" that he would repay HARDISON and then failing to do so. On the night of the murders, HARDISON was alerted to Sherden's location by

---

[24]     *See also United States v. Norwood*, 2015 WL 2250493, at *14 (E.D. Mich. May 13, 2015) (collecting cases and explaining that evidence that the defendants committed a murder while other gang members were present and then "bragged about it later to . . . a coconspirator of the enterprise . . . further supports a finding that at least one of the animating purposes behind this killing was to enhance or increase their position within the group.").

[25]     Trotter testified that the GDs exercised some degree of "control" over certain areas in Clarksville, including Main Street, and that non-GDs were not permitted to sell drugs in those areas. (Doc. 2048 at 125 (Trotter).) There was, consequently, evidence that Sherden was encroaching on the drug territory of the GDs, although the government did not base its theory of the case upon this evidence.

18

Dowlen, a fellow GD. HARDISON enlisted the aid of another GD, Trotter, to travel to Sherden's house and confront him. Sherden held a pistol during his interaction with HARDISON, which HARDISON took as a sign of disrespect. HARDISON murdered Sherden with a pistol he had gotten from a fellow GD (Trotter). After the murders, he gave the gun to a fellow GD (Trotter) and told him to get rid of it. And he reported the murders to ranking GDs, as gang rules required.

The GDs convened at least two meetings about the murders, including a meeting of the local deck where HARDISON and Trotter conveyed the details of the murders to the gang (including Darden), and a meeting of high-ranking GDs, including the GD governor who presided over Tennessee. Although the GDs in the latter meeting initially considered "eradicating" HARDISON, they ultimately concluded that HARDISON was "in the right." Indeed, rather than sanction him, they put him on the "security team," where he carried out "smashings" and drive-by shootings. The GDs also rushed to his aid several months later, when he was jumped by someone he believed to be a Blood. And despite being incarcerated between June 2013 and November 2015, *see* Exh. 6477, HARDISON's stock in the gang kept rising: by 2016/2017, he had become the regional chief of enforcement and earned a place on the Blackout Squad. The government thus offered overwhelming evidence at trial to satisfy the "purpose" element of Counts Two and Four.

*United States v. Gills*, 702 F. App'x 367 (6th Cir. 2017) is instructive. *Gills* involved members of "Murda Ville," a gang operating in a project in Flint, Michigan. *Id.* at *373. Leon Gills, a member of Murda Ville, was convicted of the attempted murder in aid of racketeering of four people who were friends with Jonathan Wilson. *Id.* at *376. Gills was dating a person named Crystal, who previously dated Wilson. *Id.* Wilson came to Crystal's apartment one day; found Crystal in bed with Gills; threatened Gills with a gun; and left. *Id.* Later that day, Gills and another member of Murda Ville went "hunting" for Wilson. *Id.* They drove to a store and saw a van they

19

knew to be associated with Wilson. *Id.* Four people, not including Wilson, walked out of the store; got into the van; and made eye contact with Wilson, who shot at (and struck two) of them. *Id.*

The Sixth Circuit rejected Gills's argument that the government offered insufficient proof of a gang-related purpose. *Id.* Gills argued that the jury could have concluded that he shot at the van "because he was angry with Wilson" and took that anger out on Wilson's friends. *Id.* But the Sixth Circuit noted that Murda Ville had a "reputation for violence" that depended upon its members "maintaining their individual reputations"; "[t]he gang therefore expected that members would respond violently, even to minor slights." *Id.* Gills called a fellow gang member after the confrontation with Wilson to report that Gills had been "disrespected." *Id.* According to the gang's ethos, Gills "needed to respond with force, or else risk being seen as 'soft.'" *Id.* at 376-77. The Sixth Circuit explained that "the manner in which Gills responded"—bringing a gang member "to witness his act of violence," and "bragg[ing] about the shooting to other Murda Ville members"— "could convince a jury that [Gills] sought to preserve his standing in the gang." *Id.* at 377.

The evidence against HARDISON is vastly more compelling than the evidence against Gills, who could plausibly claim that at least one of his motives for the shooting was settling a personal dispute which seemingly had nothing to do with Murda Ville at all. At HARDISON's trial, the government offered reams of evidence that the GDs cultivated a reputation for violence and valorized ruthless members like HARDISON. The government offered evidence that the GDs considered members who failed to respond to perceived disrespect as "soft" or "weak"; this evidence included HARDISON's participation in the "smashing" of Derrick Deon Williams, who was kicked out of the GDs for failing to respond to aggression from a rival gang. (Doc. 2062 at 53-55 (Warfield).) The government offered evidence that HARDISON brought Trotter to Sherden's house with him, to witness (and potentially to assist in) the double homicide. And the

20

government offered evidence that HARDISON, who made known his desire to become a killer for the gang before the murders, sought to commemorate his murder of Weyand by enlisting Duffey to prepare a sketch of her face with a bullet hole in the forehead as a cover for his rap album. Thus, viewed through the prism of *Gills*, the evidence undoubtedly permitted the jury to find that an animating purpose was HARDISON's desire to maintain or increase his position with the GDs.[26]

HARDISON's reliance on *United States v. Ledbetter*, 929 F.3d 338 (6th Cir. 2019) is inapposite. *Ledbetter* involved charges against members of the Short North Posse ("SNP") in Columbus, Ohio. *Id.* at 344. Deounte Ussury, a SNP member, was convicted of the racketeering murder of Dante Hill. *Id.* at 345, 356-58. The evidence showed that Hill, a regular buyer of marijuana from Tabib Broomfield (a drug dealer and friend of Ussury's, but not a SNP member), showed up at Broomfield's house to buy drugs from Broomfield. *Id.* at 356. Broomfield, who was not there and was "fresh out" of marijuana, called Ussury to ask if Ussury would travel to Broomfield's house and supply Hill. *Id.* Ussury apparently did travel to Broomfield's house, and then shot and killed Hill during the drug deal. *Id.* The government called no witnesses who saw Ussury murder Hill. *Id.* at 356. Instead, the government offered evidence that Ussury, who acted alone, was supposed to be selling drugs to Hill when Hill was shot; cell site data which put Usurry in the area; and two witnesses who testified that Ussury admitted shooting Hill. *Id.* at 356.

The Sixth Circuit vacated Usurry's VICAR murder conviction, concluding that the government had failed to satisfy the statute's purpose element because it had offered "no evidence

---

[26] Indeed, the record amply demonstrated that the double homicide *in fact* had the consequence of maintaining or increasing HARDISON's position in the enterprise. A rational juror could reasonably infer that HARDISON intended that consequence when he committed the crime. *See, e.g.*, Wayne LaFave, 1 Substantive Criminal Law § 5.2(f) (3d ed. 2021) ("It is not always easy to prove at a later date the state of a man's mind at that particular earlier moment when he was engaged in conduct causing or threatening harm to the interests of others . . . Naturally, what he does and what foreseeably results from his deeds have a bearing on what he may have had in his mind.").

that [SNP] members were expected or encouraged to unilaterally rob and murder low-level drug users who otherwise supported the gang by purchasing its drugs." *Id.* at 358. The Sixth Circuit opined that "one is left to guess why Usurry acted as he did here—alone and with no apparent connection to the gang," noting that "[t]his would be a different case entirely if the [SNP] directed Ussury to rob and murder Hill, *or if Hill was somehow a target of the gang*." *Id.* (emphasis added).

HARDISON's conviction suffers from none of these infirmities. HARDISON made it known before the double homicide that he wanted to establish a reputation in the GDs as a killer, including by asking to be placed on the gang's hit squad. HARDISON did not act alone in carrying out the double homicide: he was notified by Dowlen of Sherden's location; he enlisted Trotter's aid in traveling to Sherden's house; he used Trotter's pistol for the murder; and he directed Trotter to dispose of it afterwards. He reported the murders up the GD chain of command. GD leadership believed that the killings were so intertwined with gang business that they convened at least two meetings to discuss and investigate the potential ramifications. HARDISON's reasons for carrying out the murders were rooted in the GD code of conduct. The GDs adopted that reasoning, finding that Sherden was not on count and had also violated several GD tenets, thus potentially making him a target of the GDs' ire. And the GDs recognized after the murders that HARDISON possessed a ruthlessness that would make him a valuable to the organization; his reputation after the murders skyrocketed, netting him positions of authority on the gang's security team and Blackout Squad.

Lastly, because the government offered evidence sufficient to sustain HARDISON's conviction on Counts Two and Four—the predicate acts for Counts Three and Five—the government's evidence was also sufficient to sustain his conviction on Counts Three and Five.

2. <u>There Was Sufficient Evidence to Support HARDISON's Conviction on Count Six</u>

The government offered sufficient evidence to sustain HARDISON's conviction on Count Six. The government had to prove (1) a killing, (2) committed with intent (a) to prevent a communication (b) about the commission or possible commission of a federal offense (c) to a federal law enforcement officer. *Fowler v. United States*, 563 U.S. 668, 672 (2011). The government "need not show *beyond a reasonable doubt* (or even that it is *more likely than not*) that the hypothetical communication would have been to a federal officer." *Id.* at 674. The government must instead show that "it is reasonably likely under the circumstances that (in the absence of the killing) at least one of the relevant communications" to law enforcement "would have been made to a federal officer," and "that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* at 677-78.

The government offered sufficient evidence from which a rational juror could have found these elements beyond a reasonable doubt.[27] But HARDISON contends that the government failed to offer proof from which a rational juror could have concluded that it was reasonably likely that in the absence of Weyand's killing at least one of the relevant communications she would have made about Sherden's murder would have been to a *federal* officer. (Doc. 2076 at 20.)

HARDISON is again mistaken. The jury heard testimony from Stephen Gordy, who has been an ATF agent for 20 years. (Doc. 2062 at 198 (Gordy).) SA Gordy testified that the ATF investigates (among other things) offenses involving the illegal possession of firearms, the distribution of controlled substances, and violent crimes committed by organized gangs, and that SA Gordy had personally investigated the criminal activities of gangs, including the GDs, over his

---

[27] The government offered evidence that HARDISON (1) killed Weyand (2) to prevent a communication to a law enforcement officer. HARDISON does not contest the proof on either of these elements. (Doc. 2076 at 19-20.)

career. (*Id.*) Although SA Gordy is based in the Eastern District of Tennessee, he testified that the ATF has a group in the Middle District of Tennessee (covering Clarksville) that investigates gangs, including the "[i]llegal possession of firearms, distribution of controlled substances, threatening witnesses, murders . . . a wide gamut of crimes." (*Id.* at 199.) SA Gordy testified further that he and his team assisted the ATF group in the Middle District of Tennessee with HARDISON's arrest, which stemmed from HARDISON's federal criminal conduct. (*Id.* at 203-18.)

The jury also heard testimony about a broad array of criminal activity carried out by the GDs in Clarksville. They heard evidence that—in 2012 alone—the GDs were responsible for the double homicide on Main Street; multiple drive-by shootings; the shooting death of Charles Sims; the murder of Malcolm Wright; and multiple violent "smashings" of errant gang members. They also heard evidence that witnesses like Dowlen and Trotter, who possessed firsthand information about HARDISON's commission of the double homicide, conveyed that information during interviews with federal agents during the federal investigation into the criminal activities of the GDs in Clarksville. And they heard that HARDISON's fingerprints were found at the scene of the murders. It is inconceivable that, had Weyand not been killed, federal investigators—possessing reams of information identifying HARDISON as Sherden's murderer—would not have spoken with her about that murder. The likelihood that Weyand would have communicated with a federal officer about Sherden's murder was thus far from "remote, outlandish, or simply hypothetical": rather, it was a near certainty that such a communication would have occurred.[28]

---

[28]     At a minimum, it was reasonably likely under the circumstances that she would have communicated with a federal law enforcement officer, which is all that is required to sustain a conviction. *See, e.g.*, *Stuckey v. United States*, 603 F. App'x 461, 461-62 (6th Cir. 2015) (reasonably likely that a federal law enforcement officer would have received at least one communication from a witness murdered by a "leader and 'enforcer' of a violent drug gang" whose organization was the subject of a federal investigation).

24

HARDISON nevertheless contends that "[t]here is no mention in the record of any federal investigation or case that was pending at the time of the Main Street homicides." (Doc. 2076 at 20.) But the government is not required to prove that a federal investigation or case was pending at the time the killing occurred to obtain a conviction. *See* 18 U.S.C. § 1512(f)(1) ("For purposes of this section . . . an official proceeding need not be pending or about to be instituted at the time of the offense."). Were that the rule, a defendant who committed a federal crime and then immediately murdered a witness who threatened to talk to the FBI could seek acquittal on the grounds that no federal investigation was pending at the time of the witness murder.

HARDISON also contends that "there is no evidence to support the contention that [HARDISON] would have any reason to know that the crime might be reported to federal law enforcement." (Doc. 2076 at 20.) But *Fowler* confronted that precise issue, asking "what, if anything, the [g]overnment must show about the likelihood of a hypothetical communication with a federal law enforcement officer in circumstances where the defendant *did not think specifically about any particular communication or its recipient*." 563 U.S. at 673 (emphasis added). The Supreme Court answered that question in *Fowler* by setting out the "reasonable likelihood" test above, which the government easily meets on the evidence here.[29] Regardless, HARDISON's claim fails even on its own terms: HARDISON was no stranger to the justice system by January 2012,[30] and would undoubtedly have known that Sherden's killing—the execution-style murder of a person who claimed to be a GD and displayed a six-pointed star in his living room—was reasonably likely to result in a communication to a federal law enforcement officer.

---

[29] *See also United States v. Mathis*, 2016 WL 7240187, at *6 (W.D. Va. Dec. 13, 2016) ((rejecting defendant's argument "that he should be acquitted on Count 36 because he had no reasonable likelihood of knowing that the investigation into Quick's murder related to a federal proceeding as opposed to a state proceeding," and explaining that this argument "is contradicted by the plain statutory language" (quotations omitted)).

[30] HARDISON was incarcerated from April 20, 2004, to May 8, 2011. (Exh. 6477.)

25

III.    <u>Conclusion</u>

WHEREFORE, for the reasons above, the government respectfully requests that this Court deny defendant Brandon Durell HARDISON's Motion for Judgment of Acquittal (Doc. 2075) without a hearing.

Respectfully submitted,

MARK H. WILDASIN
United States Attorney

By:    */s/ Ben Schrader*
BEN SCHRADER
Assistant United States Attorney
Middle District of Tennessee


DAVID L. JAFFE
Chief, Organized Crime and Gang Section
Criminal Division, U.S. Department of Justice

By:    */s/ Gerald A.A. Collins*
GERALD A.A. COLLINS
Trial Attorney, Organized Crime and Gang Section
Criminal Division, U.S. Department of Justice


Dated:      April 5, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2022, I sent a copy of the foregoing via the Court's electronic filing system to counsel for the defendant.

*s/ Ben Schrader*
BEN SCHRADER
Assistant United States Attorney