# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:17-cr-00124 |
| | ) | |
| [3] BRANDON DURELL HARDISON | ) | |

## MEMORANDUM OPINION

On November 3, 2021, a jury found Brandon Durell Hardison guilty on each of the seven counts leveled against him in the Fourth Superseding Indictment. Now pending is his Motion for Judgment of Acquittal and accompanying Memorandum (Doc. Nos. 2075, 2076), to which the Government has responded in opposition (Doc. No. 2084). Hardison's Motion will be granted in part and denied in part.

## I. Background

Over the course of 10 days, the jury heard a great deal of evidence about the Gangster Disciples in Clarksville, Tennessee, an allegedly criminal organization that the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) is designed to dismantle. This evidence was necessary because Hardison was charged in Count One with participating in the affairs of that enterprise through a pattern of racketeering activity that included acts involving murder. Hardison does not challenge his conviction on the RICO count, however, and for that reason the Court finds it unnecessary to discuss in any detail the background, history, and operation of the Gangster Disciples. Such information can be found in this Court's prior decision relating to the trial of Hardison's co-defendants,[1] United States v. Darden, No. 3:17-CR-00124, 2019 WL 3946133, at

---

[1] Hardison's trial was severed because the Government initially sought the death penalty as to him.

*5-8 (M.D. Tenn. Aug. 20, 2019), as well as in the Sixth Circuit's opinion on appeal from that decision, United States v. Lucas, No. 19-6390, 2021 WL 4099241, at *1-3 (6th Cir. Sept. 9, 2021).[2]

Instead, the Court will discuss the facts as they pertain to the two overarching arguments presented by Hardison: (1) the Government did not prove the essential elements of the Violence in Aid of Racketeering ("VICAR") charges under 18 U.S.C. § 1959, as alleged in Counts Two and Four; and (2) the Government did not prove an essential element of witness intimidation in violation of 18 U.S.C. § 1512, as charged in Count Six. Based upon that claimed failure, Hardison moves for a judgment of acquittal under Rule 29(c)(1) of the Federal Rules of Criminal Procedure on Counts Two through Six. He does not seek an acquittal on Counts One or Seven, nor does he seek a new trial on any of the counts under Rule 33 (Doc. No. 2077).

## II. Counts Two Through Five

Count Two alleged that Hardison murdered Derrick Sherden and Count Four alleged that he murdered Amanda Weyand, both in aid of racketeering. Counts Three and Five are directly related to those counts because they allege that Hardison caused the deaths through the use of a firearm in violation of 18 U.S.C. § 924(j). Because Hardison submits the Government did not prove the racketeering element of the VICAR charges, it necessarily follows that the firearm counts fail

---

[2] From those decisions, the reader would learn certain terminology that the Gangster Disciples use and which appear in this opinion. For example, (1) gang members are "Brothers of the Struggle" ("BOS"): (2) a local chapter of the gang is known as a "set" or "deck" and is run by a "Regent," while a state or large area is under the control of a "Governor"; (3) members who are in a deck, attend meetings, and pay dues, are said to be "on count"; and (4) members show their affiliation by flashing gang signs, the most ubiquitous of which is "throwing up pitchforks" by using the thumb, index, and middle fingers. Further, (1) ranked members have "Positions of Authority" or "POS," and only they can authorize the "smashing" (beating) or "eradication" (killing) of fellow gang members for rule violations; (2) the "Blackout Squad" is a group of anonymous members that carry out sanctioned killings; (3) "putting it on the BOS" or "putting it on the hammer" means that you are taking a solemn oath to do (or not do) something; and (4) members are expected to pay their debts, and those who do not are known as "poor paymasters."

2

as well.

At trial, the Government presented a straightforward case relating to the double murder of Sherden and Weyand at 1114 Main Street, Clarksville, Tennessee on January 6, 2012. According to the evidence, Sherden, who went by the nickname "Meech," claimed to be a Gangster Disciples member, although he was not "on count" with the Clarksville deck and did not attend monthly gang meetings or pay dues. (Doc. No. 2060, Tr. at 127). Nevertheless, he had a "7-4" tattoo of his face (presumably in reference to the 7th and 4th letters of the alphabet, *i.e.*, G. D.), as well as a six-pointed star on his living room wall that is a well-known Gangster Disciple symbol.[3] (Doc. No. 2055 Tr. at 273-74).

Sherden was a marijuana user and small-time dealer. He would periodically buy marijuana from Tavaraes Trotter, a Gangster Disciples member. Those purchases generally occurred in the Lincoln Homes public housing development in Clarksville where Trotter's sister lived and where Trotter stashed weapons for the Gangster Disciples. Trotter, who referred to Sherden at trial as his "brother," had been to Sherden's home on four to five occasions to smoke marijuana. While there, he met Weyand whom he knew as "Lil Bit." (Doc. No. 2084, Tr. at 181-82).

Shortly before 9:00 p.m. on January 6, 2012, Sherden called his friend Keith Garrett and asked him for a ride to Universal Package Liquor Store on College Street. Garrett obliged and drove Sherden to the liquor store where he purchased a bottle of Taaka Vodka, a lower-shelf brand costing $7.99. After Sherden returned to the car, Garrett drove to the Rhino Mart on North Second Street and then dropped Sherden back home. (Doc. No. 2056, Tr. at 45-51).

At about the time that Garrett was driving Sherden to the liquor store, Lavell Traylor was

---

[3] Each point of the star is said to represent one of the virtues held dear to the gang

working at a Sonic Drive-In in Clarksville. He received a call from Hardison who asked for a ride to "go pick up some money." Traylor picked Hardison and Josh Henry up at Kandice Wallace's house. Also living in the home was Tiffany Baxter, Henry's girlfriend. (Doc. No. 2056, Tr. at 261-63).

Traylor drove Hardison and Henry to Lincoln Homes where they ran into Trotter. Trotter heard Hardison say, "Imma kill that n****r," (Doc. 2048 at 183-84), referring to Sherden who allegedly owed Hardison $80 for a prior marijuana purchase.[4] Hardison then asked Trotter to take him to Sherden's house. (Id. at 184).

Hardison and Trotter got into Traylor's Chevrolet Impala in which Henry was still sitting. Trotter told Traylor how to get to Sherden's house and, once there, directed him to park across the street. Hardison and Trotter went up to the house while Traylor and Henry remained in the vehicle.

Trotter knocked on the door and stepped inside, saying, "What's up bruh?" Sherden then turned towards the door with a pistol in his hand and said, "Boy, you better start knocking." (Id. at 194.) Sherden and Trotter greeted each other with a Gangster Disciples' handshake. Trotter and Hardison then followed Sherden into the kitchen, at which point Sherden offered his visitors a drink. Hardison asked Sherden about the money he was owed, to which Sherden (with the gun still in his hand) responded, "Man, bruh, I'm getting that together," and Hardison replied, "Say no more." Hardison then stepped outside, presumably to smoke a cigarette. (Id. at 194-95).

Once Hardison was outside, Sherden told Trotter he had made a rap CD and put it on the stereo. He then sat down on the couch near the front door, laying the gun next to him. Trotter sat

---

[4] It is unclear from the record whether Sherden owed Hardison $60 or $80. Whatever the amount, by all accounts it was a paltry sum.

in a chair across from Sherden. As the two were listening to the CD, Hardison reentered the house, pulled a pistol from his pocket and shot Sherden point-blank in the head. Trotter jumped from the couch and ran towards the front door with Hardison yelling at him to "go grab the girl," meaning Weyand who was in the bedroom at the back of the living room screaming hysterically. (Id. at 204-05). Trotter ignored Hardison and ran out the front door. As he exited, Trotter heard four or five more gunshots. Trotter continued running to Traylor's car and jumped into the back seat. Moments later, Hardison appeared from the house and climbed into the front passenger seat. (Id. at 209).

Once inside the vehicle, Hardison told the occupants, "Anyone of y'all say something about this, I'm going to kill y'all." (Id.). He also gave the murder weapon to Trotter and told him, "do something with this." (Id. at 209). Traylor then drove Trotter back to Lincoln Homes.

At Lincoln Homes, Trotter went to his sister's house where he "bleached" the gun to remove fingerprints and disassembled it. In doing so, Trotter noticed that the gun, a chrome plated 9mm, was the same gun he had loaned to Hardison two weeks earlier. Trotter placed the disassembled gun into a bag with a brick and, accompanied by two fellow Gangster Disciples, disposed of it by tossing the bag into the river. (Id. at 209-11).

At around 10:30 p.m. (which corresponded to the time that Hardison and Traylor were in Sherden's home), Garrett spoke with Sherden and heard Sherden say words to the effect of, "I don't do business like that," after which the phone went dead. (Doc. No. 2056, Tr. at 45). Suspicious, Garrett drove to Sheridan's home where he and a neighbor looked through the storm door and saw Sherden lying motionless on the couch. The neighbor called 911. (Id.).

Upon arrival, police found Sherden dead on the couch from two gunshot wounds to the right side of the head. Weyand was dead in the bedroom, having been shot in the shoulder, behind her left

5

ear, and in the back of her head. One 9mm cartridge casing was recovered from the living room floor and four more were found in the bedroom. All of those casings came from the same firearm. In addition, five of Hardison's fingerprints were found on a cup in the living room, and one of his fingerprints was found on a Taaka Vodka bottle. (Id. at 145-147).

The day after the double murder, Hardison woke Baxter up, "kind of giggled," and said, "somebody got Meech" and that "Meech was dead." (Doc. No. 2057, Tr. at 210). Henry was present during those statements and, according to Baxter, was "real quiet" and acting "strange." (Id.). When Baxter asked Hardison how he knew Sherden was dead, Hardison just said, he "knew," even though Baxter found no news reports about the deaths. (Id. at 211).

At some point shortly after the murders, Trotter called Danyon Dowlen, a longtime member of the Gangster Disciples who held various high ranking positions of authority in the organization over the course of many years. Trotter, who "was in a bad way" and "kind of shook up," told Dowlen that Sherden and Weyand were dead. (Doc. No. 2060 Tr. at 36-37).

In addition to the foregoing evidence, the jury also heard about a confession to the double murders that Hardison allegedly made to John Duffey. Duffey, an erstwhile tattoo artist, was housed with Hardison at the West Tennessee Detention Facility in Mason, Tennessee. There, the two became friends, and Hardison commissioned Duffey to draw an album cover for a rap album he intended to produce. In its brief, the Government accurately summarized Duffey's testimony as follows:

> Duffey agreed to help Hardison and prepared a sketch at Hardison's direction that included images of significance to Hardison. Hardison told Duffey (in conversations over time) that Hardison had murdered two people, "Derrick" and "Amanda" at "Derrick's" house in Clarksville, Tennessee; that "Josh" and "Wolf" had gone with Hardison to the house; that Hardison had shot "Derrick" "in the side of the head on

6

the couch twice"; and that Hardison had shot "Amanda" "twice in the back of the head." The images included the word "Head Shock," which Duffey explained should have been "Head Shot," and which Hardison told Duffey was a reference to "someone being shot in the head"; the face of a woman with a bullet hole in her forehead, "where the bullet hole was dripping out the front so it looked like she was shot from the back"; the words "Creeper da Reaper," a nickname for Hardison; an angel of death; and two bullets, which Duffey understood signified "two bullets to the head." The sketch also included a tumbler glass with a fingerprint on it, which Hardison said referred to "the only piece of evidence" "the government had on him in the house" where Hardison had murdered Sherden and Weyand. Hardison also told Duffey about why he was going to trial: he said that he "wanted to pull the rats out that were on the case that were telling on" him, so he could "expose them and have them serve repercussions on it." Hardison also said that the bullet "187" tattoo on his face was meant as a message, so that "anybody who was ratting on him in the future would see that death would come to them."

(Doc. No. 2084 at 11, n.18) (internal citations to record omitted). In short, the album cover was essentially a roadmap of the double homicide.

Clearly from the foregoing evidence, any reasonable jury could conclude that Hardison murdered Sherden and Weyand. Hardison does not suggest otherwise. Instead, his argument is that the Government failed to show that the murders were in aid of racketeering.

"To establish a VICAR violation, the government must show: '(1) that the Organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.'" United States v. Woods, 14 F.4th 544, 555 (6th Cir. 2021) (quoting, United States v. Odum, 878 F.3d 508, 516 (6th Cir. 2017)). Hardison argues the Government has not met the fifth, or "purpose," element.

Hardison insists that the proof showed the murders were a "spontaneous act," that arose from Sherden's failure to pay an $80 marijuana debt during which Sherden was armed with a pistol that

7

made Hardison uneasy. While there was proof that Hardison dabbled in marijuana sales, there was no evidence to suggest that his drug dealing had anything to do with the Gangster Disciples, and none of the proceeds went to the organization as would be expected were it part of a gang venture.

Hardison also notes that not a single witness testified that he committed the murders for the purpose of increasing or maintaining his position in the gang. To the contrary, it was against the rules for a Gangster Disciples member to kill another member, unless it was sanctioned by those in positions of authority, which the double murders were not. Indeed, shortly after the murders discussion occurred among the upper echelon of the Clarksville deck about whether to "eradicate" Hardison because of his actions. Hardison submits that "[b]ased on the proof at trial related to Hardison's history in the gang, he would have been aware, prior to the homicides, that such actions would be a capital offense under the gang's laws. Therefore, it offends all logic and reason that he would commit these acts as a means to increase or maintain his position." (Doc. No. 2076 at 16-17).

To be sure, "VICAR does not extend 'to any violent behavior by a gang member under the presumption that such individuals are always motivated, at least in part, by their desire to maintain their status within the gang[.]'" United States v. Hackett, 762 F.3d 493, 500 (6th Cir. 2014) (quoting United States v. Banks, 514 F.3d 959, 968 (9th Cir. 2008)). "Otherwise, in gang cases, the purpose element would be nearly a tautology. Nor is it enough if the defendant's gang-related purpose was 'merely incidental' to his action." Id. By the same token, however, the Government is not "required to prove the defendant acted 'solely' or 'primarily' for a gang-related purpose." Id. (citation omitted). Instead, as the Sixth Circuit has explained, "VICAR's 'purpose' element is met if the jury could find that an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise.'" Odom, 878 F.3d at 519.

In making that determination in the present procedural posture of this case, the Court is cabined by the standard of review governing Rule 29 motions. "The relevant inquiry is whether, 'viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Fisher, 648 F.3d 442, 450 (6th Cir. 2011) (emphasis in original) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

"Under the Jackson v. Virginia standard, a reviewing court does 'not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury.'" Id. (citation omitted). "'Substantial and competent circumstantial evidence by itself may support a verdict and need not remove every reasonable hypothesis except that of guilt.'" Id. (quoting United States v. Lee, 359 F.3d 412, 418 (6th Cir. 2004)). Given this, a defendant moving for a judgment of acquittal under Rule 29 bears a "very heavy" burden. United States v. Ostrander, 411 F.3d 684, 691 (6th Cir. 2005) (citing United States v. Walls, 293 F.3d 959, 967 (6th Cir. 2002); United States v. Tocco, 200 F.3d 401, 424 (6th Cir. 2000)).

Viewed through the prism of Rule 29, the Government presented more than enough evidence from which a reasonable jury could conclude that the "animating purpose" behind Hardison's murder of Sherden and Weyand was "to maintain or increase" his position with the Gangster Disciples. On this score, the jury could have viewed the evidence in the following way.

Hardison is a Gangster Disciples to his very core. He is adorned with tattoos representing his loyalty to the gang and its way of life, literally from his head downward. These include multiple six-pointed stars (including a large one on his face); the name "Larry Hoover," the founder of the Gangster Disciples; a bullet containing the number "187," the police code for murder; and a stop sign

9

signifying "stop snitching." (Doc. No. 2060 at 19-29).

Hardison moved from Nashville to Clarksville and made his presence known at least by June 2011 when he was seen "throwing up pitchforks" on the dance floor at a club where rival gang members were also present. This was indeed a bold move, suggesting that Hardison was fearless and confident of his status as a Gangster Disciple. Because of this move and his physical stature, Hardison was immediately viewed as an asset to the Clarksville deck. He told Trotter that he "wanted to be respected," told Dowlen that he wanted to be "famous," either "for rapping or murder," and lobbied Dowlen to be on the Blackout Squad, even before the double homicides occurred. (Doc. No. 2048, Tr. at 173-74; Doc. No. 2060, Tr. at 12-13).

It is a cardinal rule that Gangster Disciples do not kill each other, at least not without permission from those in Positions of Authority, lest they be eradicated. This rule, however, is too small a hook on which to hang Hardison's judgment of acquittal hat.

Sherden moved from Chicago, Illinois to Clarksville. He claimed to be a Gangster Disciples member, but that was never established by members of the Clarksville deck. He did not pay dues or attend local meeting, and was not "on count." In fact, when those in Positions of Authority were debating Hardison's fate over the killings, Dowlen persuaded them that the cardinal rule had not been broken because, while Gangsters Disciples had looked into the matter, they could not confirm that Sherden was actually a member. Ultimately, the powers-that-be determined that Hardison was "in the right" and he would not be eradicated or otherwise sanctioned. (Doc. No. 2059, Tr. at 44-46).

A jury could also determine that Hardison was "in the right" under the Gangster Disciples' code because Sherden violated a sacred oath and was a "Poor Paymaster." He "put it on the BOS" that he would repay the debt. (Doc. No. 2059 at 125-26). To make matters worse, several individuals

10

knew about the debt, as Hardison himself acknowledges in his brief.

Gangster Disciples do not take disrespect lightly. To the contrary, respect is important to them, and this includes respect for the individual member and the organization as a whole. (Doc. Nos. 2048 at 60, 107-08; 2062 at 53-55). Sherden's disrespect was two-fold – he reneged on a debt that he solemnly vowed to repay, and he displayed a weapon throughout the time Hardison was in the residence before going outside to smoke a cigarette. Worse yet, this disrespect was displayed in front of a fellow Gangster Disciple, and several others knew about Sherden's debt and his efforts to duck Hardison.

"[A] jury can reasonably infer" that the animating purpose of a killing is to increase stature in a gang "where the evidence shows that a defendant committed the violent crime 'because he knew it was expected of him by reason of his membership in the enterprise or that he committed it in furtherance of that membership[.]'" United States v. Rich, No. 18-2268, 2021 WL 4144059, at *25 (6th Cir. Sept. 13, 2021) (quoting United States v. Ledbetter, 929 F.3d 338, 358 (6th Cir. 2019)). This includes "retaliating violently in response to disrespectful behavior[.]" Id. (citing Odum, 878 F.3d at 519.[5] The card carrying member that he was, Hardison was not about to allow such an affront to a Gangster Disciples member go unpunished, or least a jury could have so concluded. From the evidence, the jury could have easily determined that the murders were not so much over a petty drug debt as they were about showing respect to a Gangster Disciple who viewed himself as tough and wanted his fellow Brothers in the Struggle to know it.

---

[5] Trotter obviously thought the murders were gang-related because he reported the Main Street homicides to Marcus Darden, the Regent of 615, as would be expected whenever there is a "major incident" reflecting on the Gangster Disciples. This led to two meetings regarding Hardison's fate, including one in which Hardison pled his case, and another where Byron Purdy, the Gangster Disciples Governor over Tennessee, participated by phone. (Doc. No. 2048, Tr. at 224-26; Doc. No. 2060, Tr. at 41-44).

The evidence that the jury heard in this case is markedly different than that presented to the jury in Ledbetter, on which Hardison heavily relies. From the appellate court's recounting of the facts in that case, Dante Hill was murdered by Decounte Ussury during the course of a drug transaction. The similarities between that case and this case are: (1) the murders occurred during a drug transaction; (2) a firearm was displayed by the victim; (3) the murderer was a member of a criminal gang; and (4) the murderer reached out to fellow members of the gang to dispose of the murder weapon. In finding that Hill's murder did not occur so that Ussury could increase his status in the gang, the Sixth Circuit observed that "[w]hile there was plenty of evidence that Short North Posse members were expected to be violent and take part in sanctioned robberies and murders, there was no evidence that members were expected or encouraged to unilaterally rob and murder low-level drug users who otherwise supported the gang by purchasing its drugs." Ledbetter, 929 F.3d at 358. The Sixth Circuit concluded:

> At bottom, the evidence of Ussury's motivation was thin, and whatever evidence there was does not support a reasonable inference that Ussury robbed and murdered Hill [to maintain or increase his status in the gang]. The evidence did not show that this was a Short North Posse robbery, nor that Ussury committed a solo act of violence to boost his reputation within the gang. It is not enough that a violent gang member did a violent thing.

Id. at 359.

Here, the evidence of Hardison's motivation was not thin. While the evidence does not show the double homicide were Gangster Disciples' murders, it overwhelmingly showed Sherden was killed to increase Hardison's status in the Clarksville deck and Weyand was killed because she was a witness to the crime. And increase his status it did.

Within two months of the murders, Hardison was placed on the "security team" by Lamar

12

Warfield, the Chief of Security at that time. (Doc. No. 2062 at 48-50). This is hardly surprising given the Gangster Disciples' credo. Indeed, the double murders "boosted his MO within the gang," Hardison had "status," and fellow gang members began to "cling to him," "praise him," and "bow down to him." (Doc. No. 2048 at 231). In short, the Main Street murders established Hardison was not afraid "to pull a trigger" and "commit multiple murders," and this earned him the "respect" of his fellow Gangster Disciples that he so craved. (Id. at 232). He would go on to carry out smashings and participate in drive-by shootings of rival gang members, among other violent crimes. Ultimately Hardison replaced Warfield as Chief of Security for the 615 region, and was selected by Warfield to be on the regional Blackout Squad, a position Hardison had coveted for years. (Doc. No. 2055 at 154, 158; Doc. No. 2062 at 91-92, 111-15). Hardison's dream had become realized – he was known for murder, at least among his fellow Gangster Disciples. Accordingly, Hardison's Motion for Judgment of Acquittal on Counts Two through Five will denied.

### III. Count Six

In Count Six, Hardison was charged with killing Weyand in violation of 18 U.S.C. § 1512. Subsection (1) of that statute punishes one who "kills or attempts to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense," while subsection (2) is directed at one who "uses physical force or the threat of physical force" in order to "hinder delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense[.]" 18 U.S.C. §§ 1512(a)(1)(C) and (2). The statute goes on to state "no state of mind need be proved with respect to the circumstance . . . that the law enforcement officer is an officer or employee of the

13

Federal Government[.]" Id. § 1512(g)(2). Finally, the statute provides that "an official proceeding need not be pending or about to be instituted at the time of the offense[.]" Id. ¶ 1512(f)(1).

By its very terms, essential to a Section 1512 conviction is that a defendant's actions hinder, delay, or prevent "communication to a law enforcement officer or judge of the United States," meaning a federal (as opposed to state or local) agent or judge. It is on the alleged failure of the Government to prove this element that Hardison seeks a judgment of acquittal on Count VI. The Government insists the evidence was more than sufficient.

In analyzing the parties' argument on this issue, the Court need go no further than the Supreme Court's decision in United States v. Fowler, 563 U.S. 668 (2011). In that case, defendant and his accomplices planned to rob a bank. As they were meeting in a cemetery prior to the robbery, a local police officer happened upon the group. Noticing that they were wearing dark clothing and gloves, the officer pulled his weapon and demanded that the men identify themselves. The officer was then overpowered, his gun was taken, and he was killed.

Defendant was charged with, and convicted of, violating Section 1512. On appeal, defendant argued, as Hardison does here, that the evidence was "insufficient to show that he had killed [the officer] intending to prevent [him] from communicating with a federal officer." Id. at 570-71. The Eleventh Circuit disagreed and, like several other circuits, held that all that was necessary for conviction was a showing of a "'possible or potential communication to federal authorities[.]'" Id. at 671 (quoting United States v. Fowler, 603 F.3d 883, 888 (11th Cir. 2010)).

In resolving a split among the circuits, the Supreme Court began by quoting the statutory language in Section 1512(g)(2) about no state of mind being required "with respect to the circumstance" and framed the "not necessarily rare" issue as follows:

14

> The question here is how this language applies when a defendant (1) kills a victim, (2) with an intent (a) to prevent a communication (b) about the commission or possible commission of a federal offense but (c) to law enforcement officers in general rather than to some specific law enforcement officer or set of officers which the defendant has in mind.

Id. at 672. The Court held:

> The Government need not show that such a communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that it is more likely than not.
>
> . . . But the Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical.

Id. at 678.

In support of its position that it more than established the *federal* law enforcement requirement as set forth in Fowler, the Government summarizes the testimony of Stephen Gordy, an Alcohol, Tobacco, and Firearms ("ATF") agent as follows:

> SA Gordy testified that the ATF investigates (among other things) offenses involving the illegal possession of firearms, the distribution of controlled substances, and violent crimes committed by organized gangs, and that SA Gordy had personally investigated the criminal activities of gangs, including the GDs, over his career. Although SA Gordy is based in the Eastern District of Tennessee, he testified that the ATF has a group in the Middle District of Tennessee (covering Clarksville) that investigates gangs, including the "[i]llegal possession of firearms, distribution of controlled substances, threatening witnesses, murders . . . a wide gamut of crimes." SA Gordy testified further that he and his team assisted the ATF group in the Middle District of Tennessee with HARDISON's arrest, which stemmed from HARDISON's federal criminal conduct.

(Doc. No. 2084 at 23-24) (internal citations omitted). The Government also points out that "[t]he jury also heard testimony about a broad array of criminal activity carried out by the GDs in Clarksville," including "that—in 2012 alone—the GDs were responsible for the double homicide on Main Street; multiple drive-by shootings; the shooting death of Charles Sims; the murder of Malcolm Wright; and multiple violent 'smashings' of errant gang members." (Id. at 24). Based

upon this evidence, the Government argues that "[t]he likelihood that Weyand would have communicated with federal officers about Sherden's murder was thus far from 'remote, outlandish, or simply hypothetical'; rather, it was a near certainty that such a communication would have occurred." (Id. at 25). The Court disagrees.

At the time of the murders, neither the ATF or any other federal law enforcement agency was poking around the Gangster Disciples or investigating its affairs. While the Government is correct that the statute does not require that official proceeding be pending or about to be instituted, the crimes Hardison was involved in (*e.g.* murders and assaults) were state law crimes, unlike in Fowler where bank robberies are often prosecuted federally.

When the facts are construed in the Government's favor as they must be for present purposes, the evidence before the jury did not show that at the time of the double murders federal law enforcement had any interest in the Gangster Disciples, their activities, or their state law crimes. To be sure, there was always some possibility that a federal agency could investigate the gang at some point, but "a 'mere possibility' standard is precisely what the Supreme Court rejected in Fowler." Lobbins v. United States, 900 F.3d 799, 802 (6th Cir. 2018). On this point, the Supreme Court could not have been any clearer:

> Often, when a defendant acts in ways that violate state criminal law, some or all of those acts will violate federal criminal law as well. And where a federal crime is at issue, communication with federal law enforcement officers is almost always a possibility. Thus, to allow the Government to show only a mere possibility that a communication would have been with federal officials is to permit the Government to show little more than the possible commission of a federal offense. (That is to say, the latter showing by itself would almost automatically show the statutorily necessary connection with a federal law enforcement officer.) The "possibility" standard would thereby weaken or eliminate the independent force of the separate statutory requirement that the defendant, in killing the victim, must intend to prevent communication with one who is "a law enforcement officer or judge of the United

16

States."

Moreover, because of the frequent overlap between state and federal crimes, the use of a standard based on the word "possible" would transform a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature.

Fowler, 563 U.S. at 676-78 (internal citations omitted).

Based on Fowler, the Government was required to "show a reasonable likelihood that, had [Weyand] communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." Id. at 677. At best, the Government showed a remote possibility and that is nowhere near enough to sustain a conviction. Therefore, Hardison's Motion for Judgment of Acquittal on Count Six will be granted.

## IV. Conclusion

On the basis of the foregoing, Hardison's Motion for Judgment of Acquittal will be granted in part and denied in part. The Motion will be granted with respect to Count Six, but denied with respect to Counts Two through Five.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE