IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| | ) | No. | 3:17-cr-00124 |
| v. | ) | | |
| | ) | | Chief Judge Crenshaw |
| | ) | | |
| [3] BRANDON DURELL HARDISON | ) | | |

## <u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>

The United States of America, through Mark H. Wildasin, United States Attorney for the Middle District of Tennessee, and David L. Jaffe, Chief of the Organized Crime and Gang Section, U.S. Department of Justice, respectfully files this memorandum to aid the Court in its sentencing determination. The defendant, Brandon Durell HARDISON, was a brutal enforcer for the Gangster Disciples, a violent, national street gang operating in Clarksville, Tennessee and elsewhere. A federal jury convicted him of RICO conspiracy and multiple serious offenses in aid of racketeering, and he faces a guidelines range of life imprisonment.

On January 6, 2012, HARDISON took the lives of Derrick Sherden and Amanda Weyand. Several months later, he set in motion events that resulted in the murder of Malcolm Wright. By these actions, HARDISON forfeited his right to live as a free man. This Court should sentence him to life in prison.[1]

---

[1]     Counts One through Five each carry a statutory maximum term of imprisonment of life, or death. Count Seven carries a statutory maximum term of imprisonment of 20 years. Counts Two and Four also carry statutory mandatory minimum terms of imprisonment of life. The government specifically requests that this Court sentence HARDISON to life in prison on Counts One through Five, and to 20 years of imprisonment on Count Seven.

# I. Factual and Procedural Background

## A. Overview of the Gangster Disciples in Clarksville

The Gangster Disciples ("GDs") were founded in the late 1960s in Chicago, Illinois, by Larry Hoover and David Barksdale. (Doc. 2055 at 107 (Kelly).)[2] Serving underneath Hoover, who is known as the "chairman," is the Board of Directors, whose members push new policies to regional and state gang leadership. (*Id.* at 108-9.) GDs also hold positions of authority, or "POAs," at the state level, including governor and chief of security. (*Id.* at 109-10.) GDs also hold local POAs which mirror those at the state level. (*Id.* at 110-11.) POAs carried out specific duties: the "secretary," for example, handles the organization's paperwork, and the "treasurer" handles the money. (*Id.* at 115-16.) The chief of enforcement, or "chief enforcer," ensures observance of GD laws within the organization. (*Id.* at 110.) The chief of security handles gang "security" and "protocol." (*Id.*) The chief of security also maintained a "security team," whose members carried out violations and collected delinquent dues. (*Id.* at 140.) Members retaliated against those in conflict with the gang and kept guns for that purpose. (*Id.* at 140-41; Doc. 2048 at 56, 64-65 (Trotter).) Members were expected to be armed with guns at all times. (Doc. 2048 at 64 (Trotter).)

The GDs had initiation rituals. (Doc. 2055 at 102-06 (Kelly.) They held meetings to discuss gang business and collect dues. (Doc. 2048 at 67-72, 110 (Trotter).) And they kept track of dues and attendance with dues rosters. (Doc. 2055 at 119-20 (Kelly).) They had foundational literature and laws, most notably the "17 laws." (*Id.* at 136-37.) If a member violated these laws, he could be subject to "violation" or "smashing," or even death, by fellow GDs. (*Id.* at 137-39.) The GDs used specialized terms, like "on count," "poor paymaster," and "putting it on the BOS." (*Id.* at

---

[2]      References to transcripts of the October and November 2021 trial in this case appear in the following format: ECF Docket Number, Page Number, and Witness Name. References to trial exhibits appear as "Exh. #." In the interest of space, the government has avoided citing the testimony of multiple witnesses where doing so would be duplicative.

112-13; Doc. 2048 at 65-66, 99-100, 101 (Trotter); Doc. 2059 at 126-27 (Dowlen).) The GDs had symbols, like the six-pointed star, the pitchfork, and the colors black and blue. (Doc. 2055 at 134-36 (Kelly).) And the GDs had rivals, like the Bloods. (*Id.* at 141.)

The GDs wanted to become the "baddest" and "most feared" gang in Clarksville. (Doc. 2048 at 104 (Trotter).) They sought to achieve that goal by assaulting, shooting, or killing rival gang members. (*Id.* at 106.) Demonstrating a willingness to kill was a way to earn respect within the GDs. (Doc. 2048 at 106-07, 232 (Trotter); Doc. 2062 at 41-42 (Warfield).) The GDs valued members who engaged in such conduct, "encourag[ing]" or "prais[ing]" those who shot at or killed rival gang members. (Doc. 2048 at 106-07, 232 (Trotter); Doc. 2059 at 108-09 (Dowlen).) Violence of this sort made people "fear the GDs." (Doc. 2059 at 69-70 (Dowlen); Doc. 2062 at 41-42 (Warfield).) Members who were unwilling to engage in such conduct were perceived as "weak," and had difficulty maintaining membership in the GDs. (Doc. 2048 at 107-08 (Trotter).)

The GDs had a secretive team of assassins, known as the "Blackout Squad." (Doc. 2062 at 123-24 (Warfield).) The "main mission" of the Blackout Squad was to "carry out murders" or "hits"; to "kill" or "eradicate" persons on behalf of the gang. (Doc. 2055 at 155 (Kelly); Doc. 2060 at 47-48 (Dowlen).) GDs who did not hold a POA typically did not know who was on the Blackout Squad. (Doc. 2060 at 48 (Dowlen).) Its members traveled to different regions or states to carry out assignments so it would be harder for witnesses to identify them. (Doc. 2055 at 156-57 (Kelly).) The GDs looked for specific qualities in members who were placed on the Blackout Squad, including "[h]eartlessness," "fearless[ness]," and a "[w]illingness to kill"; HARDISON possessed those qualities. (Doc. 2060 at 48-49 (Dowlen); Doc. 2062 at 12-25, 125 (Warfield).) Before HARDISON committed the double homicide, he was unequivocal in his desire to join the Blackout Squad: he told Danyon Dowlen, "Put me on the blackout squad." (Doc. 2060 at 48 (Dowlen).)

3

## B. **HARDISON Comes to Clarksville**

HARDISON made his GD affiliation known in Clarksville as early as 2010 or 2011, identifying himself as a GD to fellow gang member Dekota Kelly when they met at a convenience store. (Doc. 2055 at 151-53 (Kelly).)[3] HARDISON introduced himself to GD members Dowlen and Tavares Trotter in June 2011 at a club in Clarksville. (Doc. 2048 at 168 (Trotter.) Rival gang members were also in the club. (*Id.*) The GDs saw HARDISON, who was alone and shirtless on the dance floor, "acting wild" and "throwing up the pitchforks." (*Id.* at 168-69.) None of the GDs from Clarksville knew HARDISON, so they introduced themselves. (*Id.* at 168-71.) As they exchanged GD greetings, HARDISON said he was from Nashville and had moved to Clarksville. (*Id.* at 170-71.)

HARDISON was a "big, stocky fella," and was "bold." (Doc. 2048 at 173 (Trotter).) The GDs recognized that HARDISON could be an asset, and that they could use him for "security purposes" or to "aid and assist[]" the GDs. (*Id.* at 172-73.) The GDs perceived HARDISON—who was not afraid to flash GD signs in front of rivals even though he had been alone—as someone "strong," who "wouldn't back down from nothing." (Doc. 2060 at 11-12 (Dowlen).) GDs like HARDISON who made it known that they would engage in violence, "set [the GDs] up to be respected and feared" by the "opposition," meaning rival gangs. (*Id.* at 16-17.) After the GDs met him in June 2011, he came to GD meetings in Clarksville regularly. (Doc. 2048 at 174 (Trotter).) He did not have a POA at first. (Doc. 2060 at 13-14 (Dowlen).)[4] HARDISON proved a valuable asset, making himself available to carry out "violations," shootings, or murders. (*Id.* at 16.)

---

[3]     In a Facebook post dated July 4, 2011, HARDISON is depicted in a "selfie"-style photograph, holding what appears to be two firearms and draping a six-pointed star necklace over his arm (Doc. 2055 at 199-203 (Chaney); Exh. 6033.) In a video posted online sometime prior to January 2012, HARDISON is depicted in Clarksville brandishing guns, displaying a black flag, and flashing a pitchfork sign (Doc. 2059 at 137-43 (Dowlen); Exh. 6030.)
[4]     Dowlen believed HARDISON was initially placed on the "security team" with other GDs who did not have a "function" (meaning a POA). (Doc. 2060 at 13-14 (Dowlen).)

4

HARDISON made statements to Dowlen and Trotter that gave them insight into what HARDISON wanted to achieve with the GDs. (Doc. 2060 at 12-13 (Dowlen).) HARDISON told Trotter that he "wanted to be respected." (Doc. 2048 at 173-74 (Trotter).) And HARDISON told Dowlen that he wanted to be "famous for something," "either for rapping or murder"; Dowlen testified that HARDISON saw "the Gangster Disciples as a means to do that." (Doc. 2060 at 13 (Dowlen).) Dowlen testified further that the GDs were "all [HARDISON] knew"; that he was "real loyal to the Gangster Disciples"; and that being a GD was "inbred into him." (*Id.* at 12-13) HARDISON manifested his loyalty to the GDs by acquiring dozens of gang tattoos, including the words "Larry Hoover" and six-pointed stars, all over his body. (*Id.* at 19-29 (Dowlen).) HARDISON acquired tattoos demonstrating an affinity for violence and witness intimidation.[5] And HARDISON made posts to Instagram demonstrating his loyalty to the GDs, including "a lot of gang-affiliated stuff" and "a lot of disrespectful stuff towards other rival gangs."[6] HARDISON made posts like this to "instill fear in people." (Doc. 2062 at 118-19 (Warfield).)

### C. <u>The Main Street Double Homicide</u>

#### 1. <u>Derrick Sherden and Amanda Weyand</u>

Derrick Sherden came to Clarksville in early September 2011. (Doc. 2055 at 269 (Heard).)[7] Sherden began dating Amanda Weyand, who moved into 1114 Main Street. (Doc. 2048 at 36-37 (Smith).) Sherden came to Lincoln Homes one day looking to buy marijuana and met Trotter. (Doc. 2048 at 178-79 (Trotter).) Afterwards, Sherden periodically bought marijuana from Trotter.

---

[5] These included tattoos of a stop sign meaning "stop snitching," an AK-47 bullet containing the numbers "187" (the police code for murder), and the phrase, "Straightway Assassins." (Doc. 2060 at 19-29 (Dowlen).)

[6] These included a drawing of a person urinating on a person with a red "flag" and the words "F**k Blood"; a post claiming HARDISON had "bodied some you red rag homies," meaning murdered Bloods; an image of the grim reaper inside a six-pointed star; and the comment, "Send um to da reaper, homie." (Doc. 2062 at 117-21 (Warfield).)

[7] Sherden had come to Clarksville in approximately 2010, but returned to Indiana. Sherden's move to Clarksville in early September 2011 was understood to be a permanent move. (Doc. 2055 at 272 (Heard).)

(*Id.*) Sherden also claimed to be a GD: he had a "7-4" tattoo on his face, and a six-pointed star on his wall. (*Id.* at 273-74 (Heard); Exh. 1126.) To be legitimate or in good standing with GD rules and regulations, it was expected to be "on count." (Doc. 2060 at 53 (Dowlen).) It was considered disrespectful to the organization to claim to be GD but not be "on count"; and such action could result in serious consequences. (*Id.* at 126 (Dowlen).) But Sherden never came to GD meetings in Clarksville and was never considered to be "on count." (2048. at 180 (Trotter); Doc. 2060 at 30, 127-28 (Dowlen).) Prior to the double homicide, Trotter had been to Sherden's house approximately 4-5 times, to smoke marijuana and hang out. (Doc. 2048 at 181 (Trotter).) Trotter described Sherden as his "brother," and said that they had a "good relationship"; Dowlen described them as "real cool" and "close." (*Id.* at 181, 187; Doc. 2060 at 151 (Dowlen).) During his visits to Sherden's house, Trotter also encountered Weyand, whom Trotter knew as "Lil Bit." (Doc. 2048 at 181-82 (Trotter).)

## 2. The Night of the Homicides

On the night of the homicides, at 8:57 p.m., Sherden called his friend Keith Garrett and asked him for a ride to the Universal Package Liquor Store. (Doc. 2056 at 45-49 (Garrett).) Garrett picked Sherden up and drove him to the store. (*Id.* at 50-51.) Garrett waited outside while Sherden went inside and got "a bottle of something." (*Id.*) Records showed that the store sold a $7.99 liquor bottle at 9:12 p.m., 9:28 p.m., and 9:31 p.m. that evening. (Doc. 2056 at 215-25 (Howard).) Sherden came out of the store carrying a brown bag which contained a medium-sized liquor bottle. (Doc. 2056 at 51-52 (Garrett).) Garrett dropped Sherden off at 1114 Main Street. (*Id.* at 52.) Garrett went inside briefly, and Sherden put the liquor bottle on the coffee table. (*Id.* at 52-55, 66-67.)

Lavell Traylor was working that evening at the fast-food restaurant Sonic. (Doc. 2056 at 260-61 (Traylor).) At approximately 8:00 or 9:00 p.m., HARDISON contacted Traylor and told

Traylor he "needed a ride to go pick up some money." (*Id.* at 261.)[8] Traylor drove in a black Impala to the house where HARDISON was staying with his girlfriend, Kandice Wallace. (*Id.* at 260-63.) Tiffany Baxter—who was living at the house with her boyfriend, Josh Henry—was also present. (Doc. 2057 at 184-85 (Baxter).) HARDISON said that Sherden "needed to give him his money" and that he wanted Henry to go with him to Sherden's house to collect the debt. (*Id.* at 207-09.)[9]

HARDISON, Henry, and Traylor left and drove to Lincoln Homes to pick up a fourth person. (Doc. 2056 at 263-65 (Traylor).) They arrived in Lincoln Homes and encountered Trotter. (Doc. 2048 at 183-84 (Trotter); Doc. 2056 at 265-66 (Traylor).) Trotter heard HARDISON say, "Imma kill that n****r." (Doc. 2048 at 183-84 (Trotter).)[10] Trotter asked HARDISON why he was "talking reckless" and asked HARDISON who he was talking about. (*Id.* at 184.) HARDISON said he was talking about "Meech," an alias for Sherden, and that Sherden owed him $80. (*Id.*)

HARDISON asked Trotter to take him to Sherden's house on Main Street. (Doc. 2048 at 185 (Trotter).) Dowlen and Trotter did not think HARDISON knew which house Sherden lived in, but Trotter thought it possible that HARDISON had been there before. (*Id.* at 186-87, 267-68; Doc. 2060 at 131-32 (Dowlen).)[11] Trotter, believing he could "deescalate[]" the situation—in part because Sherden had been making money selling drugs, and should have been in a position to repay his debt to HARDISON—agreed to take HARDISON to Sherden's house. (Doc. 2048 at 185-87, 278-79 (Trotter).)[12] HARDISON and Trotter got into the black Impala with Traylor and

---

[8]    Dowlen, who knew that Sherden owed HARDISON a drug debt, saw Sherden ride through Lincoln Homes in a Jeep, and called HARDISON to let him know. (Doc. 2060 at 31-32, 128-29, 150 (Dowlen).)

[9]    Baxter testified that HARDISON repeatedly discussed Sherden's drug debt in front of her; that HARDISON demanded repayment from Sherden and threatened that "it was going to be a problem" if Sherden did not pay him back; that HARDISON left "a lot," "possibly" eight or ten threatening calls, texts, or voicemails to Sherden regarding this drug debt; and that Sherden had nevertheless not paid HARDISON back. (Doc. 2057 at 197-206).

[10]    Dowlen denied hearing anyone make this statement. (Doc. 2060 at 134 (Dowlen).)

[11]    Other than testimony from Baxter that there was a time during their relationship when they seemed "cool" with each other, there was no evidence that HARDISON and Sherden were friends. (Doc. 2057 at 197 (Baxter).)

[12]    Dowlen testified that HARDISON showed up in Lincoln Homes in a dark-colored Malibu or Impala with Henry and "Lavell" (Lavell Traylor); that, as they were talking, Trotter joined the conversation; that Trotter produced what may have been a 9mm pistol, with nickel-plating and a pearl handle; that Trotter said, "Yo, check this out. This

Henry. (Doc. 2056 at 265-66 (Traylor).) Traylor was driving. (Doc. 2048 at 190-91 (Trotter).) Trotter directed them to Sherden's house and told Traylor to park across the street. (*Id.* at 192-93, 278; Doc. 2056 at 266-67 (Traylor).)[13] HARDISON and Trotter got out of the car and walked to Sherden's house; Traylor and Henry stayed in the vehicle. (Doc. 2056 at 268-69 (Traylor).)

Trotter knocked on Sherden's door and walked inside, saying, "What's up bruh?" (Doc. 2048 at 194 (Trotter).) Sherden, who was facing away from the door, turned around holding a gun. (*Id.* at 194, 284-85.) Trotter identified himself and Sherden said, "Boy, you better start knocking." (*Id.* at 194.) At the same time, Weyand appeared at the door to her bedroom. (*Id.* at 194, 197-98.) Sherden and Trotter greeted each other with a GD handshake; Sherden and HARDISON did not. (*Id.* at 201-02.) Trotter and HARDISON followed Sherden into the kitchen. (*Id.* at 194-97.) Trotter was not watching HARDISON the entire time they were in the house together and testified that it was possible that there was a time when HARDISON was in the living room while Trotter was in the kitchen. (*Id.* at 198-99.) Sherden tried to make small talk and offered them a drink. (*Id.* at 194-95.) A moment later, HARDISON asked Sherden about the money he owed HARDISON. (*Id.* at 195.) Sherden, who was still holding a gun, replied, "Man, bruh, I'm getting that together," by which he meant that he planned to repay HARDISON. (*Id.* at 195.) Sherden did not repay HARDISON at that time, however. (*Id.* at 199-200.) HARDISON replied, "Say no more," and stepped outside, ostensibly to smoke a cigarette. (*Id.* at 196, 200-01.)

After HARDISON stepped outside, Sherden told Trotter that he had made a rap CD. (Doc. 2048 at 202 (Trotter).) Sherden put the CD in the stereo; sat on the couch near the front door; and laid his gun on the couch next to him. (*Id.* at 202, 285.) Trotter sat in a chair across from Sherden.

is my new baby. I just got—I just bought this"; and that HARDISON asked to see the gun. (Doc. 2060 at 32-35, 132-33 (Dowlen).) Dowlen testified further that HARDISON asked Trotter whether he would take them to Sherden's house; that Trotter agreed; and that HARDISON, Trotter, Henry, and "Lavell" left to go to the house. (*Id.* at 35.)

[13]     Traylor testified that HARDISON directed him to the house on Main Street. (Doc. 2056 at 266-67 (Traylor).)

(*Id.* at 202-03.) As they listened to the CD, HARDISON stepped through the front door; pulled a pistol from his coat pocket; and shot Sherden in the head at point-blank range. (*Id.* at 203-05, 286-87.) Trotter saw smoke rising from Sherden's head. (*Id.* at 204-05.) Trotter leapt from his chair and ran towards the front door. (*Id.*) As he fled, Trotter saw Weyand in her room; she was "screaming," "hysterically," in a way Trotter would "never forget." (*Id.* at 204-06.) HARDISON instructed Trotter, "Man, go grab the girl," but Trotter kept running towards the front door. (*Id.* at 204-05.) As he exited the front door, he heard approximately four or five gunshots. (*Id.*)

Trotter walked quickly back to the car that Traylor and Henry were inside and got into the rear passenger side seat. (Doc. 2048 at 208-09 (Trotter).) HARDISON, who walked out of Sherden's house moments later, got into the front passenger seat. (*Id.* at 209.) HARDISON told Traylor to pull off. (*Id.*) HARDISON threatened the occupants of the vehicle; according to Trotter, HARDISON said, "Anyone of y'all say something about this, I'm going to kill y'all." (*Id.*)[14] HARDISON passed the pistol he had used to commit the murders to Trotter, and said, "Hey, bruh, hey, folks, do something with this." (*Id.* at 209-10.)[15] Trotter then realized that the gun—a chrome 9mm with a marble handle—was one he loaned to HARDISON two weeks earlier. (*Id.* at 209-11.)

Traylor dropped Trotter off in Lincoln Homes. (Doc. 2048 at 212 (Trotter).) Trotter walked to his sister's house; bleached the pistol (to remove any fingerprints); and disassembled it. (*Id.* at 213.) Trotter got into a truck with two other GDs and traveled to a small bridge over a river. (*Id.* at 214-15.) Trotter, who had put the gun into a bag with a brick, threw the bag into the river. (*Id.*)[16] Trotter rode to his sister's house and met up with other GDs at a bar in Clarksville. (*Id.* at 216.)

---

[14]     Traylor testified that Trotter said something to the effect of, "Just keep your fucking mouth closed," although Traylor also testified that he did not have a clear memory of the conversations in the car that night. (Doc. 2056 at 274-75 (Traylor); Doc. 2057 at 48-49 (Traylor).) Trotter denied threatening anyone. (Doc. 2056 at 13 (Trotter).)
[15]     Traylor testified that he did not see a gun inside the vehicle and did not see anything get passed from the front seat to the back seat. (Doc. 2057 at 44-46 (Traylor).)
[16]     Dowlen testified that he told Trotter to "get rid" of the gun. (Doc. 2060 at 136 (Dowlen).)

At 10:26 p.m., Garrett contacted, or was contacted by, Sherden. (Doc. 2056 at 45 (Garrett).) Garrett heard Sherden say words to the effect of, "I don't do business like that," and the phone went dead. (*Id.* at 45, 55-57.) Garrett was close to Sherden's house and drove there to investigate. (*Id.* at 56-57.) He arrived and encountered Marquintus Majors. (*Id.* at 57-58.) Majors said that he had heard gunshots. (*Id.* at 78-79 (Majors).) Garrett peered into the house and saw Sherden's body on the couch. (*Id.* at 58-59 (Garrett).) Majors then called 911. (*Id.* at 79-85 (Majors).)

When the police arrived, they saw that Sherden had been shot twice in the right side of the head. (Doc. 2056 at 145-46 (Minton); Doc. 2057 at 119-25 (Eutenier).) Weyand had been shot in her upper right shoulder (with an exit wound in her back); behind her left ear (with an exit wound on the left side of her face); and in the lower part of the back of her head (with an exit wound in her forehead). (Doc. 2056 at 146-47, 151 (Minton); Doc. 2057 at 142-45 (Eutenier).) Police recovered one 9mm cartridge casing from the living room floor and four 9mm cartridge casings from the bedroom where Weyand's body was found. (Doc. 2056 at 137, 140-41, 147-50, 197-98 (Minton).) All of these casings had been fired from the same 9mm firearm. (Doc. 2062 at 191-92 (Arney).) Police also recovered a cup and a Taaka vodka bottle from the coffee table in the living room. (Doc. 2056 at (Minton).) Five fingerprints belonging to HARDISON were on the cup. (Doc. 2057 at 81-82, 87 (Kirk).) One fingerprint belonging to HARDISON and one fingerprint belonging to Trotter were on the vodka bottle. (*Id.* at 81-82, 87.) The Taaka vodka bottle was an item that sold for $7.99 at the University Package Liquor Store at that time. (Doc. 2056 at 205-09 (Howard).)

Traylor, after dropping Trotter off, dropped HARDISON and Henry off at Wallace's house. (Doc. 2056 at 276 (Traylor).) The next morning, at approximately 4:00 or 5:00 a.m., HARDISON woke Baxter up, and told her, as he "kind of giggled," that "Meech was dead" and that "somebody got Meech." (Doc. 2057 at 209-10 (Baxter).) Baxter tried to confirm this but could find no news

10

reports of Sherden's death. (*Id.* at 210-11.) Henry, who was present for this conversation, "seemed uncomfortable" and was "[r]eal quiet and strange." (*Id.* at 211-12.) When Baxter asked HARDISON how he knew Sherden had been killed, HARDISON "just said he knew." (*Id.* at 211.)

Shortly after the double homicide, Trotter called Dowlen and said, "They dead," meaning Sherden and Weyand. (Doc. 2060 at 36-37 (Dowlen).) Dowlen described Trotter as "in a bad way" and "kind of shook up about it." (*Id.* at 36-37.)[17] HARDISON met with Dowlen about the double homicide the next day. HARDISON told Dowlen that he and Trotter knocked on the door to Sherden's house; that Sherden answered with a .45 caliber pistol in his hand, and that HARDISON "felt some type of way" about that; that Sherden offered them a drink, but HARDISON declined; and that HARDISON stepped out of the house, stepped back in, and shot Sherden. (*Id.* at 37-38.) HARDISON later provided additional details of the murders to Dowlen. HARDISON told Dowlen that Sherden had "put it on the BOS" that Sherden was going to repay the drug debt and that Sherden had not repaid it. (*Id.* at 40-41.) HARDISON also said that he felt "disrespected" that Sherden answered the door with a gun in his hand. (*Id.* at 38-40.) HARDISON said that when he stepped back into the house, he shot Sherden in his head once and Sherden's hands shot up, so HARDISON shot him in the head again. (*Id.* at 39.) HARDISON said that Trotter ran out the door; that HARDISON saw Weyand with a book in her hand; that she "raised the book up to her face"; and that he "double tapped her," meaning that he shot her in the head twice. (*Id.*)[18]

---

[17]     Dowlen called HARDISON to ask why HARDISON would "do that," meaning kill Sherden and Weyand, and to tell HARDISON that Trotter "wasn't ready for nothing like that." (Doc. 2060 at 36-37 (Dowlen).)

[18]     The Court also heard powerful corroborating evidence from John Duffey, with whom HARDISON was housed in west Tennessee. (Doc. 2061 at 81-82 (Duffey).) HARDISON and Duffey became friends because Duffey was a tattoo artist, and HARDISON wanted Duffey to draw artwork for some of HARDISON's rap album covers. (*Id.* at 82-89.) Duffey agreed to help HARDISON and prepared a sketch at HARDISON's direction that included images of significance to HARDISON. (*Id.* at 92-93, 95.) HARDISON told Duffey (in conversations over time) that HARDISON had murdered two people, "Derrick" and "Amanda" at "Derrick's" house in Clarksville, Tennessee; that "Josh" and "Wolf" had gone with HARDISON to the house; that HARDISON had shot "Derrick" "in the side of the head on the couch twice"; and that HARDISON had shot "Amanda" "twice in the back of the head." (*Id.* at 98-106, 144-45, 163.) The images included the word "Head Shock," which Duffey explained should have been "Head Shot," and which HARDISON told Duffey was a reference to "someone being shot in the head"; the face of a woman with a

11

### 3.  Trotter and HARDISON Report the Double Homicide to Darden

Approximately two days after the murders, GD member Elance Lucas called Trotter and told him to "come up to Guthrie." (Doc. 2048 at 218 (Trotter).) Trotter traveled to Lucas's father's house and met with Marcus Darden. (*Id.* at 221.) Trotter reported the double homicide—a "major incident," which gang rules required him to report up the chain of command—to Darden, and then returned to Clarksville. (*Id.* at 221-24 (Trotter).) Similarly, a day or two after the murders, HARDISON traveled to Lucas's father house to report them to gang leadership. (Doc. 2062 at 42-44, 133-34, 136-37 (Warfield).) Darden, Lamar Warfield, and other GDs were present when HARDISON arrived. (*Id.* at 43.) Warfield was aware at that time of a double homicide on Main Street.' (*Id.* at 47-48, 133-34.) When HARDISON arrived, Darden asked him whether he was "all right" and whether he "need[ed] any AA [aiding and assisting]." (*Id.* at 43-46 (Warfield).)[19] Darden (or Maurice Burks) also asked HARDISON whether he had gotten rid of the gun he used to carry out the murders; HARDISON said that he had. (*Id.* at 46-47, 135.) HARDISON told Darden that he "did what he had to do," and "couldn't leave no witnesses behind." (*Id.* at 46.) Warfield understood HARDISON to mean that he had committed the murders. (*Id.* at 46-47.)[20]

---

bullet hole in her forehead, "where the bullet hole was dripping out the front so it looked like she was shot from the back"; the words "Creeper da Reaper," a nickname for HARDISON; an angel of death; and two bullets, which Duffey understood signified "two bullets to the head." (*Id.* at 110-16.) The sketch also included a tumbler glass with a fingerprint on it, which HARDISON said referred to "the only piece of evidence" "the government had on him in the house" where HARDISON had murdered Sherden and Weyand. (*Id.* at 116.) HARDISON also told Duffey about why he was going to trial: he said that he "wanted to pull the rats out that were on the case that were telling on" him, so he could "expose them and have them serve repercussions on it." (*Id.* at 162-63.) HARDISON also said that the bullet/"187" tattoo on his face was meant as a message, so that "anybody who was ratting on him in the future would see that death would come to them." (*Id.* at 118.)

[19]  Warfield did not believe HARDISON was a member of the Clarksville GDs at this time. (Doc. 2062 at 44 (Warfield).) Rather, Warfield believed HARDISON "had just" "moved to Clarksville" and "was trying to become a member of the Clarksville deck." (*Id.*) But HARDISON reported the incident to Darden as required under GD rules. (*Id.* at 44-45.) And the GDs "knew he was GD already," and "just treated him like a brother." (*Id.* at 138.)

[20]  Warfield acknowledged that HARDISON did not state explicitly that he murdered Sherden and Weyand on Main Street. (Doc. 2062 at 137 (Warfield).) But based on Darden's mentioning that HARDISON was coming to the house to talk about the Main Street double homicide and the timing of HARDISON's arrival, Warfield understood, that HARDISON was referring to the double homicide on Main Street. (*Id.* at 136-37.)

### 4. GD Meetings Regarding the Double Homicide

Approximately one week after reporting the double homicide to Darden, Trotter was called to a meeting of GDs who held POAs. (Doc. 2048 at 224 (Trotter).) The purpose of the meeting was to help the GDs gather information about the murders and decide how to respond. (*Id.* at 224-25.) Darden, Jabbaul Pettus, Trotter, and HARDISON, among others, attended the meeting. (*Id.* at 225.) HARDISON told the GDs how the double homicide occurred. (*Id.* at 226.) HARDISON said that Sherden owed HARDISON $80 for some marijuana that he had fronted to Sherden. (*Id.*) HARDISON said that Sherden had "put it on the hammer" or "put it on the BOS" that he was going to pay HARDISON back, meaning that it was "certified and stamped" that Sherden would do it. (*Id.* at 226-28.) Putting something "on the BOS," or "on the hammer," was like swearing an oath on the GDs; a GD could be violated for putting something "on the BOS" or "on the hammer" and not following through. (*Id.* at 101; Doc. 2059 at 126 (Dowlen).) HARDISON said that Sherden was "acting hard, like he ain't want to pay." (*Id.* at 226.) HARDISON also said that Sherden "had the pistol out" and "ain't put the pistol down," and that HARDISON shot him. (*Id.* at 226-28.)

As HARDISON finished, Trotter interrupted him; said that Sherden "did say he was going to pay"; but that HARDISON said, "Say no more." (Doc. 2048 at 228 (Trotter).) Trotter then gave his account. (*Id.* at 229.) The GDs deliberated about how to address the murders. (*Id.*) Darden and Pettus, commenting on HARDISON's account, said, "Bruh got a point. Brother [Sherden] didn't never put the gun down. He was being a poor paymaster." (*Id.*) A "poor paymaster," in GD parlance, was a person who failed to make good on his debts, like drug debts; a GD member could be violated for being a "poor paymaster." (*Id.* at 99-100; Doc. 2059 at 125-26 (Dowlen).) The GDs took no action regarding the murders at this time, however. (Doc. 2048 at 230 (Trotter).)

13

The GDs also held a meeting of regional POAs in Nashville about the double homicide. (Doc. 2060 at 41-44 (Dowlen).) There was a perception at the time that Sherden was a GD, and if HARDISON had killed a fellow GD, the GDs might "eradicate" HARDISON. (*Id.*) Dowlen traveled to that meeting with Darden and Pettus. (*Id.*) Byron Purdy, the GD "governor" who exercised authority over all of Tennessee, was present by phone. (*Id.* at 44.) At the beginning of the meeting, Purdy asked the GDs to explain what had happened. (*Id.*) The GDs said that HARDISON had killed two people, one of whom "was supposed to be a GD," and then debated how the GDs ought to respond. (*Id.*) Initially, the "majority" of the GDs were "leaning towards eradicating" HARDISON; at one point, they asked Purdy if they could bring GDs from outside Clarksville to "eradicate" HARDISON. (*Id.* at 44-45.) Dowlen then gave an impassioned defense of HARDISON. (*Id.* at 45.) Dowlen explained that the GDs had never "verified" Sherden and did not know whether he was a legitimate GD, as he had claimed; by contrast, there was no question that HARDISON was "verified." (*Id.* at 45, 126-27.) Dowlen also argued that Sherden had "put it on the BOS" that he would repay his debt to HARDISON, and that Sherden had not, and that this failure could be considered a violation of GD rules. (*Id.* at 46.) Dowlen also argued that Sherden answered the door with a gun in his hand, which HARDISON perceived as a sign of "disrespect." (*Id.* at 45-46.) After Dowlen's arguments, the GDs "came to the conclusion that . . . HARDISON was "in the right" and "wouldn't be sanctioned or eradicated" for killing Sherden. (*Id.* at 46.)[21]

## 5. **HARDISON's Reputation Rises**

After the double homicide, HARDISON "gained a lot of respect and a lot of fear" among the GDs. (Doc. 2060 at 47 (Dowlen).) They "looked up to him, bow[ed] down to him" and to

---

[21]     There is no evidence in the record about whether the GDs discussed possible sanctions for HARDISON for killing Weyand, who was not a GD and was therefore considered to be a "peon."

"whatever he sa[id]," and "praise[d]" him. (Doc. 2048 at 231-32 (Trotter).) The murders "boosted his MO within the gang," and helped him "get[] status," because it was "clear at that point . . . that . . . HARDISON was not afraid to pull a trigger" and was "[n]ot afraid to commit multiple murders." (*Id.* at 132-33, 231-32; Doc. 2060 at 47, 120 (Dowlen).) Warfield, the chief of security in Clarksville at the time, knew that HARDISON could be a valuable asset to the GDs after the double homicide, because he had "kilt two people" and could be called upon for "retaliation to other rival gangs or security purposes." (Doc. 2062 at 48-50, 124 (Warfield).) Warfield put HARDISON on the security team "right after" the double homicide, meaning within a month or two. (Doc. 2048 at 231-32 (Trotter).) That decision was a direct result of HARDISON's commission of the double homicide. (Doc. 2062 at 49-50 (Warfield).) Warfield also put together a "Blackout Squad" for the Clarksville deck after the double homicide. (*Id.* at 124-25.) Warfield "always just knew [HARDISON] was willing" to serve on the Blackout Squad, and so when Warfield began assembling it, HARDISON was "one of the first candidates for it." (*Id.* at 125.) Later, in approximately 2016, when Warfield was serving as chief of security for the 615 region, Warfield put HARDISON on the regional Blackout Squad. (*Id.* at 125-27.) In approximately 2016 and 2017, HARDISON became the chief of security or chief enforcer for the 615 region. (Doc. 2055 at 154, 158 (Kelly); Doc. 2062 at 91-92, 111-15, 176 (Warfield); Exh. 3755.)

During his time with the Clarksville deck, HARDISON lived up to his reputation for violence. The gang used him to carry out several vicious "smashings" of members who had violated gang rules. (Doc. 2048 at 77-98 (Trotter); Doc. 2062 at 50-58 (Warfield); Exh. 6211.) HARDISON was chosen to carry out beatings like these because he was a member of the security team; because he was "big" and "hit hard"; and because he was prepared to "go full force" during the beatings. (Doc. 2048 at 96-98 (Trotter).) The GDs also used HARDISON to plan and/or carry

out drive-by shootings targeting members of the Bloods gang. On September 26, 2012, for example, following the Bloods' murder of GD member Shannon Fairley a/k/a "Mac Juve," HARDISON, Trotter, and other GDs carried out a drive-by shooting of a residence where Bloods gang member Antonio McGougan a/k/a "Tum Tum" lived. (Doc. 2055 at 195-96 (Chaney); Doc. 2048 at 242-57, 259-60 (Trotter); Doc. 2060 at 51-58 (Dowlen).) In the fall of 2012, HARDISON and other GDs planned (but did not carry out) a shooting targeting Plush, a Clarksville nightclub frequented by Bloods. (Doc. 2060 at 80-84 (Dowlen); Doc. 2062 at 60-65, 150 (Warfield).) And on November 3, 2012, when HARDISON was jumped at Sidelines bar in Clarksville by (he believed) a member of the Bloods, he called on the GDs for backup. (Doc. 2057 at 8-12 (Traylor); Doc. 2060 at 50, 84-87, 95-96, 107-08, 111 (Dowlen); Doc. 2062 at 58-59, 65, 69-72, 76 (Warfield).) The GDs responded in force, traveling to C-Ray's nightclub, where HARDISON assaulted Bloods gang member Malcolm Wright. (Doc. 2060 at 206-09 (Gaskin); Doc. 2062 at 71-74, 81-84, 180 (Warfield).) Shortly after that assault began, Maurice Burks shot Wright and killed him. (Doc. 2062 at 76-80, 84-87 (Warfield).) HARDISON, who was a "valued" and "respected" member of the GDs, was "praised" by the GDs for the assault. (Doc. 2060 at 95-96 (Dowlen).)

A federal grand jury indicted HARDISON in connection with the conduct above on RICO Conspiracy (Count One), two counts of Murder in Aid of Racketeering (Counts Two and Four), two counts of Causing Death through the Use of a Firearm (Counts Three and Five), Tampering with a Witness Through Killing (Count Six), and Assault Resulting in Serious Bodily Injury in Aid of Racketeering (Count Seven). After a two-week trial in October and November 2021, a jury convicted HARDISON on all counts. (Doc. 2016.) This Court granted HARDISON's post-trial motion for a judgment of acquittal on Count Six. (Docs. 2095, 2096.)

16

## II.    Sentencing Guidelines Range

The Revised Presentence Investigation Report (PSR) dated November 3, 2022, calculates HARDISON's final offense level as 43, and his Criminal History Category as III. HARDISON faces a maximum period of five years of supervised release on each of Counts One through Five, and three years on Count Seven. The PSR further calculates HARDISON's guidelines range as life imprisonment. The government has no objection to the factual representations in HARDISON's PSR or to the guidelines calculation contained therein.

## III.    18 U.S.C. § 3553(a) Factors

In determining the appropriate sentence, the Court must consider the factors outlined in 18 U.S.C. § 3553(a), including, inter alia, the nature and circumstances of the offense, the history and characteristics of the defendant, the need to promote respect for the law, the need to deter the defendant from committing new crimes, the need to deter others from committing crime, the need to protect the public from further crimes of the defendant, the need to provide the defendant with correctional treatment, and the overriding need to provide a just punishment in this case.

### A.    Nature and Circumstances of the Offense

The offenses for which HARDISON was convicted in this case are as serious as any in the U.S. Code. HARDISON played a key role in establishing the Gangster Disciples as one of the most, if not *the* most, powerful, and ruthless criminal gangs operating in the Middle District of Tennessee for more than a decade beginning in approximately 2005. Over the course of the charged conspiracy, the Gangster Disciples consolidated their power over cities, towns, and localities in the Middle District of Tennessee and southern Kentucky, through an insidious campaign of witness intimidation and relentless violence. In asserting their dominance over rival gangs, Gangster Disciples members assaulted, shot, and killed rival gang members, sometimes gravely wounding

17

innocent persons in the process. They imposed discipline on their members and on persons who were witnesses to their crimes in order to conceal their criminality from law enforcement, rewarding members who actively sought to frustrate the efforts of law enforcement. And they fueled their criminality through the trafficking of a panoply of illegal drugs, including cocaine, crack cocaine, marijuana, and prescription pills.

In short, the Gangster Disciples—including HARDISON—wreaked havoc in the Middle District of Tennessee and elsewhere for more than a decade, crippling communities by dealing drugs and committing heinous acts of violence with impunity, before the government eventually brought their leaders and principal lieutenants to justice. HARDISON's conduct as a ranking member of the Gangster Disciples enterprise was among the most horrific conduct perpetrated by any member of the gang, and includes HARDISON's execution-style murder of Sherden and Weyand on January 6, 2012; HARDISON's commission of multiple brutal "smashings" of Gangster Disciples who violated gang rules, including one "smashing" that sent the victim to the hospital; HARDISON's participation in the September 26, 2012 drive-by shooting targeting Bloods gang member Antonio McGougan; and HARDISON's assault of Bloods gang member Malcolm Wright inside C-Ray's nightclub on November 3, 2012, which immediately preceded Wright's murder by fellow Gangster Disciple Maurice Burks. The sentence in HARDISON's case should be commensurate with the broad swath of destructive conduct for which he, as a member of this violent criminal enterprise, was responsible. This factor must weigh heavily in the Court's sentencing determination.

## B.    History and Characteristics of the Defendant

HARDISON has a serious record of criminal conduct. As reflected in the PSR, HARDISON has adult convictions for sale of a controlled substance (in 2005), aggravated robbery

(in 2005), and unlawful possession of a firearm by a convicted felon (in 2014). HARDISON also has a juvenile adjudication for carjacking (in 2002). And HARDISON has repeatedly violated the terms of court-ordered supervision. This factor must weigh heavily in the Court's sentencing determination as well.

###### C. The Need to Achieve Sentencing Goals (Accountability, Deterrence, Promoting Respect for the Law, and Rehabilitation)

A sentence of life imprisonment will achieve the essential goals of sentencing. A sentence of that length reflects the magnitude of the offenses for which HARDISON was convicted and will provide a just punishment for his offenses. A sentence of that length will also serve as specific deterrence to HARDISON, who has previously received lenient sentences and continued to engage in and sanction acts of extraordinary violence and witness intimidation. A sentence of that length will also serve the ends of general deterrence because it will send a message to other violent gang members and drug traffickers that engaging in conduct of this sort will lead to a substantial prison sentence. During his incarceration, the Bureau of Prisons will provide HARDISON with needed educational and vocational training. More importantly, however, a sentence of life imprisonment will ensure that the public is forever protected from HARDISON's dangerous criminal behavior.

###### D. The Kinds of Sentences Legally Available

The Guidelines range in this case is in Zone D of the Sentencing Table, which provides that the minimum term shall be satisfied by a sentence of imprisonment. (U.S.S.G. § 5C1.1(f); HARDISON PSR ¶ 160.)

###### E. The U.S. Sentencing Guidelines and Sentencing Policy Statements

The Guidelines sentence for HARDISON in this case is life imprisonment. Counts Two and Four also carry a mandatory minimum life sentence. Imposing a sentence of life imprisonment would thus be precisely what HARDISON's Guidelines call for in this case and would be

19

consistent with an evenhanded application of the Guidelines and of relevant Sentencing Policy Statements.

### F.    The Need to Avoid Unwarranted Sentencing Disparities

The sentence in this case should also avoid unwarranted sentencing disparities. Imposing a sentence of life imprisonment would avoid unwarranted disparities among defendants with similar records who have been sentenced for similar offenses under similar circumstances.

### G.    The Overriding Need for a Just Punishment

Lastly, the sentence imposed should reflect the overall need to provide a just punishment for HARDISON in this case. To that end, the sentence ought to reflect the gravity of criminal conduct as a member of the Gangster Disciples in Clarksville, including his carrying out of numerous violent crimes; HARDISON's criminal history, which includes violent, assaultive conduct; and the need to provide specific and general deterrence.

### IV.    Conclusion

For the reasons above, the government respectfully requests that the Court sentence HARDISON to life in prison. Such a sentence would be appropriate in this case under the factors set forth at 18 U.S.C. § 3553(a).

Respectfully submitted,

MARK H. WILDASIN
United States Attorney


By:     */s/ Ben Schrader*
BEN SCHRADER
Assistant United States Attorney
Middle District of Tennessee


DAVID L. JAFFE
Chief, Organized Crime and Gang Section

20

U.S. Department of Justice


By:     */s/ Gerald A.A. Collins*
        GERALD A.A. COLLINS
        Trial Attorney, Organized Crime and Gang Section
        U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2022, I electronically filed one copy of the government's Memorandum in Aid of Sentencing via the CM/ECF electronic filing system, which will automatically send a notification to Luke Evans, Esq. and Paul Bruno, Esq., counsel for the defendant.

By:    */s/ Ben Schrader*
        BEN SCHRADER
        Assistant United States Attorney