IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

UNITED STATES OF AMERICA,      )
                               )
        Plaintiff,           )
                               )
  v.                           )    Case No.
                               )    3:17-cr-00124-3
BRANDON DURELL HARDISON,       )
                               )
        Defendant.           )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR.
CHIEF DISTRICT JUDGE

TRANSCRIPT

OF

PROCEEDINGS

December 7, 2022

Sentencing Hearing

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES ON THE FOLLOWING PAGE

PREPARED BY:
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter
719 Church Street, Suite 2300
Nashville, TN 37203
lise_matthews@tnmd.uscourts.gov

APPEARANCES:

For Plaintiff USA:    John Benjamin Schrader
                      U.S. Attorney's Office
                      (Nashville Office)
                      Middle District of Tennessee
                      719 Church Street
                      Suite 3300
                      Nashville, Tennessee 37203-3870

                      Gerald Collins
                      Department of Justice
                      Criminal Division
                      Building 950
                      Pennsylvania Avenue NW
                      Washington, D.C.


For the Defendant:    Luke A. Evans
                      Bulloch Fly, Hornsby, & Evans
                      302 North Spring Street
                      Murfreesboro, Tennessee 37130

                      Paul J. Bruno
                      Barrett Johnston Martin
                      & Garrison, LLC
                      Philips Plaza
                      414 Union Street
                      Suite 900
                      Nashville, TN 37219

1      I N D E X
2      Wednesday, December 7, 2022
3
4
5      <u>INDEX OF WITNESSES</u>
6      (None)
7
8
9
10     <u>INDEX OF EXHIBITS</u>
11     (None)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          The above-styled cause came on to be heard on

2   December 7, 2022, before the Honorable Waverly D. Crenshaw,

3   Jr., Chief District Judge, when the following proceedings

4   were had, to-wit:

5          THE COURT:  All right.  Be seated.

6          All right.  We're here on Case 17-124, *United*

7   *States of America v. Brandon Hardison*.

8          Counsel want to make your appearance.

9          MR. COLLINS:  Good afternoon, Your Honor.  Gerald

10  Collins behalf of the United States government.

11         MR. SCHRADER:  Good afternoon, Your Honor.  Ben

12  Schrader for the United States.

13         MR. EVANS:  Good afternoon, Your Honor.  Luke

14  Evans on behalf of Brandon Hardison.

15         MR. BRUNO:  And Paul Bruno on behalf of Brandon

16  Hardison, Your Honor.

17         THE COURT:  All right.  So, Mr. Hardison, we're

18  here today because on November the 3rd you were found guilty

19  by a jury on Count One through Seven of the fourth

20  superseding indictment.  On May the 18th the Court entered a

21  judgment of acquittal on Count Six.

22         So today we come for sentencing on Count One,

23  conspiracy to participate in racketeering activity.  On this

24  count you face a term of not more than life imprisonment, a

25  $250,000 fine, up to five years of supervised release.

1    Count Two, murder in aid of racketeering.  On this
2  count you're subject to life imprisonment, a fine up to
3  $250,000, and supervised release up to life.
4    Count Three, use, carry, brandish, and discharge
5  of a firearm resulting in death, in violation of 18 U.S.C.
6  924(j).  On this count you can be -- you can be sentenced to
7  any term of years or life imprisonment, consecutive to any
8  other sentence, up to $250,000 fine, and up to five years of
9  supervised release.
10    On Count Four, again, murder in aid of
11  racketeering, same -- you face up to life -- you face life
12  imprisonment, a fine of $250,000, and up to five years of
13  supervised release.
14    Count Five, use, carry, and brandish, discharge,
15  again, a term of years or life imprisonment consecutive to
16  any other sentence, up to $250,000 fine, and up to five years
17  of supervised release.
18    And then Count Seven, assault resulting in serious
19  bodily injury, not more than 20 years of imprisonment, up to
20  $250,000 fine, and up to three years of supervised release.
21    Do you understand you could be -- Mr. Hardison,
22  you can be sentenced to the statutory maximums?
23    THE DEFENDANT:  Yes, sir.
24    THE COURT:  Okay.  In preparation for the
25  sentencing, I've reviewed all of the papers filed.  Most

1    importantly, the November 3rd, 2022, presentence report.

2                Did you get a copy of that, Mr. Hardison?

3                THE DEFENDANT:  Yes, sir.

4                THE COURT:  And did you get a chance to review

5    that with your lawyers?

6                THE DEFENDANT:  Yes, sir.

7                THE COURT:  Okay.  Did you ask them questions, to

8    the extent you had -- yeah.  Pull that microphone up.

9                Did you ask them any questions about the

10   presentence report, to the extent you had any?

11               THE DEFENDANT:  Yes, sir.

12               THE COURT:  And then, with the -- with the

13   government's briefs that they have filed, did you also get a

14   chance to review those documents?

15               THE DEFENDANT:  Yes, sir.

16               THE COURT:  And talk to your lawyers about those

17   documents?

18               THE DEFENDANT:  Yes, sir.

19               THE COURT:  Do you want any more time to look at

20   any of those documents, the presentence report or anything

21   else?

22               THE DEFENDANT:  I'm good.

23               THE COURT:  And, to the extent you had questions,

24   did your lawyers give you answers that you understood?

25               THE DEFENDANT:  Yes, sir.

1          THE COURT:  And you let them know if you wanted
2    them to -- if you wanted them to clarify any --
3          THE DEFENDANT:  Yes, sir.
4          THE COURT:  Do you have any complaints or
5    grievances about your lawyers' services to this point in
6    time?
7          THE DEFENDANT:  No, sir.
8          THE COURT:  All right.
9          I understand the government has no objections to
10   the presentence report?
11         MR. COLLINS:  That is correct, Your Honor.  Thank
12   you.
13         THE COURT:  Okay.  Mr. Hardison has several
14   objections.
15         Do you want to add anything that's not in the
16   papers?
17         MR. EVANS:  No, Your Honor.  I don't have any
18   additional legal argument outside of what's been argued in
19   the pleadings.
20         THE COURT:  All right.
21         Did you have any proof on any of these that you
22   wanted to present?
23         MR. EVANS:  No proof, Your Honor.
24         THE COURT:  All right.  So we're ready for the
25   Court to rule?  On the objections to the presentence report?

1      MR. EVANS:  Yes, Your Honor.

2      THE COURT:  All right.  So the first objection,

3  Mr. Hardison objects to the offense conduct contained in

4  paragraphs 20 through 66, claiming that he's not guilty of

5  the crimes alleged.  This objection is overruled because the

6  jury has ruled and spoken.

7      Second, Mr. Hardison objects to the sentencing he

8  will receive on Counts Three and Five being consecutive to

9  all other counts.  Those convictions were for violation of 21

10  U.S.C. Section 924(j).  That provides that a person in the

11  course of a violation of subsection (c) causes the death of a

12  person through the use of firearm -- a person who, in the

13  course of violation of subsection (c), causes the death of a

14  person through the use of firearm shall, if the killing is

15  murder, be punished by death or by imprisonment for any term

16  of years or for life.  And, if the killing is manslaughter,

17  be punished as provided in that section.

18      As the -- as the defendant and the parties

19  recognize, the Sixth Circuit has yet to address the issue of

20  whether a 924(j) count is to run consecutively to other

21  sentences imposed.  Those circuits that have addressed the

22  issue are split.  The Second Circuit ruling, consecutive term

23  of imprisonment is required.  The Third Circuit and the

24  Fourth Circuit, as well as the Eighth Circuit and the

25  Eleventh Circuit also say consecutive term of imprisonment is

1  not required.

2          In *United States v. Wallace*, the Sixth Circuit

3  recognized the split and found it need not resolve the

4  question here because the record made clear that the district

5  court would impose the same sentence regardless of its

6  purported error.

7          Likewise, here, the Court believes it need not

8  weigh into this issue because it has no effect on the total

9  offense level nor the mandatory life sentence on Counts Two

10  and Four.

11          Third, Mr. Hardison objects to the two-level

12  enhancement under Sentencing Guideline 3B1.1(c), which

13  provides that, based on the defendant's role in the offense,

14  increase the offense level as follows:  If the defendant was

15  an organizer or leader of a criminal activity that involved

16  five or more participants or was otherwise extensive,

17  increase by four levels.  If the defendant was a manager or

18  supervisor and the criminal activity involved five or more

19  participants, increase by three levels.  Or if the defendant

20  was an organizer, leader, manager, or supervisor in any

21  criminal activity other than what was described in (a) and

22  (b), increase by two levels.

23          The commentary goes on to provide (as read):

24              To qualify for an adjustment under this section

25              the defendant must have been the organizer,

leader, manager, or supervisor of one or more of the participants.

Here, the two-level enhancement was properly assessed, as Mr. Hardison was for a time the chief of security, and that necessarily involved managing or supervising others. He was also a member of the blackout squad.

Regardless, given that the offense level tops out at 43, a two-level reduction would have no effect on the guideline range, nor would it affect the mandatory life sentence.

Fourth, Mr. Hardison takes issue with Section 2A1.1, attempted murder guideline, which carries a base level -- a base offense level of 30 in relation to the shooting of Antonio McGougan's residence. Instead, he submits that Section 2A1.1 guideline calling for a base offense level of 14 should have been used because it was an aggravated assault, not an attempted murder.

At trial, the proof showed that on September 26th, 2012, Trotter, Lucas, Burks, Hardison, Zachary, Hendrix, and other Gangster Disciple members planned a drive-by shooting of a residence on Richardson Street in Clarksville, Tennessee, where Antonio McGougan, a Bloods member, resided with his parents. The shooting was to be a retaliation for the murder of Shannon Fairley, a Gangster Disciple member.

1    Armed with multiple firearms, including assault

2  rifles, the group traveled to the residence in separate

3  vehicles, with one being a blocker car and the other being a

4  shooter car.  Trotter and Hardison were in the shooter car.

5    Upon arrival at the residence, several people were

6  milling about in front.  Nevertheless, Trotter and Hardison

7  opened fire.  After several shots were fired, the vehicles

8  fled the area upon hearing police sirens.  Ultimately, a

9  high-speed chase ensued and crossed into Kentucky.

10    The facts presented here are similar to those in

11  *United States v. Mays*, 285 F.App. 269, 273, Sixth Circuit,

12  2008, where an attempted murder guideline was found to apply.

13  There, members of the Outlaws motorcycle gang participated in

14  a drive-by shooting at the clubhouse of the Iron Horsemen, a

15  rival motorcycle gang.  The evidence at trial showed that

16  Outlaw gang members decided to go to the Iron Horsemen

17  clubhouse to let them know we was around, quote-unquote, and

18  to, quote, light the place up.

19    Like here, the evidence shows that gang members

20  decided to go to a rival's in a show of force with a getaway

21  plan in advance.  See *United States v. Wilson*, 992 F.2d 156

22  at 158, Eighth Circuit, 1993, affirming the application of

23  Section 2A1.1(a)(1), where defendant fired a shotgun out of a

24  passenger window toward a group of people.  Even though the

25  shotgun blast hit no one, this objection is overruled because

the brazen shooting was not simply an attempted assault.

Fifth, Mr. Hardison takes issue with applying Guideline 2A1.5, conspiracy of solicitation or solicitation to commit murder, to the abandoned Plush Nightclub shooting. He argues that the facts relied upon in the presentence report state that Defendant, along with other Gangster Disciples, planned a shooting at the Plush Nightclub, but these facts fail to sufficiently establish the existence of a conspiracy or that the object of the alleged conspiracy was to kill; therefore, 2A1.5 is not applicable.

Does the government plan any proof on this issue?

MR. COLLINS:  Your Honor, no further proof in terms of witnesses.  However, may I approach the --

THE COURT:  Sure.

MR. COLLINS:  Your Honor, I think the Court, though -- well, first of all, I think the government at trial has put on evidence that this was a planned retaliation shooting.  Similar to --

THE COURT:  So that's my question.  What does the government believe that evidence is?  Of an actual plan?

MR. COLLINS:  So, Your Honor, there's been testimony that the Court has heard specifically at trial from -- we would point to Mr. Warfield, testimony that the Court has even heard a little bit of again today where members of the Gangster Disciples wanted to plan this

retaliatory shooting, that there was an agreement amongst
them to do so, and that Mr. Warfield in particular went out
to this location to scout the location, to make sure that it
was a location that was -- a place where they could carry out
the act at that point in time.

            And it was -- as you've heard multiple times, it
was Mr. Warfield who then came back to the group, having made
the decision not to go forward.  However, prior to him
leaving that -- that location where they met and discussed
the plan, the group had agreed that this attack should take
place at Plush Nightclub, Your Honor.

            THE COURT:  Okay.  Let me hear from Mr. -- the
defendant.

            MR. EVANS:  Your Honor --

            THE COURT:  And you're a bit at a -- you didn't
get to hear what Mr. Warfield shared earlier.

            MR. EVANS:  And that's correct, Your Honor.  I was
not here for that portion.

            (Overlapping speech.)

            MR. EVANS:  Your Honor, I would say this:  If the
government felt that the facts in the PSR were insufficient
to support the enhancement, they could have objected and they
could have asked that those facts be added with specific
references to the trial testimony and/or presented
Mr. Warfield for this hearing today to put forward whatever

information that they're claiming that he provided specific to the Plush Nightclub. He testified, I guess, earlier this morning. They didn't do that.

The problem is that, even by the statements made by the government, is they planned a shooting. And specifically -- and I lay this out -- across Objection 4 and 5, it requires more than just the plan to commit a shooting; it requires a plan to commit a violation of Section 111 -- or 1111, rather, and that has to be the object of the conspiracy.

And there is insufficient proof before the Court or information before the Court for purposes of sentencing to substantiate that -- that enhancement, because just merely going to -- a plan to go commit a shooting that didn't come to fruition doesn't rise to that level, Your Honor.

So the --

THE COURT: So I guess -- well, looks like the evidence could be interpreted two different ways. One, given that they had planned this one that I just referenced earlier, the McGougan, it suggests they could have planned this one as well at Plush. So that shows that this group was able to do it.

On the other hand, though -- and you don't -- you're are at a disadvantage -- Mr. Warfield testified that, yeah, he went out and looked the place over, and he came --

he came to the unilateral -- he came to the decision and
unilaterally decided, no, we shouldn't do this. And that
would suggest it wasn't, because he made the decision without
consulting with anyone. If there was a conspiracy, it wasn't
much of a conspiracy, because he decided on his own, after he
saw the -- who was at the Plush Nightclub, we shouldn't do
this. And he lied. He then went back and lied to the others
so they wouldn't do it. And that doesn't -- that doesn't
sound like a conspiracy.

MR. EVANS: Yes, Your Honor.

And my recollection of the trial testimony -- and
it may have been from Mr. Warfield or someone else -- was
exactly as Your Honor has suggested there, which was -- it's
consistent. He -- someone unilaterally decided they didn't
want to do it because they just didn't want to do it.

THE COURT: And that's what Mr. Warfield said. He
was that "some person."

MR. EVANS: And that he admitted that he made it
up -- my recollection, which could be erroneous on that --
was that I don't even know that he went by the nightclub;
that he just drove out that way and decided he didn't want --
if I'm remembering trial testimony -- and forgive me if I'm
wrong -- but he didn't even make it all the way there and
just decided he didn't want to do it.

But that's not a conspiracy, as Your Honor's

```
 1  indicated, especially a conspiracy to commit murder under
 2  federal statute.
 3              THE COURT:  All right.  Let's give the government
 4  the last word, then I'll rule.
 5              MR. COLLINS:  And thank you, Your Honor.
 6              And, just so the record's clear, Your Honor, the
 7  government has put forth evidence on this at least two times,
 8  Your Honor.
 9              First, looking at the testimony of Mr. Warfield at
10  trial -- and the transcript is under Document Number 2062.
11  On page --
12              THE COURT:  Hold on.  Let me pull up my notes.
13  I've been using them quite a bit here.  Go ahead.
14              MR. COLLINS:  So looking at Document Number 2062,
15  page 59, starting at line 3, there was an extensive amount of
16  discussion before the Court where Mr. Warfield talked about
17  Mr. Fairley and how he had been killed and how the Gangster
18  Disciples held the Bloods responsible for this, and that he
19  went through a discussion on why -- Mr. Fairley's
20  relationship to the Gangster Disciples, why he was removed
21  from the organization.
22              And then, from that, that led into a discussion on
23  page 60 at page 9 [sic] about the Plush Nightclub incident,
24  and this was described as a location where the Bloods hung
25  out.
```

1          Now, in the days following Mr. Fairley's death,
2    that the Gangster Disciples discussed the possibility of
3    targeting Plush because that was a location in which the
4    Bloods hung out.  And then Mr. Warfield talked about at
5    length how they came up with the idea to target the location,
6    that they wanted to go by there and see if they could catch
7    some of the gang members there.
8          And he specifically said, "And, yeah, like, we was
9    planning to do that that day, and we were talking about it.
10   I was sent to scope out the location."
11         He then talks about -- "I was sent out to go scope
12   out the place and see it -- see was any Bloods out there and
13   see was it -- did I think it was a good idea to go out there
14   at that point and period of time."  And that's on page 61,
15   starting at line number 2.
16         That he identified individuals who were involved,
17   to include the defendant, who was part of the planning; that
18   Mr. Dowlen was part of the planning; that Mr. Lucas was part
19   of the planning; and that there were potentially others that
20   he didn't recall.
21         And that -- not only did they discuss the shooting
22   and that he would be the person who would scout the location,
23   but that there were guns involved and that individuals had
24   different types of guns that were present; that he had
25   handguns.  He didn't remember specifically if there were big

guns that were involved. But that there were guns involved
that -- that people -- that people had on them during this
discussion.

And that he specifically then, based on this
agreement by the group, the individuals that he described
were present, he then was sent out from the location to go
scout the location. And, while on the way to the location,
he did decide that he did not want to go forward.

However, when he left the meeting, there was an
agreement by everybody at that location that this would take
place, and that's why he was sent out as the scout.

THE COURT: According to Mr. Warfield.

MR. COLLINS: According to Mr. Warfield.

THE COURT: Anybody else corroborate that?

MR. COLLINS: So, Your Honor, Mr. Dowlen also
testified to this as well.

THE COURT: Anybody other than Mr. Dowlen?

MR. COLLINS: Your Honor, those are the two
individuals that I have.

THE COURT: Okay.

MR. COLLINS: Based on my recollection. If the
Court gives me one quick moment, let me just double-check.

THE COURT: Okay.

MR. COLLINS: Okay. And, Your Honor, no, it
doesn't sound like anyone -- well, no one else in the

1   Hardison specific trial testified to it.

2   Mr. Dowlen, like I said, did testify to it -- and

3   just for the record, Your Honor, that is captured in Document

4   1474, starting on page 44, at line number 1, where Mr. Dowlen

5   talks about -- about them targeting Plush.

6   The same thing:  There was conversations about how

7   this would take place; that Mr. Lucas and Warfield arrived at

8   Mr. Hardison's house with a couple of assault rifles; they

9   went through, trying to figure out what was going to -- what

10  they were going to do and how they were going to handle it in

11  terms of who was going to have specific roles in carrying out

12  the shooting.

13  He also talks about Mr. Warfield also being sent

14  out to scout the location as well.

15  So that's the evidence that the government has,

16  Your Honor.  And I would submit on that.

17  THE COURT:  Okay.  So I'm going to find based on

18  the recitation of what came out at trial, as well as what I

19  heard from Mr. Warfield over the past couple of days, that,

20  on this particular issue, I'm going find that -- the evidence

21  equal on both sides.  So it hasn't been established by

22  preponderance.

23  My primary -- I have several concerns.  One, even

24  if I went with what Mr. Warfield said, I have a hard time

25  squaring his unilateral decision to not proceed with the

invasion.  And then he testified that was -- he told them
something that wasn't true in getting them not to do it.  So
no invasion of the Plush Nightclub ever occurred.  Because he
was -- because he made that unilateral decision, which was
apparently followed, I have a hard time coming by
preponderance of the evidence that, you know, the essence of
a conspiracy was here by agreement.  Especially if others, as
he claimed, were involved in it.

Then we go to Mr. Dowlen's testimony.  I'll say
this with Mr. Dowlen:  Some of the things that Mr. Dowlen
says are truthful, and some of the things that Mr. Dowlen
says challenge truthfulness.

And for those reasons, I just find it hasn't been
established by a preponderance; so I'll sustain that.

Then we go to the sixth issue raised by
Mr. Hardison, objects to the enhancement under 3B1.1 for
being a leader or organizer of a criminal activity in
relation to the shooting at C-Ray's.

I guess let me hear from the government on that.
I do recollect that Mr. Hardison called Darden, and Darden
issued the famous quote, "All hands on deck."  But that
doesn't -- that doesn't help me conclude that Mr. Hardison
was a leader or organizer for C-Ray's.  Mr. Darden sent the
message out, "All hands on deck."

MR. COLLINS:  The Court's brief indulgence, Your

1   Honor.

2           So, Your Honor, it's -- the government believes

3   that at trial we put forth evidence and we proved that it was

4   Mr. Hardison who was initially attacked at Sidelines

5           THE COURT:  Uh-huh.

6           MR. COLLINS:  And, based on this attack, he put

7   out a call to the other Gangster Disciples, to include Mr. --

8   to Mr. Darden and the Gangster Disciples so that they could

9   assemble and then retaliate against Bloods members, either at

10  that location and/or where they found them.

11          And so it's the government's position -- this has

12  always been the government's position -- that Mr. Hardison

13  was the --

14          THE COURT:  Remind me what proof -- because I

15  agree with you -- everything you said to that point.  But

16  then the critical thing is Hardison called Darden and Darden,

17  who we know was the head of all Tennessee, sends the

18  message -- and -- "All hands on deck."  And we have further

19  testimony that people reacted to that, "people" being

20  Gangster Disciples.  And even testimony, "I dropped what I

21  was doing because 'all hands on deck' means all hands on

22  deck," which came from Darden.

23          MR. COLLINS:  And the Court's brief indulgence,

24  Your Honor.  Let me pull the exact location of the testimony.

25          THE COURT:  And I guess by that time, as well,

Mr. Hardison's role would have been on the blackout squad, I think. So he would have been under Mr. Darden, hence why he probably called Darden to say -- to report what happened. So Mr. Darden ends up making the decision all hands on deck.

MR. COLLINS: And, Your Honor, it's the government's recollection, Your Honor -- and I'm trying to identify it specifically in the testimony. The Court's indulgence. But it's the government's recollection as well that -- that the defendant at that point in time also was a part of the security team.

THE COURT: Right.

MR. COLLINS: And that in and of itself would have then empowered him to be able to have other individuals --

THE COURT: Then why wouldn't he have called and said, "All hands on deck"? Why did he have to call Darden if he's so powerful?

MR. COLLINS: Well, Your Honor, I think there's still a chain of command as it relates to this organization and the structure. And so I think, if you look at the facts as it relates to the Main Street murders, the defendant had already learned, I think, by that point -- by the time that this incident occurred that you couldn't just unilaterally make decisions without people knowing.

THE COURT: He was a manager, but he wasn't a leader. He had to go up the chain of command.

1          MR. COLLINS:  Well, I think, Your Honor, that he

2    has the ability as a manager to organize people and to have

3    those people --

4          THE COURT:  Okay.

5          MR. COLLINS:  -- respond and take part in

6    activities.  But, at the same time, it's still within an

7    organizational structure where he has to notify people.

8          Especially in a situation where -- we've heard

9    many times throughout this trial, Your Honor, that there were

10   instances where they wanted to do retaliations but they had

11   to be careful of the heat that was going to be on them.  And

12   during this window of time, there was a lot of attention on

13   them.  So it would make sense that, even as a manager, he

14   would still then talk to Darden before executing a plan like

15   this unilaterally.

16         THE COURT:  So it sounds like we agree, he wasn't

17   a leader or organizer?  He was at best maybe a manager?

18         MR. COLLINS:  Well, Your Honor, I think -- look, I

19   think that, based off of the facts that we know through the

20   evidence, once he -- once the Gangster Disciples got to that

21   location, he was part of the discussion on how this was going

22   to play out.  And he was part of the discussion --

23         THE COURT:  Once they got to C-Ray's?

24         MR. COLLINS:  That's correct, Your Honor.

25         THE COURT:  Okay.

 1          MR. COLLINS:  Well, let me back up, Your Honor.

 2   Once the Gangster Disciples assembled, first at Sidelines and

 3   at C-Ray's as well, Your Honor, he was part of the

 4   decision-making process on how this whole thing was going to

 5   play out.  And so, Your Honor, the government believes that

 6   the evidence does show that he was a leader and a -- a

 7   manager and a leader in this situation, Your Honor, and that

 8   the enhancement should apply.

 9          THE COURT:  All right.  So I'm going to sustain

10   that objection on the leader or organizer for the reasons we

11   just discussed.

12          So, with that, I'll accept the facts in the

13   presentence report, and we'll go to the guideline

14   calculation, which is, first, on Count One, conspiracy to

15   participate in racketeering, the guideline for conspiracy to

16   participate in racketeering provides a base offense of 19,

17   but also provides that if the offense level is greater for

18   the underlying criminal activity, such as it is in this case,

19   then that controls.

20          For the guideline purposes and the racketeering

21   activities alleged in Count One, Mr. Hardison is responsible

22   for, one, the murder of Derek Sherden; two, the murder of

23   Amanda Weyand; three, the attempted murder of Antonio

24   McGougan; four, the conspiracy to commit murder because these

25   involved separate victims and they cannot be grouped.

1          Number one, murder of Derek Sherden, Count Two,

2   the base offense level is 43 for first-degree murder.  Two

3   points are added for obstruction of justice because

4   Mr. Hardison instructed Trotter to get rid of the firearms.

5   And Mr. Hardison attempted to persuade his cellmate, John

6   Duffey, to claim that the murder was committed by Trotter.

7   That gives an adjusted offense level of 45.

8          Number two, murder of Amanda Weyand, Count Four,

9   base offense level starts at 43 for first-degree murder.  Two

10  points are added for obstruction for the same reasons.  So we

11  get another adjusted offense level on number -- on the murder

12  of Amanda Weyand at 45.

13         Then, three, attempted murder of Antonio McGougan.

14  Base level starts at 33 for attempted murder.  There are no

15  adjustments.  So the final for the adjusted offense level is

16  33.

17         And then the underlying racketeering activity,

18  Number 4, the murder -- the conspiracy to commit murder,

19  gives a -- at Plush Nightclub is 33 under the guideline for

20  conspiracy to commit murder.  There are no adjustments there,

21  so the adjusted offense level is 33.

22         Then we turn to the multicount adjustment under

23  the guideline.  Count Two receives one unit; Count Four

24  receives one unit; and the attempted murder of McGougan and

25  the conspiracy to commit murder receives zero units.  So

there's a total number of units. The combined adjusted
offense level for racketeering is then 45 plus 2, for 47.

So, Count One, base offense level is 47.

MR. COLLINS: And I'm sorry, Your Honor. I'm
sorry, Your Honor. And I noticed in your calculation you
included the conspiracy at Plush, even though I thought just
now you just sustained it. And I thought you were still
including it as. . .

THE COURT: Well, I did, but it has no effect on
the guideline.

MR. COLLINS: Okay. I just wanted to make sure.

THE COURT: It has no effect on the guideline.

MR. COLLINS: Thank you, Your Honor.

THE COURT: Count Two, murder in aid of
racketeering, Derek Sherden, the base level is 43 for murder
in aid of racketeering and provide -- 43 provides that the
level is -- is greater than the underlying activity, or 12.
So 2 points are added for obstruction for the same reasons:
He instructed Trotter to get rid of the firearm and attempted
to persuade his cellmate, John Duffey, to claim the murder
was committed by Trotter. So the adjusted offense level
there is 43 plus 2, which is 45.

Then Count Four, murder in aid of racketeering,
Amanda Weyand. Again, 43 for the murder in aid of
racketeering, plus 2 for the obstruction, which is an

adjusted offense level of 45.

Then Count Seven, racketeering and assault resulting in bodily injury for Malcolm Wright. Base level for 14 for aggravated assault. Five points because a firearm was discharged. Seven because the victim sustained permanent or life-threatening, but only 10 points are allowed to be added to the base level. So that brings him to 24. Plus 4 points for being the leader -- I sustained that, so the adjusted offense level is 24.

The adjusted offense level for all counts is 43. While 47 is the total offense level because Count One is the highest, the guideline makes 43 the ceiling or the top. So I can only do 43 points for the offense level.

In addition to the foregoing, there's the mandatory minimum term on both Counts Three and Count Five that must be served consecutive to any other sentences.

Turning to criminal history, there are 3 points for a 2005 conviction for the sale of controlled substance out of the Davidson County Criminal Court and 1 point for a conviction for aggravated robbery in the Davidson County Court, which gives him 4 points and sets him at Category III.

So the total offense level of 43 on Counts One, Two, and Three and a criminal history of III results in a sentencing range of life imprisonment. In addition, Counts Three and Five each call for a consecutive sentence of 120

months.  Probation is not authorized under the guideline.
The guideline range for supervised release is up to five
years.  The guideline range for a fine is up to 500,000.
There's a special assessment of $100 per count, which is
mandatory.

        Does the government have any objections to the
guideline range?  Other than those noted?

        MR. COLLINS:  No, Your Honor.  Thank you.

        THE COURT:  Mr. Evans?

        MR. EVANS:  Your Honor, yes, as noted --

        THE COURT:  Other than those noted.

        MR. EVANS:  Not other than that.

        THE COURT:  So I understand there's some victim
impact witnesses?

        MR. COLLINS:  Yes, that is correct, Your Honor.
What I would like to do, Your Honor, if possible, is call
them in groups related to each victim, if that's fine with
the Court.

        THE COURT:  And I'll remind everyone who is about
to speak, your comments are directed to me.

        MR. COLLINS:  The Court's indulgence.  So, Your
Honor, the first person will be Ms. Johnicia Heard, who is
the sister of Mr. Derek Sherden.

        MS. J. HEARD:  Good afternoon, everyone.

        THE COURT:  How are you?

```
 1              MS. J. HEARD:  I'm okay.  I'm a little nervous.
 2              THE COURT:  Okay.  Just direct your comments to
 3    me.  Don't worry about anybody else.
 4              MS. J. HEARD:  I know.  Thank you.
 5              Sorry.  I'm really nervous.  I had a lot to say,
 6    but now it's just all went away.
 7              But Derek was my little brother.  And I loved him.
 8    I miss him.  He was a big teddy bear.  He -- I don't know
 9    what else to say.  I'm sorry.
10              THE COURT:  I appreciate you being here.
11              MS. J. HEARD:  Okay.  Thank you.
12              MR. COLLINS:  Your Honor, next would be
13    Mr. Sherden's sister, Katina Heard.
14              THE COURT:  How are you?
15              MS. K. HEARD:  Hey.  How you doing?
16              THE COURT:  Okay.  Thank you.
17              MS. K. HEARD:  Honestly, Your Honor, I'm going to
18    be honest with you, this is a hard pill to swallow.  I feel
19    like I lost my best friend.  My daughter calling me all night
20    crying, because my brother was a father figure.  And I'd give
21    anything to have him back.  I don't see no family deserve to
22    go -- I'm sorry.  I'm sorry.
23              THE COURT:  That's all right.  Take your time.
24              MS. K. HEARD:  I don't see no family deserve to go
25    through this.  My life has been hard, Your Honor.
```

1 (Indiscernible.) My life ain't the same. Me and my brother

2 was close. He was my best friend. We talked every day. And

3 just the thought of him being gone, Your Honor, I just want

4 justice for my brother. Because he deserve it. He loved --

5 he had a son that he'll never get to know his father, and I

6 just want to be able to sleep tonight.

7 And my daughter wanted me to say some words. She

8 says she want justice for her uncle because that's -- because

9 he was her father figure and she loved him and she miss him,

10 and it's hard for her to live. It's hard for all of us to

11 live, me and my siblings.

12 I said I wasn't going to cry when I got up here,

13 but I can't help it. I've been to every trial, Your Honor,

14 and I just want justice for my brother. I'm going to be

15 honest. It's not fair my brother not sitting over there in

16 one of those chairs. I can't hug him. I can't talk to him.

17 I can't never be with him.

18 So, on behalf of me and my daughter and my family,

19 I just want justice for my brother.

20 THE COURT: Thank you for being here and sharing

21 that.

22 MS. K. HEARD: Thank you, Your Honor.

23 THE COURT: Thank you very much.

24 MR. COLLINS: And then, Your Honor, two of the

25 Heard siblings provided statements that they ask that the

1    government read to the Court.

2            THE COURT:  All right.

3            MR. COLLINS:  And so, Your Honor, the first

4    statement is from John Parker, who has been identified as

5    Mr. Sherden's brother.  He wanted to just simply relate to

6    the Court that no one deserves what happened to Derek and

7    Amanda.  That he personally believes that the maximum

8    sentence possible is appropriate.  And he wanted to thank

9    everyone for their consideration for his words.

10           THE COURT:  All right.

11           MR. COLLINS:  And then, Your Honor, the second

12   statement is from Katrina Heard.  And that's -- so you just

13   heard from Katina.  Katrina with an "r."  And she prepared a

14   statement and it reads as follows (as read):

15               First and foremost, I would like to thank God

16               for this day.  It's finally here.  My life was

17               scattered twice January 6th.  I lost my last son

18               John January -- I lost my last son January 6th,

19               2005.  January 6th, 2012, was the last time I

20               heard my baby brother's voice.  We talked the

21               whole day.  He helped keep my spirits up from

22               being sad about my son.  Sadly, my brother's life

23               was taken that same night seven years later.  We

24               last talked around 10:15 p.m.  I made him laugh.

25               And to know he was found dead around 10:30 p.m., I

couldn't believe this and always wondered why.

My life hasn't been the same since that night.
I sometimes find myself depressed and crying,
missing him so much.  I have to face reality,
knowing I'll never see him again.

Baby brother, your sisters, your brother, your
nieces and nephews miss you so much.  Our hearts
will be forever broken.  We love you, Derek.

And for you, Mr. Hardison, I would like to let
you know I forgave you the same night, not knowing
who had did this.  All because I have God to
answer to, and so do you.  I miss my brother
beyond what you could think.  One thing I do know,
Derek trusted you to let you in his home, and you
betrayed him by taking his life.

My brother wasn't a bad guy at all.  He just
made some bad decisions, like we all have at one
point in time in our life.  I hurt daily.  My kids
hurt.  My family hurts.  You took a big part of
our hearts that night.  I'm crying as I write this
all.  I can see -- I'm crying.  As I write this,
all I can see is the photos of him dead on the
couch.

I watch you in court have no remorse at all for
you what you did.  I really hope you find God

 1        because you will definitely need him.  Derek is

 2        gone and resting with the angels in heaven.  You

 3        are about to live in pure hell for what you did to

 4        my family and the other families.  I will never

 5        hate you, but I will pray for you because you're

 6        pure evil.

 7            I want the Courts to know my brother was loved

 8        and was a gentle giant with a big heart.  Derek

 9        and Amanda didn't deserve their life to be cut

10        short by murder.  He was only 23, with a full life

11        ahead.

12            I would like to thank Mr. Hernandez and all of

13        the other attorneys for a good job well done.  I

14        appreciate all of them from the bottom of my

15        heart.  Without them, this day would not be

16        possible.

17            Judge, I would like to see Mr. Hardison get the

18        supermax sentence in this case.  A life sentence

19        for each life that was taken by his hands.

20            Thank you for allowing me to express myself.

21            Signed, Katrina Heard.

22        THE COURT:  All right.

23        MR. COLLINS:  And, Your Honor, at this time, the

24  government would like to call family members and friends who

25  are associated with Amanda Weyand, first starting with her

1  mother, Ms. Marilyn Smith.

2          THE COURT:  If there are others, you can come

3  forward, too.

4          MR. COLLINS:  Ms. Moore, do you want to come up,

5  too?

6          So, Your Honor, Marilyn Smith first, and then

7  Ms. Nancy Moore.

8          MS. SMITH:  Hi.

9          THE COURT:  Okay, go ahead.

10         MS. SMITH:  My family and I have waited a long

11  time for this day to come.  I am glad you were stopped from

12  killing any more.  You took from my family, Amanda's kids'

13  mother, my only child, whom you did not even know.  Amanda

14  would have given her last dollar to you if you needed it.

15         Amanda was a Christian who loved her children, who

16  got messed up with thugs who didn't care who they hurt as

17  long as they were in power, controlling with greed.

18         I am still struggling not to hate you.  You see

19  what you did?  The Bible says a person has to forgive in

20  order to be in heaven.  And I believe that's true.  And I

21  believe that is true, so I have to let my feelings of hate,

22  sadness go away before I die.

23         It's like a part of my heart has been ripped out

24  of my chest.  What gives you the right to be a Muslim when

25  you would still hate and so many young lives hurt?  They were

ages two, five, nine and 16.

A lot has happened to me since you took my daughter's life. Amanda's dad, his only daughter, died of a massive heart attack a year later after her death, leaving the kids without a grandpa because he loved her so and had been a paraplegic since his daughter was three.

Three of Amanda's kids are without a dad.

My mother, sister, two brothers has died, all who would have laid down their life for Amanda.

I have asked for the death penalty. So I'm now hope you get life in prison and no parole and not have a peaceful memory.

Thank you.

THE COURT: You're welcome.

Ms. Johnson.

MS. JOHNSON: Your Honor, this is my sister. Amanda was my niece. We come from a big family, four brothers, four girls. Amanda was the baby of our family. She was precious. She had made bad choices. But she didn't get to see any of her children graduate. She didn't get to meet any of her grandchildren.

And what gives a person a right to take a life? There is no reason. There is no reason.

At Christmastime, I went and picked up Amanda at the house where they were killed and took her to our family's

1  Christmas dinner.  I loved her so much.  And then, when I
2  took her back home, I said, "Amanda, you need to come home."
3          And she said, "Nan, I pray about it every day.
4  I'm going to come home."
5          Well, he never gave her the chance to come home.
6  I hope he thinks about this every day of his life.  I hope he
7  does.  I hope it hurts him.  Someday in his life, I hope it
8  hurts him for the lives he's taken from all of us.  And I do
9  want justice for Amanda.
10         Thank you.
11         THE COURT:  Thank you very much.
12         All right.
13         MR. COLLINS:  And then, Your Honor, the government
14  would call Ms. Vicki Davis.
15         MS. DAVIS:  Good afternoon, Your Honor.
16         THE COURT:  Good afternoon.
17         MS. DAVIS:  Again, my name is Vicki Davis, and I
18  am the mother of Malcolm Wright.  I submitted my impact
19  statement to this courtroom several times.  But let me give
20  you a quick glimpse of Malcolm's background and upbringing.
21         Malcolm is -- Malcolm is what you will call a
22  military brat.  He was raised in the Army because I served 22
23  years of active service.  We moved every two years from state
24  to state to country to country.  Even with all the moving,
25  Malcolm was brilliant, kind, and good natured.  It seemed he

could talk to anyone about anything.  He was the glue to our family.

In high school, he was a straight-A student, started college after high school.  We are a happy family, very close and outgoing.  We love watching sports.  We are Georgia fans.  He was his siblings' best friend, an essential life support system for his sister and brother.

On an early Saturday morning, at exactly 5:58 in the morning on November 3rd, 2012, my doorbell rang.  I went to the door and looked through the side windows of the door.  It was a tall white man.  He introduced himself as Detective Finley.  He asked to come in.

As my heart was racing, I opened up the door, and he said, "Your son Malcolm was shot and didn't make it."

I immediately fell to the floor.  Since that day, I've had a broken heart syndrome.

Let me explain the magnitude the murder of my son Malcolm has had on me and my family.  Malcolm's death is the worst trauma I have ever experienced.  The trauma I experienced in the Army at war does not even compare.  This trauma is more intense.  The memories and hopes will always be.  Malcolm's death has been a range of different and ongoing challenges for me and my family.  The psychological, biological, and social effects it's cost us all.  Malcolm's death has caused me physical symptoms, including stomach

ulcers, pain, muscle cramps, migraines, in and out of mental
institutions, because I cannot comprehend that someone would
take my son's life.

My pride in fighting for this country is gone.  I
have lost the war when I lost my son Malcolm to gun violence.

The stress it puts on my family is enormous.
Empty chair, room, space.  Never gets any less empty.  I miss
my son every day of my life.  He now has three nieces and
four nephews.  They will never get to know their Uncle
Malcolm.

It's taken a huge toll on the trust I have in
others and in our country.  This country that I sacrificed my
life for was all for nothing, and all the suffering
transferred to those close to me.

Malcolm's sister and brother are not here today
because this day is too emotional and draining, and I wanted
to protect them from this pain that no one should go through.

Everyday questions such as "How many kids do you
have" can trigger intense distress.  I have nightmares all
the time of my doorbell ringing, and it's Detective Finley
telling me my son was shot and killed.  The sound of
doorbells gives me anxiety.

You took so much from us.  Every day we wake up,
we are reminded that Malcolm is not here.  My everyday life
is a struggle because of the way my son was taken from us.

1   There can be no closure for us today.  We will always
2   continue to think of Malcolm every waking moment.
3              Please, Your Honor, I ask that you fully punish
4   the defendant to the max.  He has destroyed so many families
5   here today.  People must be responsible for their own actions
6   if we are to keep the scale of justice balanced.
7              Hardison, I hope that and pray one day you face
8   reality and you confess that you have committed these crimes
9   and ask for forgiveness.  I forgive you.  I have no hate in
10  my heart for you.  I have peace today.
11             Thank you, Your Honor.
12             THE COURT:  All right.  Thank you for being here.
13             MS. DAVIS:  This is my husband, Charles Davis,
14  standing next to me.
15             MR. COLLINS:  And, Your Honor, that would be all
16  of the family members.
17             THE COURT:  All right.
18             So does the government want to be heard before
19  sentence is imposed?
20             MR. COLLINS:  Yes, Your Honor.  Briefly.
21             And thank you, Your Honor.  I know the Court has
22  had an opportunity to review the sentencing memo that the
23  government has provided, as well as the supplementing
24  documents.  However, I just wanted to make it clear on this
25  record that the government would be recommending the maximum

1  sentence for the defendant in this case.  And specifically,

2  the government would be asking for life on Counts One

3  through -- One through Five and a maximum of 20 years on

4  Count Number Seven.

5          The government understands, Your Honor, that there

6  is a mandatory minimum count as it relates to the VICAR

7  murder counts.  The other counts carry a maximum of life.  We

8  ask that life sentences be imposed on each one of those

9  counts.

10          And the government makes this recommendation

11  because the government believes that, based on the facts of

12  this case, it's an appropriate sentence in this matter.  And

13  also, a maximum sentence on each one of these counts

14  satisfies the requirements or the mandates that are outlined

15  in the 3553(a) factors that we know that the Court must

16  consider when fashioning an appropriate sentence.

17          With that said, Your Honor, I would like to just

18  go through a couple of highlights from the sentencing

19  memorandum to justify why we've made this recommendation and

20  then I'll step down, Your Honor.

21          THE COURT:  All right.  Go ahead.

22          MR. COLLINS:  Thank you, Your Honor.

23          Your Honor, when you think about the nature and

24  circumstances of the offense in which this defendant is

25  convicted of, I think -- one of the first lines in our

sentencing memo is that this defendant has now been convicted
of some of the most serious crimes that a person could have
committed.

       And during -- during the trial, the government
presented evidence, Your Honor, that showed that the
defendant was a part of this national criminal organization,
the Gangster Disciples.  But not only just a regular member,
Your Honor.  He was a stalwart member of this organization,
somebody who went to extreme measures for this organization,
somebody who held positions of authority, positions of
authority that specifically centered around violence, and
that he carried out violent acts on behalf of the
organization's beliefs and its goals.

       And, as the Court has heard through the testimony
that's been presented in this case -- and actually multiple
hearings -- this was an organization that was very
intentional about creating this -- this atmosphere of fear
and of dominance through various violent crimes -- the
assaults, the robberies, the attempted murders, the
shootings, and murders.

       And the one person, Your Honor, who carried out
the most serious of these crimes was the defendant.  And the
government -- the government illustrated this, of course,
through -- through the crimes that the Court has already
heard about, the violent smashings of gang members that the

defendant routinely participated in.  You've heard about that clearly through the murders of Derek Sherden and Amanda Weyand.

Derek Sherden, who was supposed to be an associate of the defendant, someone that he killed over a $60 marijuana debt.  Amanda Sherden [sic], who was an innocent victim who literally was just in the wrong place at the wrong time.

The planned -- the planned and executed shooting of the McGougan residence in retaliation with the Bloods.  A shooting that took place while this house was occupied by various relatives of the McGougans and individuals on the street.

And, of course, the unprovoked assault of Malcolm Wright, an assault that led to the events which resulted in Mr. Wright's death.

It's through these acts, Your Honor, that -- and the other things that the defendant was involved in that the government believes that this defendant embodied the depravity of this organization, the impact that it had on the community.

But it was also through this embodiment, Your Honor -- and the government believes this is very important when the government -- when the Court fashions a sentence -- it's also through this embodiment of this organization that the defendant then empowered the organization and its

1    members.

2              And the Court has heard from several witnesses.

3    You've heard from Mr. Dowlen, Mr. Trotter, Mr. Warfield, and

4    even some of the civilians who were familiar with the

5    Gangster Disciples, that this was an organization that wanted

6    to be the biggest and baddest gang in the district.  And,

7    because of that, they wanted individuals who were big and

8    bad, too.

9              And you've heard it multiple times.  The person

10   that was considered to be the biggest and the baddest was the

11   defendant.  The person that was considered to be the boldest

12   and -- and the most fearless was the defendant.  And the

13   defendant was that person who the Gangster Disciples

14   recognized would willingly take part in violent activities on

15   behalf of the gang.

16             And, when he would do it, they would also join in.

17   They felt stronger by having someone like the defendant who

18   was involved in their organization.  And, because of that, it

19   empowered them and encouraged them to take part in this reign

20   of terror with impunity that you heard about throughout the

21   case.

22             And so, when fashioning the sentence, Your Honor,

23   and why we think a maximum sentence is appropriate, we ask

24   that the Court weigh specifically the defendant's conduct,

25   but also the impact, the embodiment, the empowerment that he

1  gave this organization in order to carry out his criminal

2  activities throughout the district.

3          THE COURT:  So, just to make sure I understand,

4  you said in the beginning One through Five.

5          MR. COLLINS:  Count --

6          THE COURT:  Right.  But then Five and Three are

7  consecutive.

8          MR. COLLINS:  That is correct, Your Honor.

9          THE COURT:  Okay.

10         MR. COLLINS:  That is correct.

11         THE COURT:  So what's your recommendation?  Five

12 and Three have to run consecutive to any other term.

13         MR. COLLINS:  That's correct, Your Honor, and we

14 would ask the Court run consecutive -- we would ask that the

15 Court do life sentences on Counts One, Two, Four.

16         THE COURT:  Oh, there you go.  Keep going.

17         MR. COLLINS:  Okay.

18         THE COURT:  And then what's your recommendation on

19 Three and Five?

20         MR. COLLINS:  And, Your Honor, based on the

21 Court's finding, we would ask that those counts run

22 consecutive.

23         Those also carry a maximum of life, and I would

24 like to address, Your Honor, why -- why I believe they should

25 be consecutive as well.  I was going to do that later on --

1          THE COURT:  All right.

2          MR. COLLINS:  -- in the presentation, if that's

3    okay with the Court.

4          THE COURT:  We're there now.  I'm going to hear

5    from Mr. Evans, Mr. Hardison if he wants to talk, and I'm

6    ready to impose sentence.

7          MR. COLLINS:  Sure, Your Honor.

8          Well, look, Your Honor, clearly the defendant --

9    I've looked at the PSR.  The defendant has, you know, what

10   the government believes is a serious criminal background,

11   based on convictions as well as contacts.

12         While the PSR I believe is instructive, I think

13   what's more instructive, Your Honor, are the comments that

14   you heard from the people during the course of the trial who

15   interacted with the defendant on a day-to-day basis.  These

16   were individuals who talked about his incessant need to be

17   involved in violence; that he wanted to be known for either

18   rapping or murder; that he actively sought out opportunities

19   to be involved in violent conflict.

20         You heard from Mr. Duffey about how the

21   defendant -- you know, he wanted to pull the rats out to

22   test -- so that they could face violent consequences; that he

23   had the bullet on his face so that people would know -- these

24   are all things, Your Honor, that the government believes are

25   consistent -- well, they -- they're consistent with the

1    defendant's need to be involved in violent activities.

2           And the government believes, Your Honor, that, you

3    know, when you look at this case, there is absolutely no

4    remorse from this defendant.  Zero.  And, in actuality, this

5    is the defendant who so embraced this violent culture --

6           THE COURT:  Yeah, I get all that.  I agree with

7    all that.  I mean, you speak from the record.

8           So you're suggesting a life sentence on Count One,

9    Two, and Four, and then two more consecutive life sentences?

10          MR. COLLINS:  That's correct, Your Honor.

11          THE COURT:  Okay.  And then 20 years on Five --

12   Seven?

13          MR. COLLINS:  That's correct, Your Honor.

14          THE COURT:  Okay.

15          MR. COLLINS:  And, look, Your Honor -- this is the

16   last thing I'll say.  And I was going to talk about the

17   course and goals of sentencing or objectives of sentencing.

18          Your Honor, based on the evidence in this case,

19   the defendant and the Gangster Disciples were very, very

20   intentional about the message that they sent out to the

21   community, how they wanted to be the biggest and the baddest.

22   The defendant in all of his actions was very, very

23   intentional.  He wanted people to fear him, and that's why he

24   acted in certain ways.  He wanted people to know that Derek

25   Sherden and Amanda Weyand were executed --

1          THE COURT:  I know you speak from the record, and
2     you do it well.  We all recognize, in the federal system,
3     life is life.
4          MR. COLLINS:  I got that, Your Honor.
5          My point is, Your Honor -- my point is, I think
6     that this Court should be as intentional as the defendant and
7     the Gangster Disciples were in their activities and fashion a
8     sentence that not only punishes this defendant but shows the
9     public that this type of activity will not be accepted, this
10    type of conduct is not accepted, and consecutive life
11    sentences will send that type of message.
12         THE COURT:  Okay.
13         MR. COLLINS:  And that's the point I was trying to
14    make, Your Honor.
15         THE COURT:  I understand.
16         MR. COLLINS:  It captures a -- a general
17    deterrence.  Hopefully, look, it will specifically deter the
18    defendant or not -- or not -- but we think general deterrence
19    is very important in this case based on the fact that you've
20    heard, like I said, testimony that people lionized this
21    defendant.  Young men who were violent members of the gang,
22    young men who weren't.  They followed him.  And we believe
23    that this type of sentence is necessary to generally deter
24    the public, promote respect for the law, as well as, Your
25    Honor, to provide adequate punishment for the defendant.

1          THE COURT:  All right.

2          Mr. Evans.

3          MR. COLLINS:  Thank you, Your Honor.

4          MR. EVANS:  So, Your Honor, in response to the

5    government's statements -- and I didn't glean from their

6    sentencing position that they were asking for multiple

7    consecutive life sentences.

8          THE COURT:  Well, you understand now.

9          MR. EVANS:  I do know now.  And the government

10   asked you to be -- I think he said as intentional as the

11   defendant in rendering a sentence.

12         Well, Your Honor has to be obviously always

13   intentional in his eyes, but he -- but you're also tempered

14   in your acts by statute and consideration of statute.  And

15   consideration of more than just the -- the offense

16   characteristics and the nature and the circumstances of the

17   offense.

18         3553(a) is what instructs the Court in this

19   instance on how to fashion the appropriate sentence.  There's

20   no question that the -- the loss of life in this case is

21   significant.  But this Court has to consider more than just

22   that when considering a sentence.  And I'd ask the Court when

23   considering what sentence to levy in this case to walk

24   through some of those factors.  I know the Court will and

25   always does.  But I just want to talk about a few of them

1    briefly for the Court, just to highlight them.

2              Deterrence:  Brandon Hardison, by virtue of the

3    statutory required sentence for Counts Two and Four, will

4    never walk out of prison.  Ever.  He will die there.  Life

5    means life in the federal system, as Your Honor just noted.

6              Your Honor's also indicated by virtue of the

7    ruling today that it's going to be life plus at least 20

8    years, that those counts, Three and Five, will be

9    consecutive.  And, while Mr. Hardison takes issue with the

10   consecutive nature of even those sentences, the question is

11   what -- what goals of sentencing does it further to sentence

12   him beyond his natural life?  And the short answer is none.

13   It doesn't make a greater deterrent to give him a sentence

14   that he can't serve.  It doesn't deter others' acts to give a

15   sentence that he can't serve.  It's nonsensical to sentence

16   someone beyond their natural life and say that that for some

17   reason has the effect of deterring future behavior of others

18   or that specific defendant.

19             And, respectfully, to the Court, I disagree with

20   the -- with the government here.  Your job here today, Your

21   Honor, is not to send a message beyond that that is embodied

22   in the 3553(a) factors.  A life sentence plus 20 years as --

23   which is the minimum sentence for Counts Three and Five, and

24   which would be the sentence based on Your Honor's ruling

25   today, is a significant sentence.  It promotes respect for

the law.  It's his life.  It's his entire -- the entire rest
of his life where he will not be free.  It's a just
punishment.

And just very briefly about Mr. Hardison.  And I
know this is in the sentencing filing.  But Your Honor has to
consider his history and characteristics as well.  And I
think it's important to note where Mr. Hardison came from and
a little bit about what he endured.

And I know this can be somewhat of a -- a
difficult thing to talk about in light of all the pain that
was just shared by others.  But the Court has to consider it.
And I know the Court knows that.  But Mr. Hardison, as I note
in the sentencing papers, within weeks of coming into this
world, was severely abused, likely by his father, and taken
away from his parents and had to go live with his -- excuse
me -- paternal grandparents.  And he was deprived any
meaningful male role model when he was a child.

From all accounts, it looks as though Mr. Hardison
was back with his mother and father at times, even though
there was a court order from juvenile court saying that they
shouldn't have been.  When looking through the DCS records in
this matter and doing the mitigation investigation, there was
several indications that Mr. Hardison, although he was
ordered not to be back around his parents unsupervised, was
allowed back around them unsupervised, including his father.

His father, according to DCS records, refused to take any meaningful step to be a part of his life.  He refused to take the parenting classes -- just parenting classes -- that were necessary to get back in Mr. Hardison's life as a child.  And, by all accounts, Mr. Hardison's father suffered from his own demons, including drug addiction, for which young Brandon was subjected to.

That affects someone's life trajectory.  The social science is strong on that.  It affects life trajectory in a meaningful way.  And when the government talks about gangs, the one part that gets missed in the position of the government when they talk about gang and gang violence and people who join gangs is the why.  Is what's missing in that community that would allow someone to be charmed into gang life, to be conscripted into gang life.  What's missing there?  Is it the -- is it the meaningful male role model?  What is it?  Are they replacing that with someone in the community that's part of that gang?  Are they idolizing the wrong person?

But there's a significant institutional failure that leads to that lifestyle.  And that can't be missed in a gang case like this when the Court's considering these issues.

Lastly, Mr. Hardison has got significant mental health issues and has for a long time, including psychosis.

He's a cutter.  He's -- he has engaged in self-harm on

multiple occasions throughout his life, both while

institutionalized and out.  And he has sought help on other

occasions as well.

And, unfortunately for Mr. Hardison, it appears

that one of the brief times in his life where he was properly

medicated was when he was in TDOC, and then was released from

TDOC and lost access to that medication.  And as the -- as

we've noted -- or as the PSR notes, he did not have

meaningful access to medical treatment.  And that no doubt

had an effect on his decision-making throughout his life, his

ability to interact and have meaningful relationships with

others and in how he viewed the world and how he interacted

in that world.  And that's a significant thing for this Court

to determine when the Court is determining what sentence to

hand down.

And I would like to let the Court know that

Mr. Hardison's mother and his fiancee are both here today in

support of him.  Well, his fiancee left.  She was there, but

that's Ms. Pam Hardison.  I think she's in the hallway.

But --

THE COURT:  Okay.

MR. EVANS:  Ms. Jakwila Fitz [phonetic] is her

name.  And his cousin is also here in support of him today.

He has family that loves him.  He has children.

```
1    He's a good father.  He's trying to be a good father from the
2    place of incarceration and still meaningful- -- meaningfully
3    interacts in those children's lives on a daily basis.
4               So, Your Honor, when you render sentence for
5    Mr. Hardison today, we would ask you not to consecutively
6    hand out life sentences.  We believe the only sentence that
7    would be appropriate based on the confines of the law would
8    be a life sentence plus 20 years, based on Your Honor's
9    ruling.  And that's the sentence we would ask you to hand
10   down.
11              THE COURT:  All right.
12              MR. EVANS:  And, Your Honor, we've asked for a --
13   for certain recommendations in our papers.  I can go back
14   over them, what we would like the Court to recommend.
15              THE COURT:  Okay.
16              MR. EVANS:  Amend those --
17              THE COURT:  Do you want to address those now?
18              MR. EVANS:  Yeah, I can.  Yes, Your Honor.
19              We've asked the Court to include in
20   recommendations that he be housed as close as possible to
21   Nashville, Tennessee.
22              THE COURT:  Sure.
23              MR. EVANS:  That the Court recommend him to
24   participate in mental health treatment.
25              THE COURT:  Sure.
```

```
 1            MR. EVANS:  Drug treatment.  And any available
 2    educational program that --
 3            THE COURT:  Certainly.
 4            MR. EVANS:  -- that the institutions would have.
 5            THE COURT:  Okay.
 6            MR. EVANS:  And, Your Honor, we don't believe a
 7    fine in this case would be appropriate because he's
 8    financially unable.
 9            Thank you, Your Honor.
10            THE COURT:  Does Mr. Hardison want to speak?
11            MR. EVANS:  He does not, Your Honor.
12            THE COURT:  Okay.  Anything else?  From the
13    government?
14            MR. COLLINS:  No, Your Honor.  Thank you.
15            THE COURT:  Mr. Luke -- I mean, Evans, Bruno?
16            MR. EVANS:  Your Honor, the only other issue I
17    would make a request of the Court at the conclusion of the
18    hearing as it relates to Mr. Hardison's family.
19            THE COURT:  Does he want a minute with his mother?
20            MR. EVANS:  Yes, Your Honor.
21            THE COURT:  That will be arranged through the
22    marshals.
23            All right.  So the Court's ready to impose the
24    sentence.
25            You know, the cardinal rule here, the statutory
```

rule, is to impose a sentence that's sufficient but not greater than necessary to accomplish the purposes of the sentencing laws.  And I can't remember where I read it, but when I did do a little research -- I do think it was Justice Gorsuch, but I may be wrong -- what does that mean?  And in a nutshell I think he said that means the Court's not supposed to impose a sentence that is harsh, but sufficient to accomplish the purposes of the sentencing laws.  And that's what I -- my sentence intends to do.

So Mr. Hardison, all of the 3553 factors here: The seriousness of the offenses, plural, of conviction, the multiple murders in -- particularly, as well as the other activity of violence, and drug activity, all perpetrated through this conspiracy with the Gangster Disciples, merits a severe sentence.  And the guideline I think does try to capture that on the issue -- the sentence also accomplishes -- I think my sentence also accomplishes the need of punishment.  I think we heard some of that from the victims.  But also the law demands punishment for what you have done and what the jury has found you guilty of doing.

Yes, there is a message of general deterrence. And the Court has no doubt that this sentence will send that message.  And specific deterrence here, quite frankly, given especially Counts Two and Four that impose the mandatory life speaks for itself, to the extent that's accomplished.  It's

1    really more of an issue of general deterrence.

2              My sentence will also send a message of respect

3    for the law and respect for other human lives that have been

4    affected here in a manner that can never be changed.

5              So for all of the reasons under 3553(a) and having

6    considered the guidelines, my sentence is as follows:

7              On Count Two that addresses the murder of Derek

8    Sherden, I impose the mandatory life sentence.

9              On Count Four that addresses the murder of Amanda

10   Weyand, I impose the mandatory life sentence.

11             On Count -- on Count One, which is the conspiracy

12   to participate in racketeering activity, which the Court --

13   and I want the record to reflect, includes multiple predicate

14   overt acts:  Firearms, assaults, drug-related action, as well

15   as the murders that I've already referenced, and other overt

16   acts of criminal behavior captured in there, the Court

17   believes and imposes on Count One a sentence of life.

18   Although in Count One, Two, and Three, those life sentences

19   run concurrent.

20             On Count Seven, has a maximum term of 20 years.  I

21   will impose the 20-year sentence, also to run concurrent.

22             However, Counts Three and Counts Five have

23   consecutive sentences.  And I've heard the government's

24   argument about a consecutive life sentence.  And with all due

25   respect, the Court doesn't -- the Court believes that would

be harsh and defy laws of physics and life as we know it.
Mr. Hardison has but one life. All of us have one life. And
I have captured that in the murders that I've already
rendered here. I just think it would -- it would -- it would
be harsh to impose another life sentence because it
practically cannot be served. It practically cannot be
served. And the only reason to do that is vengeance and
revenge and harshness. And there's no place for such
emotions in a court of law. So I'm going to impose a
consecutive sentence on Count Three of ten years, which again
will never be served, because life means life in the federal
system, and then a consecutive sentence in Count Five of ten
years.

Again, Mr. Hardison will never -- will never get
to those because Counts One, Counts Two, and Counts Four that
addresses the multiple murders that he -- the jury's found
here, he's received a sentence of life. And in the federal
system life is life, no ifs, no ands or buts.

I'll impose a lifetime supervised release. I will
not impose a fine. I do have to impose the mandatory special
assessment, $100 per count, for the six counts, Counts One,
Two, Three, Four, Five and Seven, for a total of $600.

I will accept all the recommended special requests
from Mr. Hardison's -- and his attorneys for -- to recommend
to the Bureau of Prisons.

```
 1              All right.  Does the government have any
 2  objections to the sentence?
 3              MR. COLLINS:  No, Your Honor.  Thank you.
 4              THE COURT:  I'm sorry?
 5              MR. COLLINS:  I said no, Your Honor.
 6              THE COURT:  All right.  Mr. Evans?  Mr. Bruno?
 7              MR. EVANS:  Yes, Your Honor.
 8              THE COURT:  Okay.  I think I've said all that's
 9  appropriate here.  It sort of speaks -- the offenses of
10  conviction speak for itself.  And this Court really can add
11  nothing more to that.
12              I do thank those who took time to come and express
13  their feelings to the Court.  And that's important to the
14  process.  And I do ask the marshals to give, under
15  appropriate security -- mother or girlfriend?  That's the
16  girlfriend?
17              MR. EVANS:  No.  Your Honor.  That's Ms. Pam
18  Hardison.  That's his mother.
19              THE COURT:  Oh, okay.  The mother then.
20              All right.  Thank you.
21              (Court adjourned.)
22
23
24
25
```

1    REPORTER'S CERTIFICATE

2

3         I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6         That I reported on the Stenograph machine the

7    proceedings held in open court on December 7, 2022, in the

8    matter of UNITED STATES OF AMERICA v. BRANDON DURELL

9    HARDISON, Case No. 3:17-cr-00124-3; that said proceedings in

10   connection with the hearing were reduced to typewritten form

11   by me; and that the foregoing transcript (pages 1 through 58)

12   is a true and accurate record of said proceedings.

13         This the 24th day of January, 2023.

14

15                              /s/ Lise S. Matthews
                                LISE S. MATTHEWS, RMR, CRR, CRC
16                              Official Court Reporter

17

18

19

20

21

22

23

24

25