```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                       AT NASHVILLE

 3      UNITED STATES OF AMERICA,      )
                                       )
 4                 Plaintiff,          )
                                       )
 5      vs.                            )   Case No.
                                       )   3:17-cr-00124-3
 6      BRANDON DURELL HARDISON,       )
                                       )   CHIEF JUDGE CRENSHAW
 7                 Defendant.          )

 8

 9      - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

10        BEFORE THE HONORABLE WAVERLY D. CRENSHAW, JR.
                    CHIEF DISTRICT JUDGE
11

12                         TRANSCRIPT

13                            OF

14                       PROCEEDINGS

15                    September 30, 2021

16      - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

17

18

19              APPEARANCES ON THE FOLLOWING PAGE

20

21

22

23   PREPARED BY:
                   LISE S. MATTHEWS, RMR, CRR, CRC
24                   Official Court Reporter
                     801 Broadway, Room A839
25                    Nashville, TN 37203
                 lise_matthews@tnmd.uscourts.gov
```

```
 1    APPEARANCES:
 2
 3         For the Plaintiff:   John Benjamin Schrader
                                U.S. Attorney's Office
 4                              (Nashville Office)
                                Middle District of Tennessee
 5                              110 Ninth Avenue, S
                                Suite A961
 6                              Nashville, Tennessee 37203-3870

 7                              Gerald Collins
                                U.S. Attorney's Office
 8                              (Baltimore Office)
                                36 South Charles Street
 9                              4th Floor
                                Baltimore, Maryland 21201
10
11         For the Defendant:   Paul J. Bruno
                                Luke A. Evans
12                              Bulloch Fly, Hornsby, & Evans
                                302 North Spring Street
13                              Murfreesboro, Tennessee 37130
14
15
16
17
18
19
20
21
22
23
24
25
```

1              I N D E X

2        Thursday, September 30, 2021

3

4

5           INDEX OF WITNESSES

6                (None)

7

8

9

10           INDEX OF EXHIBITS

11                (None)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    The above-styled cause came on to be heard on

2  September 30, 2021, before the Honorable Waverly D. Crenshaw,

3  Jr., Chief District Judge, when the following proceedings

4  were had, to-wit:

5

6    THE COURT:  All right.  Be seated.  Good morning.

7    MR. BRUNO:  Good morning.

8    THE COURT:  Okay.  We're here on Case 17-124,

9  *United States of America v. Mr. Brandon Durell Hardison*.  And

10 Mr. Hardison is in the courtroom.

11   If counsel for the government can introduce

12 themselves on the record.

13   MR. SCHRADER:  Good morning, Your Honor.  Ben

14 Schrader for the United States.

15   MR. COLLINS:  Good morning, Your Honor.  Gerald

16 Collins for the United States.

17   MR. EVANS:  Good morning, Your Honor.  Luke Evans

18 on behalf of Mr. Hardison.

19   MR. BRUNO:  Paul Bruno on behalf of Mr. Hardison

20 as well.

21   THE COURT:  All right.  So we've convened to

22 conduct the final pretrial conference for the case scheduled

23 for October the 18th.

24   I'm going to cover a lot of material, stop at some

25 point, and so then -- so jot down any questions you have.

We're going to start first with jury selection and we'll go
from there.

All right.  So we'll be ready to bring in the
potential jurors at 9:00 on Monday, October the 18th.  Since
the last time that we got together, I made some final edits
and changes to the jury questionnaire, and we then summoned
750 citizens in the Middle District of Tennessee for jury
service.  Of the 750 that were summoned, 147 responded.

Now, of the 147 that responded, 138 came to the
courthouse and completed the questionnaire.

The difference between 750 and those who came
in -- those who responded accounts for -- the big numbers
account for about 230, approximately, that did not respond
to -- to the summons; 330 were excused on statutory basis;
about 50 simply weren't delivered by the Postal Service; and
the remaining number were deferred to another day or service
in the future.

And I -- the total number that was summoned -- I'm
sorry -- is 774.

So, of the 138 that came in and completed the
questionnaire, we've determined that 93 have indicated
they're available and ready to serve starting October the
18th.  They were also told that if for whatever reason the
case is not finished by November the 23rd and bleeds into the
week of Thanksgiving, they were informed that we would be in

recess the week of Thanksgiving and will return after that, if necessary. And they were all still available to serve.

So, based on other cases and -- and the prior case connected to this, related to this one, I do believe we can get a fair and impartial, unbiased jury from those 93. And the Court's preference would be to call those 93 in to -- to appear here in the courthouse on the 18th of October at 9:00.

For those who have a conflict, which would be the difference between -- in the numbers I've already given you, what I would propose, as we did before, that I'm going to provide to you all at noon on October the 1st a CD that contains the names of those -- that contains -- identifies those jurors who have a conflict. You all can then review the questionnaires, confirm their conflict, and let me know by 9:00 on October the 5th, by filing a notice, whether you agree to proceed with those jurors who do not have a conflict, the 93, or do we need to have -- have -- require those who have a conflict to be summoned.

Again, I anticipate, after you review the questionnaires, that you'll agree that those with conflicts need not appear on the 18th, and they'll be excused, and the only ones that will come for jury service will be the 93.

So, again, at 9:00 on October the 5th, you'll file a notice agreeing -- or not, but I suspect agreeing -- to proceed with those that have no conflict, the 93. I'm

1    sorry -- the 100- -- the 93 that have no conflict.

2          Then on -- at noon on Friday, October the 8th,

3    we'll give you a CD with the redacted questionnaires for the

4    93 that have no conflict.  The CD must not be copied,

5    printed, or otherwise duplicated.  You'll each get one CD,

6    and you're free to take notes based on the information on the

7    CD.  The CD needs to be returned to the Court immediately

8    after jury selection on the 18th.

9          What you receive on Friday, October the 8th, will

10   not contain the name or address or employment of the

11   prospective jurors.  That will be provided to counsel at 9:00

12   on October the 14th.  This is what I call the jury key.  It

13   is for counsel's eyes only.  It's not to be shared, absent

14   Court permission.  And, again, the jury key will be returned

15   to the Court immediately following completion of jury

16   selection on the 18th.

17         As we'll get into in a minute, at all times during

18   the jury selection process, prospective jurors will be

19   referred to by number.  I've already granted the motion for

20   an anonymous jury and, consistent with that, the information

21   you receive will identify jurors by number.  That includes

22   the information on their completed questionnaires.  You'll be

23   able to match them later as trial draws closer with the jury

24   key.  And during voir dire you'll refer to each juror by

25   number and in no instance will any names be used.

1          So, by way of example, if there is a potential

2    juror who is a nurse, say works at Vanderbilt, you can ask

3    him or her about their employment, without getting into the

4    specifics about exactly where.  "Ma'am, sir, you're a nurse?

5    You live" -- you'll know then they live in Brentwood.  And if

6    there's any particular questions you want to ask -- but it

7    would be no reason to refer to their specific place of

8    employment, that being Vanderbilt.

9          As we've done in other trials, the jury's going to

10   remain together throughout the day.  They'll be taking their

11   breaks in the jury assembly room, which has a restroom and a

12   full kitchen.  The jurors will be entering and exiting the

13   building in an entrance that's separate from that used by the

14   general public.

15         We've also provided for them to have designated

16   offsite parking during the course of the trial.  There will

17   be secondary screening at the entrance of the courtroom.

18         All cell phones will be collected at the entrance

19   of the courtroom and available to -- to persons when you

20   exit -- when you leave the courtroom.  That includes everyone

21   except counsel of record only.  But counsel needs to make

22   sure that's on silent and limited use.

23         Public -- members of the public will not be

24   allowed to bring in cell phones, or anyone else who is not

25   counsel of record.  Also, because of persistent issues, I'm

1  going to order the marshal to make sure that he reminds

2  deputy marshals and court security officers who are assigned

3  to this case to maintain the highest level of professionalism

4  throughout the trial.  For example, I should not observe

5  deputy marshals or court security officers constantly on

6  their cell phones for ten, 15, and even 30 minutes, as has

7  become somewhat the custom here.  And the marshals certifying

8  that's been done by October the 8th.

9        Also, by October the 8th, you're going to provide

10  me an agreed statement that explains to the jury why certain

11  precautions are being taken.  For example, so that jurors are

12  not contacted by the media and to ensure that information

13  about their private lives is not exposed to the media.  And

14  that will be due on October the 8th.

15        So, when you come in in the morning of the 18th,

16  we'll have done the random selection.  You'll have on your

17  desks a copy of the proposed -- you'll have on your desk a

18  seating chart of the random selection, by number.  You'll

19  have the questionnaires.  You'll have the key to make the

20  connection for any questions that you want to ask.

21        I'm pretty sure we're going to conduct the voir

22  dire in a different courtroom.

23        Correct?  Yeah.

24        And that will be for attorneys, the government

25  representative, Mr. Hardison, and his lawyers.  And the rest

1  of the courtroom is going to be full.

2        I anticipate that the first -- when we start at

3  9:00 on the 18th, we'll have 56 of the 93 jurors in the room.

4  And you'll have a chart for those 56.  Because we're going to

5  voir dire them all at once.  If past practice is a guide, we

6  were able to get a jury, 12 -- 12 jurors, plus six

7  alternates -- that's the limit I can do under the rules --

8  from that 56.  Because that will give us, I think, about 22

9  to excuse for cause.  And, again, we know they're available.

10        So you all and the Court will go right into

11  anything about these particular jurors that might render them

12  problematic to serve.  I'm going to allow an hour for each

13  side for voir dire.  I do require that voir dire be strictly

14  follow-up or strictly questions that go to whether or not

15  this particular juror has any bias or prejudice or in some

16  way is unfit to serve.  I'm not going to allow the voir dire

17  to be a beginning of your opening statement.

18        So let me just -- I know Mr. Schrader has done a

19  case.  My memory tells me that Mr. Evans has.  But I'm not --

20  I can't call it up.  I just know it's there.

21        MR. EVANS:  Yes, Your Honor.  Marquis Brandon.

22        THE COURT:  But, Mr. Bruno, I don't think you

23  have.

24        MR. BRUNO:  We actually -- with Larry Arnkoff and

25  I, we actually -- Rodrecus Smith, we selected the jury and

1  started the proof, and then the case resolved.  So I think
2  we've done one jury selection.

3          THE COURT:  Okay.  Well, we're going to do it the
4  same way here, except with all the COVID provisions.

5          Once we have the jury, you see the setup that we
6  have currently in the courtroom.  You'll do everything from
7  your -- from your desk and from the podium; "everything"
8  being opening, direct, cross, closing, objections.  There
9  will never be a reason for you to leave your desk or the
10 podium on your desk.  Everything will be there.  All the
11 exhibits will be done electronically in that they need to be
12 on your laptop or whatnot so you can punch the button and
13 show it on the screen.

14         That doesn't preclude you from sharing with the
15 jury particular exhibits that you think -- documents that you
16 want them to have a copy of.  Once in evidence, that can be
17 done.  But we need to -- those will be distributed by the
18 court security officer, who will have on gloves and make sure
19 that we don't endanger the jury by giving them a particular
20 document.

21         The witness will need a witness -- an exhibit
22 book -- exhibit notebook.  The Court's going to need three
23 exhibits -- hard copies of exhibits, and plus one on your CD.
24 Obviously, the other -- your opponent will need a copy, if
25 they don't already have some knowledge about what exhibits

1    you're going to call -- you're using.

2            We're not going to have any bench conferences.

3    And the way we're going to handle that is that I'll be

4    available in the mornings at 8:30; I'll be available for the

5    lunch break, but that's limited to 30 minutes; and then all

6    of the issues really need to be addressed at 4:30 when we

7    conclude for the day.  The jury will leave, and then we'll

8    take up any evidentiary issues you anticipate.

9            Because I'm going to ask the government to provide

10   a rolling list of five witnesses so that the defense is ready

11   to proceed, and we can have our 4:30 meeting and it be

12   productive.  I recognize we're going to be in trial for a

13   while.  I recognize you've got a lot to do and to handle.

14   But we do need to make use of the time at 4:30 for any

15   evidentiary issues so those can be ruled upon and you can

16   prepare for the next day.

17           However, in those rare instances -- if there's

18   some uncertainty about a witness or two, make sure that the

19   defense has that list no later than 8:00 the night before the

20   following trial day.

21           So, again, we can't do bench conferences because

22   of COVID.  If there really is an exigent circumstance that we

23   need to talk, we will have to excuse the jury and either do

24   it here in the courtroom, or we'll have to retire to chambers

25   with the court reporter.

1    If we retire to chambers and take it up, then the

2  Court will ensure that the Realtime that -- that we engage in

3  in chambers plays in the courtroom so Mr. Hardison can read

4  what is being discussed.  Because we'll have only attorneys

5  in the -- but Mr. Hardison will be able to follow exactly

6  what everyone is saying.

7    Obviously, we're not going to have a lot of time

8  in the morning.  So that's going to have to be very short,

9  very pithy.  Because I want everyone here by 8:50 so we can

10  start promptly at 9:00.  If it's something that's going to

11  take more than a couple minutes to discuss, I'm going to just

12  defer that, call the next witness, and let's move on.  We've

13  got -- we'll have to put that off until we have more time to

14  discuss it.

15    So -- and that's -- the same is true at lunch.

16  4:30 is the time we're going to take up really substantive

17  things to keep the case moving the next day.

18    So the government will provide a rolling list of

19  the witnesses, as well as identification of what exhibits for

20  that witness, for the next five witnesses.  If for whatever

21  reason the government needs to call a witness out of order,

22  please give the Court and the defense advance notice of that

23  so the Court and defense can prepare.

24    I pull all the exhibits the night before -- or,

25  rather, the courtroom deputy pulls them.  So I'll have my

files of the five witnesses and the rolling list and the
exhibits.  If you call somebody that's not in that list, I'm
not going to have the exhibits, and that's going to cause
delay.  And I'll probably just say, "Let's skip that person
and go to the next.  Let's keep moving."

So the Court does expect all counsel to be present
every day and all day.  If you have a competing matter, try
to schedule that on Friday, because we'll only go Monday
through Thursday in trial.  Fridays will be the day that
we're not in -- we'll be in recess and you can take care of
your other cases.

Jurors are going to be provided lunch at the --
the Court can do so under statute.  So their lunches will be
ready as soon as we recess for lunch.  They can eat it in 30
minutes, and then we'll be ready to start back.  Anticipate
lunch sometime around 12:15 to 12:45, give or take.  You
know, if we have a witness that we're about to wrap up, I'm
going to try to wrap up that witness and then take lunch.

The defense will have, of course, 10 peremptory
challenges.  The government has six by statute -- by rule.
Of the 93 people who have been -- who have completed the
questionnaire and are available to serve, the Court has asked
the jury administrator to give me demographics.  I've
received that information, and the Court has reviewed it.  I
do believe the 93 people who are going to be summoned on

October the 18th represents a fair cross section of the community in all respects, including racial composition. All total, 22 percent of the 93 are minority, which, to the Court's knowledge, actually exceeds the percentage in the Middle District of Tennessee. Specifically -- and I'm talking about all 30 -- 33 -- 33 to 34 counties in the Middle District. And, in particular, it appears about 14 percent are African-American, which, again, is right at what I think we have in the Middle District. So, again, the Court believes that the 93 who are qualified with no conflict represents a fair cross section in all respects of the district.

Okay. I'm going to stop here because I think I've covered issues having to do with the jury pool, voir dire, how we're going to handle the jury.

And, obviously, we've got a lot more to talk about, but with things regarding the jury, does the government have any questions?

MR. SCHRADER: I do, Your Honor. Just a few questions and a couple of requests.

First of all, I appreciate the Court putting time and thought into this process. It's complicated, and particularly in a case like this, and COVID hasn't made things any easier for anybody.

With respect, first, to physical exhibits, there

1  are some physical exhibits the Court has.  If we intend to

2  use those on a given day, should we just notify Ms. Parise

3  the day before?

4          THE COURT:  And/or Ms. Kincaid.

5          MR. SCHRADER:  Okay.

6          With respect to cell phones, Ms. Helton, our case

7  paralegal, and Agent Rundle, our lead case agent, are often

8  in trial coordinating logistics in order to make sure things

9  are smooth here in the courtroom.  So they may be

10 coordinating, for example, with other agents who are sort of

11 shepherding witnesses around various parts of the courthouse

12 so that they're here when they're supposed to be to testify.

13         So my request is that Ms. Helton and Agent Rundle

14 also be permitted to use their cell phones, really for that

15 purpose, so that they can text message --

16         THE COURT:  Well, they can use it.  It will be

17 right outside the door.  They can certainly do that during

18 breaks and lunch and whatnot.

19         MR. SCHRADER:  But I think the issue is -- you

20 know, a witness will be done, and the Court will say, "Call

21 your next witness," and we want to make sure that witness is

22 there.  And --

23         THE COURT:  Here in the courthouse?

24         MR. SCHRADER:  No.  In other words, is outside and

25 is ready to go when -- when the witness who was testifying is

1  done.

2         In order to make sure that happens, for example,

3  Ms. Helton may be communicating with staff in the U.S.

4  Attorney's office or Agent Rundle may be contacting other

5  agents who are with a witness in another part of the

6  courthouse.  And so they're just making sure that those folks

7  are here so that there are no delays between witnesses.

8         Because if -- the alternative is agents will have

9  to step out and then text whoever is with a witness, and then

10 that witness will have to come down.  I think they can do it

11 unobtrusively.  They did that last trial, too.

12        THE COURT:  Yeah.  I mean, you're going to have

13 your five witnesses and then -- I mean, you can do it however

14 you want, but you know how you're going to call them.  You

15 can tell the first three, "Be here at 9:00," and we know

16 they're here.  Then the next ones in the afternoon, "Be here

17 at 1:00," and -- be here.  I don't mind the lawyers having

18 their cell phones, although that privilege could be revoked

19 as it was in the first trial for a couple of lawyers.  But I

20 think when I start spreading it out I just run a risk.

21        Let's just try it that way.  And, if it really

22 becomes a problem, then I'll be glad to revisit it.

23        MR. SCHRADER:  I can tell the Court, I don't use

24 my cell phone during trial.  I think it's distracting.  But

25 part of the reason I don't have to use it at all is because I

```
 1  have folks like Ms. Helton and Agent Rundle who can be
 2  texting agents and getting folks here.  So --
 3              THE COURT:  Well, let's just have them here at
 4  9:00 and at 1:00, and we know they're here.  And then
 5  Ms. Helton can provide you the help you need.
 6              MR. SCHRADER:  I take it Ms. Helton and Agent
 7  Rundle can access their computers during the trial?  They'll
 8  have those here?
 9              THE COURT:  Sure.  And look like the defense has
10  computers, too -- yeah.
11              MR. EVANS:  Oh, no, not confused at all.
12              THE COURT:  No.  You have one right there.
13              MR. BRUNO:  You have a computer.
14              MR. EVANS:  Oh, computer.  Oh, yes.
15              THE COURT:  Sure.
16              MR. SCHRADER:  So that -- I mean, that would be
17  one way to solve that problem.
18              THE COURT:  Okay.  What else?
19              MR. SCHRADER:  Just as sort out of curiosity, does
20  the Court know what percentage of folks in the 93 have been
21  vaccinated?  Or have some sort of COVID immunity?
22              THE COURT:  I don't know that as we're here today.
23              MR. SCHRADER:  Okay.  And then, I don't know if
24  the Court will entertain this, but 30 minutes is -- is hard
25  for lunch, particularly in a lengthy trial.  I know 45
```

1  minutes was hard in the Darden trial.  I would like 45

2  minutes again.  I know that everyone wants to get this case

3  done quickly, but there a lot of things that happen over a

4  lunch break.  And those things don't always include eating,

5  frankly.  So my request --

6           THE COURT:  Yeah.  I'm going to stay with 30

7  because it's worked so well in the civil cases and it worked

8  well in the Orusa case.  Let's try it.  If it really becomes

9  a problem, then we can revisit it.  But it's worked so well.

10 It keeps people focused.  It keeps them here.  I don't lose

11 them.  And we get back to work.  We get back to work.  So

12 let's try 30 minutes and see how it works.

13          MR. SCHRADER:  I'll let the Court know if I'm

14 having trouble.

15          THE COURT:  Now, separately from that, I know the

16 Clerk's going to be in communication with the marshal to make

17 sure provisions are made for Mr. Hardison both at lunch and

18 otherwise, since he'll be out of the regular loop for

19 provisions.

20          MR. SCHRADER:  Can I have just one moment, Your

21 Honor?

22          THE COURT:  Sure.

23          MR. SCHRADER:  Two questions from Ms. Helton.

24          The first relates to the jury questionnaires.  We

25 like to print them out and make notes on them, kind of as

1  we're discussing that.

2          Can we do that as long as we return those

3  materials to the Court?

4          THE COURT:  No.  You can look at the CD, and you

5  can make notes from what you're looking at.  But you can't

6  print it out.

7          MR. SCHRADER:  Okay.  And then -- what was the

8  other question?  Oh, that's right.

9          So the exhibits themselves are -- the electronic

10 versions of them are too large to fit on CDs.  So can we

11 provide them to the Court on a thumb drive?

12         THE COURT:  Sure.

13         MR. SCHRADER:  Thank you, Your Honor.

14         THE COURT:  And you all need to do that jointly so

15 that -- and at some point you need to merge the defense

16 exhibits.  Because that thumb drive will go back into the

17 jury room, and I'll ask one of the jury to select one of

18 their number to control the computer so we don't have

19 multiple people touching the same thing.

20         And, just so it's clear, I'm not aware the Court

21 has any authority to make the jurors be vaccinated.  So we'll

22 probably have vaccinated and unvaccinated.  Although I will

23 tell you, as things have progressed, the percentage of people

24 who come vaccinated is growing every time.  I think I've had

25 one jury for sure that was 100 percent vaccinated, and then

1   another two juries that had, like, one person who wasn't.

2   Maybe two that wasn't.  So that's been encouraging.

3           MR. SCHRADER:  Ms. Helton just wants to know, in

4   terms of that thumb drive containing exhibits, the Court

5   wants all of the government's exhibits?  In other words, all

6   the ones that are marked?

7           THE COURT:  All the ones that are going to go back

8   to the jury.

9           MR. SCHRADER:  Oh, okay.  At the end of the trial.

10          THE COURT:  Right.  You're going to need your

11  respective exhibits on your computer.

12          MR. SCHRADER:  Sure.

13          THE COURT:  So you can punch it and show it to the

14  jury.

15          MR. SCHRADER:  Understood.  Thank you, Your Honor.

16          THE COURT:  All right.  Questions from --

17  Mr. Bruno?

18          MR. BRUNO:  Just briefly, Your Honor.

19          I understand that we'll voir dire -- I guess are

20  we going to voir dire all 56?

21          THE COURT:  Yes.

22          MR. BRUNO:  At the same time?

23          THE COURT:  Yes.

24          MR. BRUNO:  And then, on cause challenges, you'll

25  take that first?

1       THE COURT:  Sure.  Good.  All right.  Let me go
2  through that.

3       MR. BRUNO:  Okay.

4       THE COURT:  I guess we haven't done that.

5       So what we do there -- again, no bench
6  conferences.  Ordinarily I would bring the juror up to the
7  bench and we'll talk.  So the way we'll do that is, as we're
8  going through voir dire, I'll do mine, you'll do yours, and
9  we'll be done with all the questioning.

10      As we go through voir dire and we find out that
11 Juror Number 9 wants to talk or we need to talk with Juror
12 Number 9 individually, then I'll call them back into
13 chambers.  And we're going to be -- Judge Richardson -- I
14 think we're going to be in Judge Richardson or Judge
15 Trauger -- Judge Trauger?

16      MS. KINCAID:  It hasn't been determined yet.  Most
17 likely Judge Richardson's.

18      THE COURT:  Okay.  If it's Judge Richardson, he
19 has a really expansive conference room that's very private.
20 And we went back there with a court reporter, the juror,
21 space, and partitions for the lawyers.  And we'll just call
22 them back while we're back there.  So I'll make a running
23 list of which jurors we'll need to talk to individually, or
24 which jurors have asked to talk to us individually, because
25 I'll afford them the opportunity not to share private

1  information in public.  And we'll do that back in chambers.

2  And that's worked pretty well, too.

3            Go ahead.

4            MR. BRUNO:  So, when we exercise cause

5  challenges --

6            THE COURT:  Okay.  When we finish talking to all

7  the folks in the jury room individually, then I'll go ahead

8  and we'll do our for cause right then and there.  And then

9  you can mark your lists.  The first 12 will be the jury, and

10  then the next six will be alternates in the order that

11  they're selected.  So we'll know who Alternate Number 1 is,

12  Alternate Number 2, Alternate Number 3.

13            MR. BRUNO:  Along those lines, when we submit our

14  cause challenges, those people are removed --

15            THE COURT:  On your list.  We'll strike them.

16            MR. BRUNO:  Okay.  You strike those.

17            So then we have ten and they have six on

18  peremptories.

19            Do you require us to do one -- exercise all up to

20  ten at that point in time, or do we get back --

21            THE COURT:  Oh, no back striking.  You'll exercise

22  them in the blind all at once.

23            MR. BRUNO:  All at one time.  Okay.  And then --

24  so we have ten, and then we have six alternates.

25            THE COURT:  And you get an additional three for

1    alternates.

2         MR. BRUNO:  And we'll just do that -- after we

3    have the 12, then we'll do an additional three.

4         THE COURT:  Right.

5         MR. BRUNO:  Okay.

6         THE COURT:  So we'll do the for cause back in

7    chambers; then I'll give you a few minutes to do your

8    peremptory; you'll send me back the lists; I'll make those

9    strikes; then I'll call you back and say, "Okay, here's your

10   12.  Now exercise your three peremptory on the alternates."

11   Done.  The first six are going to be the alternates.

12        MR. BRUNO:  I understand.  Thank you.

13        THE COURT:  And I don't tell the alternates

14   they're alternates until the end of the case.

15        MR. BRUNO:  Thank you.

16        THE COURT:  All right.

17        MR. EVANS:  Nothing further, Your Honor.  Thank

18   you.

19        THE COURT:  Any new questions come up from the

20   government?

21        MR. SCHRADER:  No, Your Honor.

22        THE COURT:  All right.  Anything that the jury

23   administrator wants to bring forward that I didn't --

24        MS. KNOCH:  No.  You covered it.

25        THE COURT:  Ms. Kincaid?

1          MS. KINKADE:  No, Your Honor.

2          THE COURT:  All right.  Y'all are free to go, and

3    we will march on.

4          So let's come back here now.  I want you all to be

5    sure, and especially the government here, I need an

6    alphabetized witness list from both parties on August -- I'm

7    sorry -- October the 8th.  It can be filed under seal.  I

8    need a brief one- to two- to three-sentence summary of the

9    testimony anticipated from each witness so I can understand

10   how that witness is going to fit into the case.  Obviously

11   that doesn't apply to impeachment witnesses.

12         Exhibit lists will also be due October 8th.  Each

13   will be numbered sequentially, without exception, and we'll

14   never run out of a number.  So we don't do 10Aiii.  We don't

15   do that.  Every exhibit will have its own number.  And

16   Mr. Koshy taught me the importance of that.  I need one -- I

17   need the original and three copies of the exhibits in a

18   three-ring binder by October the 15th, as well as one CD

19   containing all the exhibits.

20         You all have provided me a joint summary of the

21   case that I find acceptable and fair.  I am going to read

22   that to the jury during my voir dire to provide context for

23   questions.

24         Also, for the final -- also, for the final trial

25   jury, they'll get a Redweld with a notebook for -- for them

1  to take notes, a pen for them to write notes, and they will
2  get a copy of your joint summary of the case.
3          Any -- does the government have any objections to
4  that?
5          MR. SCHRADER:  No, Your Honor.
6          THE COURT:  The defense?
7          MR. EVANS:  No objection.
8          THE COURT:  And, just as a reminder, they'll leave
9  that here in the courtroom at the end of every day in their
10 seats, and it will be very safe until the next day.
11         That will also be the folder they use for any
12 documents that you all want them to have their own copy of,
13 for whatever reason.
14         So I don't anticipate reading the fourth
15 superseding indictment that at trial we'll refer to only as
16 "the indictment."  And even in the -- we'll certainly provide
17 them a copy, and I know we have a motion related to that, but
18 I'll use that as well -- I'll provide them a copy, but use
19 your summary in the final charge.
20         As you all already know, I'll just remind you,
21 there will be no use of any foul, profane, expletives or any
22 such other locker room, alley kind of banter or words.  If
23 such a word needs to be used, then it should be spelled into
24 the record, you know, s-h-i-t, and thereafter referred to as
25 "the S word" or whatever word it is by the first letter.  I

think we'll all know what it means.

I appreciate it may be necessary for some of the witnesses to refer to Mr. Hardison or other witnesses by a nickname. That needs to be kept to a minimum. I ask that all witnesses be referred to as, you know, Mr. Johnson, Mr. Smith, Ms. or Mrs., as the case may be.

With regards to transcripts, you do need to make your arrangements, but the Court will allow you to cite from a rough transcript for purposes of any arguments to be made during the course of the trial. But, if the counsel believes they need an official, I'll certainly approve any CJA reimbursement for that.

You all have given me some jury instructions. And perhaps I wasn't as clear as I need to be right now. I do want you all to meet and discuss that in person and give it another try. And to help you in that -- and I want that done by October the 8th at noon, new jury instructions and verdict form.

I have two copies of the jury charge in Orusa. I've changed it since y'all were last here, in some of the general language I've changed. I've also changed my instruction on implicit bias. So that's the most recent version.

Again, I would suggest meet in person, go over it, and see if you can't reach agreement on most of that. Go

1  back to the Darden instructions and use that as the template,

2  which I think there was some attempt to do.  And then add

3  anything that -- you know, a special request, because of a

4  certain witness, if we're going to have a -- a witness

5  testifying who is addicted or whatnot, then you may want to

6  suggest a special instruction on that.  And the verdict form,

7  too.

8          But I do think you go back to the Darden ones, and

9  then -- my approach is going to be that's sort of the --

10  that's a very good template.  If we vary from that, I'm going

11  to need to know why.  Now, I'm not saying I'm not.  But --

12  and if you all agree we need to vary, that's all the better.

13  But use that as the template, a pretty strong template.  And

14  my approach is going to be, why do we need that here?  Why do

15  we need something in addition?  I think we want to keep

16  everything we had.  So the question is only going to be what

17  we may want to add to it.

18          But, in any case, your new proposed jury

19  instructions and verdict form will be due noon on October the

20  8th, after you've met in person and had a substantive, good

21  faith, professional discussion.

22          And then -- well, then I'll -- oh, provide those

23  to me on a CD -- no.  Provide those -- I'm sorry.  Provide

24  those to me in Word version.  Word version.  And it makes it

25  easier for me to make my changes.

1    If you all have any COVID questions -- oh, this

2  goes back to jury.  I'll only ask the COVID questions so as

3  to not allow either party to curry favor with the jury.  So,

4  if you've got a particular COVID question you want me to ask,

5  then you need to provide that to me by noon on October the

6  8th.

7    So, in order to do that, you probably want a

8  summary of what COVID questions I generally ask.  And what I

9  generally do is I will -- I'll tell them that -- you know,

10  there's signage on the eighth floor requiring masks to be

11  worn at all times.  That temperature checks will occur for

12  them and all parties and everyone in the courtroom on a daily

13  basis.  You'll each have a little dot that tells me that your

14  temperature and your oxygen level is correct.  This includes

15  any witnesses.

16    Another reason for you to have all your witnesses

17  here in the morning, because we'll have a nurse here to take

18  their temperature check and oxygen levels and get their

19  colored dot.  And then, if witnesses come in the afternoon,

20  they're going to need to go to the Clerk's office to be

21  checked and get their clearance that they're good to come

22  into the courtroom.

23    They'll be asked questions, as well as you all

24  will be every day.  I'll tell them that we've created

25  protocols for their safety.  I'll tell them that, since we

started back doing jury trials, I think since June of 2020, to our knowledge no juror has -- no juror has gotten sick by virtue of their service.

I'll tell them that they'll get a safety bag that contains hand sanitizer, more masks, wipes, all sorts of things for their safety. The courtroom will be cleaned as needed throughout the course of the trial. I'll share with them as well that we've had a medical professional engaged to help us with recommendations. I'll share with them a summary that we recently met with Dr. Hildreth, the President of Meharry Medical College, who gave us -- who advises this President and the prior President, and he gave us a sobering report about what he expects, and that we've made provisions to -- and we continue to address every day, changing our protocol to protect the lawyers, the parties, the public, and the court staff.

I did a video that I think I told you about. I don't think y'all had a chance to see it. But I know during the video I directly address COVID-19, and I did a little summary there about some of the things the Court has done and it will continue to do. So when they came in to complete the questionnaire -- COVID is on everybody's mind -- they received some information there. I think when they received their summons, they also maybe got a letter from me about the pandemic and the things that we're doing.

1    They've been asked repeatedly -- when they came in
2  to do the questionnaire, when they come in on the 18th -- a
3  series of questions about any flu-like symptoms, have you
4  traveled outside of the United States, have you been in
5  contact with anyone that's been diagnosed, are you a health
6  care worker?  Anyone who is sick, been around anyone --
7  anyone who has experienced -- experiencing COVID-19 symptoms,
8  anyone who is living with somebody who is currently having
9  COVID-19 issues, or anyone who asserts that their health
10  might be -- that they have some underlying medical issues
11  that might put them peculiarly at risk are quickly excused.
12    So anyone who has any -- we excused them right off
13  the bat.  And there is our challenge in this case.  Because
14  the -- you know, the jurors who are selected are going to be
15  living their normal lives, although I will ask them to
16  exercise some caution now that they're judges of the facts in
17  this case.  They can't engage in the same activity that they
18  did.  So just -- all I can do is urge caution, restraint on
19  the weekend, and what they do, please, please, they're very
20  important people to the Court, and I -- I ask them just to
21  defer a little bit of their extracurricular activities so
22  they can perform their service.
23    Obviously we'll do social distancing.  I think
24  I've told you, they'll be in the jury assembly room.  We try
25  to get them in and out of the courtroom without touching

```
1   things or doors and whatnot.
2           So that's sort of a -- that's a summary of all the
3   things we do.  And I'll share some of those.  So, if there's
4   particular COVID questions you all want me to ask, then go
5   ahead and give me those questions by noon on October the 8th.
6   I'll go through them and use them.  Obviously, at 4:30, we'll
7   take up any substantive evidentiary issues or things that we
8   need to have clarity.  That doesn't prohibit either side from
9   making your general objections -- objection, hearsay, or lack
10  of foundation -- that's -- all that's fair game and you can
11  continue to do that.
12          I guess for -- I can't remember your co-counsel's
13  name.
14          MR. SCHRADER:  Mr. Collins.
15          THE COURT:  Mr. Collins.
16          So, Mr. Collins, I do -- if you object, that's
17  your witness.  So be careful what witnesses you object to.
18  Only one attorney per witness during the trial.
19          Oh, who's the government representative going to
20  be?  For trial?
21          MR. SCHRADER:  What's the --
22          THE COURT:  Government's representative at trial.
23          MR. SCHRADER:  I'm not sure what that means
24  exactly, Your Honor.  Oh, I'm sorry.  The case agent who will
25  be here?  Agent Rundle, Jake Rundle.
```

1    THE COURT: So, Mr. Rundle, you need to be here

2 every day, all day. You're not excused unless I excuse you.

3    AGENT RUNDLE: Yes, sir.

4    THE COURT: Opening statements will be limited to

5 one hour.

6    You all have had a case with me and you had no

7 problems, but I'll say this one more time -- perhaps

8 sometimes I'm not clear -- if you're going to use a

9 demonstrative exhibit at trial, show it to the other side.

10 So if you're going to use this red pen as a demonstrative,

11 show it to Mr. Schrader, Mr. Bruno, and get him to agree, no

12 objections to the use.

13    Mr. Schrader, if you're going to use a blue pen,

14 whatever the demonstrative is, show that to the other side,

15 and then file with me on noon on October the 8th that I've --

16 "I have disclosed to the other side all demonstratives to be

17 used during the opening, and I hereby certify to the Court

18 there are no objections to the use of the demonstratives."

19    Is that -- is that clear?

20    MR. EVANS: Yes, Your Honor.

21    MR. BRUNO: Yes, Your Honor.

22    MR. SCHRADER: Yes, Your Honor.

23    THE COURT: Okay. Okay. Let's just keep

24 everything noon on October the 8th.

25    Be -- please familiarize yourself one more time

with the evidence presenter.  You can put a document on the presenter.  You can enlarge it.  And that is the one constant feedback I get from the jurors:  Why don't the lawyers know how to use the evidence presenter?  Why don't the lawyers enlarge it so we can read it?

And then the other constant complaint is, given all the time the lawyers had, when they punch the button to play the video, why wasn't it ready to go?

And I don't have a good answer for that because I tell them, "At the pretrial conference, I told them all these things," and, yet, we have problems.  So just be sure you know how to enlarge the exhibit.

Now, all the jurors I've had are very diligent. Now, they are following the evidence very closely.  They -- they're not taking what you all say as gospel.  They want to see it for themselves.  And that includes documents.  And, also, they all seem to expect, rightfully, some level of professionalism.

So you know this video's coming.  You've talked about it in your opening.  And yet, when you hit the button, we all sit here looking at each other because it doesn't work.  So just be sure you know how to use the material.

And same thing with use of your -- of the lavaliere, microphone.  Be sure it's working so we can hear. It makes a big difference in whether you can hear something

1    or not.

2              If there is any media coverage here, remind

3    yourselves of the local rule.

4              Okay.  I think I'll stop again before I go to my

5    next list.

6              Any questions about anything that we've discussed

7    so far?  Mr. Schrader?

8              MR. SCHRADER:  Yes, Your Honor.

9              First, on the witness list, my recollection of the

10   scheduling order was that that was originally due on

11   October 4th.  Is this a new date, then, for when it's due?

12   Okay.

13             THE COURT:  But you're free to file it on

14   October 4th.  I'm just saying I need it no later than the

15   8th.

16             MR. SCHRADER:  I'm happy to wait.

17             So what I've done in this case, for the witness

18   list, is -- it's lengthy.  But there were really about 50

19   witnesses or so that I have a high degree of confidence we're

20   going to be calling.

21             I also have a high degree of confidence that we're

22   almost certainly not calling the people who are not in that

23   category.

24             So the witness list that I prepared has two

25   categories, both alphabetized.  The first is witnesses the

1  government is likely to call at trial.

2  THE COURT:  So you have a will call list?

3  MR. SCHRADER:  Yes.

4  THE COURT:  And then you have a may call list?

5  MR. SCHRADER:  Exactly.  And that's really for --

6  to help the Court and also defense counsel sort of know where

7  to focus in terms of who it is the government's going to be

8  calling.

9  So that's the way I've currently structured it.  I

10  could just remove those categories and just make everything

11  one long alphabetical list, but I think it might be helpful,

12  frankly, for folks to know who it is we're likely to call in

13  this case and who we're not.

14  THE COURT:  I agree.

15  MR. SCHRADER:  So I'll plan on filing it that way.

16  THE COURT:  But now I still need that two- to

17  three-sentence summary of the amended testimony.

18  MR. SCHRADER:  And that's included in the

19  government's witness list.

20  THE COURT:  In the witness list?  Yeah.  In the

21  witness list.

22  MR. SCHRADER:  And that's what I'm referring to.

23  THE COURT:  All right.

24  MR. SCHRADER:  On the jury instructions, we -- we

25  actually met with defense counsel yesterday for a couple of

1    hours to talk about --

2            THE COURT:  And I meant to note that.  I read

3    that.  So I thank you all for planning that.

4            MR. SCHRADER:  Because there were issues we were

5    able to work out.  Some stipulations we'll be able to agree

6    to to try to move things along in this trial.

7            THE COURT:  So let's do any stipulations by --

8    let's do any stipulations by 9:00 on October the 15th.

9            MR. SCHRADER:  Yes, sir.

10           One of the things we talked about was jury

11   instructions.  And I can tell you that we -- meaning the

12   government -- went back to the Darden instructions and sort

13   of started there.  But, as the Court may recall from the last

14   trial, we had filed a set of proposed jury instructions at

15   the beginning.  And we had some objections to the

16   instructions that were ultimately issued in that case.

17           So I'm -- we're always happy to talk with defense

18   counsel about whether there is sort of common ground that we

19   can reach.  But, at the end of the day, I don't know that

20   we're going to see eye to eye, necessarily, on -- with the

21   Court about what the instructions for this case ought to look

22   like.

23           So what we filed here were, as advocates, what we

24   believe the jury instructions ought to be in the Hardison

25   case.

```
 1          THE COURT:  Yeah.  And I think we addressed the
 2  same issues in Darden.  I do specifically recall it came down
 3  to one charge and some wording, quite frankly -- so let's
 4  start with Darden.  And you all add to that by agreement and
 5  tell me why.  And then if the government -- for whatever
 6  Government reasons the government has, you can put that on a
 7  side additional request.  And I'll segregate that from the
 8  Court.
 9          I'll look at it.  I'll read it.  I'll consider it.
10  But I think we probably covered all that before.  You can
11  tell me why we should change it now.
12          MR. SCHRADER:  And I don't disagree with the
13  Court.  I mean, I guess -- I don't know whether the Court has
14  in mind a set of instructions to issue in this case or plans
15  to, you know, put them together at some point.
16          THE COURT:  Well, I'm telling you, quite frankly,
17  I do.  It's the Darden ones.  I'm not hiding that at all.
18          MR. SCHRADER:  And I guess from my perspective, if
19  there were a set of instructions the Court said, "This is
20  what's going to be issued" -- I guess the Court's saying it's
21  the Darden instructions.  But, you know, we have a different
22  defendant here, different charges.  I understand what the
23  Court wants us to do.
24          THE COURT:  I'm not saying don't tell me.  Go
25  ahead and tell me additional things.  But just segregate
```

1  that.  Give me a side filing of that.

2          MR. SCHRADER:  Okay.  All right.  We'll do our

3  best.

4          THE COURT:  All right.  Anything else?

5          MR. EVANS:  No, Your Honor.

6          THE COURT:  Anything we've discussed so far?

7          MR. BRUNO:  No, Your Honor.

8          THE COURT:  All right.  So what's left here are

9  the outstanding motions in limine and then the motion of

10  Mr. Hardison about additional overt acts.

11          Is there anything else that the government thinks

12  we need to address here other than those two items?

13          MR. SCHRADER:  I don't believe so, Your Honor.

14  No, sir.

15          THE COURT:  Okay.

16          MR. EVANS:  Your Honor, there is one issue related

17  to Mr. Hardison, and that's -- kind of under that umbrella,

18  there's a couple of different things.  One is to update the

19  Court, through coordinating with the marshals further, his

20  eye exam, I've been notified, pursuant to the Court's order,

21  was -- is scheduled for the second week of October.

22          And it's my understanding -- and I heard back from

23  Mr. Withers on this.  I'm looking at my email so I can tell

24  you the correct date.  He emailed me on Friday,

25  September 3rd, in response to my -- in response to my inquiry

1   after the Court's order.  I believe that's when it was.  And
2   said it's the second week of October.
3           I then responded to him on September 7th and said
4   is there any way that that can be moved sooner?  I'm very
5   concerned about him being able to prepare for trial and
6   having glasses in time for trial.
7           And then I was -- I got a response email later
8   that day from Mr. Withers that said he was aware of the
9   Court's order, and that there was absolutely no way for that
10  to be moved up.  His exact words were, "There are no other
11  corners that can -- that I can cut."
12          So I wanted to inform the Court on that.
13          THE COURT:  What day on the second week?  Are you
14  talking about the 11th, the 12th or --
15          MR. EVANS:  The email just says "the second week"
16  specifically.  And I don't think they'll give -- for security
17  reasons won't give us -- won't inform us of the exact date
18  because of the day of transport.
19          THE COURT:  And help me -- I know it's an eyeglass
20  issue.  Eyeglasses for what?
21          MR. EVANS:  He -- so he needs them to be able to
22  see the jurors and to be able to see documents, to be able to
23  visually see around the courtroom.
24          I know he's indicated that -- we were talking
25  today, and the juror seats are a little blurry to him.  He

```
 1   also is struggling with document review as well.
 2            THE COURT:  Okay.  That's a problem.
 3            MR. EVANS:  And the second issue --
 4            THE COURT:  Well, let's --
 5            MR. EVANS:  Oh.
 6            THE COURT:  What's your proposed solution to the
 7   first one?
 8            MR. EVANS:  Well, I didn't know if Your Honor
 9   wanted to hear all the issues first.
10            The proposed solution is -- the only one is that I
11   don't have an actual solution other than if we can make it
12   sooner, if there's a way to cut the corner that he says can't
13   be cut.  And it just baffles me that, with the entire force
14   of the federal government behind them, they can't get an eye
15   exam done for someone awaiting a trial for their life,
16   essentially, in a sooner amount of time.
17            THE COURT:  Okay.  What's the next issue?
18            MR. EVANS:  The next issue is Mr. Hardison is
19   currently at Daviess County.  He's being housed there.  And
20   your court -- Your Honor knows that that -- probably that
21   that jail is shut down to any visits.
22            And then we had an issue that MS. KINKADE was --
23   was very instrumental in helping resolve what I had emailed
24   out to the marshals again about whether or not Mr. Hardison
25   would even be able to attend today, based on their moratorium
```

1  on transporting defendants.  And I appreciate her efforts and

2  the marshals' efforts in getting him here today.

3         The question becomes him being available for

4  preparation.  And right now we have no availability for

5  preparation.  Daviess County does not have -- when I've

6  asked, at least, they don't even have a videoconference

7  option.

8         We had originally discussed having Mr. Hardison

9  moved closer to -- actually, to DDC, in preparation for

10  trial, and had hoped that would be done.  I had requested

11  that as well from the marshals.  And have followed back up

12  with Mr. Withers prior to today about that, can he be moved

13  so we can prep.

14         And the response that -- the paraphrased response

15  was, essentially, he can't be -- they would look to see if

16  they had a room or a bed space at DDC, but that, if he got

17  moved, he wouldn't be able to have an eye exam because the

18  eye exam is set through Owensboro, and that that would mess

19  that up.

20         And so he kind of put it back to me in a Catch-22

21  form.  And so neither option is -- is acceptable for

22  Mr. Hardison going forward in order to ensure that he is

23  prepared and can actively participate in his own defense.

24         THE COURT:  All right.  Mr. Schrader, do you want

25  to add anything?

1          MR. SCHRADER:  No, sir.

2          THE COURT:  Well, let's take a break.  There's no

3   question that Mr. Hardison has to participate in preparation

4   of his defense for trial.  He's entitled to that.  And the

5   Constitution guarantees that.  I have no reason and basis to

6   question what an officer of the court, Mr. Evans, has said to

7   me.  I don't like the options I'm looking at here.  So I

8   would like to get this fixed sooner than later.

9          Kelly, call Vicki and have her come back to the

10  courtroom.

11         So I'm going to ask MS. KINKADE to come back.  I'm

12  going to take a -- a -- we're going to recess here, and ask

13  Mr. Schrader and Mr. Collins and Mr. Evans and Mr. Bruno,

14  with Ms. Kindade's guidance, maybe you all go and visit

15  whoever needs to be visited and tell them we have been

16  planning for a long time to start this case on the 18th.

17  I've got 93 people waiting to come and be jurors.  You've got

18  50 witnesses.  You've got proof.  And the Court's ready to

19  go.  I have nothing else on my calendar but this.  Our

20  ability to start on the 18th is now jeopardized because of

21  these issues.  And I'm hoping that you all can explore a

22  solution that keeps this case on track.

23         Even for jury selection, the jury needs to see

24  Mr. Hardison.  Mr. Hardison needs to see the jury.  Those are

25  the peers who are going to come in and determine whether or

1   not the government has carried it's burden of proof on the

2   charges before the Court.  His ability to confront witnesses

3   is compromised if he cannot see them.

4           So we need to get this fixed.  And we'll go -- and

5   we've got time.  I don't think we're going to need to get

6   together tomorrow.

7           Do you, Mr. Schrader?

8           MR. SCHRADER:  No, Your Honor.

9           THE COURT:  I'm ready to rule on all the

10  outstanding stuff.  What -- what does Mr. Evans -- do you

11  think -- I don't know what we would get together to talk

12  about tomorrow.

13          MR. EVANS:  Your Honor, I don't have anything I

14  can imagine we would need to talk about tomorrow.

15          MR. SCHRADER:  And, Your Honor, on the eyeglasses

16  issue with Mr. Hardison, the government agrees in the sense

17  that we're -- I mean, we're obviously going to be ready for

18  trial on the 18th.  We want that to happen.  I --

19          THE COURT:  And the jury --

20          MR. SCHRADER:  We can beg, borrow, and plead the

21  marshals --

22          THE COURT:  The jury -- the jury -- you heard me

23  tell you all, we asked the jury -- or rather we told the

24  jury, if this bleeds over into Thanksgiving, we'll have that

25  week off.  And then we'll come back.  But I told them also

```
1    the Court would endeavor to have this case resolved because
2    the government represented to me four to six weeks, closer to
3    four, than to six.
4            I'm sorry.
5            MR. SCHRADER:  I know who it is we, you know,
6    should make a phone call to.
7            THE COURT:  Okay.
8            MR. SCHRADER:  But we may be coming back to the
9    Court and saying would you make a phone call.
10           THE COURT:  No.  I might make an order, though.
11   Past experience has taught me that orders are taken more
12   seriously than attempts to do otherwise.
13           MR. EVANS:  And I'm not exactly sure, you know,
14   what's the issue of the delay, if it's personnel, if it's --
15   you know, if it's getting funding.  You know, I'll pay for
16   his eye exam if that gets us to start on the 18th.  I'm fine
17   with that.  I have no problem with that.  I'd take him to
18   Lenscrafters right now if the Court would let me.
19           MR. SCHRADER:  I'll split the bill.
20           MR. EVANS:  So -- but I'm absolutely happy to --
21   to -- for us to go with MS. KINKADE and -- they're not going
22   to want to see me coming.  I've become the fly in the
23   ointment for the marshals.
24           THE COURT:  Well, there's another way we could do
25   this.
```

```
1              Have we found her yet?  Okay.
2              The other way I can do it, I could ask one of the
3    deputy marshals there to summon Mr. Withers here and y'all
4    can talk to him in the recess.  Can you -- can you get
5    Mr. Withers and/or Mr. King?  How about having Mr. King and
6    Mr. Withers come up to the courtroom.
7              MARSHAL:  Yes, sir.
8              THE COURT:  All right.  So y'all can wait here.
9    Excuse me.  And, you know, if you want privacy, go in a
10   corner over there or something.  That might -- that might --
11   and that way, if you can't get a plan, then everybody will be
12   here and I'll take a try at it.
13             So, while we're on that issue, though -- and I
14   can -- Mr. -- so let's -- you all go ahead and summon them.
15   Use your phone for that.
16             But, Mr. Hardison, have we made provisions for
17   clothes?
18             MR. EVANS:  So -- yes, Your Honor.  We're
19   discussing that.  And we're actually going to take some -- a
20   couple of measurements while we have him, since we have him
21   in person.  But, yeah, we've been talking with Mr. Hardison,
22   coordinating with the family.  We're going to have him just
23   fine on clothes.
24             THE COURT:  Okay.
25             And, Mr. Hardison, I appreciate that you may not
```

```
 1   have had a chance to look at everything, but, nevertheless,
 2   have you had an opportunity to talk to your lawyers about
 3   trial preparation?
 4               THE DEFENDANT:  Yes, sir.
 5               THE COURT:  And ask them questions about trial
 6   preparation?
 7               THE DEFENDANT:  Yes, sir.
 8               THE COURT:  Have the questions that you've been
 9   asking included discussion about your constitutional right to
10   not testify at trial?
11               THE DEFENDANT:  Yes, sir.
12               THE COURT:  And have you explored with them the
13   advantages and the disadvantages or the strengths or
14   weaknesses or the pluses or the minuses of testifying or not
15   testifying?
16               THE DEFENDANT:  Yes, sir.
17               THE COURT:  And are they giving you answers that
18   resonate with you, that you understand?
19               THE DEFENDANT:  Yes, sir.
20               THE COURT:  And when they do -- when their answers
21   are less than clear, do you let them know that?
22               THE DEFENDANT:  Yes, sir.
23               THE COURT:  And, on other trial preparation
24   matters, when their answers are less than clear, do you let
25   them know that?
```

```
 1              THE DEFENDANT:  Yes, sir.
 2              THE COURT:  Do they seem receptive to your
 3    requests for clarification?
 4              THE DEFENDANT:  Yes, sir.
 5              THE COURT:  And, more importantly, do they, in
 6    fact, provide clarification when you need clarification?
 7              THE DEFENDANT:  Yes, they do.
 8              THE COURT:  You understand you'll have -- you'll
 9    make the decision on whether you testify or not testify in
10    this case?
11              THE DEFENDANT:  Yes, sir.
12              THE COURT:  Taking into consideration what the
13    professionals or what -- in this case, your lawyers, have
14    told you?
15              THE DEFENDANT:  Yes, sir.
16              THE COURT:  So any communication issues at all
17    between you and Mr. Bruno or Mr. Evans?
18              THE DEFENDANT:  No, sir.  Just -- like I said,
19    like he stated, just not them coming to see me.
20              THE COURT:  So y'all need to take that up.  So
21    we'll have -- MS. KINKADE is here.  We've asked for the
22    marshal and Mr. Withers to come up.  Basically, we've got an
23    issue -- that I might add MS. KINKADE had already -- she's
24    well aware of the eyeglass issue and the need for him to be
25    closer to his lawyers to prepare for trial.
```

1            I've already told the lawyers, and you all can

2    share with the marshal's office, if we can't get this

3    straight, our starting on the 18th is in jeopardy.  And we're

4    going to start.  But it may not -- on the 18th, which impacts

5    our 93 people, the witnesses, the lawyers.  So we really need

6    to get a solution of this so we can keep the 18th as the date

7    to proceed.

8            I apologize, Mr. Hardison.

9            So, do you have any complaints whatsoever about

10   your attorneys' services on your behalf to this point in

11   time?

12           THE DEFENDANT:  No, sir.

13           THE COURT:  So MS. KINKADE is in the courtroom.

14   We're waiting on the marshals office.  We'll be in recess,

15   and then we'll come back and I'll address the overt acts,

16   I'll address the motions in limine.

17           And I'm -- and I assume y'all are talking.  You

18   may have some things you want me to follow up.  But I don't

19   think we'll get together tomorrow.  Unless, I guess, we have

20   to get together and get this issue resolved further.

21           Okay.  Thank you.

22           (Recess.)

23           THE COURT:  All right.  Be seated.

24           So, Mr. Schrader, Mr. Evans, do you all want to

25   report on where we are?

1          MR. EVANS:  Yes, Your Honor.  We had an

2    opportunity to speak with Mr. King and Mr. Withers.  They

3    came into the courtroom.  MS. KINKADE was gracious enough to

4    come in as well.  And we had a group discussion.

5          It's my understanding from talking to the marshals

6    that they are going to -- given us their word they're going

7    to work in good faith on making some calls today with the

8    jail to see if they can -- where he's at now, at Daviess, to

9    see if they can actually give permission -- you know,

10   exceptional permission for counsel to come in and have

11   in-person meetings, up to three meetings a week, eight hours

12   a day, up until the trial date.  And they're going to report

13   back to us today on whether or not that's possible.

14         As to the glasses, they have indicated that they

15   are going to make calls today to see if they could get that

16   date moved up.

17         THE COURT:  And who is "they"?

18         MR. EVANS:  Mr. King and -- and Mr. Withers.

19         THE COURT:  All right.  So I guess the jury's out.

20   So why don't we all get together again at 9:00 in the

21   morning, and you can report on where we stand, either things

22   worked out or things need some more help.

23         MR. EVANS:  Yes, Your Honor.

24         THE COURT:  Okay.

25         All right.  Mr. Schrader?

                MR. SCHRADER:  Nothing on that issue.  I don't
know if the Court is going to rule on the pending motions.

                THE COURT:  I am indeed.

                MR. SCHRADER:  Okay.  Very good.  Thank you.

                THE COURT:  I mean, anything else on this issue?

                MR. SCHRADER:  No, sir.

                THE COURT:  But we'll all get together in the
morning so we can get a report on where we are, and hopefully
things will have worked out.

                So let's take up the defendant's motion --
Document Number 18-21, Defendant's motion to exclude
additional overt act evidence.  And then you all may want to
pull up -- to follow my rulings -- I've read everything --
Document Number 18-13, notice regarding additional overt
acts.  And, in preparation for the rulings, I've reviewed
Mr. Hardison's motion, Document 18-21; the government's
response, Document 18-28; Mr. Hardison's reply to the
government's response, Document 18-40.

                Do you all have that document, 18-13?

                MR. EVANS:  Yes, Your Honor.

                THE COURT:  Does the government have that?

                MR. SCHRADER:  Yes, Your Honor.

                THE COURT:  Okay.  Well, I've read everything.
You've responded.  And I'm just going to go into the issues
and give you a ruling.  I'm going to start on page 4, in what

1  you all have called Category Number 1, acts of alleged

2  violence involving obstruction of justice, murder, assault,

3  witness intimidation, specifically involving Mr. Hardison.

4             And, Number 1, the first such overt act occurs on

5  page 4.

6             And, having read everything and applying the

7  applicable law, I'm going to allow Number 1.  I think that's

8  within the scope of the RICO, as well as conspiracy.  And

9  specifically involves allegations regarding Mr. Hardison.

10             The same for Number 2.

11             Number 3 will be allowed because it's included in

12  the fourth superseding indictment.

13             Same is true for Number 4.

14             And 5.

15             Number 6 will be allowed because it involves

16  alleged weapon possession.

17             I'm going to exclude 7, 8, 9, because they are

18  more -- pertain more to an alleged domestic dispute and show

19  no relationship to either the RICO allegations or conspiracy.

20             10 will be allowed because it's in the fourth

21  superseding indictment.

22             And the same is true for Number 11.

23             12 will be allowed, as it pertains to the gang

24  activity and reputation of the gang.

25             Number 13, 14, 15, 16 will all be held in abeyance

1    pending discussion about the motion regarding Josh Harris --

2    I mean, Josh -- Josh Henry.

3            Number 17 will be allowed because it pertains to

4    alleged gang smashing.

5            And the same -- same -- 18 and 19 will be allowed.

6    18, alleged witness tampering, and 19, attempted witness

7    tampering.

8            That takes me to Category 2, additional overt acts

9    related to drug trafficking, firearms trafficking, and

10    illegal gun possession, specifically, again, involving

11    Mr. Hardison.

12            Number 1 on page 12 will be allowed, as it

13    pertains to drug trafficking.

14            Number 2 will be allowed, as it pertains to

15    alleged firearms for gang activity, availability of firearms.

16            As Number 3 is presented to the Court, it will not

17    be allowed because it doesn't give me a date to determine it

18    falls at all within the allegations in the indictment, or

19    otherwise Mr. Hardison would have been not in custody.  So

20    Number 3 is not allowed.

21            Number 4 is allowed.  It's in the fourth

22    superseding indictment.

23            Number 5 and 6 both pertain to firearms and will

24    be allowed.

25            Same is true for 7.

1      8 involves drug distribution, alleged, and it will

2 be allowed.

3      The -- Number 9 is in the -- Number 9 is a subject

4 of a motion in limine.  So I'll put that on hold.

5      And that takes me to Category 3, additional overt

6 acts not specifically involving Mr. Hardison, but which

7 potentially constitute *Giglio* material for testifying

8 witnesses.  Here, the Court's hampered because I don't have a

9 witness list to determine that.  But, as I'll explain, I'm

10 going to rule.

11      In general, my disallowance of some of these overt

12 acts is because of no connection to Mr. Hardison or it

13 appears Mr. Hardison was in custody and there's no facts

14 presented to the Court from which the Court can make a

15 reasonable inference that Mr. Hardison had any engagement,

16 direction, to the alleged overt act.  In other words, I can't

17 connect him being in custody to the overt act to allow it in

18 the trial.

19      The Court notes the dates that he -- that has

20 presented that he was in custody.  That doesn't preclude that

21 these overt acts could have been directed by him.  The Court

22 is simply saying that, without some factual predicate for

23 that, I -- I'm going to disallow them at this stage.

24      So now I'll go through each one of those.

25      The rationale I just expressed applies for Number

1; that will be disallowed, and 2, because it appears

Mr. Hardison was in custody.

        Number 3 I'm going to put in hold.  I have

maybe -- it appears that Danyon Dowlen is going to be a

witness, and Number 3 could constitute *Giglio* material if he

testifies.  I guess I'll know that once I see the

government's witness list, unless the government wants to go

ahead and state now affirmatively that he will be called on

your will-call witness list.

        MR. SCHRADER:  He will be called as a witness,

Your Honor.

        THE COURT:  So that can be used as *Giglio*.

        Number 4 will be disallowed because Mr. Hardison

was in custody.

        Number 5 is a period of time where Mr. Hardison

could have been out of custody, based on the information

known to the Court, but I'm going to disallow it because of

the vague last sentence, "Russian was killed later that day

in an unrelated incident."  Given that assertion, it's -- the

Court can't engage in an inference or reasonable inference to

tie it to this case.

        Numbers 6, 7, 8, will be disallowed because the

period of time here between 2005 and '18 is simply too broad

for the Court to come to the conclusion that that should be

fairly included, given the allegations in the fourth

superseding indictment or -- and/or under 403 analysis for
undue prejudice.

The same will be true and excluded for 9, 10, 11,
and 12. All of those will be excluded.

Number 13, 14, and 15 is -- as well as 16, 17, and
18, all pertain to a time period that appears Mr. Hardison
was in custody, and, for the reasons just explained earlier,
it's not sufficient information for the Court to engage in an
inference to tie him to those allegations.

I'm going to exclude 19 under 403, as well as --
based on what the Court knows to this point, appears to be
cumulative.

Number 20 is allowed because it connects back to
Dowlen.

21 is allowed.

22 is disallowed because of the inability to
identify a date certain for the Court to consider.

23 is disallowed because Mr. Hardison was in
custody.

For 24, 25, and 26, appear to be at a time that
Mr. Hardison was not in custody. However, I'm going to
preliminarily exclude them subject to the government raising
it during trial if a connection can be made. They could
pertain to the RICO conspiracy, although the Court wants to
hear how it presents at trial, because it could also be

cumulative or otherwise excludable under 403.

So 24, 25, 26, preliminarily excluded.

Number 27 is excluded based on what's presented. Simply no connection to the RICO allegations or, for that matter, Mr. Hardison.

28 is allowed.

29 is disallowed based on everything the Court has heard in the prior trial and the writings I've had on this issue. Again, the government can raise that again if necessary.

30 is disallowed because it's too broad and vague.

31, 32, 33, and 34 all pertain to times where it appears Mr. Hardison was back in custody. The Court also notes these could be cumulative or otherwise excluded under 403.

Same -- Mr. Hardison was also back in custody for 35, 36, 37, 38, 39, and 40, 41, 42, and 43. And without more information the Court has to exclude those.

All right. That takes us to the motions in limine.

MR. SCHRADER: Your Honor. Sorry. Could I ask a question about -- really about one of those in particular, but I think it kind of pertains to a group of those additional overt acts.

So Overt Act Number 27, it says (as read):

```
1                 On or about September 18th, 2012, Charles Sims
2                 a/k/a TuTu was shot and killed in Clarksville,
3                 Tennessee.
4            Mr. Dowlen is the one who shot and killed Mr.
5    Sims.  And the reason it is included on this list here --
6    it's not necessarily because it has any connection to the
7    RICO conspiracy, although Mr. Dowlen testified at trial that
8    Mr. Darden helped him disassemble a gun after that murder and
9    then helped him flee the jurisdiction afterwards.  But it's
10   included here in part because I expect that it will be a
11   topic of cross-examination at trial.
12           THE COURT:  All right.  I'll allow that as
13   potential Giglio.
14           MR. SCHRADER:  And I -- the same is true for a
15   number of these other issues.  And I don't know exactly how
16   to raise that with the Court, except maybe in a supplemental
17   filing.
18           THE COURT:  Yeah.  And that gives the defense a
19   chance to respond to it.
20           MR. SCHRADER:  And I'm happy to do that, just kind
21   of maybe put a little more meat on the bones in terms of
22   identifying folks.
23           THE COURT:  Well, I don't have your witness list.
24   And that's -- that was a problem.
25           MR. SCHRADER:  Sure.  And, you know, it would be
```

1  one thing if the defense weren't going to cross-examine
2  Mr. Dowlen on that, but I'm confident they're going to want
3  to cross-examine him on that.
4          THE COURT:  There's much to cross-examine
5  Mr. Dowlen on.
6          MR. SCHRADER:  There is.  But we obviously are
7  entitled to introduce that during his direct to take the
8  sting out.  So. . .
9          THE COURT:  All right.  Anything from the defense?
10         MR. EVANS:  No, Your Honor.
11         THE COURT:  All right.  So let's go to the motions
12  in limine.
13         I'm going to start with the government's Motion in
14  Limine Number -- well, Document Number 18-65, the
15  government's motion to permit introduction of certain medical
16  records.
17         Again, I've read the government's motion; I've
18  read Mr. Hardison's response; I've read the replies, which
19  were all good reads.  And the Court rules as follows:
20         Regarding the medical records, Document Number
21  18-65, subject to a timely objection on other evidentiary
22  basis, the motion is granted.
23         Document 18-67, pertaining to introduction of
24  certified copies of state and federal court judgments, again,
25  we're going to get to this -- well, again, I'm going to grant

the motion, subject again to any timely objection for
exclusion on other evidentiary basis, including but not
limited to relevancy.

Document 18-78 is the government's motion in
limine to admit certain business records.  And I'll make the
same ruling.  It's granted, subject to a timely objection at
trial on other evidentiary basis, including relevancy.

Let's skip Document Number -- let's skip Josh
Henry.  We'll come back to Josh Henry.

So that's -- that's all of the government's,
except we've got Government's motion to preclude inquiry as
to witness location and participation in the federal witness
security program regarding Dezorick Ford.

I need a response from the defense.

MR. EVANS:  Yes, Your Honor.  We just haven't --
we actually discussed that yesterday during our meeting.  And
we can -- I can have that response to Your Honor, if it's
appropriate, by Monday.

THE COURT:  Okay.  That will be October the 4th.

Does the government want to file a reply?

MR. SCHRADER:  Yes, Your Honor.  Just a couple of
days to reply.  So a couple of days after that will be fine.

THE COURT:  October 6th?

MR. SCHRADER:  Yes, Your Honor.

THE COURT:  October 6th for the government's

1    reply.

2           Are there any other government motions outstanding

3    other than Josh Henry?

4           MR. SCHRADER:  I don't believe so, Your Honor.

5           THE COURT:  Okay.

6           So that takes me to Mr. Hardison's Motion in

7    Limine Number 1, Document Number 1874, which is granted only

8    on a limited part regarding the notice of enhanced sentencing

9    factors and otherwise denied.  It's clear under Sixth Circuit

10   authority that the government is entitled to prove the

11   language in the indictment, and thus would not qualify as

12   surplusage -- surplus.

13          Mr. Hardison's Motion in Limine Number 2 to

14   exclude any evidence of Mr. Hardison's prior federal

15   convictions for being a felon in possession -- and I think

16   that's related -- well, let's just stop there.

17          So I guess on this I need some discussion.  Either

18   the government can prove he's a felon or you can stipulate to

19   that.

20          MR. BRUNO:  I don't know that that's the issue.  I

21   don't know whether or not he's a felon is the issue.

22          The government is wanting to get in evidence, I

23   believe, that he, in fact, possessed the weapon as part of an

24   overt act.  And so what my particular objection -- if they --

25   if the Court is allowing them to say, okay, you can put on

evidence as part of an overt act that he, you know, possessed the weapon, that's one thing, if they have a witness or something along those lines.

What I think should be prevented is the fact that he pled guilty to the offense and that there is a conviction for the offense. That's -- that's separate.

THE COURT: I appreciate -- Mr. Schrader? Do you want to go further than just prove the possession?

MR. SCHRADER: In order to -- well, the overt act alleges possession of the firearms. And the evidence of possession of those firearms includes Mr. Hardison's guilty plea to that offense. And so we'll be proving in part that he pled guilty to that conduct. There's no better evidence that he possessed those firearms than that he pled guilty to having done so.

THE COURT: Well, how are you going to -- what witness -- are you going to present a witness to testify that when -- that he -- I can't find the date. There's a date certain that he actually possessed a specific firearm?

MR. SCHRADER: Yes, Your Honor. So it will be sort of a combination of evidence. There will be testimony about the underlying facts of the conviction itself. And there are photographs substantiating his possession of those firearms, and then the judgment of conviction, as well.

THE COURT: Why do you need the judgment of

1    conviction?

2          MR. SCHRADER:  In part -- well, just because it's

3    evidence of that particular act.  In other words, he pled

4    guilty to that offense.  You know, part of what the jury

5    might be wondering is what it is he actually pled guilty to.

6    And because it's not illegal just to possess a firearm.  It's

7    illegal to possess one if you are a prohibited person.

8          THE COURT:  All right.  Well, I think what's

9    really relevant is you prove in your overt act, which you're

10   entitled to do, in presenting witnesses and/or documents that

11   show on the date you allege he, in fact, had possession,

12   constructive or actual of this firearm.

13         And then it's up to the jury to decide how to use

14   that overt act in the overall allegations in the fourth

15   superseding indictment as part of the RICO conspiracy or

16   otherwise.  So I'm going to allow you to prove that without

17   the conviction or the plea.

18         MR. SCHRADER:  That's the best evidence of that

19   act, though.

20         THE COURT:  No, it's not.  It's the witness you're

21   going to put on -- it's the witness you're going to put on,

22   whether or not it's believable.

23         And, while we're at it, that's going to apply to

24   Motion in Limine Number 3 as well, Document 18-76.  You can

25   certainly put on evidence that on the day he was arrested he

had possession of a pistol and marijuana, and maybe this --
but -- but nothing further -- to prove up your overt act.

        So I'm allowing the government to present, well,
direct -- could be direct evidence -- present evidence,
period, to prove its overt act, but not go and I think usurp
the role of the jury on -- with the conviction.

        Also, I believe under 403 that would be unduly
prejudicial to Mr. Hardison.

        And the same ruling applies to Motion in Limine
Number 3.  You can prove the XD 9 mm pistol and the
marijuana, and that's what your overt act alleges, but
nothing further.

        So that takes me to Motion in Limine Number 4,
Number 18-77.

        So help me now, Mr. -- Mr. Schrader.  You can
obviously present what was found in the -- you can talk about
the consent to search.  What I do have trouble with is the
discovery.  I don't think that qualifies as a public
document.

        MR. SCHRADER:  And, Your Honor, this is actually a
matter that Mr. Collins --

        THE COURT:  Okay.

        MR. SCHRADER:  If you can hear Mr. Collins.

        MR. COLLINS:  Good morning, Your Honor.

        THE COURT:  Good morning.

1           MR. COLLINS:  Your Honor, as we stated in our

2    filing, we believe that this evidence is both relevant and

3    intrinsic to the charges as we've outlined in most of our

4    filings, that this is an organization that uses fear and

5    intimidation to try and get witnesses not to be involved in

6    investigations and prosecutions.

7           And, specifically as it relates to this incident,

8    we know that discovery was passed around as it relates to the

9    incident with Mr. Hardison possessing these guns.  And

10   that -- that discovery was then used by other associates of

11   Mr. Hardison to intimidate witnesses, to put them on -- or

12   put their information out to the public so that it was known

13   that they cooperated as it related to this investigation.

14          And, when I say "this investigation," I mean the

15   firearm investigation.  We believe that the fact that this

16   discovery -- this specific discovery -- was found at

17   Mr. Kilgore's house supports this belief that the Gangster

18   Disciples used this tactic, that they provide discovery to

19   other individuals; these other individuals then use the

20   discovery to intimidate witnesses, and that's why we want to

21   introduce this specific discovery.

22          THE COURT:  Right.  But that necessarily is going

23   to require us to explain or require the government to explain

24   what is discovery, how does -- what is -- and -- and

25   inevitably, you're going to have to say there were other

1   charges pending.

2          MR. COLLINS:  So, Your Honor, I do believe that we

3   will have witnesses who are able to testify generally as to

4   what discovery is.  And, like --

5          THE COURT:  I'm more concerned about the charges

6   underlying why he had the discovery.  That's where the

7   prejudice comes in.

8          MR. COLLINS:  You mean the charges that stem

9   from --

10         THE COURT:  Stem from the discovery he had in his

11  possession.

12         MR. COLLINS:  Well, Your Honor -- let me say this,

13  Your Honor, we have evidence -- and we provided this to the

14  defense -- where documents from this specific packet of

15  discovery was posted online.  And it created discussion about

16  the witnesses.

17         And so I think -- I think there might even be a

18  way, Your Honor, where -- and I don't think the government is

19  opposed to this at all.  We could limit some of the discovery

20  to -- to replicate some of the items that were actually

21  posted online, or there might be a way to redact some of that

22  discovery.

23         But we think that the introduction of the

24  discovery -- to show the connection that he had this specific

25  case, that the materials from this case was passed around to

other members and associates, that documents from that that
were passed around were posted online, I think that's
important to make that connection.

        And we're going to have witnesses, Your Honor,
that are -- who are -- who are other defendants -- or
co-defendants who have videos where they show and explain
that this is their practice, this is what they do.

        And that's the importance of trying to have this
discovery be admitted, so the jury can make the legitimate
connection to what these documents are.

        THE COURT:  Sure.  Well, let me share where I am.
I think under 403 it's unduly prejudicial to get into the
2013 investigation, because that necessarily has -- you're
going to have to explain to the jury, what was that about,
well, what happened in the 2013, and we're not here to -- to
relitigate that issue.

        So I'm going preliminary grant that motion, but if
you all -- but you can raise it at trial at one of our 4:30
hearings.

        MR. COLLINS:  Thank you, Your Honor.

        THE COURT:  So I think that takes care of all
defendant's motions?

        MR. EVANS:  Yes, Your Honor.

        THE COURT:  So the only thing left on the table
now is Mr. Josh Henry.

1              So the first thing I need to take up is the

2      government's motion for leave to late file Document 18-80.

3      And, turning to that document, in particular, page 2, Item 3,

4      the government argues -- or represents as follows, quote (as

5      read):

6                       Unfortunately, despite its best efforts, the

7                  government was unable to complete the

8                  above-described motion in limine prior to the

9                  previously set deadline.  That is because the

10                 government could not obtain the statement of an

11                 essential witness who observed and/or heard many

12                 of the allegations asserted in the motion in

13                 limine prior to the September 6th, 2021, deadline.

14             So my first question to the government:  Is the

15      essential witness referenced in paragraph 3 Witness Number 5?

16             MR. COLLINS:  The Court's indulgence, Your Honor.

17             THE COURT:  I'm sorry?

18             MR. COLLINS:  I said the Court's brief indulgence,

19      Your Honor.

20             THE COURT:  Oh, sure.  And then maybe before you

21      answer you want to go and look at Footnote 1 on page 9 of

22      Document 18-89.

23             MR. COLLINS:  That is correct, Your Honor.  It is

24      Witness Number 5.

25             THE COURT:  And what is Witness Number 5's name?

```
 1              MR. COLLINS:  I'm sorry, Your Honor?

 2              THE COURT:  What is Witness Number 5's name?

 3              MR. COLLINS:  Your Honor, her last name is

 4    Pasquale.

 5              THE COURT:  Spell it.

 6              MR. COLLINS:  P-a-s-q-u-a-l-e.

 7              THE COURT:  Q-u-a-l-e.

 8              And the first name?

 9              MR. COLLINS:  Autumn, A-u-t-u-m-n.

10              THE COURT:  Now, so I have your representation now

11    about Witness Number -- and I can connect it to the argument.

12              Did the government have any contact with

13    Ms. Pasquale between May of 2013 and June of 2021?

14              MR. COLLINS:  No, Your Honor, we did not.

15              Your Honor, I can provide some greater clarity, if

16    that's okay.

17              THE COURT:  Sure.

18              MR. COLLINS:  So, Your Honor --

19              THE COURT:  And I'm trying to find the good cause

20    to allow your motion.  It's late.

21              MR. COLLINS:  Sure.  Sure, Your Honor.

22              This is an incident that the government has

23    continued to investigate over periods of time.  And in 2020

24    we had an opportunity to speak with another witness, who

25    is -- who is in -- in this filing, Witness Number 7.  And,
```

based off some of the information that Witness Number 7 provided, we were then able to connect the dots to understand the importance of Witness Number 5's information.

And so that -- at that point in time -- or soon thereafter -- the government made attempts to locate Witness Number 5.

Just in all candor, Your Honor, Witness Number 5 is a somewhat transient witness.  We were able to make contact with Witness Number 5 within the past few months. And then that became an exchange of Witness Number 5 saying that they would meet with us, Witness Number 5 not showing up, Witness Number 5 then becoming very uncooperative, Witness Number 5 not being able to be located.

And, from there, Your Honor, we were able to establish enough of a record where we were able to get a body attachment for Witness Number 5 and have Witness Number 5 come in for grand jury so that we could -- that we could then do a full inquiry and investigation into what Witness Number 5 knows.

Your Honor, one of the things that also complicated this is, of course, the COVID situation that we're in.  For an extensive period of time, there was no grand jury sitting for us to be able to get Witness Number 5 in earlier than that to secure the type of information that we would need to be able to present in a trial like this.

 1   And so that was another thing that complicated, you know,
 2   trying to have evidence that the government believed would be
 3   significant and substantial enough to support the allegations
 4   that Witness Number 5 was making.
 5              THE COURT:  Okay.  Well, even if all that's
 6   correct, nevertheless, since 2013, you had law enforcement
 7   investigators', plural, interview of Witness Number 5.
 8              MR. COLLINS:  That's correct, Your Honor.
 9              THE COURT:  So you knew the essence of Witness
10   Number 5's personal information about this incident.  But it
11   was -- correct?  I mean, they interviewed.  So I assume in
12   interviews -- you had access to that.
13              MR. COLLINS:  That is correct, Your Honor.
14              THE COURT:  But yet you don't reach out to Witness
15   Number 5 until almost eight years -- over eight years later?
16   I'm sorry.  Yeah.
17              MR. COLLINS:  Well, Your Honor, like I said, once
18   we could -- when I say "we," I mean the government as it
19   currently exists in this prosecution team.
20              As we continued to investigate this matter, we
21   then recognized the connections.  And, while we had these --
22   while we had access to these recordings, Your Honor, I think
23   the Court is very much aware that the government believes it
24   has an obligation --
25              THE COURT:  What recording --

1          MR. COLLINS:  -- to fully investigate these

2    matters and to flesh them out before we make --

3          THE COURT:  What are you referring to when you say

4    "recordings"?  Whose recordings?

5          MR. COLLINS:  So there were interviews --

6          THE COURT:  Of Witness Number 5?

7          MR. COLLINS:  Of Witness Number 5.  There were

8    interviews done with Witness Number 5 --

9          THE COURT:  Back in 2013?

10         MR. COLLINS:  That's correct, Your Honor.

11         THE COURT:  They were recorded?

12         MR. COLLINS:  That's correct, Your Honor.

13         THE COURT:  Has that been provided to the defense?

14         MR. COLLINS:  It has, Your Honor.

15         THE COURT:  Okay.

16         MR. COLLINS:  And it's been provided for, I

17   believe, more than a year before now, or -- or before, Your

18   Honor.  So some of this discovery has been provided to the

19   defense for in excess of a year, Your Honor.

20         THE COURT:  Okay.

21         MR. COLLINS:  But the point I was trying to make,

22   Your Honor, is that, even though these recordings, these

23   interviews had been conducted, there were specific questions

24   that the government believed that needed to be fleshed out,

25   especially, Your Honor, before we could make those

1 representations in filings to this Court.

2          And so that's why the government took the

3 additional step to make sure that the information that we had

4 was correct and accurate as possible before we could make

5 these representations in a filing like this, Your Honor.

6          THE COURT:  The additional step occurring in June

7 of 2021?

8          MR. COLLINS:  That's correct, Your Honor.  That's

9 correct.

10          THE COURT:  All right.  Well, I've read

11 everything, and I'm going to reserve ruling on whether or

12 not -- because things are -- things are certainly -- there's

13 a lack of clarity to the Court about what the government knew

14 and when it knew it to determine if there's good cause.

15          Nevertheless, holding that in abeyance, and having

16 read everything, the Court's persuaded by the -- what I

17 thought was an excellent opinion by Judge Marbley, and I'm

18 going to follow that.

19          And I'm going to convene a hearing, evidentiary

20 hearing, on -- October the 11th is Columbus Day.  But we're

21 going to get together on October the 12th and/or 13.

22          How many witnesses, Mr. Collins, are you all going

23 to call -- we know there's five witnesses, 1 through 5, and

24 we know there's two -- at least two law enforcement officers,

25 because you use the plural.  So that's seven.

```
 1              Is that about the right number of witnesses?
 2              MR. COLLINS:  So, Your Honor, with the inclusion
 3    of the law enforcement officers, in order to accurately paint
 4    the full picture, we probably need to put on nine witnesses.
 5              THE COURT:  All right.  Tell me who they are.
 6              MR. COLLINS:  The Court's indulgence, Your Honor.
 7              (Respite.)
 8              THE COURT:  And just for -- oh, go ahead.  I'll
 9    let you all do that.
10              MR. SCHRADER:  Can we have just a moment, Your
11    Honor?
12              THE COURT:  Sure.
13              (Respite.)
14              MR. COLLINS:  Your Honor --
15              THE COURT:  Sure.  Sure.  Go ahead.
16              MR. COLLINS:  Just further thought and
17    consideration.  The government is just going to withdraw this
18    motion at this time.
19              THE COURT:  I was going to -- that was last on my
20    list.  If you want to abandon this course, we don't need a
21    hearing.
22              MR. COLLINS:  And just for various reasons, Your
23    Honor, number one, I mean, I think we've made this very clear
24    in our representations in all of our filings about the
25    witness intimidation issue in this case.  And the government
```

```
 1   is not comfortable with identifying each and every one of
 2   these witnesses at this point in time on the record with this
 3   defendant.
 4              Too, Your Honor --
 5              THE COURT:  Well, the witnesses are going to be on
 6   your witness list.
 7              MR. COLLINS:  That's correct, Your Honor.  And I
 8   think at that point in time there are things we can do to
 9   kind of make sure the witnesses are in -- Your Honor has
10   given us a definite date on when that witness list needs to
11   be provided.  And we can do some things to make sure that
12   those witnesses are aware and are safe and in a place where
13   we can provide that information before we give it.
14              THE COURT:  And I'm sure the government's aware,
15   every witness, yours and the defense, are going to come into
16   the courtroom.  It's going to be open to the public.
17              MR. COLLINS:  No, we understand that, Your Honor.
18   We do understand that.
19              THE COURT:  Okay.
20              MR. COLLINS:  The other issue, though, Your Honor,
21   that we want to introduce is that -- I'm sure the Court is
22   very aware from the filing, a lot of the comments or
23   statements that we wanted to elicit in this filing are made
24   in conjunction with statements that were made by the
25   defendant.  There are a couple that were independent
```

statements that were not made in conjunction with the
defendant.  But the good majority of them were.

Your Honor, at this point in time, while we're
withdrawing the motion, we do anticipate in- -- introducing
some of the defendant's statements.  There may be a request
to introduce other statements around those so that they can
provide context for the jurors, and at the appropriate time
we'll advise the Court of that.

We understand that the Court would have to make
some kind of instruction to the jury to -- to have them know
that the statements that the government is seeking to admit
that are not the defendant's are just for the purpose of
context of the entire conversation.

And so I think this is an issue that we would
probably address later on as we move to admit certain
statements of the defendant, Your Honor.

THE COURT:  Okay.  Well, I'm positive I'm not
following everything you've said, but this much I know:  I
want the government to go ahead and file, no later than
October -- October the 8th, a notice, a document, that
explains in further detail what you just said.

So, number one, if we're going -- if you want to
present this -- I hear the government saying you're
withdrawing your motion for leave to late file this, and
you're withdrawing your motion in limine to admit the

1   statements of Josh Henry.

2           Is that correct?

3           MR. COLLINS:  That is correct, Your Honor.

4           THE COURT:  Okay.  So those motions will be denied

5   based upon the government's representation to withdraw.

6   However, this should not be used as a back door way of having

7   a hearing in the middle of trial.  If we're going -- if we're

8   going to present -- if the government's going to present

9   statements of Josh Henry, we need to go ahead and determine

10  Mr. Hardison's Sixth Amendment right or not.

11          So, in other words, either we do it in a mini

12  hearing, which I just think is absolutely required, and I

13  make that determination by preponderance of the evidence,

14  Tuesday and Wednesday, the 12th and 13th, or not.

15          Does the government understand?

16          MR. COLLINS:  I understand that, Your Honor.

17          THE COURT:  Okay.

18          MR. COLLINS:  I understand that.

19          THE COURT:  And the government is not going to try

20  to do at trial what I want to do at a mini hearing?

21          MR. COLLINS:  No, Your Honor.

22          And, Your Honor, I think --

23          THE COURT:  Okay.

24          MR. COLLINS:  And, just so it's clear, Your Honor,

25  for example, there are statements that we introduced in our

```
 1  filing where the defendant is having a conversation with
 2  Joshua Henry.  And Joshua Henry --
 3              THE COURT:  Presumably with other persons present.
 4              MR. COLLINS:  I'm sorry, Your Honor?
 5              THE COURT:  I guess presumably Joshua Henry, the
 6  defendant, and others?
 7              MR. COLLINS:  That's correct, Your Honor.  That's
 8  correct.
 9              THE COURT:  And others are going to come into
10  court to say what Mr. Hardison said.
11              MR. COLLINS:  That's correct, Your Honor.
12              And so there are statements that Mr. Hardison --
13              THE COURT:  But others are not going to come into
14  court to say what Mr. Henry said.
15              MR. COLLINS:  Well, Your Honor, the government
16  would not be seeking to admit those statements for the truth,
17  Your Honor.  What the government would be asking is that the
18  Court admit them with a limiting instruction for the specific
19  purpose to show context of the entire conversation.
20              THE COURT:  So that's the motion you're going to
21  file --
22              MR. COLLINS:  That's correct, Your Honor.
23              THE COURT:  -- by October the 8th.
24              And -- well, since we're not going to have -- why
25  don't you file that -- can you file that by the -- by the
```

1  6th?  And that way I can let the defendant respond by the
2  11th, so I can read it, study it, and be ready.
3              MR. COLLINS:  Yes, Your Honor.
4              THE COURT:  Okay.
5              MR. COLLINS:  And, just so it's clear, Your Honor,
6  that motion would only contain conversations where the
7  defendant and Mr. Henry were having conversations.  It
8  wouldn't include any conversations that Mr. Henry was having
9  with someone else.  Just so it's clear, Your Honor.  That's
10  what I'm trying to explain to the Court.
11              THE COURT:  No.  What I want -- what I heard you
12  to say -- I'm going to read it back -- that the government
13  will seek to ask the Court to admit statements of others, as
14  you put it, with a specific purpose to show the context of
15  the entirety.  That's the motion.
16              So I need a motion from the government to admit
17  statements of others that will provide a context of the
18  entirety and why that should be admissible.  That's the part
19  that I need help on.
20              MR. COLLINS:  I'll have it filed, Your Honor.
21  Thank you.
22              MR. EVANS:  And if Your Honor -- if I may, it
23  sounds to me like the government's asking to do by a horse of
24  a different color what they were trying to do initially,
25  which is get in statements of Josh Henry, not for the truth

1    of the matter.
2            THE COURT:  Well, I asked him that specifically
3    and he said no.  And I've made it clear I'm not going to do
4    that.
5            MR. COLLINS:  No.  That's what I -- what I said,
6    Your Honor, is that we would seek to introduce conversations
7    where the defendant made certain admissions, and those
8    admissions are made in the presence of other people, and
9    those admissions elicited responses from Joshua Henry.
10           And so we would be seeking to admit Joshua Henry's
11   statements in conjunction with the defendant's only to show
12   the context of the entire conversation.
13           THE COURT:  Yeah.  That's what we need to have a
14   mini hearing on then.  Because I'm not going to allow any
15   Joshua Henry comments until I determine whether Mr. Hardison
16   has forfeited his Sixth Amendment right.
17           MR. COLLINS:  So you still want a filing on the
18   6th that kind of fleshes out --
19           THE COURT:  Well, no, I'm back on your motion now.
20   If that's what you want to do, we need to go ahead with the
21   hearing so I can have an evidentiary hearing and make a
22   determination if his Sixth Amendment rights have been
23   forfeited.
24           MR. COLLINS:  Well, Your Honor, we would -- we
25   would not be having that.  We would withdraw our motion, as

1   we've already said, as it relates to the first issue, and

2   we won't -- we won't address the second issue as I've

3   presented it to the Court.

4           THE COURT:  Okay.  But this -- whatever you want

5   to present regarding Joshua Henry, directly, indirectly, from

6   the right, from the left, from the up or the down, you need

7   to file a motion on it.  Or, if it's not going to be

8   anything, just file me a notice saying no need for such a

9   motion.

10          But whatever you're going to present that relates

11  to Joshua Henry -- and what Joshua Henry said -- at trial

12  needs to be presented to the Court by October the 6th with a

13  response from the defendant by October the 11th.  And then I

14  can read it and, if I don't understand it, we can get back

15  together.

16          Or you can just file me a notice saying the

17  government does not intend to present anything that uttered

18  out of the mouth of Joshua Henry.

19          MR. COLLINS:  All right.  Your Honor, we'll file

20  something by the 6th.

21          THE COURT:  Okay.

22          Now, does the government believe it's going to

23  file anything that's going to need a hearing?  Because we're

24  just -- our time is getting short here.

25          Mr. Collins?

 1          MR. COLLINS:  No, Your Honor, I don't believe so,

 2    Your Honor, not that will require a hearing, no.

 3          THE COURT:  All right.  Okay.  Well, we've

 4    covered -- any other questions from the government about

 5    anything pertaining to the trial starting on the 18th?  Of

 6    course, we'll all get back tomorrow at 9:00.  So why don't

 7    you all sleep on it.  Have a cup of coffee, think about it

 8    some more.  Because I'm going to ask the same question

 9    tomorrow at 9:00.  And then we'll get the report back from

10    the marshal and see where we are.

11          So I'll see you all at 9:00 in the morning.

12          Mr. Schrader has something today.

13          MR. SCHRADER:  I always have something, Your

14    Honor.

15          Just to make sure this is on the record, we

16    actually provided yesterday to the defense nearly all of the

17    exhibits we intend to introduce at trial.  So they have

18    copies of those now for themselves.  And I don't know exactly

19    when we're going to get an answer back, but it's possible we

20    get one back today -- I think we'll be around the

21    courthouse -- if it's possible to resolve this today as

22    opposed to coming back tomorrow.

23          THE COURT:  Well, we may need to come back

24    tomorrow because, even though I didn't raise it, only because

25    I forgot, I am concerned if Mr. Hardison's going to have to

have a two-and-a-half hour drive from his place of custody to
court every day.  That's five hours on the road, first of
all.  And we're going to -- we're going to be doing this for
four to six weeks.  That's not sustainable for the youngest
of men.

MR. SCHRADER:  I note that's what happened with
the defendants in the last trial.

THE COURT:  Yeah.

MR. SCHRADER:  That was six weeks.

THE COURT:  It was a problem.

MR. SCHRADER:  I'm sure it was a challenge.

THE COURT:  So that needs to get addressed as
well.

I had been told, long ago, that he would be moved
closer to Nashville because of that very issue.  So everybody
knows that's a serious issue and potentially could impede his
ability to participate in his defense.

So let's not create issues.  So, Mr. Schrader, I'm
going to charge you and Mr. -- and Mr. Collins, and Mr. Evans
and Mr. Bruno, let's raise that again with the marshal, maybe
this afternoon, and be ready to discuss that tomorrow.
Everyone, even the marshals, recognize that's not optimal.
And the Court doesn't think it's fair.  He needs to be an
active participant, because the nature of the charges are
very serious.

1          All right.  Thank you for everything.

2          MR. COLLINS:  Thank you, Your Honor.

3          (Court adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3            I, Lise S. Matthews, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6            That I reported on the Stenograph machine the

7    proceedings held in open court on September 30, 2021, in the

8    matter of UNITED STATES OF AMERICA v. BRANDON DURELL

9    HARDISON, Case No. 3:17-cr-00124-3; that said proceedings in

10   connection with the hearing were reduced to typewritten form

11   by me; and that the foregoing transcript (pages 1 through 84)

12   is a true and accurate record of said proceedings.

13           This the 23rd day of March, 2023.

14

15                            /s/ Lise S. Matthews
                              LISE S. MATTHEWS, RMR, CRR, CRC
16                            Official Court Reporter

17

18

19

20

21

22

23

24

25